ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084

*Attorney for Plaintiff*
CITY OF FRESNO

THOMAS FAUGHNAN (SBN 155238)
Chief Deputy County Counsel
tfaughnan@counsel.lacounty.gov
MICHAEL S BUENNAGEL (SBN 259000)
Senior Deputy County Counsel
mbuennagel@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF LOS ANGELES
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 584-1473
Facsimile: (213) 617-7182

*Attorneys for Plaintiff*
THE COUNTY OF LOS ANGELES

AMBER HOLDERNESS (SBN 252363)
Chief Assistant County Counsel
aholderness@countyofsb.org
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA 93101
Telephone: (805) 568-2950
Facsimile: (805) 568-2982

*Attorneys for Plaintiff*
COUNTY OF SANTA BARBARA

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile:  (415) 848-7230

*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF SANTA CLARA;
CITY OF REDWOOD CITY; CITY OF SANTA
CRUZ; CITY OF BEAVERTON; CITY OF
CORVALLIS; CITY OF HILLSBORO; CITY OF
STOCKTON; COUNTY OF SAN DIEGO;
COUNTY OF LOS ANGELES; COUNTY OF
SANTA BARBARA

RENNE PUBLIC LAW GROUP
Attorneys at Law

-1-

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CLARA; CITY AND COUNTY OF SAN FRANCISCO; CITY OF ALAMEDA; CITY OF BELLINGHAM; CITY OF BERKELEY; CITY OF CULVER CITY; CITY OF LOS ANGELES; COUNTY OF LOS ANGELES; LOS ANGELES COUNTY CONSOLIDATED FIRE PROTECTION DISTRICT; MARTIN LUTHER KING, JR. COUNTY; COUNTY OF MARIN; CITY OF OAKLAND; CITY OF PALO ALTO; CITY OF PASADENA; CITY OF PETALUMA; PIERCE COUNTY; CITY OF SACRAMENTO; CITY OF SAN DIEGO; COUNTY OF SAN DIEGO; CITY OF SAN JOSÉ; COUNTY OF SAN MATEO; CITY OF SANTA MONICA; CITY OF SANTA ROSA; SNOHOMISH COUNTY; COUNTY OF SONOMA; SONOMA COUNTY COMMUNITY DEVELOPMENT COMMISSION; SONOMA COUNTY WATER AGENCY; SONOMA VALLEY COUNTY SANITATION DISTRICT; and CITY OF TUCSON, | Case No. 3:25-cv-08330-WHO

**ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of FEMA Administrator; and FEDERAL EMERGENCY MANAGEMENT AGENCY, | |
| Defendants | |

RENNE PUBLIC LAW GROUP
Attorneys at Law

Pursuant to Civil Local Rules 3-12 and 7-11, Plaintiffs in the recently filed action, *City of Fresno, et al. v. Noem, et al.*, Case No. 5:26-cv-01535-BLF ("*City of Fresno v. Noem*"), respectfully request that this Court consider whether that action should be related to the above-captioned case, *County of Santa Clara et al. v. Noem et al.*, Case No. 3:25-cv-08330-WHO ("*County of Santa Clara v. Noem*"). Additionally, Plaintiffs note that *City and County of San Francisco et al v. United States Department of Justice et al.*, Case No. 3:25-cv-09277-JD ("*CCSF v. DOJ*") may also satisfy the criteria for a related case. Attached as **Exhibit A** is a true and correct copy of the Complaint filed by Plaintiffs in *City of Fresno v. Noem*. Attached as **Exhibit B** is a true and correct copy of the Complaint filed by Plaintiffs in *CCSF v. DOJ*.

Plaintiffs believe there is sufficient overlap among the parties and legal issues to require them to "promptly file in the lowest-numbered case" this administrative motion under Local Rule 3-12(b). However, Plaintiffs acknowledge that this action is broader in scope, encompassing the challenges brought in *County of Santa Clara v. Noem* and *CCSF v. DOJ*, as well as challenges to additional grant programs administered by the Department of Justice and the Department of the Interior. Thus, while there is meaningful overlap in legal theories, factual predicates, and certain defendants, the actions are not coextensive. Whether the overlap ultimately satisfies the standard for relation under Rule 3-12(a) is a determination Plaintiffs respectfully leave to the Court's determination.

Local Rule 3-12(a) provides that "[a]n action is related to another when: (1) the actions concern substantially the same parties, property, transaction or event; and (2) it appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." N.D. Cal. Civ. L.R. 3-12(a).

## I. ANALYSIS

### A. Actions Concerning Substantially the Same Parties, Transaction, Or Event

*City of Fresno v. Noem*, *County of Santa Clara v. Noem*, and *CCSF v. DOJ* are each cases, among

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES ARE RELATED - Case No. 3:25-cv-08330-WHO

many,[1] in which a coalition of cities and counties alleges that defendant federal agencies have imposed unlawful conditions on the federal grant funds they administer. The three cases concern several of the same defendants. *City of Fresno v. Noem* brings a broader action, challenging unlawful conditions imposed by the following defendants in a single suit: the U.S. Department of Homeland Security ("DHS"), the Federal Emergency Management Agency ("FEMA"), the U.S. Department of the Interior ("DOI"), and the U.S. Department of Justice ("DOJ"). Whereas *County of Santa Clara v. Noem* challenges only conditions imposed by DHS and FEMA, and *CCSF v. Noem* challenges conditions imposed by only DOJ and its Office of Community Oriented Policing Services.

None of the Plaintiffs in *City of Fresno v. Noem* is also a plaintiff in *CCSF v. DOJ*. The County of San Diego and the County of Los Angeles are plaintiffs in both *City of Fresno v. Noem* and *County of Santa Clara v. Noem*. However, neither county has brought claims against DHS or FEMA in *City of Fresno v. Noem*.[2]

The transactions and events at issue also overlap. The three cases challenge identical or similar conditions restricting programs that "advance or promote" DEI/DEIA and requiring boycott certifications, conditions prohibiting the "promotion" of "gender ideology," conditions mandating cooperation with federal immigration enforcement and certification of no programs benefiting "illegal immigrants," and conditions requiring compliance with present and future presidential executive orders related to grants. However, the precise wording and manner of implementation of these conditions vary

---

[1] Following the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), local governments have sought to protect their specific interests and residents by filing their own actions rather than relying on relief obtained by other jurisdictions. As a result, multiple local entities have filed similar suits advancing related legal theories. Although local public entities have endeavored to bring such challenges in a manner that conserves limited public resources, practical constraints have made universal coordination impossible. Different grant programs operate on distinct administrative timelines, and local entities often determine at different points which specific federal programs and conditions affect them. Those programmatic differences, combined with staggered awareness of potential impacts, prevent all affected public entities from joining a single action.

[2] Plaintiffs in *City of Fresno v. Noem* do not uniformly assert claims against all Defendants. The City of Fresno, City of Corvallis, City of Hillsboro, and County of Santa Barbara assert claims against all defendants. *See* Case No. 5:26-cv-01535-BLF, Dkt. 1, ¶¶ 79, 141, 155. The City of Santa Clara, City of Santa Cruz, and City of Redwood City assert claims against the DHS, FEMA, and the DOJ, but not the DOI. *See id.* ¶ 155 (defining "DOI Plaintiffs"). The County of Los Angeles and City of Stockton assert claims against the DOJ and the DOI, but not the DHS or FEMA. *See id.* ¶ 79 (defining "DHS Plaintiffs"). The County of San Diego and City of Beaverton assert claims only against the DOJ. *See id.* ¶ 141 (defining "DOJ Plaintiffs").

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES ARE RELATED - Case No. 3:25-cv-08330-WHO

RENNE PUBLIC LAW GROUP
Attorneys at Law

across the different federal programs.

Plaintiffs in *City of Fresno v. Noem* and *County of Santa Clara v. Noem* challenge the same agency action—DHS's adoption of unlawful new conditions in its "Standard Terms and Conditions." There is also overlap among the specific DHS grant programs challenged in *City of Fresno v. Noem* and *County of Santa Clara v. Noem*. Plaintiffs in both cases challenge the implementation of the unlawful conditions to the Homeland Security Grant Program, Assistance to Firefighters Grant Program, Staffing for Adequate Fire and Emergency Response Program, and the Hazard Mitigation Grant Program. However, plaintiffs' allegations in *City of Fresno v. Noem* also implicate FEMA's Flood Mitigation Assistance Program, which does not appear to be at issue in the *County of Santa Clara v. Noem* case. Additionally, there are several programs that plaintiffs in *County of Santa Clara v. Noem* rely on, which plaintiffs in *City of Fresno v. Noem* do not.

Plaintiffs in *City of Fresno v. Noem* and *CCSF v. DOJ* both challenge the unlawful conditions added to the FY2025 COPS grant NOFOs. However, plaintiffs in *City of Fresno v. Noem* challenge similar conditions added to several other grant programs administered by the DOJ, including the Edward Byrne Memorial Justice Assistance Grant (JAG) program, the Paul Coverdell Forensic Science Improvement Grant program, and several grants administered by the DOJ's Office of Victims of Crime, that are not challenged in *CCSF v. DOJ*. In addition, plaintiffs in *City of Fresno v. Noem* challenge the DOI's addition of a DEI Condition to its Office of Grants Management, General Award Terms and Conditions, which is not challenged in either *County of Santa Clara v. Noem* or *CCSF v. DOJ*.

**B.     Duplication of Labor and Expense or Conflicting Results**

Assigning these related matters to different judges would likely result in duplication of judicial labor and increased expense to the parties. The actions challenge some overlapping federal grant conditions, and as to those conditions, rely on substantially similar administrative records, program guidance, statutory authorities, and legal theories. Specifically, the challenges to DHS's "Standard Terms and Conditions," featured in *City of Fresno v. Noem* and the *County of Santa Clara v. Noem*, require review of materially identical agency documents and address similar Spending Clause and APA issues. Likewise, *City of Fresno v. Noem* and *CCSF v. DOJ* raise challenges to the same COPS FY2025 NOFO conditions that necessitate parallel analysis of the same NOFO language, record materials, and

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES ARE RELATED - Case No. 3:25-cv-08330-WHO

RENNE PUBLIC LAW GROUP
Attorneys at Law

governing statutory framework.  If *City of Fresno v. Noem* proceeds before a different judge, the courts would likely confront duplicative briefing, repeated examination of identical or overlapping administrative records, and potentially overlapping preliminary injunction and merits proceedings.

However, the cases do not fully overlap.  The *County of Santa Clara v. Noem* case does not address any DOJ grants, and the *CCSF v. DOJ* case does not address DHS grants.  Furthermore, the *City of Fresno v. Noem* case also involves distinct DOJ programs and a DOI DEI Condition that are not challenged in either the *County of Santa Clara v. Noem* or *CCSF v. DOJ*.  As to those claims, relation would yield fewer efficiencies and could introduce additional complexity to the earlier-filed cases.

## II.    CONCLUSION

There is meaningful overlap among *City of Fresno v. Noem*, *County of Santa Clara v. Noem*, and *CCSF v. DOJ* with respect to certain defendants, challenged grant conditions, legal theories, and portions of the administrative record, such that relation may promote judicial efficiency and reduce the risk of inconsistent rulings.  At the same time, *City of Fresno v. Noem* challenges additional parties and programs not at issue in the other matters.  Plaintiffs therefore respectfully submit this administrative motion in compliance with Civil Local Rule 3-12(b) and defer to the Court's determination whether relation is appropriate under Rule 3-12(a).

Dated:  March 2, 2026

RENNE PUBLIC LAW GROUP


By: _____*/s/ Ryan P. McGinley-Stempel*_____
RYAN P. McGINLEY-STEMPEL

Attorneys for Plaintiffs
City of Fresno; City of Redwood City; City of Santa Clara; City of Santa Cruz; City of Beaverton; City of Corvallis; City of Hillsboro; City of Stockton; County of San Diego; County of Los Angeles; County of Santa Barbara



EXHIBIT A

ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084

*Attorney for Plaintiff*
CITY OF FRESNO

THOMAS FAUGHNAN (SBN 155238)
Chief Deputy County Counsel
tfaughnan@counsel.lacounty.gov
MICHAEL S BUENNAGEL (SBN 259000)
Senior Deputy County Counsel
mbuennagel@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF LOS ANGELES
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 584-1473
Facsimile: (213) 617-7182

*Attorneys for Plaintiff*
THE COUNTY OF LOS ANGELES

AMBER HOLDERNESS (SBN 252363)
Chief Assistant County Counsel
aholderness@countyofsb.org
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA 93101
Telephone: (805) 568-2950
Facsimile: (805) 568-2982

*Attorneys for Plaintiff*
COUNTY OF SANTA BARBARA

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF SANTA CLARA;
CITY OF REDWOOD CITY; CITY OF SANTA
CRUZ; CITY OF BEAVERTON; CITY OF
CORVALLIS; CITY OF HILLSBORO; CITY OF
STOCKTON; COUNTY OF SAN DIEGO;
COUNTY OF LOS ANGELES; COUNTY OF
SANTA BARBARA

RENNE PUBLIC LAW GROUP
Attorneys at Law

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO; CITY OF SANTA CLARA; CITY OF REDWOOD CITY; CITY OF SANTA CRUZ; CITY OF BEAVERTON; CITY OF CORVALLIS; CITY OF HILLSBORO; CITY OF STOCKTON; COUNTY OF SAN DIEGO; COUNTY OF LOS ANGELES; COUNTY OF SANTA BARBARA, | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
|      Plaintiffs, | |
| v. | |
| KRISTI NOEM in her official capacity as Secretary of Homeland Security; the U.S. DEPARTMENT OF HOMELAND SECURITY; KAREN EVANS in her official capacity as Acting Administrator of Federal Emergency Management Agency; the FEDERAL EMERGENCY MANAGEMENT AGENCY; DOUG BURGUM in his official capacity as Secretary of the Interior; the U.S. DEPARTMENT OF THE INTERIOR; PAMELA BONDI in her official capacity as Attorney General; the U.S. DEPARTMENT OF JUSTICE, | |
|     Defendants. | |

RENNE PUBLIC LAW GROUP
Attorneys at Law

## I.    INTRODUCTION

Plaintiffs, like most local government entities, rely on congressionally authorized grant programs administered by the U.S. Department of Homeland Security (DHS), its component the Federal Emergency Management Agency (FEMA), the Department of Justice (DOJ), and the Department of the Interior (DOI) (collectively, the "Defendants") to deliver essential public services, including disaster mitigation and prevention, victim services and law-enforcement training, and water conservation initiatives that protect public safety, public health, and local economies.  For years, Plaintiffs have worked cooperatively with Defendants to administer these programs.  However, the lawful and predictable administration of these funds has recently been disrupted by the imposition of vague, unlawful, and unauthorized conditions by Defendants.

The Constitution vests Congress—not the Executive—with the authority to make laws and appropriate federal funds.  *See* U.S. Const. art. I, § 8; *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890). While the Executive Branch is charged with faithfully executing the laws enacted by Congress, that duty does not include the power to unilaterally rewrite or expand the statutory terms under which federal funds are awarded.  *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

Defendants have imposed vague and unauthorized conditions on federal funds to coerce compliance with executive policy preferences.  These actions exceed Defendants' constitutional and statutory authority, erode the separation of powers, and disregard core constitutional and statutory protections, including the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the Administrative Procedure Act's (APA) procedural safeguards.

Accordingly, Plaintiffs bring this action to vindicate the constitutional and statutory limits on Defendants' authority and to prevent ongoing and imminent harm to their communities.  Plaintiffs seek declaratory relief establishing that the challenged funding conditions are unlawful and unconstitutional, and injunctive relief prohibiting Defendants from enforcing or conditioning the receipt of congressionally authorized funds on those requirements.  Absent judicial intervention, Plaintiffs will continue to face the untenable choice of either acquiescing in unlawful conditions or forfeiting critical federal funding necessary to carry out essential public safety, public health, and environmental programs.

-3-

RENNE PUBLIC LAW GROUP
Attorneys at Law

## II.    JURISDICTION

1.    The Court has jurisdiction under 28 U.S.C. § 1331.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 et seq.

2.    Venue properly lies within the Northern District of California because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiffs the City of Santa Clara, the City of Redwood City, and the City of Santa Cruz reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district.  28 U.S.C. § 1391(e)(1).

3.    Divisional Assignment:  Pursuant to Civil Local Rule 3-2(d), except as provided in Civil L.R. 3-2(c), all civil actions that arise in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, or Sonoma shall be assigned to the San Francisco Division or the Oakland Division.  This action arises in various counties, including the counties of San Mateo, Santa Clara, and Santa Cruz.

## III.    PARTIES

4.    The City of Santa Clara is a charter city organized and existing under and by virtue of the laws of the State of California.

5.    Santa Clara receives federal funds, directly and indirectly, from DHS and FEMA, including: $60,000 in Bay Area UASI Funds for Fire CTOs Training, which reimburse personnel costs for approved trainings; $11,269,422 through a Staffing for Adequate Fire and Emergency Response (SAFER) grant funding firefighter staffing for front line operations; and approximately $250,000 in State Homeland Security Grant Program funds related to urban search and rescue training and deployment grant reimbursing personnel costs for trainings and deployments.

6.    Santa Clara participates in the DOJ's Asset Forfeiture Program, which distributes federal forfeiture proceeds in appropriate cases with cooperating state, local, and tribal law enforcement agencies through equitable sharing.

7.    Plaintiff City of Redwood City is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

8.    Redwood City relies on federal funds administered by DHS through FEMA to implement

-4-

RENNE PUBLIC LAW GROUP
Attorneys at Law

essential flood-risk reduction, climate-resilience projects, and hazard mitigation throughout the city. Redwood City has received a $306,584 Pre-Disaster Mitigation grant to support the design and engineering of seismic improvements for the Easter Bowl and Glenloch water tanks, as well as several Hazard Mitigation Grant Program (HMGP) awards to support critical flood-mitigation infrastructure, including a majority of the $501,682.50 grant for the Price Storm Drainage Pump Station Improvement Project to upgrade stormwater pumping capacity and reduce street and property flooding, $809,925 for the Bradford Storm Drainage Pump Station Improvement Project to make similar improvements, and $2,000,000 for the Redwood Shores Sea Level Rise Protection project, which will protect homes, schools, businesses, and critical infrastructure by addressing flood risk identified by FEMA and projected future sea level rise. The project will also integrate opportunities for nature-based solutions where conditions allow along a raised and strengthened Redwood Shores levee, while enhancing recreational amenities for the community.  Redwood City has also received approximately $856,904 through FEMA's Flood Mitigation Assistance Grant Program for its Redwood Creek Watershed and Wetland Capacity Project.

9.     Redwood City has also received FEMA funding to support its firefighters through a $1,320,578 Assistance to Firefighter Grant (AFG) and a $3,630,607 Staffing for Adequate Fire and Emergency Response (SAFER) grant.

10.     Redwood City participates in the DOJ's Asset Forfeiture Program, which distributes federal forfeiture proceeds in appropriate cases with cooperating state, local, and tribal law enforcement agencies through equitable sharing.

11.     Plaintiff the City of Santa Cruz is a charter city organized and existing under and by virtue of the laws of the State of California.

12.     Santa Cruz relies on DHS and FEMA funding to support efforts to mitigate potential disasters.  The City relies on receiving approximately $97,178 in FEMA Hazard Mitigation funding to update the City's local hazard mitigation plan and to mitigate future disaster losses in the community. The City's Department of Parks and Recreation relies on receiving approximately $360,994 in FEMA Disaster Relief Grant funding to conduct storm damage repair.  The City's Department of Public Works relies on receiving approximately $11,514,632 in FEMA funding for Public Works projects, including

-5-

RENNE PUBLIC LAW GROUP
Attorneys at Law

drainage system assessment, road work, and erosion repair.  The City's Water Department has been approved for approximately $2,123,000 in FEMA Disaster Relief Grant funding to conduct storm damage repair.  The City's Economic Development office intends to apply for approximately $200,000 in HSGP-UASI funding as soon as the next round of applications begins.

13.     Santa Cruz's Police Department relies on receiving approximately $19,020 in Bulletproof Vest Partnership Grant funding from DOJ.

14.     Santa Cruz's Water Department intends to apply for DOI funding through the Bureau of Reclamation for new water supply projects through the WaterSMART Grant programs as soon as funding becomes available.

15.     Plaintiff City of Fresno is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

16.     Fresno utilizes DOJ grants to support community safety efforts.  In FY 2024, Fresno was awarded a $297,935, Justice Assistance Grant (JAG).  The City is using those JAG funds to provide critical funding to support a range of program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections.  Fresno declined to apply for certain DOJ grants in FY 2025, including the Office of Community Oriented Policing (COPS) Community Policing Development Microgrant and the Law Enforcement Mental Health and Wellness Act Program grant because the application required the submittal of DEI and immigration-related certifications.

17.     Fresno also utilizes DOI grant programs.  Fresno currently has two active WaterSMART grants administered by the Bureau of Reclamation: a $734,452 BOR WaterSMART Drought Resiliency Program grant being used to install an on-site wellhead treatment system to remove naturally occurring contaminants from existing municipal potable water supply and a $379,390 WaterSMART Water and Energy Efficiency grant being used to purchase, install, and program 1,500 smart irrigation timers for its residential customers.

18.     Fresno also relies on federal funds administered by DHS through FEMA to support its Fire Department.  The Fresno Fire Department relies on a $702,727.27 Assistance to Firefighter Grant (AFG) to protect the health and safety of the public and its firefighting personnel against fire and fire-

-6-

RENNE PUBLIC LAW GROUP
Attorneys at Law

related hazards and a $7,347,000 Staffing for Adequate Fire and Emergency Response (SAFER) grant to help increase the number of firefighters to meet industry minimum standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards, and to fulfill traditional missions of the fire department.

19.   Plaintiff County of San Diego is a political subdivision of the State of California and a governmental entity that serves the San Diego County geographic region.  It is the second-most populous county in California.

20.   The County of San Diego utilizes DOJ grants to support community safety efforts.  The County plans to respond to multiple FY25 Office for Victims of Crime (OVC) Notices of Funding Opportunity released in December 2025 related to human trafficking, including OVC FY25 Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking funds, OVC FY25 Housing Assistance for Victims of Human Trafficking funds, OVC FY25 Integrated Services for Minor Victims of Human Trafficking funds, OVC FY25 Preventing Trafficking of Girls funds, and OVC FY25 Services for Victims of Human Trafficking funds.  Across these OVC funding opportunities, award ceilings range from approximately $497,000 to $1.2 million per award, depending on the specific NOFO and category, with grant periods generally spanning 36 months beginning July 1, 2026.  Application deadlines fall between February 24, 2026, and March 18, 2026.

21.   The County of San Diego is seeking this funding administered by the DOJ to support a range of services for victims of sex and labor trafficking, including prevention and early intervention, victim identification, housing stability, integrated and trauma-informed services for adults and minors, and improved coordination among law enforcement, service providers, and community partners.

22.   Plaintiff the City of Beaverton is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Beaverton City Charter.

23.   Beaverton relies on DOJ funding for its Municipal Court and police department.  The Beaverton Municipal Court received a DOJ Bureau of Justice Assistance (BJA) grant of $724,000 for its Beaverton Sobriety Opportunity for Beginning Recovery (B-SOBR) treatment court that assists repeat DUII offenders in recovering from alcohol and drug addictions.  B-SOBR participants agree to strict supervision while remaining out of jail, including court check-ins, communication with a case manager,

-7-

1    sobriety and urine tests, wearing an alcohol monitoring bracelet, and random check-ins from Beaverton

2    police officers.  The Beaverton municipal court also has a $500,000 BJA Byrne Discretionary

3    Community Project Funding/Byrne Discretionary Grants Program grant for its Behavioral Health Court,

4    which employes a probation diversion model in which participants check in twice per month with the

5    judge all while enrolling in treatment services and following their treatment plan.

6         24.    The Beaverton Police Department also has a number of BJA and other DOJ grants. The

7    department has received BJA Byrne Memorial Justice Assistance Grants in excess of $50,000 for use in,

8    without limitation, purchasing communication devices and officer training.  The Beaverton Police

9    Department has also received Patrick Leahy Bulletproof Vest Partnership Program grants that pay 50

10   percent of the cost of the bulletproof vests needed by the department.  Beaverton has participated in this

11   program for many years and currently has applied for a grant of approximately $20,000.

12        25.    The City of Corvallis is a charter city and municipal corporation organized and existing

13   under the constitution and laws of the State of Oregon and the Corvallis City Charter.

14        26.    Corvallis received funding as a subrecipient of the State of Oregon from the DOI's Land

15   and Water Conservation Fund Grant Program for FY 2024.  This grant will support Capital

16   improvements at Dr. Martin Luther King, Jr. Park in Corvallis, a project which includes the construction

17   of a children's play area, restroom facility, outdoor fitness area, and basketball court.  Corvallis also

18   received over ten-thousand dollars from DOJ for bulletproof vests in FY2025 as a subrecipient of the

19   State of Oregon as part of the Patrick Leahy Bulletproof Vest Partnership, and has received millions of

20   dollars from DHS as a vendor for the State of Oregon, acting by and through its Oregon Health

21   Authority, to support ambulance operations as part of the Ground Emergency Medical Transportation

22   grant program.

23        27.    The City of Hillsboro is a charter city and municipal corporation organized and existing

24   under the constitution and laws of the State of Oregon and the Hillsboro City Charter.

25        28.    Hillsboro  received approximately $410,000 in funding from the DOI's Land and Water

26   Conservation Fund Grant Program through the State of Oregon Parks and Recreation Department.  This

27   grant will support capital improvements for the development of futsal courts at Dairy Creek Park in

28   Hillsboro.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-8-

29.     Hillsboro has also received or manages approximately $940,000 in federal funds from DHS and FEMA, through the Oregon Emergency Management Department, from the Homeland Security Grant Program – State Homeland Security Program for vulnerable facility security enhancements and FEMA's Hazard Mitigation Grant Program.

30.     Hillsboro also relies on DOJ funding.  Hillsboro has been awarded several grants either directly from DOJ or indirectly as a subrecipient through the State of Oregon.  These grants include approximately $400,000 from the Stop Violence Against Women grant program, approximately $92,000 via various awards under the Edward Byrne Memorial Justice Assistance Grant (JAG), and approximately $224,000 from the Community Oriented Policing Services Grant Program.

31.     The City of Stockton is a charter city organized and existing under and by virtue of the laws of the State of California.

32.     Stockton will  receive approximately $500,000 in funding through the DOJ-COPS Office Safer Outcomes: Enhancing Deescalation and Crisis Response Training for Law Enforcement Safer Outcomes program.  This award funds specialized training for law enforcement agencies to promote safe outcomes during police encounters with persons in crisis, including training for law enforcement officers, support personnel, campus public safety officers, and mental health professionals.

33.     Stockton also utilizes DOI grant programs.  For FY 2024, the city applied for and received a grant through the Bureau of Reclamation's WaterSMART Water and Energy Efficiency Grant program for $4,273,925.  This funding will support a project to replace and retrofit the City's outdated metering system, improving water meters with advanced metering infrastructure for residential, commercial, and irrigation customers.  The project will promote efficiency and preserve water resources to achieve a more reliable water supply for economically challenged communities in Stockton.

34.     The County of Los Angeles is a charter County organized and existing under and by virtue of the laws of the State of California.  It is the most populous county in California.

35.     Los Angeles County relies on DOJ grant programs.  The County's Department of Medical Examiner (DME) currently receives the Strengthening the Medical Examiner-Coroner Systems grant, which allows DME to secure paid fellows for the Forensic Pathologist Medical program with the hopes of attracting and retaining these fellows full-time.  The DME has applied for this grant and anticipates

-9-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

being awarded either $150,000 for one fellow or $300,000 for two fellows.  The DME also receives The Paul Coverdell Forensic Science Improvement Grant Program as a subrecipient of the California Governor's Office of Emergency Service.  These funds provide financial support for staff, including deputy medical examiners, investigators, and criminalists, to attend classes, conferences, and seminars for continuing education.  The County's District Attorney's Office (DA) has applied for a DOJ Office for Victims of Crime (OVC), FY 2025 Services for Victims of Crime grant in the amount of $500,000 to implement the Services to Victims of Gang Violence Program that is intended to strengthen and expand services to help victims rebuild their lives after gang violence.  Unfortunately, the DA was forced to not apply for a DOJ BJA FY25 National Sexual Assault Kit Initiative (SAKI) for $2.5 million to work through the County's backlog of unsubmitted and partially tested sexual assault kits and to enhance victim services and support for past and current victims of sexual assault because the application required the submittal of DEI and immigration-related certifications, and also included immigration-related priorities and DEI and immigration-related unallowable uses.

36.     Los Angeles County is also a recipient of significant DOI grant funding.  Los Angeles County Department of Parks and Recreation, through the State of California Natural Resources Agency, has applied for, and been conditionally awarded, a DOI, National Parks Service Land and Water Conservation Fund (LWCF) grant in the amount of approximately $15 million for the development of a section of the 40-acre Western Deck of the former Puente Hills Landfill Park, including a 5-acre bike skills course, a children's nature play area, a picnic area, an amphitheater, dog run, open grassland and ceremonial space.

37.     The County of Santa Barbara is a general law County organized and existing under and by virtue of the laws of the State of California.

38.     Santa Barbara County utilizes DOJ grants to support community safety efforts, both directly and as a subrecipient of the California Governor's Office of Emergency Services (Cal OES).  For FY2025 and FY2026, Santa Barbara County received over $1 million in funding as a subrecipient of DOJ OVC grant funding.  These grants enable Santa Barbara County to provide services ranging from advocacy for victims of human trafficking and outreach and support for victims of crime.  Santa Barbara County is also a direct recipient of a $385,000 BJA Smart Prosecution Innovative Prosecution Solutions

-10-

grant, which funds the Santa Barbara District Attorney's efforts to implement a Digital Evidence Management System to enhance the investigation and prosecution of violent crime in the community.

39. Santa Barbara County is also a recipient of over $5 million in DHS and FEMA funding, including a $200,919 Emergency Management Performance Grant (EMPG) to support staffing to enhance emergency management capabilities. Other FEMA grants include $448,412 from the Homeland Security Grant Program (HSGP) to support training and equipment that will strengthen the County's capacity to prevent, prepare for, protect against, and respond to acts of terrorism or other catastrophic events. Santa Barbara County also receives over $3.8 million in grants from the Hazard Mitigation Grant Program (HMGP), including a $1,384,040 grant to be used for the San Marcos Grade Stabilization Project, designed to implement slope stabilization along Old San Marcos Road. Other HMGP-funded projects include the Cold Springs Debris Basin Capacity Improvement Project, the Buena Vista Creek Debris Basin Project, and the San Ysidro Debris Basin Capacity Improvement Project, each of which will build and improve infrastructure to better withstand severe weather events.

40. Santa Barbara County has also received funding from DOI via the Bureau of Reclamation's WaterSmart program. This grant provides $436,667 in federal funding to maintain the Water-Wise Landscape Rebate Program. The Program is a collaboration between seven of the County's water purveyors and the Santa Barbara County Water Agency and helps fund lawn-replacement rebates, irrigation upgrades, and planting water-wise plants. Each purveyor has its own rebate program, and the Water Agency provides administrative support.

41. Defendant Kristi Noem is the Secretary of DHS, the highest-ranking official in DHS, and is responsible for the decisions of DHS. She is sued in her official capacity.

42. Defendant DHS is an executive department of the United States federal government. 6 U.S.C. § 111(a). DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

43. Defendant Karen Evans is the Acting Administrator of FEMA, the highest-ranking official in FEMA, and is responsible for the decisions of FEMA. She is sued in her official capacity.

44. FEMA is a federal agency within DHS. 6 U.S.C. § 313. FEMA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

45. Defendant Doug Burgum is the Secretary of DOI, the highest-ranking official in DOI, and

-11-

RENNE PUBLIC LAW GROUP
Attorneys at Law

is responsible for the decisions of DOI.  He is sued in his official capacity.

46.     Defendant DOI is an executive department of the United States federal government.  43 U.S.C. § 1451.  DOI is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

47.     Defendant Pamela Bondi is the Attorney General of the United States and the head of the DOJ, the highest-ranking official in DOJ, and is responsible for the decisions of DOJ.  She is sued in her official capacity.

48.     Defendant DOJ is an executive department of the United States federal government.  28 U.S.C. § 501.  DOJ is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

## IV.    FACTUAL ALLEGATIONS

### A.    DHS Grant Programs

49.     Congress established DHS in 2002 in the aftermath of the September 11, 2001 attacks with the goal of protecting the United States against terrorism.  *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2142.  DHS administers both competitive and entitlement grant programs.  The Secretary of Homeland Security is responsible for the overall direction, supervision, and coordination of the Department of Homeland Security, including oversight of its component agencies, the administration of grants and other financial assistance programs, and ensuring compliance with statutory and executive mandates.  *See* 6 U.S.C. § 112(a)(1).

50.     DHS often acts through its component agencies, including FEMA.  Congress established FEMA in 1979 to consolidate all federal support for emergency preparedness, mitigation, and response activities under one agency's purview.  In 2006, Congress passed legislation entitled Preserving the Federal Emergency Management Agency, which requires FEMA to "be maintained as a distinct entity" within DHS.  *See* 6 U.S.C. §§ 313(a); 316(a).  By law, the DHS Secretary is responsible for all actions taken by the Department's component agencies.  The administrator of FEMA reports directly to the DHS Secretary.

### 1.  Homeland Security Grant Program

51.     FEMA's Homeland Security Grant Program (HSGP) comprises several discrete subprograms, including the State Homeland Security Program (SHSP) and the Urban Area Security Initiative (UASI) grant program.

RENNE PUBLIC LAW GROUP
Attorneys at Law

#### a. State Homeland Security Program

52. Congress authorized the creation of the Homeland Security Grant Program – State Homeland Security Program to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism. SHSP funds have been available to States since the program was created under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) in 2001. *See* 6 U.S.C. §§ 603, 605-09.

53. Congress has directed FEMA to allocate SHSP funds pursuant to a risk assessment, which determines the relative threat, vulnerability, and consequences to each State from acts of terrorism, considering factors such as population density and history of threats. *Id*. § 608(a)(1). Recipients may then use SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a).

54. Because SHSP funds are formula grants based on a statutory risk formula, not competitive funds, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted. Congress has directed that the FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for the SHSP. *Id*. § 605(e)(1)(A)(v).

#### b. Urban Areas Security Initiative

55. Urban Areas Security Initiative (UASI) funds serve a similar purpose to SHSP funds. They are used to ensure States—and, through them, local government entities serving high-risk urban areas—build and maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism. UASI funds have been available to States—and, through them, local government entities serving high-risk urban areas—since the program was created by appropriations statute in 2003. *See* Pub. L. No. 108-90, 117 Stats. 1137, 1146. The program is codified at 6 U.S.C. §§ 603-04, 606-09.

56. Each year, FEMA must conduct a risk assessment based on a list of factors specified by statute to determine the relative threat, vulnerability, and consequences "eligible metropolitan areas"— meaning the top one hundred most populous metropolitan statistical areas in the United States—would face from an act of terrorism. *Id*. §§ 601(5), 604(b)(2)(A)(i), 608(a)(1). Based on that risk assessment,

-13-

FEMA must designate a list of high-risk urban areas that may submit applications for UASI funds.  *Id.* § 604(b)(3).  FEMA must also rely on the same set of factors—including but not limited to population density and whether the given metropolitan area was targeted by a past act of terrorism—to allocate funding to the States and high-risk urban areas that apply for grants.  *Id.* § 608(a).

57.    UASI grants are based on a risk assessment formula that Congress has directed FEMA to refine, establish, and use to allocate UASI funding.  Each State is entitled to a specific allocation based on FEMA's risk assessment and tied to the FEMA-designated high-risk urban area or areas in that State.

58.    Recipients of UASI funds must use the funds for purposes permitted by statute, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries.  *Id.* § 609(a).  States that receive UASI funds must provide the eligible urban area or areas in that State with at least 80% of the grant funds.  *Id.* § 604(d)(2)(A).

59.    States collectively receive hundreds of millions of dollars per year in UASI funds, passing most of these funds along to the high-risk urban areas.  States and the local government entities they pass these funds to use UASI funds for myriad counterterrorism and emergency response purposes, including support for urban fusion centers (hubs for sharing threat-related information across government and private sector partners), SWAT teams, canine units, and bomb squads.

60.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HSGP grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 2.  Hazard Mitigation Grant Program

61.    Section 324 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (Stafford Act) authorizes FEMA to provide funding under the Hazard Mitigation Grant Program (HMGP) for management costs incurred in the administration of HMGP.  The Stafford Act provides that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster."  42 U.S.C. § 5170c(a).

62.    The Hazard Mitigation Grant Program provides federal funding to state, local, tribal, and

-14-

RENNE PUBLIC LAW GROUP
Attorneys at Law

territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration in ways that reduce or mitigate future disaster losses.

63.     Eligible risk reduction projects include, but are not limited to, retrofitting facilities to make them more resistant to floods, earthquakes, wind, wildfires, and other natural disasters; installing permanent barriers to prevent floodwater from entering homes or businesses; building safe rooms for communities in hurricane- or tornado-prone areas; stabilizing slopes to prevent structural losses; and developing or improving warning systems. *See* 42 U.S.C. § 5170c(f)–(g)

64.     HMGP funding and funding applications do not necessarily operate on a predictable, fiscal-year basis. HMGP funding often follows the occurrence of disasters, emergencies, and other events. The amount of HMGP funds available to a State in connection with a declared disaster is a function of the level of disaster assistance provided. The State also administers a process to identify and select local project plans for FEMA approval and funding. In this process, local jurisdictions submit their applications to the State, which selects projects to submit to FEMA for approval within 15 months of the disaster declaration date. *See generally* 44 C.F.R. §§ 206.430-440. Some approved mitigation projects can span several years since many contain structural renovation components.

65.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HMGP funds related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 3.  Flood Mitigation Assistance

66.     The Flood Mitigation Assistance (FMA) Program is a federal grant program administered by FEMA to reduce or eliminate the risk of repetitive flood damage to structures insured under the National Flood Insurance Program (NFIP) and to enhance community flood resilience within NFIP-participating communities.

67.     Congress authorized the FMA program in Section 1366 of the National Flood Insurance Act of 1968, which directs FEMA to provide assistance for mitigation activities that reduce future flood losses to NFIP-insured properties. *See* 42 U.S.C. § 4104c. Congress has further expanded and supported the FMA program through Division J, Title V of the Infrastructure Investment and Jobs Act, which

-15-

RENNE PUBLIC LAW GROUP
Attorneys at Law

provides additional funding and directives for flood mitigation and resilience activities.  Pub. L. No. 117-58, 135 Stat. 1387–1388 (2021).

68.    Congress established specific statutory requirements governing the award of FMA funds. Eligible applicants must be NFIP-participating States, local governments, Tribes, or territories, and funded projects must reduce or eliminate flood risk to structures insured under the National Flood Insurance Program.  42 U.S.C. § 4104c(a)–(b).  Congress directed FEMA to prioritize mitigation projects benefiting repetitive loss and severe repetitive loss properties and to evaluate applications based on cost-effectiveness, technical feasibility, and consistency with FEMA-approved hazard mitigation plans.  *Id*. § 4104c(c)–(d).  The statute establishes a default federal cost share of up to 75 percent, while authorizing enhanced federal cost shares, including up to 100 percent, for qualifying projects addressing severe repetitive loss properties.  *Id*. § 4104c(d).

69.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FMA grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 4.   United States Fire Administration Grant Programs

70.    The U.S. Fire Administration (USFA) is a component of FEMA established by Congress under the Federal Fire Prevention and Control Act of 1974 to provide national leadership in fire prevention, training, research, and data collection.  *See* 15 U.S.C. § 2204.  The USFA's purpose is to advance fire prevention and control efforts, improve firefighter and public safety, promote public education and awareness, conduct fire-related research, and support professional development through training and technical assistance.  Consistent with these statutory responsibilities, Congress has authorized USFA, acting through FEMA, to administer national fire grant programs, including the Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program and the Assistance to Firefighters Grant (AFG) Program in accordance with the eligibility criteria, priorities, and conditions established by statute.

### a.   Staffing for Adequate Fire and Emergency Response

71.    Congress established the SAFER program to provide funding directly to local fire

-16-

departments (among other entities) to help them increase or maintain the number of trained, front-line firefighters available to serve their communities.

72. The goal of SAFER funds is to enhance local fire departments' abilities to comply with staffing, response, and operational standards established by the National Fire Protection Association, including assisting fire departments with "attain[ing] 24-hour staffing to provide adequate protection from fire and fire-related hazards." 15 U.S.C. § 2229a(a)(1)(A). SAFER grants are "awarded on a competitive basis through a neutral peer review process." *Id*. § 2229a(a)(1)(G).

73. The NOFO for the SAFER program, which is from FY 2024 but which governs awards that FEMA will make through September 30, 2025 based on applications received by July 3, 2025, states that "[g]rant funds are obligated upon [FEMA's issuance of] the offer of grant award in the FEMA GO system," and that recipients of SAFER funds must "comply with DHS Standard Terms and Conditions in effect at the time the award is issued." *See* FEMA, Notice of Funding Opportunity (NOFO): FY 24 Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_safer-nofo_fy24.pdf (last visited February 4, 2026).

#### b. Assistance Firefighter Grant

74. Congress's stated goal in creating the Assistance to Firefighters Grant (AFG) is to ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards. 15 U.S.C. § 2229(c). Eligible fire departments may apply for AFG funding, which is awarded on a competitive basis, in consultation with the chief executives of the States in which the recipients are located, with the amount of funding capped by statutory standards based on population size. *Id*. § 2229(c)(1)–(2), (e).

75. FEMA awards AFG grants on a rolling basis. The NOFO for the AFG program, which is from FY 2024 but which governs awards that FEMA will make through September 30, 2025, states that recipients of AFG funds must "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award." *See* FEMA, Notice of Funding Opportunity (NOFO): FY 24 Assistance to Firefighters Grant Program, https://files.simpler.grants.gov/opportunities/ab253b7e-83d1-40b5-9d92-f550ee51ba74/attachments/d04af45f-2c82-492c-a791-cf3fce90ab1d/FY_2024_AFG_NOFO.pdf (last visited February 4, 2026).

-17-

RENNE PUBLIC LAW GROUP
Attorneys at Law

76.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on grant funds administered by the USFA related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 5. Other DHS Grant Programs

77.     DHS and its operating divisions and agencies administer a range of other grant programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any DHS grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

78.     Congress annually appropriates funding for DHS grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of DHS with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DHS grants related to a prohibition on DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1448-1477; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 312-348; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4725–4760; Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 593-628.

79.     Plaintiffs City of Santa Clara, City of Santa Cruz, City of Redwood City, City of Fresno, City of Corvallis, City of Hillsboro, and the County of Santa Barbara (collectively, the "DHS Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive federal funding from DHS.  DHS Plaintiffs rely on millions of dollars in appropriated federal funds from DHS's direct or pass-through grant programs for projects undertaken for the benefit of their communities.

### B.    DOJ Grant Programs

80.     Congress established the Department of Justice in 1870.  28 U.S.C. §§ 501 et seq.  The DOJ administers competitive, formula, and block grant programs that provide funds to local governments to support public safety and justice activities in their communities.  DOJ administers grants directly and

-18-

RENNE PUBLIC LAW GROUP
Attorneys at Law

through its program offices, including but not limited to the Community Oriented Policing Services (COPS) Office and the Office of Justice Programs (OJP), which includes the Bureau of Justice Assistance (BJA), and the Office of Victims of Crime (OVC).

81.     The Attorney General is responsible for supervising and directing the administration and operation of the Department of Justice, including oversight of all departmental components, the administration of grants and other federal funding, and ensuring that the Department's actions comply with applicable statutory and executive requirements. *See* 28 U.S.C. § 509.

### 1. Byrne Memorial Justice Assistance Grant Program

82.     The Edward Byrne Memorial Justice Assistance Grant (JAG) program operates under a comprehensive statutory framework established by 34 U.S.C. § 10156 that mandates a precise, data-driven allocation formula for distributing federal criminal justice funding to states and localities. The allocation methodology employs a dual-factor formula: 50% of funds are allocated based on each state's population ratio compared to the total U.S. population, and 50% based on each state's average annual Part 1 violent crimes reported to the FBI over the three most recent years compared to all states. *Id*. § 10156(a)(1). Local governments receive 40% of their state's allocation based on their proportional share of Part 1 violent crimes, subject to specific eligibility requirements, including three years of crime data reporting to the FBI within the preceding 10 years. *Id*. § 10156(b)(2), (d), (e)(3). The program includes comprehensive safeguards such as minimum allocation guarantees, expenditure caps, and detailed application requirements designed to ensure evidence-based criminal justice funding while maintaining federal oversight and constitutional compliance. *See id*. § 10156(d), (e), (f).

83.     The statutory scheme authorizes funds to states and units of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice across nine specific program categories: law enforcement programs; prosecution and court programs; prevention and education programs; corrections and community corrections programs; drug treatment and enforcement programs; planning, evaluation, and technology improvement programs; crime victim and witness programs; mental health programs and related law enforcement and corrections programs; and implementation of state crisis intervention court proceedings and related programs or initiatives. 34 U.S.C. § 10152(a)

-19-

RENNE PUBLIC LAW GROUP
Attorneys at Law

84.     To receive JAG funding, a state or local government must submit an application within 120 days after funds are appropriated, including several mandatory certifications and assurances.  *See* 34 U.S.C.§ 10153.  These requirements include:  certification that federal funds will not supplant state or local funds but will increase available law enforcement funding; assurance of governing body review at least 30 days before application submission; assurance of public notice and comment opportunities; and assurance that applicants will maintain and report required programmatic and financial data.  *Id*.

85.     States must develop comprehensive statewide strategic plans detailing how grants will improve criminal justice administration.  These plans must be designed in consultation with local governments and representatives of all criminal justice system segments, including descriptions of funding allocation approaches, descriptions of evidence-based data gathering processes, identification of barriers to implementing evidence-based approaches, and be updated every five years with annual progress reports.  34 U.S.C. § 10153(a)(6).

86.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on JAG grant funds related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

## 2.  Community Oriented Policing Services Grant Programs

87.     Congress authorized the COPS program through the enactment of the Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, Title I, Sept. 13, 1994, 108 Stat. 1807, with the goal of "increas[ing] the number of law enforcement officers interacting directly with members of the community" and improving "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community."  *See* 34 U.S.C. § 10381(b).

88.     To this end, the statute authorized the DOJ to provide funds to states and localities to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety."  Pub. L. No 103-322 at § 1701, 108 Stat. at 1808.  Congress enumerated twenty-four purposes for which grants may be made, including, as relevant here, "to hire and train new, additional career law

-20-

RENNE PUBLIC LAW GROUP
Attorneys at Law

enforcement officers for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(2). In 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, Jan. 10, 2018, 131 Stat. 2276 (LEMHWA), with the goal of "provid[ing] support for law enforcement agency efforts to protect the mental health and well-being of law enforcement officers." 131 Stat. at 2276. LEMHWA amended the COPS Statute to add the following purpose for which COPS Grants may be made: "to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies." 34 U.S.C. § 10381(b)(24).

89. The COPS Statute also sets out various requirements for applications for grant funding, including that applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

90. The DOJ administers COPS Grants through the COPS Office. The COPS Office manages several types of COPS Grants each year. Plaintiffs in this case received several COPS grants, including the Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement, Community Policing Development Microgrant Program, and Law Enforcement Mental Health and Wellness Program Grant.

91. Congress annually appropriates funding for the COPS program. In the annual appropriations legislation, Congress sets forth priorities and directives to the DOJ Secretary with respect to COPS funding. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1262-1263; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 130-131; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4539-4541; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 153-154.

92. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on COPS grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### 3. Paul Coverdell Forensic Science Improvement Grant

93. Congress authorized the Paul Coverdell Forensic Science Improvement Grant program (Coverdell grant) through the enactment of the Paul Coverdell National Forensic Sciences Improvement

-21-

Act of 2000, Pub. L. No. 106-561, 114 Stat. 2788 (2000).  This statute amended the Omnibus Crime Control and Safe Streets Act of 1968 to establish the Coverdell grant program in its current form.  *See* Pub. L. No. 90-351.  The aim of the program is to improve the quality, timeliness, and credibility of forensic science services for criminal justice purposes.  *See* 34 U.S.C. § 10564(a).

94.    DOJs administration of the Coverdell grant is authorized and governed by statutory directives.  Congress authorized the Attorney General to award Coverdell grants to states and units of local government.  34 U.S.C. § 10561.

95.    Recipients may use Coverdell grants for one or more statutorily defined purposes to improve forensic science and medicolegal death investigation services.  *See* 34 U.S.C. § 10564.  Eligible uses include carrying out all or a substantial part of a program to improve the quality and timeliness of forensic science or medical examiner services, including services provided by State and local government laboratories; eliminating backlogs in the analysis of forensic science evidence across a wide range of disciplines; training, assisting, and employing forensic laboratory personnel and medicolegal death investigators as necessary to eliminate such backlogs; addressing emerging forensic science issues and technologies; educating and training forensic pathologists; and funding medicolegal death investigation systems to facilitate accreditation of medical examiner and coroner offices and certification of medicolegal death investigators.  *Id*. § 10564(a)(1)–(6).  Grant funds awarded for programmatic improvements under 34 U.S.C. § 10564(a)(1) may be used only for expenses related to facilities, personnel, computerization, equipment, supplies, accreditation and certification, education, and training, and may not be used for general law enforcement or nonforensic investigatory functions.  *Id*. § 10564(b)(1)–(2).  The statute further limits the percentage of grant funds that may be used for the construction of new facilities based on the size of the grant award, *id*. § 10564(c)(1)–(2), caps administrative expenses at ten percent of the total grant amount, *id*. § 10564(d), and defines a "backlog" as forensic evidence that has been stored and not subjected to appropriate testing due to a lack of resources or personnel, *id*. § 10564(e).

96.    To apply for a Coverdell grant, a State or unit of local government must submit several certifications to the Attorney General.  *Id*. § 10562.  The applicant must certify that it has developed a forensic science laboratory plan consistent with the program described in 34 U.S.C. § 10564(a) and must

-22-

RENNE PUBLIC LAW GROUP
Attorneys at Law

provide a specific description of how the grant funds will be used to carry out that plan. *Id.* § 10562(1). The applicant must also certify that any forensic science laboratory system, medical examiner's office, or coroner's office that will receive grant funds uses generally accepted laboratory practices and procedures established by recognized accrediting or certifying bodies. *Id.* § 10562(2). In addition, except with respect to medical examiner or coroner offices, the applicant must certify that such laboratories are accredited by an internationally recognized accrediting body, or, in the alternative, must provide a legally binding and enforceable assurance that a portion of the grant funds will be used to prepare and apply for such accreditation within two years of the grant award. *Id.*

97.     If the proposed program includes construction of a new facility, the applicant must provide a specific description of the facility and its estimated costs and must certify that the amount of grant funds used for construction will not exceed the limitations set forth in 34 U.S.C. § 10564(c). *Id.* § 10562(3). The applicant must certify that a government entity exists and that an appropriate process is in place to conduct independent external investigations into allegations of serious negligence or misconduct that substantially affect the integrity of forensic results, when such allegations involve employees or contractors of any forensic laboratory system, medical examiner's office, coroner's office, law enforcement storage facility, or medical facility in the State that will receive grant funds. *Id.* § 10562(4).

98.     The statute does not require applicants make certifications prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

99.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on Coverdell grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

100.     Funding for Coverdell grants comes from congressional appropriations. Congress recently appropriated funds for the Coverdell program in the 2025 Full-Year Continuing Appropriations and Extensions Act, 2025. *See* Pub. L. No. 119-4, 139 Stat. 9, 10-11.

101.     None of the 2025 Appropriations and Extensions Act's directives to DOJ or any other legislation authorizes DOJ to impose grant conditions prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

-23-

### 4. Office of Victims of Crime Grants

102.     Federal grants administered by DOJ have long been instrumental in supporting programs that provide compensation and assistance to victims of crime.

103.     In December 1982, President Ronald Reagan's Task Force on Victims of Crime issued a report concluding that "[t]he neglect of crime victims is a national disgrace." Among the report's key recommendations was to "enact legislation to provide federal funding to assist state crime victim compensation programs" and "provide federal funding, reasonably matched by local revenues, to assist in the operation of federal, state, local, and private nonprofit victim/witness assistance agencies that make comprehensive assistance available to all victims of crime."

104.     Two years later, Congress passed the Victims of Crime Act (VOCA), which created the Crime Victims Fund within the U.S. Treasury and established Office for Victims of Crime (OVC) as an office within DOJ. Congress structured VOCA "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime" in order to support state and local victim assistance programs. S. Rep. No. 497, 98th Cong., 2d Sess. at 1, 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3607, 3607, 1984 WL 37447. "Unlike some past compensation bills," VOCA is "intended to keep conditions on Federal Aid to a bare minimum." *Id*. at 9. The U.S. Attorney General at the time emphasized that the new grants would not "creat[e] an unnecessary bureaucracy to impose the Federal government's priorities on the States .... [T]he Federal government will provide money to the States to enable the States to effectively run their own programs." 130 Cong. Rec. S5252, 5352 (Mar. 13, 1984) (statement of Attorney General William French Smith).

105.     Over the years, Congress has amended VOCA to "allow a greater measure of flexibility to ... State and local victims' assistance programs" and provide "greater certainty" that VOCA funding "will not wax and wane with events .... [fund recipients] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential." S. Rep. No. 179, 104th Cong., 1st Sess. at 29 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 941, 1995 WL 731704.

106.     VOCA directs that the U.S. government shall deposit into the Crime Victims Fund various penalties and fees recovered from individuals convicted of federal offenses.

-24-

107.    VOCA further directs that the federal government shall draw on the Crime Victims Fund to issue annual grants to States for victim compensation and assistance.  34 U.S.C. §§ 20101-20111.

108.    Since VOCA's enactment, VOCA funds have been instrumental in providing critical support to millions of victims and survivors (and their families) of serious crime.  *See, e.g.*, Office for Victims of Crime, VOCA Victim Compensation Data Dashboard: Data Analyses for Fiscal Years 2021-2024, https://ovc.ojp.gov/funding/performance-measures/data-analyses/voca-victim-compensation (last visited February 4, 2026).

109.    As available amounts in the Crime Victims Fund have fluctuated over the years, Congress has taken action to make additional funds available, including by amendments to VOCA through the 2001 USA PATRIOT ACT, Pub. L. 107-56, and the VOCA Fix to Sustain the Crime Victims Fund Act of 2021, Pub. L. 117-27.  In January 2002, Congress also appropriated $68.1 million for the Crime Victims Fund to assist in providing relief to 9/11 victims.  Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act, Pub. L. 107-117.

### a.  OVC Formula Grants

110.    Congress has directed OVC to administer two formula grant programs pursuant to VOCA that support crime victim compensation and assistance:  Victim Compensation Formula Grants and Victim Assistance Formula Grants.

111.    The Victim Compensation and Victim Assistance grants are formula grants, not competitive grants.  Recipients are entitled to a specific amount of funding based on the applicable statutory formula.

112.    For FY 2025, over $178 million from the Crime Victims Fund is to be awarded to States, and their subrecipients under the Victim Compensation Formula Grant, and over $1.2 billion is to be awarded to States, and their subrecipients under the Victim Assistance Formula Grant.

### i.    Victim Compensation Formula Grants

113.    Victim Compensation Formula Grants provide funding to all qualifying crime victim compensation programs.  34 U.S.C. § 20102.

114.    The purpose of these grants is to provide compensation to eligible crime victims for costs resulting from crime, including for medical care, lost wages, mental health counseling, funeral expenses,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

and crime scene clean-up.  The grants are designed to supplement state and territory efforts to provide financial compensation to crime victims.  *See id.*

115.    VOCA provides that the OVC Director "shall make an annual grant" to eligible victim compensation programs based on a fixed statutory formula.  34 U.S.C. § 20102(a).

116.    VOCA delineates a precise set of requirements that a state victim compensation program must satisfy to be eligible for a grant, requiring, for example, that States pay for certain victim expenses, treat federal and state crimes and residents and non-residents the same, and do not deny compensation based on a victim's familial relationship with an offender.  *Id.* § 20102(b)(1)–(9).  The recipients must also certify that grant funds will "not be used to supplant State funds otherwise available to provide crime victim compensation."  *See id.* § 20102(b)(3).  None of the statutory eligibility or certification requirements relate to prohibitions on DEI, promotion of gender ideology, or immigration enforcement.

117.    Victim Compensation Formula Grants are distributed among eligible recipients based on a statutory formula that accounts for the amount of money each state crime victim compensation program distributed to victims in the preceding fiscal year.  Specifically, the OVC "Director shall make an annual grant from the Fund to an eligible crime victim compensation program of 75 percent of the amounts awarded" by the state compensation program "during the preceding fiscal year, other than amounts awarded for property damage."  *Id.* § 20102(a)(1).

118.    The statute recognizes only one exception to this statutory formula.  If the Crime Victims Fund is "insufficient" to provide 75 percent of the amount distributed by each State in the preceding fiscal year, "the [OVC] Director shall make, from the sums available, a grant to each eligible crime victim compensation program so that all such programs receive the same percentage of the amounts awarded by such program during the preceding fiscal year, other than amounts awarded for property damage."  *Id.* § 20102(a)(2).

119.    The statutory formula makes no reference to prohibitions on DEI, promotion of gender ideology, or immigration policy.

120.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on Victim Compensation Formula grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

-26-

RENNE PUBLIC LAW GROUP
Attorneys at Law

### ii. Victim Assistance Formula Grants

121. Victim Assistance Formula Grants provide financial support for eligible crime victim assistance programs. 34 U.S.C. § 20103(a).

122. The purpose of Victim Assistance Formula Grants is to improve the treatment of victims of crime by providing them with the assistance, support, and services necessary to aid their restoration and healing after a criminal act. These grants are intended to enable States to provide subgrants to local community-based organizations and public agencies that provide services directly to crime victims, including but not limited to victim and witness advocacy services; crisis counseling; telephone and onsite information and referrals; criminal justice support and advocacy; emergency shelter; therapy; and consistent communication about significant events in their case. *Id.* These services are to be administered without regard to a victim's immigration status. *See, e.g.*, 28 C.F.R. § 94.103(a).

123. VOCA provides that the OVC Director "shall make an annual grant" to the chief executive of each State to provide financial support to eligible victim assistance programs. 34 U.S.C. § 20103(a). Each State subgrants such funds out to community-based organizations and public agencies that provide services directly to crime victims. *Id.* § 20103(b)–(c).

124. Congress has specified the criteria for determining the eligibility of a victim assistance program to receive Victim Assistance grant funds. *Id.* § 20103(b). A program is eligible under these statutory criteria if, among other things, it is run by a public agency or nonprofit organization, has a demonstrated record of providing effective services to crime victims, assists victims in seeking compensation benefits, and does not discriminate against victims because they disagree with how a case is prosecuted. *Id.* Congress has also specified which certifications are required of a State's chief executive, including that "funds awarded to eligible crime victim assistance programs will not be used to supplant State and local funds otherwise available for crime victim assistance." *Id.* § 20103(a)(2). None of the eligibility criteria or required certifications specified in the statute relate to prohibitions of DEI, promotion of gender ideology, or immigration enforcement.

125. Victim Assistance Formula Grants are distributed among the States based on a fixed statutory formula. Under that formula, each State is entitled to a base amount of $500,000 and an additional share of the remaining available money in the Crime Victims Fund based on "each State's

-27-

RENNE PUBLIC LAW GROUP
Attorneys at Law

population in relation to the population of all States."  *Id*. § 20103(a)(3).

126.    The statutory formula makes no reference to DEI, gender ideology, or immigration enforcement.

127.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on Victims Assistance Formula grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### b.  OVC Competitive Grants

### i.    VOCA Competitive Grant Programs

128.    OVC administers many competitive grant programs authorized by VOCA, including: Services for Victims of Crime; Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program; Technology to Support Services for Victims of Crime; Services for Victims of Technology-Facilitated Abuse; Sexual Assault Nurse Examiner Program Development and Operation Guide; National Crime Victim Crisis Hotlines; and Increasing Availability of Medical Forensic Examinations for Victims of Sexual Assault.

129.    Awards under these programs support a range of initiatives designed to expand and strengthen services for crime victims, including funding specialized assistance for children, elders, and victims of technology-facilitated abuse; providing housing assistance for victims; expanding victims' access to specialized medical forensic professionals and examinations; and development of statewide technology programs to improve the quality and reach of victim services.  Collectively, they enhance the quality and accessibility of services for victims of crime nationwide.

130.    VOCA's competitive grants are generally governed by 34 U.S.C. § 20103(c), which specifies the purpose of competitive grants.  VOCA provides that the OVC Director "shall make grants" for "victim services, demonstration projects, program evaluation, compliance efforts, and training and technical assistance services to eligible crime victim assistance programs" and "for the financial support of services to victims of Federal crime by eligible crime victim assistance programs."  *Id*. § 20103(c)(1)(A)–(B).  The OVC Director "shall … use funds made available" for these grants "pursuant to rules or guidelines that generally establish a publicly-announced, competitive process."  *Id*. § 20103(c)(3)(E).  The statutory purposes of VOCA competitive grant funds do not relate in any way to

-28-

RENNE PUBLIC LAW GROUP
Attorneys at Law

prohibitions of DEI, gender ideology, or immigration enforcement.

131. Congress has also specified certain criteria for creating and awarding these competitive grant funds under VOCA. The only relevant restriction that Congress has placed on the use of these funds is that not more than 50 percent of available funds shall be used for support of victims of Federal crime. *See id.* § 20103(c)(2)(A)–(B).

132. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on VOCA Competitive grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### ii. OVC Human Trafficking Programs

133. OVC also administers several competitive grant programs focused specifically on combating human trafficking and providing comprehensive services to victims, including Housing Assistance for Victims of Human Trafficking; Integrated Services for Minor Victims of Human Trafficking; Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking; and Services for Victims of Human Trafficking.

134. Awards under these programs support a broad range of initiatives intended to identify victims of human trafficking and provide trauma-informed, victim-centered services. These initiatives include emergency, transitional, and long-term housing assistance; coordinated service delivery for minor victims; multidisciplinary task force efforts involving law enforcement, service providers, and prosecutors; and comprehensive services addressing victims' medical, mental health, legal, and social service needs. Collectively, these programs are designed to improve victim safety, stability, and access to justice, and to strengthen coordinated community responses to human trafficking.

135. The Human Trafficking Program grants are authorized under 22 U.S.C. § 7105(b), part of the Trafficking Victims Protection Act. This authorizing statute proscribes specific requirements and priorities for the Human Trafficking Program funds. 22 U.S.C.A. 7105(b)(2)(D) provides that "[i]n selecting recipients of grants under this paragraph that are only available for law enforcement operations or task forces, the Attorney General may give priority to any applicant that files an attestation with the Attorney General stating that the grant funds awarded under this paragraph…"

      a. "will be used to assist in the prevention of severe forms of trafficking in person"

RENNE PUBLIC LAW GROUP
Attorneys at Law

b. "will be used to strengthen efforts to investigate and prosecute those who knowingly benefit financially from participation in a venture that has engaged in any act of human trafficking"

c. "will be used to take affirmative measures to avoid arresting, charging, or prosecuting victims of human trafficking for any offense that is the direct result of their victimization; and"

d. "will not be used to require a victim of human trafficking to collaborate with law enforcement officers as a condition of access to any shelter or restorative services;

136.    Additionally, 22 U.S.C.A.  7105(b)(1)(A) provides "Notwithstanding title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, an alien who is a victim of a severe form of trafficking in persons, or an alien classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, shall be eligible for benefits and services under any Federal or State program or activity funded or administered by any official or agency described in subparagraph (B) to the same extent as an alien who is admitted to the United States as a refugee under section 1157 of Title 8."

137.    Furthermore, 22 U.S.C.A.  7105(b)(1)(B(i) provides, "…Federal agencies shall expand benefits and services to victims of severe forms of trafficking in persons in the United States, and aliens classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, without regard to the immigration status of such victims. "

138.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on OVC Human Trafficking Program grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### 5.  Other DOJ Grant Programs

139.    DOJ and its operating divisions and agencies administer a range of other grant programs, such as the Preventing Trafficking of Girls grants program, that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other DOJ grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or

-30-

RENNE PUBLIC LAW GROUP
Attorneys at Law

adherence to executive orders unrelated to the purpose of the funds.

140.    Congress annually appropriates funding for DOJ grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of DOJ with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DOJ grants related to a prohibition on DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1245-1266; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 113-134; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4521-4544; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 133-156.

141.    Plaintiffs the City of Santa Clara, City of Santa Cruz, City of Redwood City, City of Fresno, City of Beaverton, City of Corvallis, City of Hillsboro, City of Stockton, County of San Diego, County of Los Angeles, and County of Santa Barbara (collectively, the "DOJ Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive federal funding from the DOJ. DOJ Plaintiffs rely on millions of dollars in appropriated federal funds from DOJ's programs for the benefit of their communities.

## C.    DOI Grant Programs

142.    Congress established the Department of the Interior in 1849 to administer the rapidly expanding land holdings acquired by the Federal Government in the first half of the nineteenth century. Act of Mar. 3, 1849, ch. 108, § 11, 9 Stat. at 396.  Today, the DOI manages 420 million acres of federal lands, nearly 55 million acres of tribal lands, more than 700 million acres of subsurface minerals, and about 2.5 billion acres of the outer continental shelf.  The DOI Secretary is responsible for all actions taken by the Department and its component offices, which include the Bureau of Indian Affairs (BIA), Bureau of Indian Education (BIE), Bureau of Land Management (BLM), Bureau of Ocean Energy Management (BOEM), Bureau of Reclamation, Bureau of Safety and Environmental Enforcement (BSEE), National Park Service (NPS), Office of Surface Mining Reclamation and Enforcement (OSMRE), U.S. Fish and Wildlife Service (FWS), and U.S. Geological Survey (USGS).

143.    The Secretary of the Interior is charged with the supervision and management of the

RENNE PUBLIC LAW GROUP
Attorneys at Law

Department of the Interior and its bureaus, including the administration of federal programs and grants, management of public lands and resources, and ensuring that departmental actions are carried out in accordance with governing statutes and executive directives. *See* 43 U.S.C. §§ 1457; 1458.

### 1.  Land and Water Conservation Fund Grant Program (LWCF)

144.    Congress established the Land and Water Conservation Fund Grant Program through the enactment of the Land and Water Conservation Fund Act of 1965.  Pub. L. 88-578, 54 U.S.C. § 200301 et seq., as amended.  The purpose of the Act is to assist the states and agencies to meet the "present and future outdoor recreation demands and needs of the American people."  Pub. L. 88-578.  LWCFA appropriates federal funds to states for outdoor recreation planning, acquisition, and facilities development.

145.    DOI's administration of the LWCF is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the LWCF, the formula DOI must apply in allocating funds, and program requirements DOI may require recipients agree to as conditions for receiving funds.  *See* 54 U.S.C. § 200305.

146.    The Land and Water Conservation Act, 54 U.S.C. § 200305, contains Congress's overarching authorization for DOI to allocate LCWF grants.  The statute authorizes the DOI Secretary to make payments to the states for outdoor recreation.  Subsection (b) of 54 U.S.C. § 200305 provides for the DOI Secretary to establish a formula to determine funding amounts and sets forth eligibility criteria the DOI Secretary shall consider to determine awards.

147.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on LWCF grant funds related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 2.  WaterSMART Grant Program

148.    DOI established the WaterSMART (Sustain and Manage American Resources for Tomorrow) program in 2010 under DOI Secretarial Order 3297, with the goal to "pursue a sustainable water supply for the Nation by establishing a framework to provide federal leadership and assistance on the efficient use of water, integrating water and energy policies to support the sustainable use of all

-32-

RENNE PUBLIC LAW GROUP
Attorneys at Law

natural resources, and coordinating the water conservation activities of the various Interior bureaus and office." *See* Secretarial Order No. 3297, Department of the Interior WaterSMART Program - Sustain and Manage America's Resources for Tomorrow, U.S. Dep't of the Interior (Feb. 22, 2010), https://www.doi.gov/document-library/secretary-order/3297-department-interior-watersmart-program-sustain-and-manage (last visited February 4, 2026). The program was codified under the Omnibus Public Land Management Act of 2009, Pub. L. 111-11, as amended 42 U.S.C. § 10364.

149. The WaterSmart program authorizes the DOI Secretary to provide cost-shared funding in four grant categories on a competitive basis: water and energy efficiency, small-scale water efficiency, water strategy grants, and environmental water resources projects. *See* 42 U.S.C. § 10364(a)(1). To be eligible for funding, applicants must meet certain criteria; they must be located in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, American Samoa, Guam, the Northern Mariana Islands, and the Virgin Islands, and must submit a proposal of the improvement the grant is intended to fund. *See* 42 U.S.C. § 10364(a)(2). Applicants must also agree to cost sharing requirements of fifty percent or more of the total project cost, among other considerations. *See* 42 U.S.C. § 10364(a)(3)(e).

150. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on WaterSMART grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

151. Congress annually appropriates funding for the WaterSMART grant program. In the annual appropriations legislation, Congress sets forth priorities and directives to the DOI Secretary with respect to WaterSMART funding. *See*, e.g., Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1363; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 221; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4631; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 194, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 24.

152. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on WaterSMART grants prohibiting DEI and the "promot[ion]" of "gender ideology," or

-33-

RENNE PUBLIC LAW GROUP
Attorneys at Law

cooperation with federal immigration enforcement.

### 3. Other DOI Grants

153.    DOI and its operating divisions and agencies administer a range of other grant programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any DOI grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

154.    Congress annually appropriates funding for DOI grant programs, including the programs identified above.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOI Secretary with respect to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DOI grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1544; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 417; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4828 Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 291.

155.    Plaintiffs the City of Fresno, City of Santa Cruz, City of Corvallis, City of Hillsboro, City of Stockton, County of Los Angeles, and County of Santa Barbara (collectively, the "DOI Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive federal funding from the DOI.  These Plaintiffs rely on millions of dollars in appropriated federal funds from DOI direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### D.    Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on Federal Grants.

#### 1.    President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants

156.    Since taking office, President Trump has issued numerous executive orders directing the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the

-34-

RENNE PUBLIC LAW GROUP
Attorneys at Law

law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend.  Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including prohibiting all kinds of DEI, facilitating enforcement of federal immigration, or prohibiting the "promot[ion]" of "gender ideology."  Plaintiffs cannot comply with Defendants' vague, ambiguous, and unauthorized conditions without exposing themselves to substantial legal liability or forgo critical federal funding.

157.    The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws.  Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order").  The certification is not limited to programs funded with federal grants.  *Id.* § 3(b)(iv).

158.    The DEI Order also directs each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id.* § 3(b)(iv)(A).  The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016).  Each violation of the FCA is punishable by a civil penalty of up to $27,894, plus mandatory treble damages sustained by the federal government because of that violation.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a).  Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

159.    The DEI Order does not define the term "DEI."  As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program,

2   is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

3         160.    The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency

4   heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the

5   subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to

6   shield illegal aliens from deportation." Executive Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19,

7   2025) (the "Immigration Order").

8         161.    The Immigration Order also purports to implement the Personal Responsibility and Work

9   Opportunity Reconciliation Act (PRWORA), pursuant to which certain federal benefits are limited to

10  individuals with qualifying immigration status. *See* 8 U.S.C. § 1611(a). In particular, the Immigration

11  Order directs all agency heads to "identify all federally funded programs administered by the agency that

12  currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate

13  actions to align such programs with the purposes of this order and the requirements of applicable Federal

14  law, including … PRWORA." *Id*. § 2(i).

15        162.    On April 28, 2025, President Trump issued additional executive orders related to

16  immigration and law enforcement. The "Protecting American Communities from Criminal Aliens"

17  executive order states that "some State and local officials … continue to use their authority to violate,

18  obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in

19  coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to

20  withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility

21  verification is conducted for individuals receiving Federal public benefits … from private entities in a

22  sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental

23  entity on its behalf." https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-

24  communities-from-criminal-aliens/ (last visited February 4, 2026). The "Strengthening and Unleashing

25  America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs

26  the Attorney General to, among other things, "prioritize prosecution of any applicable violations of

27  Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and

28  unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting law

RENNE PUBLIC LAW GROUP
Attorneys at Law

enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement activity or endanger citizens." https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/ (last visited February 4, 2026).

163.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology."  Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order").  The Gender Ideology Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id*. § 2(f).  It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."  *Id*.

164.    On August 7, 2025 President Trump issued another executive order titled, Improving Oversight of Federal Grantmaking that requires that discretionary grant awards "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or "any other initiatives that compromise public safety or promote anti-American values." Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (the "Grantmaking Oversight Order").

## 2.    DHS Attaches New Conditions to DHS Grants

165.    DHS and its operating divisions and agencies have implemented President Trump's Executive Orders by imposing new and unlawful conditions (collectively, the "DHS Grant Conditions") across the expansive portfolio of DHS grants established by Congress and demanding grant recipients'

-37-

RENNE PUBLIC LAW GROUP
Attorneys at Law

agreement to those new conditions.

166.     For example, on or around April 18, 2025, DHS issued new sets of "Standard Terms and Conditions" applicable to all federal awards.  *See* U.S. Dep't of Homeland Security, Notice of Funding Opportunity for FY 2025 Standard Terms and Conditions (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf (last visited February 4, 2026) ("DHS Standard Terms and Conditions").

167.     Section XI of the Standard Terms and Conditions require entities receiving federal funds through DHS to "comply with" conditions "related to coordination and cooperation" with federal immigration officials, including six specific conditions related to immigration:

    a.  The Information Sharing Condition (Sec. IX(1)(a)): Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644, [which] prohibit state restrictions on sharing information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual ...."

    b.  The Compliance Condition (Sec. IX(1)(b)): Grant recipients "must comply" with various criminal laws, including 8 U.S.C. § 1324, that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

    c.  The Cooperation Condition (Sec IX(1)(c)): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance."

    d.  The Access Condition (Sec. IX(1)(d)): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

    e.  The Publicization Condition (Sec. IX(1)(e)): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

RENNE PUBLIC LAW GROUP
Attorneys at Law

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

f.  The Certification and Monitoring Condition (Sec. IX(2)): Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

168.  Section XVII(2)(iii) of the Standard Terms and Conditions also includes the requirement recipients certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

169.  Collectively these conditions will hereto be referred to as the "DHS Immigration Enforcement Conditions."

170.  Section XVII(2)((i-ii) of the Standard Terms and Conditions includes the requirement recipients certify that "[t[hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" and that "[t]hey do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott,"  (the "DHS DEI Condition").

171.  Subdivision XVII(3) further provides that "DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2)."

172.  Subdivision XVII(4) provides "Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law."

173.  Additionally, the DHS Standard Terms and Conditions state in Section XXXI, that "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference."   This term will hereto be referred to as the "DHS EO Condition."

174.  Neither the statutory provisions creating the DHS grant programs, the relevant appropriations acts, nor any other Congressional legislation authorizes the DHS to condition grant funds on the recipient's certification that it does not "promote DEI" or its agreement to not operate a program

-39-

RENNE PUBLIC LAW GROUP
Attorneys at Law

that "benefits illegal immigrants or incentivizes illegal immigration." Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

175. FEMA is an operating component of DHS, *see* 6 U.S.C. § 313(a), and FEMA-administered grant programs are DHS grants subject to DHS-wide policies and conditions. As a result, the DHS Standard Terms and Conditions described above apply equally to all FEMA grant programs. Accordingly, the DHS DEI Condition, the DHS Immigration Condition, and the DHS EO Condition are imposed on FEMA grant recipients and subrecipients as conditions of receiving the DHS financial assistance.

176. DHS and FEMA incorporate the DHS Standard Terms and Conditions into individual grant programs through Notices of Funding Opportunity ("NOFOs") issued for specific fiscal years and programs. For example, the Fiscal Year 2025 Homeland Security Grant Program NOFO expressly incorporates the DHS Standard Terms and Conditions by reference and states that all awards made under the NOFO are subject to those Terms and Conditions as a condition of acceptance. *See* Fiscal Year 2025 Homeland Security Grant Program NOFO, https://www.fema.gov/sites/default/files/documents/fema_gpd_homeland-security-grant-program-nofo_fy2025.pdf (last visited February 4, 2026).

177. The Homeland Security Grant Program NOFO further requires funding recipients to report whether "subrecipient's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities," "[w]hether the payment request includes an activity involving support to aliens," and "[w]hether the subrecipient has any DEI practices."

178. The Homeland Security Grant Program NOFO also contains a condition requiring "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference," which is identical to the DHS EO Condition in the DHS Standard Terms and Conditions discussed above.

179. These requirements, outlined in the DHS Standard Terms and Conditions and incorporated into the NOFOs for DHS and FEMA grant programs, are unlawful, as explained further

-40-

RENNE PUBLIC LAW GROUP
Attorneys at Law

below, because the requirements violate the Separation of Powers, the Spending Clause, the Fifth

Amendment's void-for-vagueness doctrine, and the APA.

**3. DOJ Attaches New Conditions to DOJ Grants**

180.    DOJ and its operating divisions and agencies have implemented President Trump's

Executive Orders by attaching new and unlawful conditions (collectively, the "DOJ Grant Conditions")

across the expansive portfolio of DOJ grants established by Congress and demanding grant recipients'

agreement to those new conditions.

181.    For example, on or around May 12, 2025, the DOJ's Office of Justice Programs, the part

of the DOJ that manages, awards, and oversees most federal criminal justice and victim services grant

funding, published "General Conditions" for OJP Awards in FY 2025.  *See* Dep't of Justice, "General

Conditions" for OJP Awards in FY 2025,

https://www.ojp.gov/funding/explore/legaloverview2025/mandatorytermsconditions (last visited

February 4, 2026).  The General Conditions included a term that provides:

> The recipient agrees that its compliance with all applicable Federal civil
> rights and nondiscrimination laws is material to the government's decision
> to make this award and any payment thereunder, including for purposes of
> the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by
> accepting this award, certifies that it does not operate any programs
> (including any such programs having components relating to diversity,
> equity, and inclusion) that violate any applicable Federal civil rights or
> nondiscrimination laws.

(the "OJP DEI Condition").

182.    Additionally, the NOFO for FY25 COPS Community Policing Development Microgrants

that warns applicants that funding may not be used to "promote gender ideology" (the "COPS Gender

Ideology Condition") or "for projects that provide or advance diversity, equity, inclusion, and

accessibility, or environmental justice programs, services, or activities," (the "COPS DEI Condition").

*See* Dep't of Justice., NOFO FY25 COPS Community Policing Development Microgrants,

https://cops.usdoj.gov/pdf/2025ProgramDocs/cpdmicrograms/nofo.pdf (last visited February 4, 2026).

The NOFO for FY25 COPS Community Policing Development Microgrants also provides that "the

COPS Office will provide priority consideration to state or local law enforcement applicants that respond

affirmatively to the application question related to cooperation with federal immigration officials," (the

-41-

RENNE PUBLIC LAW GROUP
Attorneys at Law

"COPS Immigration Priority Conditions").

183.    The NOFO for FY25 COPS Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement program contains the same COPS Gender Ideology, COPS DEI, and COPS Immigration Priority conditions.  *See* Dep't of Justice., NOFO FY25 COPS Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement, https://cops.usdoj.gov/pdf/2025ProgramDocs/saferoutcomes/support_nofo.pdf (last visited February 4, 2026).

184.    The NOFO for FY25 COPS Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects includes similar conditions.  *See* Dep't of Justice, Notice of Funding Opportunity for FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects, https://cops.usdoj.gov/pdf/2025ProgramDocs/lemhwa/nofo.pdf (last visited February 4, 2026.

185.    Significantly, the COPS DIE Condition is not limited to programs that violate applicable federal law.  It prohibits COPS funding from being used to "provide or advance" any diversity, equity, inclusion, and accessibility services or activities.  Regardless of whether they comply with federal law.

186.    In or around August 2025, the DOJ published the 2025 COPS Office Law Enforcement Mental Health and Wellness Act (LEMHWA) Program Award Owner's Manual.  *See* Dep't of Justice, 2025 COPS Office LEMHWA Program Award Owner's Manual, https://cops.usdoj.gov/pdf/2025AwardDocs/lemhwa/aom.pdf (last visited February 4, 2026).  The Manual provides that "[c]ompliance with this Award Owner's Manual is a condition of your award, and this manual is binding guidance."  "

187.    The LEMHWA Manual includes the a provision requiring recipients to certify "that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws" similar to the OJP DEI Conditions.  Furthermore, the 2025 LEMHWA requires that "the recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812)), and, by accepting this award, certifies that it

-42-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    does not operate any programs (including any such programs having components relating to diversity,

2    equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws," (the

3    "LEMHWA Owner's Manual DEI Condition")

4         188.    The LEMHWA Manual also requires that recipients "must comply with all applicable

5    federal laws and Presidential Memoranda and all Executive Orders by the President," (the "LEMHWA

6    EO Condition").

7         189.    The 2025 COPS Office Safer Outcomes Program Award Owner's Manual contains the

8    same conditions as the LEMHWA Program Award Owner's Manual.  *See* Dep't of Justice, 2025 COPS

9    Office Safer Outcomes Program Award Owner's Manual,

10   https://cops.usdoj.gov/pdf/2025AwardDocs/saferoutcomes/AOM.pdf (last visited February 4, 2026).

11        190.    The NOFOs issued by the OVC also contain new unlawful conditions implementing the

12   President's Executive Orders.  *See e.g.*, U.S. Dep't of Justice, Office of Justice Programs, OVC FY25

13   Victims of Crime Act (VOCA) Victim Assistance Formula Grant NOFO,

14   https://www.ojp.gov/funding/docs/ovc-2025-172428.pdf (last visited February 4, 2026); U.S. Dep't of

15   Justice, Office of Justice Programs, OVC FY25 Victims of Crime Act (VOCA) Victim Compensation

16   Formula Grant NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172429.pdf (last visited February 4,

17   2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Services for Victims of Crime

18   NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172427.pdf (last visited February 4, 2026); U.S.

19   Dep't of Justice, Office of Justice Programs, OVC FY25 Enhanced Collaborative Model (ECM) Task

20   Force to Combat Human Trafficking NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172524.pdf

21   (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Services

22   for Victims of Human Trafficking NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf (last

23   visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Integrated

24   Services for Minor Victims of Human Trafficking NOFO, https://www.ojp.gov/funding/docs/ovc-2025-

25   172521.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25

26   Preventing Trafficking of Girls NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172480.pdf (last

27   visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Housing

28   Assistance for Victims of Human Trafficking, https://www.ojp.gov/funding/docs/o-ovc-2025-172519.pdf

RENNE PUBLIC LAW GROUP
Attorneys at Law

-43-

(last visited February 4, 2026).

191.    All of the above-mentioned OVC NOFOs list as an "unallowable use," "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" and is "out of the program scope and will not be funded" (the "OVC Immigration Enforcement Condition").

192.    Although styled as a restriction on the "unallowable use of funds," or "out of program scope," this language functions as an eligibility requirement.  The NOFOs impose these requirements on all FY 2025 OVC grant awards.

193.    Many OVC NOFOs also provide that  "OJP will provide priority consideration to applicants that propose (as applicable within the scope of this funding opportunity) projects…[d]irectly supporting law enforcement operations (including immigration law enforcement operations)," (the "OVC Immigration Priority Condition").

194.    Additionally, all of the above-mentioned OVC NOFOs include a condition that provides: "Compliance with Federal civil rights and nondiscrimination laws is material to the government's decision to make any award and payment under this program, including for purposes of the False Claims Act, and each recipient will be required to certify (in its acceptance of the conditions of the award) that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws," (the "OVC DEI Condition").

195.    OVC FY25 Victims of Crime Act (VOCA) Victim Compensation Formula Grant NOFO also lists as lists as an "unallowable use" "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) any applicable Federal civil rights or nondiscrimination law (e.g., by unlawfully favoring or disfavoring individuals in any race or group on the basis that it is (or is not) a majority or minority (or privileged or unprivileged) race or group in a given area or population or sector), including in any program or activity having any component relating to diversity, equity, or inclusion,"  (the "OVC DEI Condition II").

-44-

196.    The rest of the above-cited OVC NOFOs contain a similar condition that excludes the last clause explicitly referencing DEI (the "OVC DEI Condition III").

197.    The Bureau of Justice Assistance (BJA) FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO also incorporates the unlawful conditions implementing President Trump's executive orders.  *See* U.S. Dep't of Justice, Office of Justice Programs, BJA FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO, https://www.ojp.gov/funding/docs/bja-2025-172472.pdf (last visited February 4, 2026).

198.    The FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO includes a DEI condition identical to the OVC DEI condition discussed above, (the "BJA DEI Condition").

199.    The FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO also lists as an "unallowable costs and certain activities that are out of the program scope" "any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" (the "BJA Immigration Enforcement Condition").

200.    The DOJ has also issued statements confirming this administration's overbroad interpretation of "DEI" that conflicts with current law.  In a February 5, 2025, letter to DOJ Attorney General Pam Bondi stated that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities, characterizing such programs as discriminatory if they "divide individuals based on race or sex."  The letter suggests this may include race- or gender-based affinity groups or even teaching about racial history.  *See* Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025) https://www.justice.gov/ag/media/1388501/dl?inline (last visited February 4, 2026).

201.    A second letter from Attorney General Bondi to grant recipients, issued on July 29, 2025, purports to clarify the application of federal antidiscrimination laws to DEI programs for entities receiving federal funds.  However, contrary to established legal precedent, the letter states that entities that promote DEI training programs that include discussions of inherent bias, white privilege, or toxic

-45-

RENNE PUBLIC LAW GROUP
Attorneys at Law

masculinity violate federal law.  The letter instructs entities to "[m]onitor their parties that receive federal funds to ensure ongoing compliance, including reviewing program materials."  Letter from Pam Bondi, Attorney General, to all Federal Agencies (Jul. 29, 2025) https://www.justice.gov/ag/media/1409486/dl (last visited February 4, 2026).  If this requirement, to condition federal funding on the content of program materials, were enforced, it would be a violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995).

202.    Additionally, in May 2025, the Deputy Attorney General issued a letter indicating that the DOJ will invoke the FCA to pursue funding recipients engaged in what it characterizes as "civil rights fraud"—including DEI initiatives.  Along with starting an initiative to "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds," the letter states that DOJ "strongly encourages" private FCA lawsuits against funding recipients.  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025) https://www.justice.gov/dag/media/1400826/dl?inline (last visited February 4, 2026).

203.    Neither the statutory provisions creating the DOJ grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes DOJ, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not "promote" DEI or gender ideology or its admission that its compliance with these prohibitions is material for purposes of the FCA.  Nor are Plaintiffs aware of any statute authorizing DOJ, itself or through its operating divisions and agencies, to impose conditions requiring cooperation with immigration enforcement or the prohibitions on "indirectly" promoting or facilitating a violation of the immigration laws on any other DOJ grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Federal grant recipients must comply with nondiscrimination and other federal laws.  But executive orders and statements from agency heads cannot change what these laws require under existing court decisions.

204.    The DOJ Grant Conditions described above are unlawful, as explained further below, because the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 4. DOI Attaches New Conditions to DOI Grants

205.     DOI and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOI Grant Conditions") across the expansive portfolio of DOI grants established by Congress and demanding grant recipients' agreement to those new conditions.

206.     For example, on or around July 30, 2025, the DOI's Office of Grants Management issued General Award Terms and Conditions.  *See* U.S. Dep't of the Interior, Office of Grants Management, General Award Terms and Conditions, https://www.doi.gov/sites/default/files/documents/2025-07/doi-general-terms-and-conditions-v6.pdf (last visited February 4, 2026).  These conditions include a provision that states:  "In accepting this award the grant recipient agrees to operating in compliance in all respects with all applicable Federal anti-discrimination laws, and certify that it does not operate any programs promoting diversity, equity and inclusion programs that violate any applicable Federal antidiscrimination laws." (the "DOI DEI Condition").

207.     Neither the statutory provisions creating the DOI grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes DOI, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not operate or "promote" DEI or its admission that its compliance with these prohibitions is material for purposes of the FCA.  Nor are Plaintiffs aware of any statute authorizing DOI, itself or through its operating divisions and agencies, to impose such conditions on any other DOI grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.

208.     This certification is unlawful, as explained further below, because the anti-DEI certification violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### E. The New Grant Conditions Implementing and Incorporating the Executive Orders Are Unlawful

209.     The conditions discussed above purport to incorporate executive orders as governing the use of federal funds.  These orders in many ways attempt to adopt new laws by presidential fiat, amend existing laws, and overturn court precedent interpreting laws.  In so doing, the new grant conditions seek

-47-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to

2   say what the law means.  Without Congress passing his ideological agenda, President Trump has granted

3   himself unchecked Article II powers to legislate by executive order and impose his decrees on state and

4   local governments seeking grant funding.  This not only conflicts with the Constitution, but it also

5   violates the APA.

6   ### 1.   The EO Conditions Are Unlawful

7   210.    Executive orders are formal directives issued by the President to federal agencies and

8   executive branch officials.  As implemented through the challenged grant conditions and applied to grant

9   recipients, these orders are vague, unintelligible, and incapable of consistent or lawful enforcement.

10   211.    None of the Executive Orders at issue directly impose requirements on grant recipients;

11   rather, they direct the heads of executive agencies to impose conditions on federal funding.  It is

12   nonsensical to require Plaintiffs, all local government entities, to "comply with the requirements of

13   Presidential Executive Orders" and unclear what requirements they purport to impose.

14   212.    This uncertainty renders the EO Conditions unconstitutionally vague and ambiguous

15   under both the Due Process Clause and the Spending Clause.  A condition that simply directs compliance

16   with "Presidential Executive Orders related to grants" provides no meaningful guidance as to what

17   conduct is expected, tolerated, or prohibited.  Executive orders vary in scope and subject matter, are

18   subject to change at any time, and are addressed exclusively to executive branch actors.  Local

19   government entities are left guessing whether, and how, a particular executive order applies to their

20   conduct and risk loss of critical federal funding and FCA liability if they guess incorrectly.

21   213.    Additionally, the vagueness of the EO Condition invites arbitrary and discriminatory

22   enforcement.  By incorporating executive orders in sweeping, undefined terms, the EO Conditions vest

23   federal officials with unfettered discretion to determine whether a recipient is "in compliance" without

24   reference to any objective standards.  This discretion enables the administration to wield grant funding as

25   a tool of coercion, selectively enforcing vague obligations against disfavored recipients while

26   overlooking the same conduct by others.  The ambiguity of the EO Conditions thus makes them ripe for

27   use as a mechanism of retaliation against entities that express viewpoints or pursue policies disfavored by

28   the current administration.  The absence of clear guidelines transforms the grant process, authorized by

-48-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

Congress to provide critical funding to protect public safety, public health, and local economies, into a tool of political leverage that the Executive is using to force local governments to conform to its ideological agenda.

214. Additionally, the Spending Clause requires that conditions attached to federal funds be stated "unambiguously" so that state and local governments may exercise their choice knowingly and voluntarily. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 745–50 (N.D. Cal. 2025). The EO Conditions fail this standard. Plaintiffs cannot knowingly agree to comply with all "Presidential Executive Orders related to grants" because that phrase does not inform them of what specific obligations they are undertaking, much less what obligations might be imposed in the future. A condition that operates as a moving target—changing with each new executive order—cannot satisfy the Spending Clause's prohibition of ambiguous conditions.

215. Accordingly, conditions that purport to incorporate all Presidential executive orders by reference, such as the DHS EO Condition discussed above, are unlawful and in violation of the Constitution and the APA.

### 2. The DEI Conditions Are Unlawful

216. Although the various DEI-related grant conditions differ slightly in wording, they all stem from and implement the same directive in President Trump's DEI Order. Section 3(b)(iv)(B) of the DEI Order expressly instructs each federal agency head to include "in every contract or grant award" a term requiring the contractor or grant recipient to "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. The challenged conditions mirror that mandate in substance and function. Each condition imposes a certification requirement, funding restriction, or programmatic prohibition targeting DEI-related activities, not as a neutral restatement of existing civil rights law, but as an additional condition of federal funding imposed pursuant to the DEI Order.

217. Some agencies, such as the COPS Office and the LEMHWA program, implemented the DEI Order in an unqualified and categorical manner, prohibiting the use of federal funds for any projects that "provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," regardless of whether such activities comply with federal civil rights

laws.  Other agencies purportedly limit the prohibition to DEI-related activities "that violate any applicable Federal civil rights or nondiscrimination laws."  That variation in phrasing, however, does not alter the unlawfulness of the conditions.

218.    All of the conditions, including those containing a purported qualifier, are unlawful because they do not merely require compliance with existing federal antidiscrimination statutes, which is already mandated. Instead, they impose a novel certification regime and funding condition specifically targeting programs with components relating to diversity, equity, and inclusion, and elevate that certification to a material condition of payment, often expressly invoking the False Claims Act.  In doing so, the agencies transform ordinary compliance obligations into a vague funding condition that chills lawful, protected, and congressionally authorized activities based on an executive order, not Congressional statute.

219.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the current administration's communications to federal grant recipients make clear that the agencies seek compliance with a novel, incorrect, and unsupported interpretation of federal nondiscrimination law contrary to actual nondiscrimination statutes and inconsistent with what any court has endorsed when interpreting them.

220.    The challenged DEI Conditions, although vague, clearly implicate a broader range of conduct than covered by applicable federal law.  *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 278 (D. Md.), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) ("'equity' is a concept that transcends issues of diversity, inclusion, and accessibility.  It also extends beyond areas addressed by anti-discrimination efforts and civil rights laws").  Simply placing a savings clause, such as "with applicable laws," at the end of a condition cannot cure an otherwise vague, unauthorized, or unlawful condition, nor shield it from judicial review.  *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239–1240 (9th Cir. 2018); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1278–79 (W.D. Wash. 2025).

221.    Defendants' expansive reinterpretation of nondiscrimination law is evident when compared to the prior, long-standing interpretation reflected in their regulations.  For instance, the February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil

RENNE PUBLIC LAW GROUP
Attorneys at Law

Case 3:25-cv-03698-SI    Document 116    Filed 08/06/25    Page 58 of 181

Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history.  Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (last visited February 4, 2026).

222.    Neither the text of Title VI nor any other statute enacted by Congress prohibits recipients of federal funding from considering issues of diversity, equity, or inclusion.  In fact, the opposite is true.  There are many federal laws and regulations that require recipients of federal funds to consider issues of diversity and equity.

223.    The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.  Indeed, existing case law rejects this administration's expansive views on nondiscrimination law with respect to DEI.  The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat.  Yet, the DEI Order seeks to impose his views on DEI as if they were the law by implementing funding conditions and the threat of FCA enforcement to direct and coerce recipients of federal funds into acquiescing to his administration's unorthodox legal interpretation of nondiscrimination law.

224.    Accepting these conditions would permit Defendants to threaten Plaintiffs with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with this administration's ideological agenda.  This threat is intensified by the conditions that purport to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim.  Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of.  *See* 31 U.S.C. § 3733.

225.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them.  Requiring recipients to certify that compliance "with all applicable Federal civil rights and

-51-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  nondiscrimination laws " is always "material" for purposes of FCA imposes an impermissibly vague

2  standard that is broader than the statute allows.

3      226.    The DEI Conditions also constitute arbitrary and capricious agency action in violation of

4  the APA.  Defendant agencies implementing the DEI Order failed to engage in reasoned decision

5  making, failed to consider the limits of their statutory authority, and failed to adequately explain how the

6  challenged conditions are consistent with governing civil rights statutes, longstanding agency

7  interpretations, or the purposes of the underlying grant programs.

8      227.    Accordingly, the DEI Conditions discussed above, are unlawful and in violation of the

9  Constitution and the APA.

### 3.  The Gender Ideology Conditions Are Unlawful

11      228.    The Gender Ideology Conditions improperly seek to force federal grant recipients to no

12  longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes

13  "gender ideology."  These conditions facially discriminate based on transgender status, contravening

14  antidiscrimination laws and Defendants' own regulations that prohibit discrimination based on sex.

15      229.    Both the U.S. Supreme Court and the 9th Circuit have interpreted the term "sex" in

16  discrimination contexts to encompass gender identity and transgender status.  The Supreme Court's

17  decision in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) definitively established that Title

18  VII's prohibition on sex discrimination includes discrimination against transgender individuals, holding

19  that "it is impossible to discriminate against a person for being homosexual or transgender without

20  discriminating against that individual based on sex."  *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644,

21  660 (2020).  The 9th Circuit has similarly held that "sex" and "gender" are interchangeable terms under

22  federal law and that discrimination based on gender non-conformity violates federal anti-discrimination

23  protections.  *See Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000).

24      230.    Several statutes and regulations are in conflict with the Gender Ideology Conditions.

25  Federal statute requires that regulations necessary for the guidance of personnel carrying out Federal

26  assistance functions at the site of a major disaster or emergency "shall include provisions for insuring

27  that the distribution of supplies, the processing of applications, and other relief and assistance activities

28  shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of

RENNE PUBLIC LAW GROUP
Attorneys at Law

race, color, religion, nationality, sex, age, disability, English proficiency, or economic status." 42 U.S.C. § 5151(a).

231.    Additional regulations applicable to DHS require that "[a]ll personnel carrying out Federal major disaster or emergency assistance functions, including the distribution of supplies, the processing of the applications, and other relief and assistance activities, shall perform their work in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status." 44 C.F.R. § 206.11(b).

232.    The Justice System Improvement Act provides, "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this chapter" 34 U.S.C. § 10228(c)(1).  This provision applies to all grants administered by the DOJ's Office of Justice Programs.

233.    Title IX of the Education Amendments of 1972 applies to grants that fund educational programs or activities, including grants administered by Defendants.  Under 20 U.S.C. § 1681(a), "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. §  1681.  The DOJ has implemented Title IX through comprehensive regulations at 28 C.F.R. Part 54, "which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in these Title IX regulations." 28 C.F.R. § 54.100.

234.    The Gender Ideology Condition is also vague.  The definition of "gender ideology" provided in the Gender Ideology Order is not only demeaning but also idiosyncratic and unscientific. Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who for a broad and subjective range of activities that could be seen as promoting gender ideology, such as simply complying with existing federal nondiscrimination requirements, providing services in accordance with an individual's gender identity, or using inclusive language in policies, training materials, or public communications.

-53-

RENNE PUBLIC LAW GROUP
Attorneys at Law

235.     On February 28, 2025, Judge Lauren King of the United States District Court for the Western District of Washington enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers.  See *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261-77 (W.D. Wash. 2025).

236.      Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative powers."  *Id*. at 1261.  The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people."  *Id*. at 1277 (citation omitted).

237.     The Gender Ideology Condition likewise constitutes arbitrary and capricious agency action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Agencies imposing the Gender Ideology Condition failed to engage in reasoned decision making, failed to identify any statutory authority permitting them to condition federal funding on adherence to an executive branch definition of "gender ideology," and failed to explain how the condition is consistent with governing civil rights statutes, longstanding agency interpretations, or the purposes of the underlying grant programs.  Instead, Defendants imposed a novel, ideologically driven funding restriction untethered from congressional authorization and unsupported by factual findings, rendering the condition arbitrary, capricious, and not in accordance with law.

238.     Accordingly, the Gender Ideology Conditions discussed above are unlawful and in violation of the Constitution and the APA.

**4.  The Immigration Enforcement Condition is Unlawful**

239.     Congress has not delegated to Defendants the authority to condition federal funding on a recipient's agreement to "comply with" conditions "related to coordination and cooperation" with federal immigration officials or to certify that they do not "operate any program that benefits illegal immigrants or incentivizes illegal immigration."  It is also unclear what type of conduct this might encompass,

-54-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    leaving recipients of federal funds without fair notice of what activities would violate the prohibition and

2    giving federal agencies free rein to arbitrarily enforce it.

3        240.    Nor, or does labeling the requirement as an "agency priority" cure these defects or alter its

4    substance or legal effect.  Regardless of how Defendants characterize it, the requirement operates in

5    practice as a binding condition on the receipt of federal funds, backed by the threat of grant denial,

6    termination, or enforcement action.  Conditioning funding on adherence to an agency-defined "priority"

7    related to cooperation with federal immigration enforcement has the same coercive force and legal

8    consequences as an express funding condition, yet remains unsupported by congressional authorization,

9    impermissibly vague, and susceptible to arbitrary and discriminatory enforcement.

10       241.    Multiple federal courts have already adjudicated the DHS Immigration Enforcement

11   Conditions and other materially similar conditions implemented by the Department of Transportation

12   (DOT) unlawful under the Constitution and the APA.

13       242.    In *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025), the United

14   States District Court for the District of Rhode Island held that DHS's decision to attach the Immigration

15   Enforcement Conditions to DHS-administered grants was arbitrary and capricious under the APA and

16   unconstitutional under the Spending Clause, concluding that the conditions were not reasonably related

17   to the purposes of the grants to which they were attached, were impermissibly coercive given the

18   magnitude and indispensability of the funding at stake, and were unlawfully ambiguous, depriving states

19   of clear notice of what compliance required.  The court vacated the conditions and permanently enjoined

20   federal officials from enforcing them.  Defendant DHS has appealed against that decision, which is

21   pending in the First Circuit.

22       243.    In *California v. United States Department of Transportation*, --- F. Supp. 3d ----, 2025

23   WL 3072541 (D.R.I. Nov. 4, 2025), the United States District Court for the District of Rhode Island

24   invalidated an analogous immigration enforcement conditions imposed by DOT across federal

25   transportation grants.  The court held the conditions ultra vires under the APA because no statute

26   authorized DOT to impose sweeping immigration-cooperation mandates unrelated to transportation

27   programs.  It further held the condition arbitrary and capricious for relying on factors Congress did not

28   intend DOT to consider, failing to account for state reliance interests, and imposing vague obligations.

RENNE PUBLIC LAW GROUP
Attorneys at Law

The court also held the immigration conditions violated the Spending Clause because it was not reasonably related to the federal interest in transportation programs, impermissibly coercive given the scale and indispensability of the funds, and impermissibly ambiguous because they failed to provide States meaningful notice of what cooperation entailed. The court declared the conditions unlawful, vacated them from all DOT grant agreements, and permanently enjoined DOT from implementing or enforcing them. 2025 WL 3072541, at *11–13. Initially, the DOT appealed this decision, however, on January 13, 2026, the DOT filed a motion to dismiss its appeal, conceding that these immigration conditions, as implemented by DOT, violate both the APA and the Constitution.

244. The Immigration Enforcement Condition is particularly unlawful as applied to certain grant programs, including the Office for Victims of Crime ("OVC") Human Trafficking Programs, because it directly conflicts with express statutory directives in the Trafficking Victims Protection Act ("TVPA"), 22 U.S.C. § 7105(b). Congress carefully prescribed the permissible priorities and conditions for Human Trafficking Program grants, authorizing the Attorney General to give priority only to applicants that attest grant funds will be used for enumerated anti-trafficking purposes and expressly prohibiting the use of funds to require trafficking victims to collaborate with law enforcement as a condition of access to services. 22 U.S.C. § 7105(b)(2)(D). Congress further mandated that victims of severe forms of trafficking are eligible for federal benefits and services "without regard to the immigration status of such victims," and required federal agencies to expand such benefits notwithstanding otherwise applicable immigration-related restrictions. 22 U.S.C. § 7105(b)(1)(A), (B). Conditioning OVC Human Trafficking funds on cooperation with federal immigration enforcement or on certifications concerning programs that may "benefit" undocumented individuals not only exceeds Defendants' authority but also affirmatively undermines Congress's express determination that immigration status must not be used to limit access to trafficking victim services.

245. Accordingly, the Immigration Enforcement Conditions and Immigration Priority Conditions challenged here are unlawful and in violation of the Constitution and the APA.

**F.    Plaintiffs Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services**

246. The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's

-56-

RENNE PUBLIC LAW GROUP
Attorneys at Law

choice of accepting illegal conditions that are unauthorized by Congress, violate the Constitution, and accompanied by poison pill provisions that increase the risk of FCA claims, or forgoing the grant funds—funds paid (at least partly) through local federal taxes—that are essential for vital local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

247.    The heightened FCA risk is not merely speculative.  A May 19, 2025, letter from Deputy Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws."  The letter asserts the FCA "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin."  It further states that the Civil Fraud Section and Civil Rights Division will "engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients" and "will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions."  Finally, the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that [DOJ] may consider the information and take any appropriate action."  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline (last visited February 4, 2026).

248.    The prospective loss of these federal funds would be so catastrophic to Plaintiffs' finances that the essential services they provide—including disaster preparedness, mitigation, and emergency response; wildfire and flood resilience projects; victim services; de-escalation and crisis-response training for law enforcement; community-oriented policing initiatives; and the conservation and rehabilitation of parks, open space, and water resources—would be effectively halted.  Plaintiffs cannot replace these funds with local revenue without drastically cutting other critical services or abandoning

-57-

other critical programs.  Yet agreeing to the vague, unauthorized, and contradictory grant conditions—even if Plaintiffs were to make a good faith effort to revise their policies to comply—would expose them to significant liability.  Certifying compliance with these conditions carries an intolerable risk of enforcement under the False Claims Act, and constitutional and statutory challenges from stakeholders who could assert that Plaintiffs have adopted discriminatory or otherwise unlawful policies in violation of their rights.  Plaintiffs thus face an impossible dilemma: either accept legal jeopardy by complying with the conditions or forfeit funding that is essential to the health, safety, and well-being of their residents.

1. **Plaintiffs, as Recipients of Pass-Through Funds, have a Reasonable Concern that the Challenged Conditions Apply to those Pass-Through Funds**

249.    Local government entities that receive federal grant funds may receive the funds directly from a federal agency (as a direct recipient) or indirectly from a pass-through entity (as a sub-recipient). Where a pass-through entity (for example, a state) provides federal funds to a sub- recipient (for example, a city or county within the state), the pass-through entity is responsible for ensuring the sub-recipient complies with applicable federal requirements.  *See* 2 C.F.R. § 200.332(b)(2) (pass-through entity must provide to the sub-recipient information regarding "[a]ll requirements of the subaward, including requirements imposed by Federal statutes, regulations, and the terms and conditions of the Federal award"), 200.332(e) (pass-through entity must "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward"); 2 C.F.R. § 2800.101 (incorporating 2 C.F.R. Part 200 requirements with respect to federal awards made by DOJ); 2 C.F.R. § 1402.103 (same for DOI).

250.    Consistent with 2 CFR § 200.332, the grant agreements and terms and conditions received by Plaintiffs incorporate applicable federal requirements against sub-recipients.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
*(All Grant Conditions)*

251.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

-58-

RENNE PUBLIC LAW GROUP
Attorneys at Law

252.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id*. (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

253.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

254.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id*., No. 51, at 350).

255.    "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

256.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24; *Seila Law LLC*, 591 U.S. at 227; *see also Clinton v. City of New York*, 524 U.S. 417, 450 (1998) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers" (Kennedy, J., concurring)). Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

257.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City*

RENNE PUBLIC LAW GROUP
Attorneys at Law

*& Cnty. of S.F.*, 897 F.3d at 1234.  Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.  The President has not done so.

258.    Congress has not conditioned the provision of Defendants' grants on compliance with the prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.  Nor has Congress delegated to Defendants the authority to attach the challenged conditions unilaterally.

259.    By imposing the challenged conditions on recipients of federal funds, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

260.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

261.    Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

262.    For these reasons, Defendants' conditioning of federal funds on compliance with challenged conditions violates the separation of powers doctrine.

### Count 2: Spending Clause
#### *(All Grant Conditions)*

263.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

264.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States …"  U.S. Const. art. I, § 8, cl. 1.

265.    As described above, Defendants violate the separation of powers because the challenged conditions are neither expressly nor impliedly authorized by Congress.  For the same reasons, Defendants

-60-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    violate the Spending Clause.

2         266.    The Spending Clause also requires States to have fair notice of conditions that apply to

3    federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).

4    The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v.*

5    *Murphy*, 548 U.S. 291, 296 (2006).

6         267.    Moreover, funding restrictions may only impose conditions that are reasonably related to

7    the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208

8    (1987).

9         268.    Finally, federal funds "may not be used to induce the States to engage in activities that

10   would themselves be unconstitutional." *Id*. at 210.

11        269.    Even if Congress had delegated authority to the Executive and DHS, FEMA, DOI or DOJ

12   to condition grant funding on terms prohibiting DEI and the "promot[ion]" of "gender ideology," or

13   cooperation with federal immigration enforcement, the challenged conditions would violate the Spending

14   Clause by:

15        a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

16        b.    imposing conditions that are so severe as to be coercive;

17        c.    imposing conditions that are not germane to the stated purpose of grant program funds,

18              *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are

19              unrelated 'to the federal interest in particular national projects or programs.'"); and

20        d.    with respect to the prohibition on promotion of "gender ideology," imposing a condition

21              that purports to require grant recipients to act unconstitutionally by discriminating on the

22              basis of gender identity and sex, *see id*. at 210.

### Count 3: Tenth Amendment
*(All Grant Conditions)*

25        270.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully

26   set forth herein.

27        271.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by

28   the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   people." U.S. Const. amend X.

2       272.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs

3   contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78

4   (2012). States must have a "legitimate choice whether to accept the federal conditions in exchange for

5   federal funds." *Id*. at 578.

6       273.    Even if Congress had delegated authority to the Executive or Defendants to condition

7   grant funds on any policy that "promotes" the Administration's conception of an "illegal" DEI program

8   or on participation in the Administration's enforcement of federal immigration laws, the challenged

9   conditions violate the Tenth Amendment by imposing conditions so severe as to coerce recipients of such

10  funds to adopt the Administration's reinterpretation of the law. *See id*. at 579 (Congress may not impose

11  conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

12  **<u>Count 4: Fifth Amendment Due Process – Vagueness</u>**
    *(All Grant Conditions)*

14      274.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully

15  set forth herein.

16      275.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like

17  an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair

18  notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

19  enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

20      276.    The challenged conditions are unconstitutionally vague.

21      277.    The EO Condition is vague in purporting to incorporate all executive orders. Executive

22  orders are the President's directives to federal agencies and do not apply to federal grant recipients. The

23  purported incorporation of all executive orders into the recipient or sponsor's use of grant funds renders

24  the other new grant conditions vague.

25      278.    The DEI Conditions fails to clearly define what conduct is prohibited and fails to specify

26  clear standards for enforcement. This uncertainty is amplified by agency letters and statements, that

27  conflict with federal statutes and case law.

28      279.    The Immigration Enforcement Conditions fails to define the terms it uses, including

-62-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    "cooperate," "cooperating," "impeding," "incentivize" and "enforcement" with respect to "Federal

2    immigration law," leaving federal grant recipients without fair notice of what would violate the

3    prohibition.

4         280.    The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague

5    as to require people of ordinary intelligence to guess as to what is prohibited.  By the same token, the

6    Gender Ideology Condition affords unfettered discretion to Defendants to determine, based on their

7    subjective interpretation, whether a federal grant is used to "promote gender ideology."

8         281.    Thus, the challenged conditions are unconstitutionally vague in violation of the Fifth

9    Amendment's Due Process Clause.

10               **Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2) –**

11                            **Arbitrary and Capricious**

12                           *(All Grant Conditions)*

13         282.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully

14    set forth herein.

15         283.    Defendants DHS, FEMA, DOI, and DOJ are all "agenc[ies]" as defined in the APA, 5

16    U.S.C. § 551(1).  the inclusion of the challenged conditions in the various policies and NOFOs, including

17    but not limited to, the DHS's Standard Terms and Conditions, the FY25 Homeland Security Grant

18    Program NOFO, the General Conditions for OJP Awards in FY2025, the FY25 Community Policing

19    Development Microgrants NOFO, the FY25 Safer Outcomes Enhancing De-Escalation NOFO, the FY25

20    Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects NOFO, the

21    COPS Office LEMHWA Program Award Owner's Manual, the Safer Outcomes Program Award

22    Owner's Manual, the FY25 Victims of Crime Act (VOCA) Victim Assistance Formula Grant NOFO, the

23    FY25 Victims of Crime Act (VOCA) Victim Compensation Formula Grant NOFO, FY25 Services for

24    Victims of Crime NOFO, the FY25 Paul Coverdell Forensic Science Improvement NOFO, the OVC

25    FY25 Housing Assistance for Victims of Human Trafficking NOFO, OVC FY25 Integrated Services for

26    Minor Victims of Human Trafficking NOFO, OVC FY25 Enhanced Collaborative Model (ECM) Task

27    Force to Combat Human Trafficking NOFO, the OVC FY25 Services for Victims of Human Trafficking

28    NOFO, the OVC FY25 Preventing Trafficking of Girls NOFO, and the DOI Office of Grants

RENNE PUBLIC LAW GROUP
Attorneys at Law

-63-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Management, General Award Terms and Conditions are all final agency actions subject to review under the APA.

284.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

285.    These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

286.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

287.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id*. (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action.  *Id*. at 293.

288.    Defendants have provided no reasoned explanation for their decision to impose conditions prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement on federal funds.

289.    Defendants also ignore essential aspects of the problems they purport to address via the various grant programs, including the Plaintiff's reasonable and inevitable reliance on now at-risk funds, the expectation of reimbursement from already appropriated funds, and the delaying or halting disaster mitigation projects that reduce loss of life and property, disrupting victim services that provide emergency shelter, counseling, and legal assistance to survivors of violence and exploitation, and impeding water restoration efforts necessary to protect drinking water supplies, prevent environmental contamination.

-64-

290. Furthermore, in many instances, the challenged conditions contravene the nondiscrimination laws and authorizing statutes they purport to implement.

291. Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the challenged conditions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2) –

### Contrary to the Constitution
*(All Grant Conditions)*

292. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

293. Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

294. As described above, Defendants' imposition of the challenged conditions violates bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

295. Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the challenged conditions violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2) –

### In Excess of Statutory Authority
*(All Grant Conditions)*

296. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

297. Under the APA, a "court shall … hold unlawful and set aside agency actions, findings,

-65-

RENNE PUBLIC LAW GROUP
Attorneys at Law

and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

298.   Defendants may exercise only authority granted to them by statute or the Constitution.

299.   No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

300.   No legislation authorizes Defendants to impose conditions on federal funding prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

301.   Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed grant conditions, Defendants attempt to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.

302.   Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the challenged conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.   A declaration that the DHS Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.   A declaration that Defendants' attachment or incorporation of the DHS Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

C.   A preliminary and permanent injunction enjoining DHS Defendants from imposing or enforcing the DHS Grant Conditions or any materially similar terms or conditions to any DHS funds received by or awarded to Plaintiffs, directly or indirectly;

D.   A declaration that the FEMA Grant Conditions are unconstitutional, are not authorized by

RENNE PUBLIC LAW GROUP
Attorneys at Law

statute, violate the APA, and are otherwise unlawful;

E.      A declaration that Defendants' attachment or incorporation of the FEMA Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

F.      A preliminary and permanent injunction enjoining FEMA Defendants from imposing or enforcing the DHS Grant Conditions or any materially similar terms or conditions to any DHS funds received by or awarded to Plaintiffs, directly or indirectly;

G.      A declaration that the DOI Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

H.      A declaration that Defendants' attachment or incorporation of the DOI Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

I.      A preliminary and permanent injunction enjoining DOI from imposing or enforcing the DOI Grant Conditions or any materially similar terms or conditions to any DOI funds received by or awarded to Plaintiffs, directly or indirectly;

J.      A declaration that the DOJ Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

K.      A declaration that Defendants' attachment or incorporation of the DOJ Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

L.      A preliminary and permanent injunction enjoining DOJ from imposing or enforcing the DOJ Grant Conditions or any materially similar terms or conditions to any DOJ funds received by or awarded to Plaintiffs, directly or indirectly;

M.      An order pursuant to 5 U.S.C. § 705 that postpones the effective date or any action by any Defendants to adopt, issue, or enforce the challenged Grant Conditions pending conclusion of this litigation; declares the challenged Grant Conditions void and unenforceable with respect to any application, award, agreement or other document executed by Plaintiffs; and declares that the DEI Conditions require compliance with the statutes cited therein as those statutes have been enacted by

-67-

Congress and interpreted by the judiciary.

N.     An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to:  adopt, issue, or implement the challenged Grant Conditions; require, attach, incorporate, implement, or enforce the challenged Grant Conditions at any stage of the grant process, including but not limited to any grant application or grant agreement or subagreement; construe the DEI Conditions to require anything other than compliance with the statutes cited in the DEI Conditions as they have been enacted by Congress and interpreted by the judiciary.

O.     Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiffs' participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any notice or request for payment, or reducing the amount of such approval or payment;

P.     Award Plaintiffs their reasonable costs and attorneys' fees; and

Q.     Grant any other further relief that the Court deems fit and proper.

RENNE PUBLIC LAW GROUP
Attorneys at Law

Dated: February 20, 2026

RENNE PUBLIC LAW GROUP


By: _____ */s/ Ryan P. McGinley-Stempel*_____
     RYAN P. McGINLEY-STEMPEL

Attorneys for Plaintiffs
City of Fresno; City of Redwood City; City of
Santa Clara; City of Santa Cruz; City of
Beaverton; City of Corvallis; City of Hillsboro;
City of Stockton; County of San Diego; County
of Los Angeles; County of Santa Barbara

Dated: February 20, 2026

FRESNO CITY ATTORNEY'S OFFICE


By: _____ */s/ Andrew Janz*_____
     ANDREW JANZ

Attorney for Plaintiff
City of Fresno

RENNE PUBLIC LAW GROUP
Attorneys at Law

-69-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**ECF ATTESTATION**

I, RYAN P. McGINLEY-STEMPEL, am the ECF user whose identification and password are being used to file this COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Dated:  February 20, 2026

RENNE PUBLIC LAW GROUP

By: _____ */s/ Ryan P. McGinley-Stempel* _____
     RYAN P. McGINLEY-STEMPEL

# EXHIBIT B

1  DAVID CHIU, SBN 189542
   City Attorney
2  YVONNE R. MERÉ, SBN 175394
   Chief Deputy City Attorney
3  MOLLIE M. LEE, SBN 251404
   Chief of Strategic Advocacy
4  SARA J. EISENBERG, SBN 269303
   Chief of Complex and Affirmative Litigation
5  KARUN A. TILAK, SBN 323939
   JESSE E. LANIER, SBN 303395
6  Deputy City Attorneys
   Fox Plaza
7  1390 Market Street, 6th Floor
   San Francisco, CA 94102-5408
8  Telephone: (415) 554-4223
   Facsimile: (415) 437-4644
9  E-Mail: Jesse.Lanier@sfcityatty.org

10 Attorneys for Plaintiffs
   CITY AND COUNTY OF SAN FRANCISCO
11
   *[additional counsel on signature page]*
12

13              UNITED STATES DISTRICT COURT

14           NORTHERN DISTRICT OF CALIFORNIA

15

16 CITY AND COUNTY OF SAN              Case No.  25-9277
   FRANCISCO; COUNTY OF SANTA
17 CLARA; and CITY OF TUCSON,

18         Plaintiffs,                 **COMPLAINT FOR DECLARATORY AND
                                       INJUNCTIVE RELIEF**
19         vs.

20 UNITED STATES DEPARTMENT OF
   JUSTICE; PAMELA J. BONDI, in her
21 Official Capacity; OFFICE OF COMMUNITY
   ORIENTED POLICING SERVICES; and
22 CORY D. RANDOLPH, in his official
   capacity,
23
           Defendants.
24

25

26

27

28

**INTRODUCTION**

1.     Since the mid-1990s, under the Public Safety Partnership and Community Policing Act ("COPS Statute"), Congress has authorized and appropriated more than $21 billion to be distributed as grants to local law enforcement agencies—all in service of increasing the efficacy of community policing by improving cooperative efforts between law enforcement agencies and the communities they serve.  The Department of Justice Office of Community Oriented Policing Services is charged with administering these grants.

2.     Plaintiffs the City and County of San Francisco, the County of Santa Clara, and the City of Tucson rely on grants issued pursuant to this statute ("COPS Grants") to support the vital public safety functions of their local law enforcement agencies.

3.     This year, each Plaintiff received a COPS Grant to meet critical needs for its law enforcement agencies, including grants to recruit and hire police officers in order to address serious staffing shortages and to support officers' mental health and wellness.

4.     The DOJ, however, has inserted in each of Plaintiffs' grant awards a number of unconstitutional and unlawful conditions (collectively, the "Challenged Conditions") that Plaintiffs must accept to receive the awarded funding.

5.     Specifically, these conditions require Plaintiffs to agree to and certify compliance with an interpretation of antidiscrimination law that is legally unsupported and ambiguous; agree in advance to comply with all Executive Orders and memoranda that the President has issued *and might in the future issue* to advance and impose his domestic political agenda; and agree to use funding in a manner that advances Defendants' policy goals but is at odds with the purpose of the grants.

6.     These Challenged Conditions constitute an impermissible attempt by the Executive Branch to coerce Plaintiffs into implementing certain policy objectives, in contravention of the separation of powers and other bedrock principles of the United States Constitution, settled civil rights and antidiscrimination law, the explicit terms of the COPS Statute itself, and the Administrative Procedure Act ("APA").

7.     Plaintiffs therefore face an untenable choice between, on the one hand, acquiescing to unlawful and unconstitutional conditions, and, on the other, surrendering critically-needed funds that

8.      enable their law enforcement agencies to effectively serve their communities and address the mental health needs of officers who are on the front lines of protecting public safety.

9.      Plaintiffs therefore bring this lawsuit to challenge the imposition of the Challenged Conditions on their COPS Grants.  Plaintiffs seek and are entitled to a declaratory judgment that Defendants' adoption and application of the Challenged Conditions are unlawful.  Plaintiffs also seek and are entitled to injunctive relief barring Defendants from applying or enforcing the Challenged Conditions or any materially similar conditions in connection with Plaintiffs' COPS Grant Awards. And, under the APA, Plaintiffs seek and are entitled to an order vacating and setting aside the Challenged Conditions.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 United States Code section 1331 because this is a civil action arising under the Constitution and other laws of the United States.

11.      In addition to its other remedial authorities, this Court has authority to issue declaratory relief under the Declaratory Judgment Act, 28 United States Code sections 2201-02.

12.      Venue properly lies within the Northern District of California under 28 United States Code sections 1391(b)(2) and 1391(e)(1) because Plaintiffs City and County of San Francisco and the County of Santa Clara are in this judicial district; no real property is involved in this action; and a substantial part of the events or omissions giving rise to this action occurred in this District.

## DIVISIONAL ASSIGNMENT

13.      Assignment to the San Francisco Division of this District is proper under Civil Local Rules 3-2(c)-(d) because the San Francisco Division is the Division serving San Francisco, which is where a substantial part of the events or omissions giving rise to the claims asserted below occurred, and is therefore where this action arises.

## PARTIES

### I.    Plaintiffs

14.    Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city and county.

15.    Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

16.    Plaintiff City of Tucson ("Tucson") is a municipal corporation organized and existing under the laws of the State of Arizona.

17.    Plaintiffs have standing to bring this action because Defendants' adoption and imposition of the Challenged Conditions have injured, are injuring, and will continue to injure Plaintiffs unless and until application and enforcement of the Challenged Conditions are permanently enjoined.

### II.    Defendants

18.    Defendant Department of Justice (the "DOJ") is an agency and executive department of the United States government.  It has the ultimate responsibility for implementing the federal grant programs at issue in this action.  The DOJ is an "agency" within the meaning of the APA, United States Code section 701(b)(1).

19.    Defendant Pamela Bondi is the Attorney General of the United States.  She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of the DOJ, including the Office of Community Oriented Policing Services, which administers the grants at issue in this lawsuit, except to the extent such activities are nondelegable by law.

20.    Defendant Office of Community Policing Services ("COPS Office") is an agency of the federal government within the DOJ.  It is the component of the DOJ responsible for advancing the practice of community policing by the nation's state, local, territorial, and tribal law enforcement agencies through information and grant resources.  The COPS Office oversees the administration of

the federal grant programs at issue in this lawsuit.  The COPS Office is also an "agency" within the meaning of the APA, 5 United States Code section 701(b)(1).

21.     Defendant Cory D. Randolph is the Acting Director of COPS.  He is sued in his official capacity, in which capacity he is responsible for administering all duties and programs of COPS, except to the extent such activities are nondelegable by law.

## FACTUAL ALLEGATIONS

### I.     Congress Creates COPS Grants to Aid Local Law Enforcement in Community Policing

22.     In 1994, Congress enacted the Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, Title I, Sept. 13, 1994, 108 Stat. 1807 ("COPS Statute"), with the goal of "increas[ing] the number of law enforcement officers interacting directly with members of the community" and improving "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community."  Pub. L. No 103-322 at § 10002, 108 Stat. at 1807.

23.     To this end, the statute authorized the DOJ to make grants to states and localities to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety."  Pub. L. No 103-322 at § 10002,108 Stat. at 1808.  Congress enumerated twenty-four purposes for which grants may be made, including, as relevant here, "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(2).  In 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, Jan. 10, 2018, 131 Stat. 2276 ("LEMHWA"), with the goal of "provid[ing] support for law enforcement agency efforts to protect the mental health and well-being of law enforcement officers."  131 Stat. at 2276.  LEMHWA amended the COPS Statute to add the following purpose for which COPS Grants may be made: "to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies."  34 U.S.C. § 10381(b)(24).

24.     The COPS Statute also sets out various requirements for applications for grant funding, including that applicants must "provide assurances that the applicant will, to the extent practicable,

1    seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase

2    their ranks within the sworn positions in the law enforcement agency."  34 U.S.C. § 10382(c)(11).

3            25.    The DOJ administers COPS Grants through the COPS Office.  The COPS Office

4    manages several types of COPS Grants each year.  Plaintiffs in this case received three grants, the

5    COPS Hiring Program grant ("Hiring Grant"), Community Policing Development Microgrant Program

6    ("COPS Microgrants"), and Law Enforcement Mental Health and Wellness Program Grant ("Mental

7    Health Grant").

8            26.    The Hiring Grant "furthers the COPS Office's goal of advancing public safety through

9    community policing by funding additional full-time career law enforcement positions to meet law

10   enforcement agencies' community policing strategies."  FY2025 Hiring Grant Notice of Funding

11   Opportunity Guide ("NOFO") ("Hiring Grant NOFO") at p. 1, available at https://cops.usdoj.gov/

12   pdf/2025ProgramDocs/chp/nofo.pdf [https://perma.cc/L4CV-3LZL].  The DOJ describes community

13   policing as "a philosophy that promotes organizational strategies that support the systematic use of

14   partnerships and problem-solving techniques to proactively address the immediate conditions that give

15   rise to public safety issues such as violent crime, nonviolent crime, and fear of crime."  *Id.* at p. 6.

16           27.    Hiring Grants accomplish this goal by "provid[ing] funding directly to law enforcement

17   agencies to hire and/or rehire career law enforcement officers in an effort to increase their community

18   policing capacity and crime prevention efforts."  Hiring Grant NOFO at p. 10.  Hiring Grants fund the

19   salary and fringe benefits for new or re-hired full time officers for up to a three-year period.  *Id.* at p.

20   12.

21           28.    The DOJ's COPS Microgrants "fund novel or innovative approaches to problem

22   solving by local, state, tribal, and territorial law enforcement agencies that help develop law

23   enforcement's community policing capacity through the implementation of commonsense policing

24   strategies."  FY25 COPS Microgrants Program Notice of Funding Opportunity Guide ("COPS

25   Microgrant NOFO") at p. 8, available at https://cops.usdoj.gov/pdf/2025ProgramDocs/cpdmicrogrants/

26   nofo.pdf [https://perma.cc/ZAC9-TNM7].  There are several available subcategories of COPS

27   Microgrants, including Uplifting the Image of the Law Enforcement Profession and Officer

28   Recruitment, Hiring, and Retention.  *Id.* at p. 9.  The COPS Microgrants program also allows law

enforcement agencies to propose projects "that offer highly innovative solutions" to "complex, locally identified community issues" that do not "fit within other identified microgrant categories." *Id* at p. 13.

29.     The COPS Microgrant Program funds grants that advance community policing in seven different engagement areas, one of which is "officer recruitment, hiring, and retention" ("Recruitment Microgrant"). These Recruitment Microgrants recognize that "the recruitment, selection, and retention of officers and deputies are among the most important elements to advancing community policing within an agency." COPS Microgrant NOFO at p. 10. To that end, the grant program seeks to further the ability of law enforcement agencies to "attract and retain the best law enforcement candidates who represent a variety of backgrounds, knowledge, and experiences," and "reflect[] the communities they serve." *Id*. It does this by providing funding for "innovative approach[es] to recruiting and hiring [] law enforcement officers, such as ways of reaching new talent pools or engaging with candidates who may not have previously considered working in law enforcement." *Id*. at p. 11.

30.     The Mental Health Grant "prioritizes wellness by providing resources to law enforcement agencies to support mental health and wellness efforts." FY25 LEMHWA Notice of Funding Opportunity Guide ("LEMHWA Grant NOFO") at p. 7, available at https://cops.usdoj.gov/ pdf/2025ProgramDocs/lemhwa/nofo.pdf [https://perma.cc/Z7QJ-9XNP]. COPS Mental Health Grants fund "the delivery of peer support, training, family resources, suicide prevention, stress reduction, clinical support, and other promising practices for wellness programs" for a two-year period. *Id*. at pp. 8–9.

31.     The DOJ's objectives for Mental Health Grant awards include increasing law enforcement agency capacity (1) "to provide mental health and wellness training and resources for employees of law enforcement agencies and their families," (2) "to implement peer support networks for crisis and non-crisis circumstances," and (3) "to address and reduce the stigma associated with officer mental health and wellness by supporting the implementation of mental health education and development of resources." LEMHWA Grant NOFO at p. 7. According to the DOJ, "[m]ental and psychological health is as essential as physical health for law enforcement officers to effectively keep communities safe from crime and violence," and prioritizing officer wellness results in "a more

compassionate, effective, and resilient workforce that fosters a safer environment for both officers and the communities they serve." *Id.*

## II.    Plaintiffs Apply for and Receive COPS Grants to Address Critical Public Safety Needs

32.    On March 15, 2025, Congress passed the Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, Mar. 15, 2025, Div. A Tit. III Sec. 1302, 139 Stat. 9, allocating more than $417 million to the COPS Office.

33.    In May of 2025, pursuant to that appropriation, the DOJ issued NOFOs for the FY25 Hiring Grant, the FY25 Mental Health Grant, and the FY25 COPS Microgrant.

### A.    The San Francisco Police Department Applies for and Receives the Hiring Grant to Address Critical Staffing Needs

34.    The San Francisco Police Department ("SFPD") is a department of the City and County of San Francisco and is the municipal local law enforcement agency with primary law enforcement authority for the public safety of the over 800,000 residents and thousands of visitors in San Francisco.

35.    Adequate staffing—particularly for sworn peace officers authorized to enforce laws and make arrests ("sworn officers")—is essential to SFPD's ability to meet its core public safety function and deliver just, transparent, unbiased, and responsive policing for the community.

36.    SFPD's recommended staffing level to meet its current operational needs is 2,257 sworn officers.  However, for several years, SFPD has faced critical staffing shortages.  For example, in June 2025, SFPD was over 690 sworn officers short of its recommended staffing level (a deficit of approximately 30%).  To make up for this gap, SFPD has largely relied on overtime to meet the public safety needs of the city, which is both more costly for the City and more burdensome on SFPD officers.

37.    This year, San Francisco has prioritized increasing staffing levels for SFPD and other local public safety agencies, and SFPD has made significant progress toward recruiting and retaining new sworn officers.  These efforts have produced impressive results: the City has seen a decline in crime over 2025, with violent crime down by 18 percent and property crime falling by 28 percent.

38.    Ensuring that there is adequate funding to hire and retain officers is a priority for SFPD and San Francisco.  COPS Hiring Grants have played a vital role in ensuring that SFPD can continue

to hire qualified officers to meet its staffing needs and fulfill its public safety mission.  For example, in the fiscal year that ended June 30, 2021, the City received a $6.25 million Hiring Grant.  The grant funded the salaries and fringe benefits of fifty entry-level officers.  Several of these officers were assigned to the Field Operations Bureau, which is responsible for frontline policing and community engagement, including responding to emergency calls, conducting routine patrols, and enforcing traffic laws.

39.    In 2025, SFPD once again applied for a Hiring Grant to help the Department fund fifty sworn officer positions.  The need for Hiring Grants is particularly acute this year because San Francisco faces a difficult financial outlook.  For the budget cycle for fiscal years 2025 through 2027, the City had to close a $800 million deficit.  While the budget did not cut funding for sworn staff at SFPD, outside funding—including from COPS Hiring Grants—is an essential part of the Department's goal of reaching full staffing levels.

40.    SFPD submitted its application for a Hiring Grant on June 27, 2025.  On October 10, 2025, COPS approved SFPD's Hiring Grant application for $6.25 million for the payment of the salaries and fringe benefits of fifty officers and sent to SFPD a Pre-Acceptance Award Package ("SFPD Hiring Grant Award").  *See* Ex. 1 (SFPD Hiring Grant Award).  The SFPD Hiring Grant Award, among other things, reiterates the purpose of the Hiring Grant program, lists the terms and conditions that SFPD must agree to in order to accept the grant, and describes the mechanics under which the grant funds must be drawn down, expended, and documented by SFPD.

### B. The Tucson Police Department Applies for and Receives the COPS Microgrant to Recruit Qualified Applicants

41.    The Tucson Police Department ("TPD") is a department of the City of Tucson and is the municipal local law enforcement agency with primary law enforcement authority for the public safety of the approximately 550,000 residents of Tucson.  Funding from the DOJ is a critical resource for the department.

42.    Over the past four years, TPD has expended an average of $12.4 million annually in DOJ grant funding.  For the fiscal year that ended June 30, 2025, TPD spent $13.2 million in DOJ

1  grant funds, which was almost $2 million more than its entire general-fund allocation for non-
2  personnel expenses.

3       43.     Adequate staffing, particularly for sworn officers, is essential to TPD's ability to meet
4  its core public safety function and to deliver just, transparent, unbiased, and responsive policing for the
5  community.  But filling these positions is challenging.  As of June 30, 2025, only 772 of the 871
6  authorized positions for sworn personnel were filled, and there were 181 officers eligible to retire.
7  TPD received a $6.25 million Hiring Grant in 2024, to be used for salaries and fringe benefits for
8  sworn officers over a five-year period.  With this boost to TPD's hiring capacity, TPD is now focusing
9  on maximizing the efficacy of its recruitment efforts.

10       44.     On June 30, 2025, TPD applied for a Recruitment Microgrant to help TPD expand its
11  recruiting footprint across the United States and "recruit[] a candidate pool from diverse
12  backgrounds."  *See* Ex. 2 (TPD Recruitment Microgrant Award) at p. 4.  The Recruitment Microgrant
13  was also sought to strengthen internal talent pipelines, including TPD's Pathway to Policing program,
14  which provides a pathway for non-sworn personnel, such as Community Service Officers and
15  Professional Staff Investigators, to become sworn officers.  *Id.*  These internal advancement programs
16  help TPD to effectively mentor and retain these valuable employees.  *Id.*

17       45.     On October 10, 2025, the DOJ awarded TPD the requested Recruitment Grant in the
18  amount of $175,000 and sent to TPD a Pre-Acceptance Award Package ("TPD Recruitment
19  Microgrant Award").  *See* Ex. 2.  The TPD Recruitment Award Package, among other things,
20  reiterates the purpose of the COPS Microgrants program, lists the terms and conditions that TPD must
21  agree to in order to accept the grant, and describes the mechanics under which the grant funds must be
22  drawn down, expended, and documented by TPD.

23
24  ### C.  The County of Santa Clara's Office of the Sheriff Applies for and Receives a COPS Mental Health Grant to Support Staff Wellness, Engagement, and Retention

25       46.     Santa Clara's Office of the Sheriff ("SCCSO") is a department of the County of Santa
26  Clara and serves the entire Santa Clara County area, home to approximately 1.9 million residents.
27  SCCSO enforces state and local criminal laws in the unincorporated areas of the county, which total
28  approximately 600 square miles; serves as the municipal police department under contract with three

COMPLAINT FOR DECLARATORY AND     10     n:\cxlit\li2025\260341\01878564.docx
INJUNCTIVE RELIEF; CASE NO.

1    cities in the county; offers law enforcement services under contract to Stanford University, the Santa

2    Clara County Superior Court, the Valley Transportation Authority, and other local agencies; offers

3    regional investigative support with criminal investigations carried out by other law enforcement

4    agencies at the local, state, and federal levels; and is responsible for the safety and care of the

5    incarcerated population housed in the County of Santa Clara's two jails.

6          47.    SCCSO is committed to building a resilient, mission-ready workforce through a

7    comprehensive wellness strategy that supports both fitness for duty and long-term quality of life.

8    Consistent with this commitment, SCCSO operates a suite of wellness programs that address physical

9    needs—like nutrition, exercise, sleep, and chiropractic care—as well as mental and emotional needs—

10    like confidential peer support for crisis intervention.

11          48.    This year, SCCSO has prioritized expanding its programming for mental and emotional

12    wellness.  The continuing effects on staff of recent critical incidents—especially the 2021 mass

13    shooting at a Valley Transportation Authority rail yard in the City of San José, at which SCCSO

14    deputies were first responders, and which killed ten people—have reinforced SCCSO's focus on

15    employees' mental and emotional wellness.  Moreover, data from Santa Clara's Employee Assistance

16    Program show that, relative even to other law enforcement agencies, SCCSO's staff underutilize the

17    mental health services available to the broader county workforce, suggesting a need for culturally-

18    tailored, trust-based interventions for law enforcement.  These interventions are essential to staff

19    engagement and retention.

20          49.    On June 24, 2025, SCCSO submitted its application for the Mental Health Grant.

21    SCCSO sought funding for critical wellness programming for the next two years, including (1) a

22    secular chaplain to offer emotional, moral, and spiritual support to deputies, professional staff, and

23    their families, serving people of any or no faith; (2) Courageous Heart training sessions to high-risk

24    SCCSO personnel, including those working in or exposed to Special Weapons and Tactics, sex crimes,

25    and in-custody mental health services, and those close to retirement; and (3) a pilot wellness-check

26    program conducted by licensed therapists.

27          50.    On October 10, 2025, COPS approved SCCSO's Mental Health Grant Application for

28    $200,000 to fund, among other things, a chaplain, Courageous Heart training sessions, and a pilot

wellness-check program, and sent to SCCSO a Pre-Acceptance Award Package ("Mental Health Grant Award"). *See* Ex. 3 (SCCSO Mental Health Grant Award). The Mental Health Grant Award, among other things, reiterates the purpose of the Mental Health Grant, lists the terms and conditions that SCCSO must agree to in order to accept the grant, and describes the mechanics under which the grant funds must be drawn down, expended, and documented by SCCSO.

## III. The DOJ Inserts Unlawful and Unconstitutional Conditions into Plaintiffs' Grant Awards

51. Plaintiffs' grant awards—the SFPD Hiring Grant Awards, the TPD Recruitment Microgrant Award, and the SCCSO Mental Health Grant Award—set out between thirty-nine and forty-two numbered conditions ("Grant Award Conditions") that SFPD, TPD, and SCCSO must each accept in order to receive the much-needed funds. These Grant Award Conditions, in turn, incorporate by reference several other DOJ documents, conditioning Plaintiffs' acceptance of grant awards on compliance with their terms. Plaintiffs' deadline to agree to the Grant Award Conditions is November 24, 2025.

52. Included in the Grant Award Conditions for all three types of grants are two sets of conditions that are arbitrary, vague, contradictory, and impose requirements unrelated to the purpose of the COPS Grants and in contravention of Congressional intent and authorization: (1) the Discrimination Condition (described in Part III.A below) and (2) the EO Condition (described in Part III.B below).

53. In addition, the NOFOs for all three grants each include a Federal Funding Restriction that purports to prohibit the use of awarded grant funds for various purposes that are ambiguous and contrary to the goals of the COPS Grants (addressed in Part III.C, below).

54. The Discrimination Condition, EO Condition, and Federal Funding Restriction constitute the unlawful and unconstitutional Challenged Conditions from which Plaintiffs seek relief in this case.

### A. The Discrimination Condition

55. Condition 3 of the Grant Award Conditions (the "Discrimination Condition") requires that, by accepting the grant, a Plaintiff or other grantee "certifies that it does not operate any program

(including any such programs having components relating to diversity, equity, and inclusion) that violates any applicable Federal civil rights or antidiscrimination laws." Ex 1 (SFPD Hiring Grant Award) at p. 6; Ex. 2 (TPD Recruitment Microgrant Award) at p. 6; Ex. 3 (SCCSO Mental Health Grant Award) at p. 6. This condition further requires that each Plaintiff or grantee "agrees that its compliance with all applicable Federal civil rights and antidiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for the purposes of the False Claims Act (31 U.S.C. §§ 3729-3730 and 3801-3812)." Ex. 1 at p 5; Ex. 2 at p. 7; Ex. 3 at p. 7.

56.     While Plaintiffs have routinely certified compliance with federal antidiscrimination laws as a condition of federal funding in the past, Defendants have thrown into doubt the well-established meaning of such a certification. The DOJ has issued guidance that purports to describe what antidiscrimination law requires, but, in fact, this guidance advances an ideological agenda that presents a contradictory, ambiguous, and legally unsupported distortion of federal antidiscrimination law as prohibiting any program or activity that takes into account or encourages diversity, equity, inclusion. The Discrimination Condition therefore purports to substitute the Executive's policy preferences for both Congress's enactment of antidiscrimination law and the judiciary's authoritative interpretations of those laws.

57.     Defendants' effort to impose their unsupported view of anti-discrimination law through the Discrimination Condition also throws into doubt a series of other related Grant Award Conditions that require recipients to comply with various civil rights and antidiscrimination laws (collectively the "Civil Rights Conditions").[1] For example, Condition 8 requires that recipients comply with "terms and conditions in the applicable award year COPS Office Program Award Owner's Manual" ("Award Owner's Manual") and the DOJ Grants Financial Guide ("Financial Guide"). *See, e.g.*, Ex. 1 at p. 6; Ex. 2 at p. 6; Ex. 3 at p 7. The Award Owner's Manual and Financial Guide, in turn, require

---

[1] For avoidance of doubt, the Civil Rights Conditions are not among the Challenged Conditions (which are the Discrimination Condition, EO Condition, and Federal Funding Restriction). However, as discussed below, because the Discrimination Condition and EO Condition throw into doubt the meaning of the Civil Rights Conditions, Plaintiffs request that any relief with respect to the Discrimination and EO Conditions clarify that references to statutes in the Civil Rights Conditions mean those statutes *as enacted by Congress and interpreted by the judiciary*.

compliance with federal antidiscrimination law.  *See, e.g.*, 2024 COPS Hiring Program Award

Owner's Manual at pp. 8-9, 62, available at https://cops.usdoj.gov/pdf/2024AwardDocs/chp/AOM.pdf

[https://perma.cc/P39E-JBC6]; 2024 LEMHWA Program Award Owner's Manual, at pp. 22-23, 62

available at https://cops.usdoj.gov/pdf/2024AwardDocs/lemhwa/AOM.pdf [https://perma.cc/FPB5-

4E46]; 2024 COPS Microgrant Program Award Owner's Manual at pp. 22-23, 62,

https://cops.usdoj.gov/pdf/2024AwardDocs/cpd/AOM.pdf [https://perma.cc/P66L-MEJ2];[2] Financial

Guide at p. 5, available at https://www.ojp.gov/doj-financial-guide-2024 [https://perma.cc/JV2H-

B7CE].  Condition 9 requires each Plaintiff to comply with "applicable federal civil rights and

antidiscrimination statutes and regulations."  Ex. 1 at p. 6; Ex. 2 at p. 7; Ex. 3 at p. 7.  And Condition

15 requires each Plaintiff to reaffirm its agreement to comply with the assurances and certifications

that are part of the application process, including compliance with federal civil rights and

antidiscrimination law and the COPS Statute.  Ex. 1 at p. 11; Ex. 2 at p. 11; Ex. 3 at p. 11.

58.     In a vacuum, the Civil Rights Conditions do not pose constitutional concerns, and

Plaintiffs do not challenge the federal government's authority to include the Civil Rights Conditions in

grant agreements.  However, Plaintiffs now face significant uncertainty as to what these conditions

mean.  As described below, actions taken by the Trump administration, including by Defendant Bondi,

demonstrate that Defendants have adopted a contradictory and legally unsupported interpretation of

federal civil rights and antidiscrimination statutes and caselaw.  This incorrect interpretation is

reflected in the Discrimination Condition—which could be read to suggest that any program "having

components relating to diversity, equity, and inclusion" violates Federal civil rights or

antidiscrimination laws—and casts doubt on the meaning of the Civil Rights Conditions.

59.     This uncertainty is further exacerbated because Plaintiffs must stipulate that compliance

with antidiscrimination law is material for purposes of the federal False Claims Act—which threatens

to expose Plaintiffs to significant penalties for conditions that have been rendered unascertainable by

---

[2]Notwithstanding Condition 8's requirement that grantees comply with the Award Owner's Manual
for the "applicable award year," an Award Owner's Manual for FY2025 was not provided with the
Grant Awards, and Plaintiffs have been unable to locate a FY25 Manual.  This further exacerbates the
problem that Plaintiffs must agree to terms they have not seen.  Plaintiffs reserve the right to challenge
additional unlawful or unconstitutional provisions of the FY2025 Award Owner's Manual once it
becomes available.

Defendants' unsupported pronouncements on what antidiscrimination and civil rights laws require. Thus, any relief with respect to the Discrimination Condition (and the EO Condition, discussed in Part III.B) must also clarify that references to antidiscrimination and civil rights statutes (such as in the Civil Rights Conditions) mean those statutes as enacted by Congress and interpreted by the judiciary, such that it would not be a violation of those conditions for a grantee to take actions that comply with the law as interpreted by the courts, even if those actions run counter to the Executive's view of those laws.

60. Since his inauguration, President Trump has issued a series of executive orders ("EOs") purporting to target any program that advances diversity, equity, and inclusion goals. For example, he issued orders directing all federal agencies to "terminate . . . 'equity-related grants'"—without defining "equity-related" or even "equity"—and to require grant recipients to certify that they do not operate any programs "promoting" diversity, equity, inclusion, and accessibility "that violate any applicable Federal antidiscrimination laws" in all grant terms.[3] Going further, President Trump recently ordered that discretionary grant awards must "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" whatever the Trump administration may deem to be "racial preferences or other forms of racial discrimination by the grant recipient."[4]

61. On July 29, 2025, after each of the Plaintiffs submitted their Applications, Attorney General Bondi issued a memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" ("July Bondi Memo"). The July Bondi Memo purports to "clarif[y] the application of federal antidiscrimination laws" and indicates that the guidance is applicable to all "[e]ntities that receive federal financial assistance . . . including . . . state and local governments." Ex Ex. 4 (July Bondi Memo) at p. 1.

---

[3] Ending Radical and Wasteful Government DEI Programs and Preferencing, Executive Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Executive Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[4] Improving Oversight of Federal Grantmaking, Executive Order No. 14,332, 90 Fed. Reg. 38929 (Aug. 7, 2025).

62.     But, in fact, the July Bondi Memo effectively casts any diversity, equity, and inclusion ("DEI") program as discriminatory.  More specifically, the July Bondi Memo asserts that practices and policies designed to support historically marginalized groups—including training and educational programs, scholarships, and hiring and application policies—are, under the Trump administration, unlawful and discriminatory.  *See* Ex. 4 at pp. 4-8 (classifying as unlawful training programs that purportedly "stereotype individuals" by discussing concepts such as racial privilege and "toxic masculinity;" hiring practices that "prioritize[s] candidates from 'underrepresented groups' for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups," requirements that candidates demonstrate "cultural competence" or "cross-cultural skills," and policies that "set[] racial benchmarks or mandate[] demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from 'diverse' backgrounds.").

63.     In many respects, the July Bondi Memo contradicts judicial interpretation of antidiscrimination laws.  For example, the Memo goes so far as to assert that even the use of "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics."  Ex. 4 at p. 2.  That assertion is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race."  *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)).  The July Bondi Memo also asserts that funding recipients "should affirm sex-based boundaries rooted in biological differences," Ex. 4 at p. 6, contrary to Supreme Court precedent applying Title VII sex-based protections to transgender people. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 662, 670 (2020).

64.     The July Bondi Memo's proscriptions are not only inconsistent with settled statutory and decisional civil rights and antidiscrimination law; they also flatly contradict the explicit and unambiguous text of the COPS Statute.  In enacting the COPS Statute, Congress specified that applicants for COPS Grants must "provide assurances that the applicant will, to the extent practicable,

seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." *See* 34 U.S.C. § 10382(c)(11). Indeed, Condition 8 of Plaintiffs' COPS Grant Awards (one of the Civil Rights Conditions) specifically requires Plaintiffs and other grantees to comply with the COPS Statute, including the requirement under 34 U.S.C. § 10382 to "seek, recruit, and hire qualified members of racial and ethnic minority groups" in order to increase their representation in the ranks of sworn officers. Ex. 1 at p. 6; Ex. 2 at p. 6; Ex. 3 at p. 7.

65. Defendants have usurped both the legislative and judicial functions by weaponizing the Discrimination Condition and the Civil Rights Conditions to attempt to impose the Executive's unsupported view of what these laws mean.

66. Plaintiffs now face the risk that, in certifying compliance with these conditions, they are certifying compliance with these laws not as written by Congress and interpreted by the courts, but as reconceptualized by the Executive Branch.

67. As a practical matter, the Discrimination Condition also makes it impossible for Plaintiffs to comply, on the one hand, with the guidance of the July Bondi Memo and, on the other hand, with the actual mandates of settled federal civil rights and antidiscrimination law and the text of the COPS Statute (which expressly contemplates hiring that takes into account race and sex). The Discrimination Condition and the Civil Rights Conditions—when read in the context of the July Bondi Memo—raise the very real possibility that Plaintiffs will face crushing civil and criminal penalties if they use their awarded COPS Grants funds in the manner in which Congress intended. And, as discussed further below, Defendants have only ratcheted up the stakes of this conundrum by attempting to require Plaintiffs to concede materiality for purposes of the False Claims Act in order to accept the grant.

## B. The EO Condition

68. The EO Condition likewise imposes practical and legal impossibilities on Plaintiffs.

69. As a general matter, EOs express general policy and/or are addressed to the Executive Branch of the federal government. EOs do not by their terms apply to, or impose any requirements on,

federal grant recipients. Nor do EOs have the power to attach conditions on the receipt of federal funds appropriated by Congress or to reinterpret law contrary to the judiciary.

70. The EO Condition (numbered Condition 4) of the Grant Awards requires Plaintiffs to "comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President." Ex. 1 at p. 6; Ex. 2 at p. 6; Ex. 3 at p. 6.

71. The requirement that Plaintiffs "comply with all applicable federal laws" on its face includes federal civil rights and antidiscrimination law as well as the COPS Statute. As alleged above, it is impossible for Plaintiffs to so comply while at the same time hewing to the guidance of the July Bondi Memo, which purports to reinterpret civil rights and antidiscrimination law.

72. Further, the EO Condition lacks any limiting principle. Its language could be read to require Plaintiffs to comply *not only* with existing EOs having nothing whatsoever to do with the COPS Grants *but also* with EOs yet to be issued, EOs that have been enjoined as unlawful or unconstitutional, or EOs that run contrary to the COPS Statute.

73. What's more, the EO Condition requires compliance with the directives of "Presidential Memoranda," a term that is entirely undefined in the context of the Award Packages.[5] In other words, there is no way for Plaintiffs to know whether the Trump Administration considers any particular document to be a Presidential Memoranda with provisions to which Plaintiffs must adhere.

74. In the first ten months of his current term, President Trump has issued more than 200 EOs and dozens of directives labeled as "Presidential Memoranda." As discussed above, several of these EOs have targeted so-called "diversity, equity, and inclusion" programs and advanced the Administration's unsupported and unlawful interpretation of anti-discrimination law. As such, Plaintiffs face considerable uncertainty about the meaning of the Discrimination Condition and Civil Rights Conditions in the Grant Awards. But the President's EOs and directives also cover a vast swath of the President's other ideological and policy preferences, including on the economy, education, energy, national security, medical policy, and federal government operations. There is no

---

[5] The White House's official website has subpages for Presidential Actions, including "Executive Orders" and "Presidential Memoranda," *see* https://www.whitehouse.gov/presidential-actions, but the Award Package does not refer to or incorporate this resource by reference.

way to predict whether the President will issue additional EOs or directives that the Administration will contend are "Presidential Memoranda," much less how frequently or when he will issue such EOs and Memoranda, or the subject matters or scope of new EOs and Memoranda. And Plaintiffs have no way of knowing which of the myriad current or future EOs Orders and Memoranda will be deemed "applicable" to an awarded grant.

75. Plaintiffs cannot voluntarily and knowingly agree to terms they cannot ascertain, terms that do not yet exist, or terms that have been enjoined as unlawful or may prove to be unlawful or unconstitutional. Nor can the DOJ compel them to do so. Moreover, neither the DOJ nor the COPS Office has provided a reasoned explanation or basis why the EO Condition should control how COPS Grants are distributed and used by local law enforcement. Indeed, the EO Condition effectively allows Defendants to legislate by Executive fiat through the incorporation of EOs and Memoranda that have no basis in, or connection to, the COPS Statute or COPS Grants.

### C. The Federal Funding Restriction

76. Finally, the NOFOs for each of the three types of COPS Grant at issue in this case include a section entitled "Federal Funding Restrictions" that purports to prohibit the use of COPS Office funding for various purposes that the Administration does not support, including (1) directly or indirectly supporting educational institutions "[requiring] students to have received a COVID-19 vaccination to attend any in-person education program," (2) promoting "gender ideology," (3) supporting "projects that provide or advance diversity, equity, inclusion, and accessibility or environmental justice programs, services, or activities," and (4) state and local governments and law enforcement agencies "that have failed to protect public monuments, memorials, and statues." *See* COPS Hiring Grant NOFO at p. 15; COPS Microgrant NOFO at p. 22; LEMHWA Grant NOFO at p. 15.

77. Defendants have provided no authority for the source of these purported funding restrictions, nor do they have any basis in the COPS Statute or any connection to providing support for community policing. With respect to the restriction on using funds for projects that advance "diversity, equity, inclusion, and accessibility," to the extent this policy preference is discernible, it is directly contrary to the intent of the COPS Statute, which requires applicants for grants to assure they

will "seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11). To the extent that the policy preference for opposing accessibility in particular is discernable, it is also contrary to LEMHWA's intent "to protect the mental health and well-being of law enforcement officers."

78. The condition prohibiting the use of grant funds "to promote gender ideology" does not define what the term "gender ideology" means. Nor, for that matter, does this condition make clear what it means to "promote" gender ideology. But, to the extent that "gender ideology" has the meaning ascribed by the President,[6] this restriction could be read to bar law enforcement agencies' use of LEMHWA grants to address the needs of any officer experiencing gender dysphoria—despite the fact that Congress enacted no such restriction in authorizing LEMHWA grants to address law enforcement officers' mental health and wellness.

79. Similarly, it is entirely unclear what it would mean to "directly or indirectly" support an educational institution that requires COVID-19 vaccines, or how that bears on any of the Congressional purposes enumerated in the COPS Statute. For example, if funds under the Recruitment Microgrant were used to fund a job fair at a school or university with a COVID-19 vaccine requirement, a law enforcement agency would run the risk that such use would be deemed to violate the Federal Funding Restriction—even though the purpose of the grant is to enhance the department's recruiting efforts. The final condition in the Federal Funding Restriction—related to failure to protect public monuments—is similarly ambiguous and untethered to the purpose of the COPS Statute.

80. The Federal Funding Restriction therefore represents yet another attempt to improperly impose Executive policy preferences that Congress has not sanctioned.

---

[6] *See* Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government ,Exec. Order No. 14,168 §3(g),  90 Fed. Reg. 8,615 (Jan. 20, 2025)

**IV.    Plaintiffs Face a Hobson's Choice Between Acceding to Defendants' Unlawful Conditions and Giving Up Sorely-Needed Public Safety Funding**

81.    The Challenged Conditions put Plaintiffs in an impossible position.  If Plaintiffs accept the sorely-needed grant funding in order to meet critical local law enforcement needs, they put themselves at risk of civil and criminal penalties in the event that Defendants attempt to exploit the ambiguities and contradictions of the Challenged Conditions.  If Plaintiffs reject the Challenged Conditions and thereby give up their COPS Grants, they must either forgo important staffing and officer wellness initiatives or reallocate funding from other critical public safety activities in order to fill the gap.  The dilemma is unconstitutional, and it inflicts substantial budget uncertainty on Plaintiffs.

82.    This Hobson's choice is particularly acute because Defendants have crafted the conditions to expose Plaintiffs to considerable liability if they engage in actions consistent with the COPS Statute and the judiciary's authoritative interpretation of federal civil rights and antidiscrimination law, but which run afoul of Defendants' policy agenda.

83.    Not only do Plaintiffs face a loss of funding if they cannot meet the DOJ's impossible and contradictory conditions, *see* Ex. 1 at p. 8 (Condition 12); Ex. 2 at p. 8; Ex. 3 at pp. 8-9; but Plaintiffs also face the threat of liability under the False Claims Act.  That statute imposes substantial civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a).   If a Plaintiff is found liable, it faces potential treble damages, which could result in a judgment far exceeding the amount of federal funds received in the first place. What is more, the same conduct—presentation of a false or fraudulent claim material to the federal government's issuance of payment—may also give rise to criminal liability, including up to five years' imprisonment. 18 U.S.C. § 287.

84.    Defendants have clearly communicated their intent to use the False Claims Act as a cudgel to impose their interpretation of antidiscrimination law under the guise of enforcing the Discrimination Condition and perverting the meaning and effect of the Civil Rights Conditions.  On May 19, 2025, the DOJ announced the creation of a "Civil Rights Fraud Initiative"—co-led by the DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the False Claims Act to

investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws"—or, more accurately, the Administration's reimagining thereof as reflected in the July Bondi Memo.  The DOJ's announcement asserts that the False Claims Act "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin."  It further states that "[t]he Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients."[7]

85.    The DOJ reaffirmed this threat to weaponize the False Claims Act on June 11, 2025 when Assistant Attorney General Brett Shumate announced his intent to dedicate "all available resources" of the DOJ Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices" and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws."[8]

86.    This threat is only underscored by the requirement that Plaintiffs agree to a condition stating that compliance with antidiscrimination law is "material" for purposes of the False Claims Act.  *See* Ex. 1 at pp. 5-6, Ex. 2 at p. 6; Ex. 3 at p. 6.

87.    Plaintiffs therefore face the prospect that, if they use the COPS Grants for the purposes for which Congress intended—including to recruit and hire "members of racial and ethnic minority groups and women" to increase their representation in law enforcement and to protect the mental health and well-being of the workforce—they will face crushing civil and criminal penalties for failing to abide by the DOJ's contrary interpretation of federal civil rights and antidiscrimination law.

88.    Likewise, if Plaintiffs accept the EO Condition, they will effectively be playing a game of chance with critical public safety funding: Plaintiffs will be left to guess which of hundreds of current and future EOs and Memoranda are "applicable"—without even knowing what those future

---

[7] Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025),
https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU];

[8] Asst. Att'y Gen'l, Civil Division Enforcement Priorities (June 11, 2025),
https://www.justice.gov/civil/media/1404046/dl [archived at https://perma.cc/QL7T-33TH]

EOs and directives may cover—and, if they guess wrong, Defendants can, at any time, impose legal penalties or pull essential funding.

89. Accepting the Federal Funding Restriction, in turn, would require acceding to curtail the expenditure of funds for purposes that serve the needs of Plaintiffs' law enforcement agencies and are consistent with Congress's intent as reflected in the COPS Statute.

90. Yet, rejecting these grants to avoid running afoul of the Challenged Conditions is also untenable.

91. If SFPD does not receive its Hiring Grant, for instance, it would likely have to use more General Fund money than it currently does to cover the salaries and benefits for the fifty officers covered by the grant. (The Hiring Grant covers approximately 70% of each newly-hired officer's salaries and benefits.) However, given the City's budget deficit and strained financial position, using limited General Fund dollars in order to fund fifty officers would likely require allocating considerable money away from other important SFPD public safety services. If SFPD cannot locate or reallocate other sources of funds to meet its staffing needs, SFPD runs the very real risk of remaining understaffed and compromising the services the SFPD is able to provide San Francisco, its residents, and its visitors. As alleged above, SFPD has covered staffing gaps with overtime. This practice is burdensome on officers and undermines SFPD's ability to retain career officers due to overwork and burnout. Being unable to bolster the ranks at SFPD risks losing hard-fought positive momentum in reduced crime, community safety, and community trust—each of which are explicit aims of the COPS Statute.

92. Likewise, if TPD does not receive its Microgrant Recruitment Award funds, it will face a choice between trying to replace that funding with critically limited general fund dollars or continuing to struggle with hiring and retention of highly qualified candidates. Use of general fund dollars to cover recruiting efforts reduces resources available for other critical public safety programs. But continued understaffing increases reliance on overtime and places additional strain on current officers, risking burnout, diminished morale, and, as a consequence, loss of experienced personnel. Without this boost to its recruiting efforts, TPD's ability to effectively and efficiently utilize its 2024 Hiring Grant funding will also be adversely impacted.

93.     If the County of Santa Clara cannot accept its Mental Health Grant award, SCCSO must either reallocate money from its other services or forgo supporting SCCSO's mental and emotional wellness programming.  Given Santa Clara's projected loss of $1 billion in funding under H.R. 1 for FY25–26, SCCSO is already deciding how to cut expenditures by tens of millions of dollars.  Reallocating money to support what the Mental Health Grant would have funded would likely take funding away from any number of public safety services, including—perversely—its existing wellness initiatives.  On the other hand, forgoing support for mental and emotional wellness programming would likely diminish SCCSO staff's quality of life and ability to perform their jobs; leave unchecked the unique risks of working in law enforcement, like elevated rates of depression, post-traumatic stress disorder, substance use, and suicide; and increase staff attrition.  Either outcome thwarts LEMHWA's goal "to protect the mental health and well-being of law enforcement officers."

## FIRST CAUSE OF ACTION

### Violation of Separation of Powers

94.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

95.     The Constitution vests Congress—not the Executive—with "[a]ll" of the federal government's "legislative Powers."  U.S. Const. art. I, § 1; *id.* § 8, cl. 1; *id.* § 9, cl. 7.

96.     The Constitution "exclusively grants the power of the purse to Congress, not the President."  *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  "Congress's power to spend is directly linked to its power to legislate. Incident to the spending power, Congress may attach conditions on the receipt of federal funds."  *Id.* at 1231-32.

97.     The "executive Power" vested in the President does not include the power to attach conditions on the receipt of federal funds.  To the contrary, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *City & Cnty. of S.F.*, 897 F.3d at 1232 (alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

98.     Accordingly, absent an express delegation, only Congress, not the Executive Branch, is entitled to attach conditions to federal funds.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF; CASE NO.                                    24                        n:\cxlit\li2025\260341\01878564.docx

99.     The separation of the legislative, executive, and judicial powers among the three branches is a central and core tenet of our Constitution.  *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024) (the separation of powers "doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers"); *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) ("the Constitution's rule vesting federal legislative power in Congress is 'vital to the integrity and maintenance of the system of government ordained by the Constitution.'" (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892))).

100.     Consistent with these principles, the Executive Branch acts at the "lowest ebb" of its constitutional power when it "takes measures incompatible with the express or implied will of Congress."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

101.     In leveraging its spending power under the Constitution, Congress has not conditioned the provision of funding for COPS Grants on compliance with a prohibition on all forms of DEI policies and initiatives or any of the other policies that Defendants seek or may seek in the future to impose on Plaintiffs through any of the Challenged Conditions or through misapplication of the Civil Rights Conditions.  Nor has Congress delegated to Defendants the authority to attach any such conditions unilaterally.

102.     To the contrary, the Challenged Conditions are in fact contrary to Congress's intent as expressed in the COPS Statute and in LEMHWA.  In the COPS Statute, Congress specifically instructed that applicants provide assurances that they will "seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).  And, in LEMHWA, Congress expressed its intent to support that workforce by "protect[ing] the mental health and well-being of law enforcement officers."

103.     By imposing the Challenged Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without constitutional authorization from Congress and in the absence of statutory authority to do so.

104. For these reasons, Defendants' conditioning of Plaintiffs' COPS Grants on compliance with the Discrimination Condition, EO Condition, and Federal Funding Restriction, and their misapplication of the Civil Rights Conditions, violates the constitutional separation of powers.

105. Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

## SECOND CAUSE OF ACTION

### Violation of Spending Power

106. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

107. Congress's power to attach conditions to federal funding "is of course not unlimited, but is instead subject to several general restrictions." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). The Challenged Conditions violate at least three of the Constitution's restrictions on the spending power.

108. First, the spending power requires recipients to have fair and advance notice of conditions that apply to federal funds so that recipients can "voluntarily and knowingly" decide whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously," because recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" grantees "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

109. Second, the government may only impose conditions on federal funding that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207-208; *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord New York v. United States*, 505 U.S. 144, 167 (1992).

110. As discussed in the First Cause of Action, Congress has not delegated authority to Defendants or the Executive to condition COPS Grants on recipients' agreement to terms prohibiting DEI statements and policies as conceived by the Administration (illustrated by the July

Bondi Memo); mandating compliance with all current and future EOs and Presidential memoranda; or prohibiting using funds for DEI policies, "gender ideology," institutions requiring COVID-19 vaccines, and other disfavored policies reflected in the Federal Funding Restriction.  But even if Congress had, the Challenged Conditions would nonetheless be unlawful and unenforceable because, in contravention of the spending power, they are ambiguous, not germane to the purposes of the statutes that authorize the COPS Grants, and require recipients to engage in actions that are themselves unconstitutional.  Each of these flaws applies to each of the Challenged Conditions.

### a.    Ambiguity

111.    The Discrimination Condition and Civil Rights Conditions are ambiguous and unascertainable.  As an initial matter, the Discrimination Condition (Condition 3) does not define key terms, including "diversity, equity, and inclusion."  Moreover, while Plaintiffs have understood well-settled statutory and judicial interpretations of civil rights and antidiscrimination laws—and have certified to compliance based on that understanding in the past—the meaning of these terms has been upended by the July Bondi Memo's vague and contradictory guidance and the DOJ's threat to pursue False Claims Act litigation against any jurisdiction that pursues policies inconsistent with that guidance.  As such, the Discrimination Condition, and the Civil Rights Conditions in conjunction at least with the July Bondi Memo, prevent any reasonable grantee, including Plaintiffs, from understanding their scope and meaning and, therefore, from knowingly accepting the conditions.

112.    The EO Condition likewise is fatally ambiguous because it fails entirely to specify what EOs and Presidential Memoranda are supposedly covered by the condition, purports to require Plaintiffs to agree to EOs and Memoranda not in existence, and provides no guidance on which EOs and Memoranda (both present and future) are deemed "applicable."  As such, the EO Condition prevents any reasonable grantee, including Plaintiffs, from understanding its scope and meaning and, therefore, from knowingly accepting the condition.

113.    The Federal Funding Restriction is ambiguous because it fails to define key terms, including "gender ideology," "diversity, equity, inclusion, and accessibility," and "environmental justice" and fails to explain what it means to "directly or indirectly support or subsidize" an educational institution requiring the COVID-19 vaccine, to "promote" gender ideology, or to "fail to

1  protect" public monuments, memorials, and statues."  As such, the Federal Funding Restriction
2  prevents any reasonable grantee, including Plaintiffs, from understanding its scope and meaning and,
3  therefore, from knowingly accepting the condition.

4  **b.  Germaneness**

5  114.  The Challenged Conditions are not germane to the purposes of the COPS
6  Grants, the COPS Statute (which authorizes the Grants), or the federal interest in the projects funded
7  by the COPS Grants, which pertain to public safety and community policing.

8  115.  The Discrimination Condition is not germane to the purpose of the COPS
9  Statute and, in fact, contradicts the express requirement of the COPS Statute that applicants "seek,
10  recruit, and hire members of racial and ethnic minority groups and women in order to increase their
11  ranks within the sworn positions in the law enforcement agency."  34 U.S.C. § 10382(c)(11).  When
12  viewed through the lens of the Trump administration's novel and unsupported interpretation of federal
13  civil rights and antidiscrimination law as memorialized in the July Bondi Memo and elsewhere, the
14  Civil Rights Conditions are likewise not germane to the purpose of the COPS Statute and, in fact,
15  contradict the same express requirements of the COPS Statute

16  116.  The EO Condition on its face purports to apply without limit to hundreds of
17  EOs and dozens of Memoranda—and untold numbers of EOs and Memoranda that have yet to be
18  enacted—despite the fact that these directives have no nexus to the COPS Statute, and are in many
19  instances contrary to the Congressional intent expressed therein.

20  117.  The Federal Funding Restriction purports to restrict the use of funding in ways
21  that are not germane to the purpose of the COPS Statute, and are in some instances contrary to the
22  Congressional intent expressed therein.

23  118.  Defendants' violations of the Spending Power have caused harm and will
24  continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

25  **THIRD CAUSE OF ACTION**

26  **Violation of Due Process Clause of the Fifth Amendment: Unconstitutional Vagueness**

27  119.  Plaintiffs reallege and incorporate by reference the allegations of the preceding
28  paragraphs.

120.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall... be deprived of life, liberty, or property, without due process of law . . . ."

121.     Under this Clause, a governmental enactment is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

122.     Each of the Challenged Conditions is unconstitutionally vague.

123.     In light of the guidance of the July Bondi Memo, the Discrimination Condition and the Civil Rights Conditions require people of ordinary intelligence to guess as to what is prohibited.  The July Bondi Memo's interpretation of federal civil rights and antidiscrimination law is contrary to decades of jurisprudence and contradicts the explicit mandates of the COPS Statute to promote the hiring of racial and ethnic minority and women law enforcement officers.  It is literally impossible for Plaintiffs and other grantees to comply with both.

124.     The resulting patchwork of requirements and instructions is a standardless landscape that invites Defendants to enforce the Discrimination Condition and the Civil Rights Conditions in an arbitrary, even malicious, fashion.

125.     By the same token, other conditions of the COPS Grant Awards afford nearly unfettered discretion to Defendants to determine, based on their subjective interpretation (and presumably following the principles outlined in the July Bondi Memo) whether an activity or policy violates civil rights and antidiscrimination law.

126.     The EO Condition is vague in purporting to incorporate "all" Executive Orders and Presidential Memoranda.  As alleged above, EOs are the President's directives to federal agencies and do not apply to federal grant recipients.  The requirements that Plaintiffs and other grantees follow "all" such written directives—regardless of their subject matter, whether they yet exist, or whether they have been rendered unconstitutional or unenforceable by a court—renders the other funding conditions vague.

127.     Further, the EO Condition term "Presidential Memoranda" is undefined in the context of the COPS Grant Awards.  It is therefore impossible for Plaintiffs or other grantees to know what additional written directives in theory control their acceptance of the COPS Grant Awards.

128.     The EO Conditions leaves Plaintiffs and other grantees without fair notice of what activities or policies would violate this Challenged Condition or other conditions of the COPS Grant Awards.

129.     The Federal Funding Restriction fails to define key terms like "gender ideology," "diversity, equity, inclusion, and accessibility," and "environmental justice" and fails to explain what it means to "directly or indirectly support or subsidize" an educational institution requiring the COVID-19 vaccine, to "promote" gender ideology, or to "fail to protect" public monuments, memorials, and statues."  It therefore fails to provide a person of ordinary intelligence fair notice of what uses of funding are prohibited.

130.     Defendants' violations of the Due Process Clause of the Fifth Amendment have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

## FOURTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act: Arbitrary and Capricious

131.     Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

132.     Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1).

133.     Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

134.     Defendants' incorporation of the Challenged Conditions as requirements for acceptance of COPS Grant Awards is a final agency action.

135.     Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

136. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

137. Defendants have provided no reasoned explanation or basis for their decision to incorporate the Challenged Conditions in COPS Grant Awards, which have no reasonable connection or nexus to those issues.

138. Defendants have ignored essential aspects of the "problem" they purport to address by incorporating the Challenged Conditions in COPS Grant awards, including by failing to (a) assess which of these conditions are lawful and consistent with the authorizing statute and the Constitution; (b) consider Plaintiffs' reasonable and inevitable reliance on now at-risk funds, and (c) consider the potential impacts on public safety and officer wellness of withholding the funding appropriated by Congress.

139. Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

140. Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Challenged Conditions in COPS Grant awards violates the APA because it is arbitrary and capricious; to provide preliminary relief under 5 U.S.C. § 705; and to temporarily restrain, and preliminarily and permanently enjoin Defendants from including the Challenged Conditions in COPS Grant awards to Plaintiffs without complying with the APA.

## FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act: Contrary to Constitution

141. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

142.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

143.     As described above, the Challenged Conditions violate bedrock constitutional provisions and principles, including the spending power, the separation of constitutional powers between and among the President, Congress, and judiciary, and the Due Process Clause of the Fifth Amendment.

144.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Challenged Conditions in COPS Grant awards violates the APA because it contrary to constitutional rights, powers, privileges, or immunities; to provide preliminary relief under 5 U.S.C. § 705; and to temporarily restrain, and preliminarily and permanently enjoin Defendants from including the Challenged Conditions in COPS Grant Awards without complying with the APA.

145.     Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

## SIXTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act: Excess of Statutory Authority

146.     Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

147.     Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

148.     Defendants may exercise only authority granted to them by statute or the Constitution.

149.     No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds.  The Challenged Conditions are not authorized by any statute under which the COPS Grant exists, nor under any other statute, and are in fact contrary to the requirements of the COPS Statute.

32

150.    Defendants' violations have caused harm and will cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

151.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Challenged Conditions in COPS Grant awards violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; to provide preliminary relief under 5 U.S.C. § 705; and to temporarily restrain, and preliminarily and permanently enjoin, Defendants from including the Challenged Conditions in COPS Grants awards without complying with the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court grant the following relief:

1.    A declaration that the Challenged Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

2.    A declaration that Defendants' attachment and incorporation of the Challenged Conditions and materially similar requirements in any documents incorporated by reference into the Grant Award Conditions for COPS Grants is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

3.    An order temporarily restraining and preliminarily and permanently enjoining Defendants from attaching, incorporating, imposing, or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs for COPS Grants or any COPS Grants funds awarded to or received by Plaintiffs, whether directly or indirectly, including but not limited to the SFPD Hiring Grant Award, the TPD Recruitment Microgrant Award, and the SCCSO Mental Health Grant Award;

4.    An order temporarily restraining and preliminarily and permanently enjoining Defendants from attaching, incorporating, imposing, or enforcing the requirement that Plaintiffs comply with the Civil Rights Conditions, federal civil rights law, antidiscrimination law, or the COPS Statute as requiring anything other than compliance with such laws as enacted by Congress and interpreted by the judiciary;

5.      An order pursuant to 5 U.S.C. § 705 that: (i) postpones the effective date of any action by any Defendants to adopt, issue, enforce, or implement the Challenged Conditions or any materially similar terms or conditions pending conclusion of this litigation; (ii) declares the Challenged Conditions void and unenforceable with respect to any application, award, agreement, or subagreement, or other document executed by Plaintiffs that is related to COPS Grants; and (iii) declares that Plaintiffs need only comply with the Civil Rights Conditions, federal civil rights law, antidiscrimination law, and the COPS Statute as enacted by Congress and interpreted by the judiciary;

6.      An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to: (i) adopt, issue, enforce, or implement the Challenged Conditions or any materially similar terms or conditions; (ii) require, attach, incorporate, implement, or enforce the Challenged Conditions in any application, award, agreement or subagreement, or other document executed by Plaintiffs related to COPS Grants; or (iii) construe the requirements that Plaintiffs comply with the Civil Rights Conditions, federal civil rights law, antidiscrimination law, and the COPS Statute in any mannyer other than how such laws have been enacted by Congress and interpreted by the judiciary;

7.      Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

8.      An award to Plaintiffs of their reasonable attorneys' fees, costs, and other expenses; and

9.      Any other and further relief that this Court deems just and proper.

Dated:  October 28, 2025

Respectfully submitted,

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
KARUN A. TILAK
JESSE E. LANIER
Deputy City Attorneys

By: /s/ David Chiu
DAVID CHIU
Deputy City Attorney

Attorneys for Plaintiffs
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel

By: /s/Tony LoPresti
TONY LOPRESTI
County Counsel

KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
BILL NGUYEN, SBN 333671
Deputy County Counsel
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:     (408) 292-7240
E-Mail:          tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

1

2
ROI I. LUSK
City Attorney

3
By: /s/ Roi I. Lusk

4
ROI I. LUSK
County Counsel

5

6
REGINA L. NASSEN Ariz. Bar No. 014574 *
Principal Assistant City Attorneys, Tucson City

7
Attorney's Office
255 W. Alameda, 7th Floor

8
P.O. Box 27210
Tucson, Arizona 85726-7210

9
Telephone: (520)837-4207
Facsimile: (520)623-9803

10
E-Mail: regina.nassen@tucsonaz.gov

11
ERIN B. BERNSTEIN, SBN 231539
PRIANKA MUNGALE, SBN 348165

12
Bradley Bernstein Sands, LLP
1212 Broadway, Suite 1100

13
Oakland, California 94612
Telephone: (510)380-5801

14
E-Mail: ebernstein@bradleybernstein.com

15
Attorneys for Plaintiff
CITY OF TUCSON

16

17
*Application for admission pro hac vice
forthcoming

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I, DAVID CHIU, am the ECF user whose identification and password are being used to file this COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, I hereby attest that the other above-named signatories concur in this filing.

# Exhibit 1



# Department of Justice (DOJ)

### Office of Community Oriented Policing Services (COPS Office)

*Washington, D.C. 20531*

| | |
|---|---|
| **Name and Address of Recipient:** | CITY & COUNTY OF SAN FRANCISCO<br>1245 3RD ST<br>FL 6 |
| **City, State and Zip:** | SAN FRANCISCO, CA 94158 |
| **Recipient UEI:** | SRZKDWN293M2 |

| | |
|---|---|
| **Project Title:** FY25 COPS Hiring Program | **Award Number:** 15JCOPS-25-GG-00974-UHPX |
| **Solicitation Title:** FY25 COPS Hiring Program | |
| **Federal Award Amount:** $6,250,000.00 | **Federal Award Date:** 10/10/25 |

| | |
|---|---|
| **Awarding Agency:** | Office of Community Oriented Policing Services |
| **Award Type:**<br>**Funding Instrument Type:** | Initial<br>Grant |

**Opportunity Category:** D
**Assistance Listing:**
16.068 - COPS Hiring Program

| | |
|---|---|
| **Project Period Start Date:** 10/1/25 | **Project Period End Date:** 9/30/30 |
| **Budget Period Start Date:** 10/1/25 | **Budget Period End Date:** 9/30/30 |

**Project Description:**
The FY25 COPS Hiring Program (CHP) provides funding to law enforcement agencies to hire and/or rehire additional career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts. Anticipated outcomes of CHP awards include engagement in planned community partnerships, implementation of projects to analyze and assess problems, implementation of changes to personnel and agency management in support of community policing, and increased capacity of agency to engage in community policing activities

## Award Letter

October 10, 2025

Dear Paul Yep,

On behalf of Attorney General Pamela Bondi, it is my pleasure to inform you the Office of Community Oriented Policing Services (the COPS Office) has approved the application submitted by  CITY & COUNTY OF SAN FRANCISCO  for an award under the funding opportunity entitled 2025 FY25 COPS Hiring Program. The approved award amount is $6,250,000.
Review the Award Instrument below carefully and familiarize yourself with all conditions and requirements before accepting your award. The Award Instrument includes the Award Offer (Award Information, Project Information, Financial Information, and Award Conditions) and Award Acceptance. For COPS Office and OVW funding the Award Offer also includes any Other Award Documents.

Please note that award requirements include not only the conditions and limitations set forth in the Award Offer, but also compliance with assurances and certifications that relate to conduct during the period of performance for the award. These requirements encompass financial, administrative, and programmatic matters, as well as other important matters (e.g., specific restrictions on use of funds). Therefore, all key staff should receive the award conditions, the

assurances and certifications, and the application as approved by the COPS Office, so that they understand the award requirements. Information on all pertinent award requirements also must be provided to any subrecipient of the award.

Should you accept the award and then fail to comply with an award requirement, DOJ will pursue appropriate remedies for non-compliance, which may include termination of the award and/or a requirement to repay award funds.

Prior to accepting the award, your Entity Administrator must assign a Financial Manager, Grant Award Administrator, and Authorized Representative(s) in the Justice Grants System (JustGrants). The Entity Administrator will need to ensure the assigned Authorized Representative(s) is current and has the legal authority to accept awards and bind the entity to the award terms and conditions. To accept the award, the Authorized Representative(s) must accept all parts of the Award Offer in the Justice Grants System (JustGrants), including by executing the required declaration and certification, within 45 days from the award date.

To access your funds, you will need to enroll in the Automated Standard Application for Payments (ASAP) system, if you haven't already completed the enrollment process in ASAP. The Entity Administrator should have already received an email from ASAP to initiate this process.

Congratulations, and we look forward to working with you.


Cory D. Randolph
COPS Acting Director

## Office for Civil Rights Notice for All Recipients

The Office for Civil Rights (OCR), Office of Justice Programs (OJP), U.S. Department of Justice (DOJ) enforces federal civil rights laws and other provisions that prohibit discrimination by recipients of federal financial assistance from OJP, the Office of Community Oriented Policing Services (COPS), and the Office on Violence Against Women (OVW).

Several civil rights laws, including Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973, require recipients of federal financial assistance (recipients) to give assurances that they will comply with those laws.  Taken together, these and other civil rights laws prohibit recipients from discriminating in the provision of services and employment because of race, color, national origin, religion, disability, and sex or from discriminating in the provision of services on the bases of age.

Some recipients of DOJ financial assistance have additional obligations to comply with other applicable nondiscrimination provisions like the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits discrimination on the basis of religion in addition to race, color, national origin, and sex.  Recipients may also have related requirements regarding the development and implementation of equal employment opportunity programs.

OCR provides technical assistance, training, and other resources to help recipients comply with civil rights obligations. Further, OCR administratively enforces civil rights laws and nondiscrimination provisions by investigating DOJ recipients that are the subject of discrimination complaints.  In addition, OCR conducts compliance reviews of DOJ recipients based on regulatory criteria.  These investigations and compliance reviews permit OCR to evaluate whether DOJ recipients are providing services to the public and engaging in employment practices in a nondiscriminatory manner.

For more information about OCR, your civil rights and nondiscrimination responsibilities, how to notify your employees or beneficiaries of their civil rights protections and responsibilities and how to file a complaint, as well as technical assistance, training, and other resources, please visit www.ojp.gov/program/civil-rights-office/outreach.  If you would like OCR to assist you in fulfilling your civil rights or nondiscrimination responsibilities, please contact us at askOCR@ojp.usdoj.gov or www.ojp.gov/program/civil-rights-office/about#ocr-contacts.

## Award Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

## Recipient Information

**Recipient Name**

**UEI**
SRZKDWN293M2                    **ORI Number**

**Street 1**                               **Street 2**
1245 3RD ST                              FL 6

**City**                                   **State/U.S. Territory**
SAN FRANCISCO                           California

**Zip/Postal Code**                        **Country**
94158                                  United States

**County/Parish**                          **Province**


## Award Details

**Federal Award Date**                     **Award Type**
10/10/25                                Initial

**Award Number**                          **Supplement Number**
15JCOPS-25-GG-00974-UHPX                00

**Federal Award Amount**                   **Funding Instrument Type**
$6,250,000.00                           Grant

| Assistance Listing Number | Assistance Listings Program Title |
|---|---|
| 16.068 | COPS Hiring Program |

| Statutory Authority |
|---|
| The Public Safety Partnership and Community Policing Act of 1994, 34 U.S.C. § 10381 et seq |

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*


## Project Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

**Solicitation Title**                     **Awarding Agency**
2025 FY25 COPS Hiring Program            COPS

**Application Number**

GRANT14447390

| Grant Manager Name | Phone Number | E-mail Address |
|---|---|---|
| Tammy Richardson | 202-598-6908 | tammy.richardson2@usdoj.gov |

**Project Title**
FY25 COPS Hiring Program

| Performance Period Start Date | Performance Period End Date |
|---|---|
| 10/01/2025 | 09/30/2030 |

| Budget Period Start Date | Budget Period End Date |
|---|---|
| 10/01/2025 | 09/30/2030 |

**Project Description**
The FY25 COPS Hiring Program (CHP) provides funding to law enforcement agencies to hire and/or rehire additional career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts. Anticipated outcomes of CHP awards include engagement in planned community partnerships, implementation of projects to analyze and assess problems, implementation of changes to personnel and agency management in support of community policing, and increased capacity of agency to engage in community policing activities

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Financial Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

A financial analysis of budgeted costs has been completed. All costs listed in the approved budget below were programmatically approved based on the final proposed detailed budget and budget narratives submitted by your agency to the COPS Office. Any adjustments or edits to the proposed budget are explained below.

Budget Clearance Date:              9/15/25 5:42 PM

| Comments |
|---|
| No items |

## Budget Summary

| Budget Category | Proposed Budget | Change | Approved Budget | Percentage |
|---|---|---|---|---|
| Sworn Officer Positions: | $24,314,077 | $23 | $24,314,100 | |
| Civilian or Non-Sworn Personnel: | $0 | $0 | $0 | |
| Travel: | $0 | $0 | $0 | |
| Equipment: | $0 | $0 | $0 | |

| | | | |
|---|---|---|---|
| Supplies: | $0 | $0 | $0 | |
| SubAwards: | $0 | $0 | $0 | |
| Procurement Contracts: | $0 | $0 | $0 | |
| Other Costs: | $0 | $0 | $0 | |
| Total Direct Costs: | $24,314,077 | $23 | $24,314,100 | |
| Indirect Costs: | $0 | $0 | $0 | |
| Total Project Costs: | $24,314,077 | $23 | $24,314,100 | |
| Federal Funds: | $6,250,000 | $0 | $6,250,000 | 25.71% |
| Match Amount: | $18,064,100 | $0 | $18,064,100 | 74.29% |
| Program Income: | $0 | $0 | $0 | 0.00% |

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Award Conditions

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

**Condition 1**
Restrictions on Internal Confidentiality Agreements: No recipient or subrecipient under this award, or entity that receives a contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts the lawful reporting of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information. Full-Year Continuing Appropriations and Extensions Act, 2025, Public Law 119-4; Further Consolidated Appropriations Act, 2024, Public Law 118-47, Division B, Title VII, Section 742.

**Condition 2**
Compliance with 8 U.S.C. § 1373: Authority to obligate or expend contingent on compliance with this condition. State or local government entity recipients of this award, and any subrecipient of this award at any tier that is an entity of a State or of a unit of local government, must comply with 8 U.S.C. §1373, which provides that such entities may not prohibit, or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity. This includes any prohibitions or restrictions imposed or established by a State or local government entity or official.

Any obligations or expenditures of a recipient or subrecipient that are impermissible under this condition shall be unallowable costs for purposes of this award.

References to the Immigration and Naturalization Service in 8 U.S.C. 1373 are to be read, as a legal matter, as references to components of the U.S. Department of Homeland Security.

**Condition 3**
Federal Civil Rights and Nondiscrimination Laws (certification): The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812),

and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

**Condition 4**
Federal Laws, Presidential Memoranda, and Executive Orders: Recipients of grant funding must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President.

**Condition 5**
Award Monitoring Activities: Federal law requires that recipients receiving federal funding from the COPS Office must be monitored to ensure compliance with their award conditions and other applicable statutes and regulations. The COPS Office is also interested in tracking the progress of our programs and the advancement of community policing. Both aspects of award implementation—compliance and programmatic benefits—are part of the monitoring process coordinated by the U.S. Department of Justice. Award monitoring activities conducted by the COPS Office include site visits, enhanced office-based grant reviews, alleged noncompliance reviews, financial and programmatic reporting, and audit resolution. As a COPS Office award recipient, you agree to cooperate with and respond to any requests for information pertaining to your award. This includes all financial records, such as general accounting ledgers and all supporting documents. All information pertinent to the implementation of the award is subject to agency review throughout the life of the award, during the close-out process and for three-years after the submission of the final expenditure report. 2 C.F.R. §§ 200.334 and 200.337, and, as applicable, 34 U.S.C. § 10385(a).

**Condition 6**
Authorized Representative Responsibility: The recipient understands that, in accepting this award, the Authorized Representatives declare and certify, among other things, that they possess the requisite legal authority to accept the award on behalf of the recipient entity and, in so doing, accept (or adopt) all material requirements throughout the period of performance under this award. The recipient further understands, and agrees, that it will not assign anyone to the role of Authorized Representative during the period of performance under the award without first ensuring that the individual has the requisite legal authority.

**Condition 7**
Contract Provision: All contracts made by the award recipients under the federal award must contain the provisions required under 2 C.F.R. Part 200, Appendix II to Part 200—Contract Provisions for Non-Federal Entity Contracts Under Federal Awards. Please see appendices in the Award Owner's Manual for a full text of the contract provisions.

**Condition 8**
Award Owner's Manual: The recipient agrees to comply with the terms and conditions in the applicable award year COPS Office Program Award Owner's Manual; DOJ Grants Financial Guide; COPS Office statute (34 U.S.C. § 10381, et seq.) as applicable; Students, Teachers, and Officers Preventing (STOP) School Violence Act of 2018 (34 U.S.C. § 10551, et seq.) as applicable; the requirements of 2 C.F.R. Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards), including subsequent changes, as adopted by the U.S. Department of Justice in 2 C.F.R. § 2800.101; 48 C.F.R. Part 31 (FAR Part 31) as applicable (Contract Cost Principles and Procedures); the Cooperative Agreement as applicable; representations made in the application; and all other applicable program requirements, laws, orders, regulations, or circulars.

Failure to comply with one or more award requirements may result in remedial action including, but not limited to, withholding award funds, disallowing costs, suspending, or terminating the award, or other legal action as appropriate.

Should any provision of a condition of this award be held to be invalid or unenforceable by its terms, then that provision shall first be applied with a limited construction so as to give it the maximum effect permitted by law (to any person or circumstance) under this award. Should it be held, instead, that a condition (or a provision thereof) is of utter invalidity or unenforceability, such condition (or such provision) shall be deemed severable from this award.

**Condition 9**
Federal Civil Rights: The recipient and any subrecipient must comply with applicable federal civil rights and nondiscrimination statutes and regulations including: Section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d),

as implemented in Subparts C and D of 28 C.F.R. Part 42; section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), as implemented in Subpart G of 28 C.F.R. Part 42; section 901 of the Education Amendments of 1972 (20 U.S.C. § 1681), as implemented in Subpart D of 28 C.F.R. Parts 42 and 54; section 303 of the Age Discrimination Act of 1975 (42 U.S.C. § 6102), as implemented in Subpart I of 28 C.F.R. Part 42; and section 809(c) of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. § 10228(c)), as implemented in Subpart D of 28 C.F.R. Part 42. In addition to applicable federal statutes and regulations that pertain to civil rights and nondiscrimination, the recipient and any subrecipient must comply with the requirements in 28 C.F.R. Parts 22 (Confidentiality of Identifiable Research and Statistical Information); 28 C.F.R. Part 23 (Criminal Intelligence Systems Operating Policies); 28 C.F.R. Part 38 (Partnerships with Faith-Based and Other Neighborhood Organizations); and 28 C.F.R. Part 46 (Protection of Human Subjects). For an overview of the civil rights laws and nondiscrimination requirements in connection with your award, please see https://www.ojp.gov/program/civil-rights/overview.

**Condition 10**
Duplicative Funding: The recipient understands and agrees to notify the COPS Office if it receives, from any other source, funding for the same item or service also funded under this award.

**Condition 11**
Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and COPS Office authority to terminate award): The recipient and subrecipient agree to comply with the following requirements of 2 C.F.R. Part 175, Appendix A to Part 175 – Award Term:
I. Trafficking in Persons
(a) Provisions applicable to a recipient that is a private entity. (1) Under this award, the
recipient, its employees, subrecipients under this award, and subrecipient's employees must not engage in:
(i) Severe forms of trafficking in persons;
(ii) The procurement of a commercial sex act during the period of time that this award
or any subaward is in effect;
(iii) The use of forced labor in the performance of this award or any subaward; or
(iv) Acts that directly support or advance trafficking in persons, including the following acts:
(A) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;
(B) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:
(1) Exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant or cooperative agreement; or
(2) The employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;
(C) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;
(D) Charging recruited employees a placement or recruitment fee; or
(E) Providing or arranging housing that fails to meet the host country's housing and safety standards.
(2) The Federal agency may unilaterally terminate this award or take any remedial
actions authorized by 22 U.S.C. 7104b(c), without penalty, if any private entity under this award:
(i) Is determined to have violated a prohibition in paragraph (a)(1) of this appendix; or
(ii) Has an employee that is determined to have violated a prohibition in paragraph
(a)(1) of this appendix through conduct that is either:
(A) Associated with the performance under this award; or
(B) Imputed to the recipient or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, ''OMB
Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement),'' as implemented by DOJ at 2 C.F.R. Part 2867.
(b) Provision applicable to a recipient other than a private entity. (1) The Federal agency
may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C.
7104b(c), without penalty, if a subrecipient that is a private entity under this award:
(i) Is determined to have violated a prohibition in paragraph (a)(1) of this
appendix; or
(ii) Has an employee that is determined to have violated a prohibition in paragraph
(a)(1) of this appendix through conduct that is either:

(A) Associated with the performance under this award; or
(B) Imputed to the subrecipient using the standards and due process for imputing the
conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB
Guidelines to Agencies on Government-wide Debarment and Suspension
(Nonprocurement)," as implemented by 2 C.F.R. Part 2867.
(c) Provisions applicable to any recipient.
(1) The recipient must inform the Federal agency and the Inspector General of the Federal agency immediately of any
information you receive from any source alleging a violation of a prohibition in paragraph (a)(1) of this appendix.
(2) The Federal agency's right to unilaterally terminate this award as described in paragraphs (a)(2) or (b)(1) of this
appendix:
(i) Implements the requirements of 22 U.S.C. 78, and
(ii) Is in addition to all other remedies for noncompliance that are available to the Federal agency under this award.
(3) The recipient must include the requirements of paragraph (a)(1) of this award term in any subaward it makes to a
private entity.
(4) If applicable, the recipient must also comply with the compliance plan and certification requirements in 2 CFR
175.105(b).
(d) Definitions. For purposes of this award term:
Employee means either:
(1) An individual employed by the recipient or a subrecipient who is engaged in the performance of the project or
program under this award; or
(2) Another person engaged in the performance of the project or program under this award and not compensated by
the recipient including, but not limited to, a volunteer or individual whose services are contributed by a third party as an
in-kind contribution toward cost sharing
requirements.
Private Entity means any entity, including for-profit organizations, nonprofit organizations, institutions of higher
education, and hospitals. The term does not include foreign public entities, Indian Tribes, local governments, or states
as defined in 2 CFR 200.1.
The terms "severe forms of trafficking in persons," "commercial sex act," "sex trafficking," "Abuse or threatened abuse
of law or legal process," "coercion," "debt bondage," and "involuntary servitude" have the meanings given at section
103 of the TVPA, as amended (22 U.S.C. 7102).


## Condition 12

Termination: Recipient understands and agrees that the COPS Office may terminate funding, in whole or in part, for
the following reasons:
(1) When the recipient fails to comply with the terms and conditions of a Federal award.
(2) When the recipient agrees to the termination and termination conditions.
(3) When the recipient provides the COPS Office written notification requesting termination including the reasons,
effective date, and the portion of the award to be terminated. The COPS Office may terminate the entire award if the
remaining portion will not accomplish the purposes of the award.
(4) Pursuant to any other award terms and conditions, including, when an award no longer effectuates the program
goals or agency priorities to the extent such termination is authorized by law.
2. C.F.R. § 200.340.


## Condition 13

Recipient Integrity and Performance Matters: For awards over $500,000, the recipient agrees to comply with the
following requirements of 2 C.F.R. Part 200, Appendix XII to Part 200 – Award Term and Condition for Recipient
Integrity and Performance Matters:
I. Reporting of Matters Related to Recipient Integrity and Performance
(a) General Reporting Requirement.
(1) If the total value of your active grants, cooperative agreements, and procurement contracts from all Federal
agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you
as the recipient must ensure the information available in the responsibility/qualification records through the System for
Award Management (SAM.gov), about civil, criminal, or administrative proceedings described in paragraph (b) of this
award term is current and complete. This is a statutory requirement under section 872 of Public Law 110–417, as
amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111– 212, all information posted in
responsibility/qualification records in SAM.gov on or after April 15, 2011 (except past performance reviews required for
Federal procurement contracts) will be publicly available.
(b) Proceedings About Which You Must Report.

(1) You must submit the required information about each proceeding that—
(i) Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;
(ii) Reached its final disposition during the most recent five-year period; and
(iii) Is one of the following—
(A) A criminal proceeding that resulted in a conviction;
(B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;
(C) An administrative proceeding that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or
(D) Any other criminal, civil, or administrative proceeding if—
(1) It could have led to an outcome described in paragraph (b)(1)(iii)(A) through (C);
(2) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and
(3) The requirement in this award term to disclose information about the proceeding does not conflict with applicable laws and regulations.
(c) Reporting Procedures. Enter the required information in SAM.gov for each proceeding described in paragraph (b) of this award term. You do not need to submit the information a second time under grants and cooperative agreements that you received if you already provided the information in SAM.gov because you were required to do so under Federal procurement contracts that you were awarded.
(d) Reporting Frequency. During any period of time when you are subject to the requirement in paragraph (a) of this award term, you must report proceedings information in SAM.gov for the most recent five-year period, either to report new information about a proceeding that you have not reported previously or affirm that there is no new information to report. If you have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000, you must disclose semiannually any information about the criminal, civil, and administrative proceedings.
(e) Definitions. For purposes of this award term—
Administrative proceeding means a nonjudicial process that is adjudicatory in nature to make a determination of fault or liability (for example, Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with the performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.
Conviction means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere. Total value of currently active grants, cooperative agreements, and procurement contracts includes the value of the Federal share already received plus any anticipated Federal share under those awards (such as continuation funding).


**Condition 14**
Reporting Subawards and Executive Compensation: The recipient agrees to comply with the following requirements of 2 C.F.R. Part 170, Appendix A to Part 170 – Award Term:
I. Reporting Subawards and Executive Compensation
(a) Reporting of first-tier subawards—(1) Applicability. Unless the recipient is exempt as provided in paragraph (d) of this award term, the recipient must report each subaward that equals or exceeds $30,000 in Federal funds for a subaward to an entity or Federal agency. The recipient must also report a subaward if a modification increases the Federal funding to an amount that equals or exceeds $30,000. All reported subawards should reflect the total amount of the
subaward.
(2) Reporting Requirements. (i) The entity or Federal agency must report each subaward
described in paragraph (a)(1) of this award term to the Federal Funding Accountability
and Transparency Act Subaward Reporting System (FSRS) at http://www.fsrs.gov.
(ii) For subaward information, report no later than the end of the month following the month in which the subaward was issued. (For example, if the subaward was made on November 7, 2025, the subaward must be reported by no later than December 31, 2025).
(b) Reporting total compensation of recipient executives for entities—(1) Applicability. The recipient must report the total compensation for each of the recipient's five most highly compensated executives for the preceding completed fiscal year if:
(i) The total Federal funding authorized to date under this Federal award equals or
exceeds $30,000;
(ii) in the preceding fiscal year, the recipient received:
(A) 80 percent or more of the recipient's annual gross revenues from Federal procurement contracts (and

subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and,

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

(2) Reporting Requirements. The recipient must report executive total compensation described in paragraph (b)(1) of this appendix:

(i) As part of the recipient's registration profile at https://www.sam.gov.

(ii) No later than the month following the month in which this Federal award is made, and annually after that. (For example, if this Federal award was made on November 7,

2025, the executive total compensation must be reported by no later than December 31,

2025.)

(c) Reporting of total compensation of subrecipient executives—(1) Applicability. Unless a first-tier subrecipient is exempt as provided in paragraph (d) of this appendix, the recipient must report the executive total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

(i) The total Federal funding authorized to date under the subaward equals or exceeds $30,000;

(ii) In the subrecipient's preceding fiscal year, the subrecipient received:

(A) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and,

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal awards (and subawards) subject to the Transparency Act; and

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see

the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

(2) Reporting Requirements. Subrecipients must report to the recipient their executive total compensation described in paragraph

(c)(1) of this appendix. The recipient is required to submit this information to the

Federal Funding Accountability and Transparency Act Subaward Reporting System (FSRS) at http://www.fsrs.gov no later than the end of the month following the month in which the subaward was made. (For example, if the subaward was made on November 7, 2025, the subaward must be reported by no later than December 31, 2025).

(d) Exemptions. (1) A recipient with gross income under $300,000 in the previous tax year is exempt from the requirements to report:

(i) Subawards, and

(ii) The total compensation of the five most highly compensated executives of any subrecipient.

(e) Definitions. For purposes of this award term:

Entity includes:

(1) Whether for profit or nonprofit:

(i) A corporation;

(ii) An association;

(iii) A partnership;

(iv) A limited liability company;

(v) A limited liability partnership;

(vi) A sole proprietorship;

(vii) Any other legal business entity;

(viii) Another grantee or contractor that is not excluded by subparagraph (2); and

(ix) Any State or locality;

(2) Does not include:

(i) An individual recipient of Federal financial assistance; or

(ii) A Federal employee.

Executive means an officer, managing partner, or any other employee holding a management position.

Subaward has the meaning given in 2 CFR200.1.

Subrecipient has the meaning given in 2CFR 200.1.

Total Compensation means the cash and noncash dollar value an executive earns during an entity's preceding fiscal year. This includes all items of compensation as prescribed in 17 CFR 229.402(c)(2).

**Condition 15**
Assurances and Certifications: The recipient acknowledges its agreement to comply with the Assurances and Certifications forms that were signed as part of its application.

**Condition 16**
Conflict of Interest: Recipients and subrecipients must disclose in writing to the COPS Office or pass-through entity, as applicable, any potential conflict of interest affecting the awarded federal funding in 2 C.F.R. § 200.112.

**Condition 17**
Debarment and Suspension: The recipient agrees not to award federal funds under this program to any party which is debarred or suspended from participation in federal assistance programs. 2 C.F.R. Part 180 (Government-wide Nonprocurement Debarment and Suspension) and 2 C.F.R. Part 2867 (DOJ Nonprocurement Debarment and Suspension).

**Condition 18**
Equal Employment Opportunity Plan (EEOP): Please see the Office for Civil Rights website https://www.ojp.gov/eeop-notice for current information on the recipient's responsibilities related to the federal regulations pertaining to the development and implementation of an Equal Employment Opportunity Plan.

**Condition 19**
Employment Eligibility: The recipient agrees to complete and keep on file, as appropriate, the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS) Employment Eligibility Verification Form (I-9). This form is to be used by recipients of federal funds to verify that persons are eligible to work in the United States. Immigration Reform and Control Act of 1986 (IRCA), Public Law 99-603.

**Condition 20**
Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information: Recipients and subrecipients agree not to discharge, demote, or otherwise discriminate against an employee as reprisal for the employee disclosing information that he or she reasonably believes is evidence of gross mismanagement of a federal contract or award, a gross waste of federal funds, an abuse of authority relating to a federal contract or award, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or award. Recipients and subrecipients also agree to provide to their employees in writing (in the predominant native language of the workforce) of the rights and remedies provided in 41 U.S.C. § 4712. Please see appendices in the Award Owner's Manual for a full text of the statute.

**Condition 21**
False Statements: False statements or claims made in connection with COPS Office awards may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law. 31 U.S.C. § 3729-3733.

**Condition 22**
Mandatory Disclosure: Recipients and subrecipients must timely disclose in writing to the Federal awarding agency or pass-through entity, as applicable, all federal criminal law violations involving fraud, bribery, or gratuity that may potentially affect the awarded federal funding. Recipients that receive an award over $500,000 must also report certain civil, criminal, or administrative proceedings in SAM and are required to comply with the Term and Condition for Recipient Integrity and Performance Matters as set out in 2 C.F.R. Part 200, Appendix XII to Part 200. Failure to make required disclosures can result in any of the remedies, including suspension and debarment, described in 2 C.F.R. § 200.339. 2 C.F.R. § 200.113.

**Condition 23**
Reports/Performance Goals: To assist the COPS Office in monitoring and tracking the performance of your award,

your agency will be responsible for submitting semi-annual programmatic performance reports that describe project activities during the reporting period and quarterly Federal Financial Reports using Standard Form 425 (SF-425). 2 C.F.R. §§ 200.328 - 200.329. The performance report is used to track your agency's progress in implementing the award, and, as applicable, community policing strategies including gauging the effectiveness of your agency's community policing capacity. The Federal Financial Report is used to track the expenditures of the recipient's award funds on a cumulative basis throughout the life of the award.

## Condition 24
System for Award Management (SAM.gov) and Universal Identifier Requirements: The recipient agrees to comply with the following requirements of 2 C.F.R. Part 25, Appendix A to Part 25 – Award Term:
I. System for Award Management (SAM.gov) and Universal Identifier Requirements
(a) Requirement for System for Award Management. (1) Unless exempt from this requirement under 2 CFR 25.110, the recipient must maintain a current and active registration in SAM.gov. The recipient's registration must always be current and active until the recipient submits all final reports required under this Federal award or receives the final payment, whichever is later. The recipient must review and update its information in SAM.gov at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the recipient's immediate and highest-level owner and subsidiaries and providing information about the recipient's predecessors that have received a Federal award or contract within the last three years.
(b) Requirement for Unique Entity Identifier (UEI). (1) If the recipient is authorized to make subawards under this Federal award, the recipient:
(i) Must notify potential subrecipients that no entity may receive a subaward until the entity has provided its UEI to the recipient.
(ii) Must not make a subaward to an entity unless the entity has provided its UEI to the recipient. Subrecipients are not required to complete full registration in SAM.gov to obtain a UEI.
(c) Definitions. For the purposes of this award term:
System for Award Management (SAM.gov) means the Federal repository into which a recipient must provide the information required for the conduct of business as a recipient. Additional information about registration procedures may be found in SAM.gov (currently at https://www.sam.gov).
Unique entity identifier means the universal identifier assigned by SAM.gov to uniquely identify an entity.
Entity is defined at 2 CFR 25.400 and includes all of the following types as defined in 2 CFR 200.1:
(1) Non-Federal entity;
(2) Foreign organization;
(3) Foreign public entity;
(4) Domestic for-profit organization; and
(5) Federal agency.
Subaward has the meaning given in 2 CFR 200.1.
Subrecipient has the meaning given in 2 CFR 200.1.

## Condition 25
Additional High-Risk Recipient Requirements: The recipient agrees to comply with any additional requirements that may be imposed during the award performance period if the awarding agency determines that the recipient is a high-risk recipient. 2 C.F.R. § 200.208.

## Condition 26
Evaluations: The COPS Office may conduct monitoring or sponsor national evaluations of its award programs. The recipient agrees to cooperate with the monitors and evaluators. 34 U.S.C. § 10385(b).

## Condition 27
Background Investigations: Recipients agree to ensure that each officer(s) hired with CHP funding will be subject to a background investigation, notify the COPS Office upon completion of the background investigation for each officer hired under the CHP award, and cooperate with the COPS Office and provide updates on the status of background investigations upon request. 2 C.F.R. § 200.208
If the COPS Office determines that CHP funds are being used to pay the salary and fringe benefits of an officer who has not undergone a background investigation, the COPS Office may temporarily suspend grant funds in accordance with 2 C.F.R. §200.339 until the agency can demonstrate the background investigation has been completed.

**Condition 28**
Retention: At the time of award application, your agency committed to retaining all sworn officer positions awarded under the CHP award with state and/or local funds for a minimum of 12 months following the conclusion of 36 months of federal funding for each position, over and above the number of locally-funded sworn officer positions that would have existed in the absence of the award. Your agency cannot satisfy the retention requirement by using CHP-funded positions to fill locally-funded vacancies resulting from attrition. 34 U.S.C. § 10382 (c)(8).

**Condition 29**
Allowable Costs Condition: The funding under this project is for the payment of three years (36 months) of approved full-time entry-level salaries and fringe benefits during the five-year (60 months) period of performance. The maximum federal share is $125,000 per officer position (unless a local match waiver is approved) for career law enforcement officer positions hired and/or rehired on or after the official award start date. Any salary and fringe benefit costs higher than entry-level that your agency pays a CHP-funded officer must be paid with local funds. Your agency is required to use CHP award funds for the specific hiring categories awarded. In accordance with 2 C.F.R. § 200.400(g), the recipient or subrecipient must not earn or keep any profit resulting from the award. Funding under this program may be used for the following categories:
• Hiring new officers, which includes filling existing officer vacancies that are no longer funded in your agency's budget;
• Rehiring officers laid off by any jurisdiction as a result of state, local, or Bureau of Indian Affairs (BIA) budget reductions; and/or
• Rehiring officers who were, at the time of award application, scheduled to be laid off (by your jurisdiction) on a specific future date as a result of state, local, or BIA budget reductions.
If your agency's local fiscal conditions have changed and your agency needs to change one or more of the funded hiring categories, your agency should request an award modification and receive prior approval before spending CHP funding under the new category. The approved budget in the award package specifies the amount of CHP funds awarded to your agency. Please note that the salary and fringe benefit costs requested in your CHP application may have been adjusted or removed. Your agency may only be reimbursed for the approved cost categories up to the amounts specified in the approved budget. Only actual allowable costs incurred during the award period will be eligible for reimbursement and drawdown. If your agency experiences any cost savings over the course of the award (for example, your award application overestimated the total entry-level officer salary and fringe benefits package), your agency may not use that excess funding to continue salary payments to the officers beyond 36 months. Any funds remaining after your agency has drawn down for the costs of approved salaries and fringe benefits incurred for each awarded position during the 36-month funding period will be deobligated during the closeout process and should not be spent by your agency.

**Condition 30**
Advancing Department of Justice Priority Problem Focus Areas: This condition applies to agencies that selected one of the following priority crime problem/focus areas to address in their COPS Hiring Program (CHP) application:
• Violent Crime
• Squatting and Encampment Enforcement
• Homeland and Border Security
• Nuisance and Abatement and Quality of Life
• School Based Policing
Your agency understands and agrees to the following: Your agency will implement the one specific community policing plan identified in your CHP award application?
Your agency will address its specific priority crime problem throughout the entire CHP award period?

Your agency will implement any organizational changes identified in its CHP award application;
Your agency will cooperate with any award monitoring by the COPS Office to ensure that it is initiating or enhancing its community policing efforts to address its priority crime problem, which may include your agency having to respond to additional or modified reporting requirements.

**Condition 31**
Supplementing, not Supplanting: State, local, and tribal government recipients must use award funds to supplement, and not supplant, state, local, or Bureau of Indian Affairs (BIA) funds that are already committed or otherwise would have been committed for award purposes (hiring, training, purchases, and/or activities) during the award period. In other words, state, local, and tribal government recipients may not use COPS Office funds to supplant (replace) state, local, or BIA funds that would have been dedicated to the COPS Office-funded item(s) in the absence of the COPS

Office award. 34 U.S.C. § 10384(a).

## Condition 32

Career Law Enforcement Officer: Officer hiring funds may only be used to pay entry-level salaries and fringe benefits for full-time "career law enforcement officers" for 36 months. The COPS Office's statute defines a "career law enforcement officer" as "a person hired on a permanent basis who is authorized by law or by a State or local public agency to engage in or supervise the prevention, detection, or investigation of violations of criminal laws." 34 U.S.C. §10389(1). A recipient agency may use officer hiring funds to pay the salary and benefits of recruits while in academy training to become "career law enforcement officers" if it is the standard practice of the agency to do so with locally-funded recruits. The State of Alaska, and any Indian tribe or tribal organization in that State, may also use officer hiring funds for a "village public safety officer" defined as "an individual employed as a village public safety officer under the program established by the State pursuant to Alaska Statute 18.65.670." Tribal Law and Order Act of 2010, Pub. L. 111-211, title II, § 247 (a)(2).

## Condition 33

Local Match: COPS Hiring Program award recipients are required to contribute a local match of at least 25 percent towards the total cost of the approved award project, unless waived in writing by the COPS Office. The local match must be a cash match from funds not previously budgeted for law enforcement purposes and must be paid during the award period. The local match contribution must be made on an increasing basis during each year of the three-year award period, with the federal share decreasing accordingly. 34 U.S.C. § 10381(g).

## Condition 34

Modifications: Occasionally, a change in an agency's fiscal or law enforcement situation necessitates a change in its COPS Office CHP award. Award modifications under CHP are evaluated on a case-by-case basis in accordance with 2 C.F.R. § 200.308(i). For federal awards in excess of the simplified acquisition threshold (currently $250,000), any modification request involving the reallocation of funding between budget categories that exceed or are expected to exceed 10 percent (10%) of the total approved budget requires prior written approval by the COPS Office. Regardless of the federal award amount or budget modification percentage, any reallocation of funding is limited to approved budget categories. In addition, any budget modification that changes the scope of the project requires prior written approval by the COPS Office. In addition, please be aware that the COPS Office will not approve any modification request that results in an increase of federal funds.

In addition, modification requests should be submitted to the COPS Office when an agency determines that it will need to shift officer positions awarded in one hiring category into a different hiring category and/or reduce the total number of positions awarded. For example, if an agency was awarded CHP funding for two new, additional sworn officer positions, but due to fiscal distress/constraints the agency needs to change the hiring category from the new hire category to the rehire category for officers laid off or scheduled for layoff on a specific future date post-application, the agency would have to request a modification. The COPS Office will only consider a modification request after an agency makes final, approved budget and/or personnel decisions. An agency may implement the modified award following written approval from the COPS Office. Please be aware that the COPS Office will not approve any modification request that results in an increase of federal funds.

During the CHP award period, it may become necessary for an agency to modify its CHP award due to changes in an agency's fiscal or law enforcement situation. Modification requests should be submitted to the COPS Office when an agency determines that it will need to shift officer positions awarded in one hiring category into a different hiring category, reduce the total number of positions awarded, shift funds among benefit categories, and/or reduce the entry-level salary and fringe benefit amounts. For example, an agency may have been awarded CHP funding for 10 new, additional full-time sworn officer positions, but due to severe fiscal distress/constraints, the agency determines it is unable to sustain all 10 positions and must reduce its request to five full-time positions; or an agency may have been awarded CHP funding for two new, additional sworn officer positions, but due to fiscal distress/constraints the agency needs to change the hiring category from the new hire category to the rehire category for officers laid off or scheduled for layoff on a specific future date post-application. Award modifications under CHP are evaluated on a case-by-case basis. The COPS Office will only consider a modification request after an agency makes final, approved budget and/or personnel decisions. An agency may implement the modified award following written approval from the COPS Office. Please be aware that the COPS Office will not approve any modification request that results in an increase of federal funds.

## Condition 35

School Resource Officer (SRO) Training Requirement: COPS Office-funded SROs are required to complete a 40-hour basic SRO training course from a list of COPS Office-approved providers. Training must be completed no later than nine months after the date shown on the award congratulatory letter or six months from the date of the SRO's hire, whichever comes first. If a COPS Office-funded SRO leaves the recipient agency after completing the training, the recipient agrees to pay for the new SRO, who is assigned to backfill this position, to attend a 40-hour basic training course. The new SRO must complete the training no later than nine months after being placed in the school. If the officer has completed 40-hour basic training within the last 12 months prior to the award date, the condition has been fulfilled. Any longer than 12 months will require the officer to retake the course. The agency must coordinate with the training provider to secure funding to cover registration and travel expenses.

If your agency fails to comply with the SRO basic training within the specified timeframe, the COPS Office may temporarily suspend grant funds or take other remedial actions in accordance with 2 C.F.R. §200.339 until your agency complies with this requirement.

## Condition 36

Extensions: Your agency may request an extension of the 60-month award performance period to receive additional time to implement your award program. Such extensions do not provide additional funding. Any request for an extension will be evaluated on a case-by-case basis. Only those recipients that can provide a reasonable justification for delays will be granted no-cost extensions. Reasonable justifications may include difficulties in filling COPS Office-funded positions, officer turnover, or other circumstances that interrupt the 36-month funding period. An extension allows your agency to compensate for such delays by providing additional time to complete the full 36 months of funding for each position awarded. 2 C.F.R. §§ 200.308(f)(10) and 200.309. Extension requests must be received prior to the end date of the award.

## Condition 37

Contracts and/or MOUs with other Jurisdictions: Sworn law enforcement officer positions awarded must be used for law enforcement activities or services that benefit your agency and the population that it serves. The items funded under the CHP award cannot be utilized by other agencies unless the items benefit the population that your agency serves. Your agency may use items funded under the CHP award to assist other law enforcement agencies under a resource sharing, mutual aid, or other agreement to address multi-jurisdictional issues as described in the agreement.

## Condition 38

Community Policing: Community policing activities to be initiated or enhanced by your agency and the officers funded by this award program were identified and described in your CHP award application. Your agency developed a community policing plan for the CHP award with specific reference to a crime or disorder problem and the following elements of community policing: (a) problem solving—your agency's plan to assess and respond to the problem identified; (b) community partnerships and support, including related governmental and community initiatives that complement your agency's proposed use of CHP funding; and (c) organizational transformation—how your agency will use the funds to reorient its mission to community policing or enhance its involvement in and commitment to community policing. Throughout the CHP award period, your agency is required to implement the community policing plan it set forth in the CHP award application.

The COPS Office defines community policing as a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. CHP awards through the specific officers funded (or an equal number of redeployed veteran officers) must be used to initiate or enhance community policing activities. All newly hired additional or rehired officers (or an equal number of redeployed veteran officers) funded under CHP must implement your agency's approved community policing plan, which you described in your award application.

## Condition 39

Memorandum of Understanding Requirement (for School Resource Officers only)

Recipients using award funding to hire and/or deploy School Resource Officers into schools understand and agree to the following:

• Your agency must submit a signed Memorandum of Understanding (MOU) between the law enforcement agency and the school partner(s) to the COPS Office before obligating or drawing down funds under this award. The MOU must be submitted to the COPS Office within 90 days of the date shown on the award letter. If your agency fails to submit the MOU within the 90 days, the COPS Office may temporarily suspend grant funds in accordance with 2 C.F.R. §200.339 until your agency submits the MOU.

• Your agency's MOU must contain the following information?

o The purpose of the MOU
o Clearly defined roles and responsibilities of the school district and the law enforcement agency, focusing officers' roles on safety
o Information sharing
o Supervision responsibility and chain of command for the SRO
o Signatures
Note: Please refer to the MOU Fact Sheet for a detailed explanation of the requirements under each of the bullets.

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Award Acceptance

### Declaration and Certification to the U.S. Department of Justice as to Acceptance

By checking the declaration and certification box below, I--

A.    Declare to the U.S. Department of Justice (DOJ), under penalty of perjury, that I have authority to make this declaration and certification on behalf of the applicant.

B.    Certify to DOJ, under penalty of perjury, on behalf of myself and the applicant, to the best of my knowledge and belief, that the following are true as of the date of this award acceptance: (1) I have conducted or there was conducted (including by applicant's legal counsel as appropriate and made available to me) a diligent review of all terms and conditions of, and all supporting materials submitted in connection with, this award, including any assurances and certifications (including anything submitted  in connection therewith by a person on behalf of the applicant before, after, or at the time of the application submission and any materials that accompany this acceptance and certification); and (2) I have the legal authority to accept this award on behalf of the applicant.

C.    Accept this award on behalf of the applicant.

D.    Declare the following to DOJ, under penalty of perjury, on behalf of myself and the applicant:  (1) I understand that, in taking (or not taking) any action pursuant to this declaration and certification, DOJ will rely upon this declaration and certification as a material representation; and (2) I understand that any materially false, fictitious, or fraudulent information or statement in this declaration and certification (or concealment or omission of a material fact as to either) may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant to civil penalties and administrative remedies under the federal False Claims Act (including under 31 U.S.C. §§ 3729-3730 and/or §§ 3801-3812) or otherwise.

**Agency Approval**

| **Title of Approving Official** | **Name of Approving Official** | **Signed Date And Time** |
|---|---|---|
| COPS Acting Director | Cory D. Randolph | 9/29/25 5:32 AM |

## Authorized Representative

☐ Declaration and Certification (Law Enforcement Executive/Program Official)

**Entity Acceptance**

## Title of Authorized Entity Official
 no value

## Name of Authorized Entity Official
 no value

**Signed Date And Time**
 no value

☐ Declaration and Certification (Government Executive/Financial Official)

**Entity Acceptance**

**Title of Authorized Entity Official**
Chief Financial Officer

**Name of Authorized Entity Official**
 no value

**Signed Date And Time**
 no value

# Exhibit 2



# Department of Justice (DOJ)

## Office of Community Oriented Policing Services (COPS Office)

*Washington, D.C. 20531*

| | |
|---|---|
| **Name and Address of Recipient:** | CITY OF TUCSON<br>255 W ALAMEDA ST |
| **City, State and Zip:** | TUCSON, AZ 85701 |
| **Recipient UEI:** | X487LACQEQN6 |

| | |
|---|---|
| **Project Title:** FY25 CPD Microgrants - CITY OF TUCSON, AZ | **Award Number:** 15JCOPS-25-GG-01048-PPSE |

**Solicitation Title:** FY25 Community Policing Development Microgrants

| | |
|---|---|
| **Federal Award Amount:** $175,000.00 | **Federal Award Date:** 10/10/25 |

| | |
|---|---|
| **Awarding Agency:** | Office of Community Oriented Policing Services |

| | |
|---|---|
| **Award Type:**<br>**Funding Instrument Type:** | Initial<br>Grant |

**Opportunity Category:** D
**Assistance Listing:**
16.710 - Public Safety Partnership and Community Policing Grants

| | |
|---|---|
| **Project Period Start Date:** 10/1/25 | **Project Period End Date:** 9/30/27 |
| **Budget Period Start Date:** 10/1/25 | **Budget Period End Date**: 9/30/27 |

**Project Description:**
The Tucson Police Department (TPD) will enhance their workforce by: (1) expanding the recruiting footprint for the department across the United States, primarily through participation in targeted job fair events, digital and social media campaigns, and traditional advertising, (2) recruiting a candidate pool from diverse backgrounds to expand efforts and attract qualified candidates and (3) by developing and encouraging a pathway for TPD's non-sworn, including Community Service Officers (CSOs), Professional Staff Investigators (PSIs), and Professional Staff to become sworn officers. The requested funding would be used to build new efforts and enhance strategies currently underway at TPD centered around marketing, and the internal Pathway to Policing (P2P) program. Specifically, funding will address marketing tactics, marketing materials, and travel for targeted recruitment efforts.

## Award Letter

October 10, 2025

Dear Chad Kasmar,

On behalf of Attorney General Pamela Bondi, it is my pleasure to inform you the Office of Community Oriented Policing Services (the COPS Office) has approved the application submitted by  CITY OF TUCSON  for an award under the funding opportunity entitled 2025 FY25 Community Policing Development Microgrants. The approved award amount is $175,000.
Review the Award Instrument below carefully and familiarize yourself with all conditions and requirements before accepting your award. The Award Instrument includes the Award Offer (Award Information, Project Information, Financial Information, and Award Conditions) and Award Acceptance. For COPS Office and OVW funding the Award Offer also includes any Other Award Documents.

Please note that award requirements include not only the conditions and limitations set forth in the Award Offer, but also compliance with assurances and certifications that relate to conduct during the period of performance for the award. These requirements encompass financial, administrative, and programmatic matters, as well as other important matters (e.g., specific restrictions on use of funds). Therefore, all key staff should receive the award conditions, the assurances and certifications, and the application as approved by the COPS Office, so that they understand the award requirements. Information on all pertinent award requirements also must be provided to any subrecipient of the award.

Should you accept the award and then fail to comply with an award requirement, DOJ will pursue appropriate remedies for non-compliance, which may include termination of the award and/or a requirement to repay award funds.

Prior to accepting the award, your Entity Administrator must assign a Financial Manager, Grant Award Administrator, and Authorized Representative(s) in the Justice Grants System (JustGrants). The Entity Administrator will need to ensure the assigned Authorized Representative(s) is current and has the legal authority to accept awards and bind the entity to the award terms and conditions. To accept the award, the Authorized Representative(s) must accept all parts of the Award Offer in the Justice Grants System (JustGrants), including by executing the required declaration and certification, within 45 days from the award date.

To access your funds, you will need to enroll in the Automated Standard Application for Payments (ASAP) system, if you haven't already completed the enrollment process in ASAP. The Entity Administrator should have already received an email from ASAP to initiate this process.

Congratulations, and we look forward to working with you.

Cory D. Randolph
COPS Acting Director

## Office for Civil Rights Notice for All Recipients

The Office for Civil Rights (OCR), Office of Justice Programs (OJP), U.S. Department of Justice (DOJ) enforces federal civil rights laws and other provisions that prohibit discrimination by recipients of federal financial assistance from OJP, the Office of Community Oriented Policing Services (COPS), and the Office on Violence Against Women (OVW).

Several civil rights laws, including Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973, require recipients of federal financial assistance (recipients) to give assurances that they will comply with those laws. Taken together, these and other civil rights laws prohibit recipients from discriminating in the provision of services and employment because of race, color, national origin, religion, disability, and sex or from discriminating in the provision of services on the bases of age.

Some recipients of DOJ financial assistance have additional obligations to comply with other applicable nondiscrimination provisions like the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits discrimination on the basis of religion in addition to race, color, national origin, and sex. Recipients may also have related requirements regarding the development and implementation of equal employment opportunity programs.

OCR provides technical assistance, training, and other resources to help recipients comply with civil rights obligations. Further, OCR administratively enforces civil rights laws and nondiscrimination provisions by investigating DOJ recipients that are the subject of discrimination complaints. In addition, OCR conducts compliance reviews of DOJ recipients based on regulatory criteria. These investigations and compliance reviews permit OCR to evaluate whether DOJ recipients are providing services to the public and engaging in employment practices in a nondiscriminatory manner.

For more information about OCR, your civil rights and nondiscrimination responsibilities, how to notify your employees or beneficiaries of their civil rights protections and responsibilities and how to file a complaint, as well as technical assistance, training, and other resources, please visit www.ojp.gov/program/civil-rights-office/outreach. If you would like OCR to assist you in fulfilling your civil rights or nondiscrimination responsibilities, please contact us at askOCR@ojp.usdoj.gov or www.ojp.gov/program/civil-rights-office/about#ocr-contacts.

## Award Information

This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.

## Recipient Information

### Recipient Name

### UEI
X487LACQEQN6

### ORI Number

### Street 1
255 W ALAMEDA ST

### Street 2

### City
TUCSON

### State/U.S. Territory
Arizona

### Zip/Postal Code
85701

### Country
United States

### County/Parish

### Province

## Award Details

### Federal Award Date
10/10/25

### Award Type
Initial

### Award Number
15JCOPS-25-GG-01048-PPSE

### Supplement Number
00

### Federal Award Amount
$175,000.00

### Funding Instrument Type
Grant

| Assistance Listing Number | Assistance Listings Program Title |
|---|---|
| 16.710 | Public Safety Partnership and Community Policing Grants |

### Statutory Authority

The Public Safety Partnership and Community Policing Act of 1994, 34 U.S.C. § 10381 et seq

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Project Information

This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.

## Solicitation Title
2025 FY25 Community Policing Development Microgrants

## Awarding Agency
COPS

## Application Number
GRANT14443112

| Grant Manager Name | Phone Number | E-mail Address |
|---|---|---|
| Ebonyque Taylor | 202-598-1297 | ebonyque.taylor@usdoj.gov |

## Project Title
FY25 CPD Microgrants - CITY OF TUCSON, AZ

## Performance Period Start Date
10/01/2025

## Performance Period End Date
09/30/2027

## Budget Period Start Date
10/01/2025

## Budget Period End Date
09/30/2027

## Project Description
The Tucson Police Department (TPD) will enhance their workforce by: (1) expanding the recruiting footprint for the department across the United States, primarily through participation in targeted job fair events, digital and social media campaigns, and traditional advertising, (2) recruiting a candidate pool from diverse backgrounds to expand efforts and attract qualified candidates and (3) by developing and encouraging a pathway for TPD's non-sworn, including Community Service Officers (CSOs), Professional Staff Investigators (PSIs), and Professional Staff to become sworn officers. The requested funding would be used to build new efforts and enhance strategies currently underway at TPD centered around marketing, and the internal Pathway to Policing (P2P) program. Specifically, funding will address marketing tactics, marketing materials, and travel for targeted recruitment efforts.

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Financial Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

A financial analysis of budgeted costs has been completed. All costs listed in the approved budget below were programmatically approved based on the final proposed detailed budget and budget narratives submitted by your agency to the COPS Office. Any adjustments or edits to the proposed budget are explained below.

Budget Clearance Date:          9/8/25 5:02 PM

| Comments |
|---|
| No items |

## Budget Summary

| Budget Category | Proposed Budget | Change | Approved Budget | Percentage |
|---|---|---|---|---|
| Sworn Officer Positions: | $0 | $0 | $0 | |
| Civilian or Non-Sworn Personnel: | $0 | $0 | $0 | |
| Travel: | $66,312 | $0 | $66,312 | |
| Equipment: | $3,700 | $0 | $3,700 | |
| Supplies: | $64,988 | -$10,000 | $54,988 | |
| SubAwards: | $0 | $0 | $0 | |
| Procurement Contracts: | $40,000 | $0 | $40,000 | |
| Other Costs: | $0 | $10,000 | $10,000 | |
| Total Direct Costs: | $175,000 | $0 | $175,000 | |
| Indirect Costs: | $0 | $0 | $0 | |
| Total Project Costs: | $175,000 | $0 | $175,000 | |
| Federal Funds: | $175,000 | $0 | $175,000 | 100.00% |
| Match Amount: | $0 | $0 | $0 | 0.00% |
| Program Income: | $0 | $0 | $0 | 0.00% |

[  ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Award Conditions

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

**Condition 1**
Restrictions on Internal Confidentiality Agreements: No recipient or subrecipient under this award, or entity that receives a contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts the lawful reporting of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information. Full-Year Continuing Appropriations and Extensions Act, 2025, Public Law 119-4; Further Consolidated Appropriations Act, 2024, Public Law 118-47, Division B, Title VII, Section 742.

**Condition 2**
Compliance with 8 U.S.C. § 1373: Authority to obligate or expend contingent on compliance with this condition. State or local government entity recipients of this award, and any subrecipient of this award at any tier that is an entity of a State or of a unit of local government, must comply with 8 U.S.C. §1373, which provides that such entities may not prohibit, or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity. This includes any prohibitions or restrictions imposed or established by a State or local government entity or official.

Any obligations or expenditures of a recipient or subrecipient that are impermissible under this condition shall be unallowable costs for purposes of this award.

References to the Immigration and Naturalization Service in 8 U.S.C. 1373 are to be read, as a legal matter, as references to components of the U.S. Department of Homeland Security.

**Condition 3**
Federal Civil Rights and Nondiscrimination Laws (certification): The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

**Condition 4**
Federal Laws, Presidential Memoranda, and Executive Orders: Recipients of grant funding must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President.

**Condition 5**
Award Monitoring Activities: Federal law requires that recipients receiving federal funding from the COPS Office must be monitored to ensure compliance with their award conditions and other applicable statutes and regulations. The COPS Office is also interested in tracking the progress of our programs and the advancement of community policing. Both aspects of award implementation—compliance and programmatic benefits—are part of the monitoring process coordinated by the U.S. Department of Justice. Award monitoring activities conducted by the COPS Office include site visits, enhanced office-based grant reviews, alleged noncompliance reviews, financial and programmatic reporting, and audit resolution. As a COPS Office award recipient, you agree to cooperate with and respond to any requests for information pertaining to your award. This includes all financial records, such as general accounting ledgers and all supporting documents. All information pertinent to the implementation of the award is subject to agency review throughout the life of the award, during the close-out process and for three-years after the submission of the final expenditure report. 2 C.F.R. §§ 200.334 and 200.337, and, as applicable, 34 U.S.C. § 10385(a).

**Condition 6**
Authorized Representative Responsibility: The recipient understands that, in accepting this award, the Authorized Representatives declare and certify, among other things, that they possess the requisite legal authority to accept the award on behalf of the recipient entity and, in so doing, accept (or adopt) all material requirements throughout the period of performance under this award. The recipient further understands, and agrees, that it will not assign anyone to the role of Authorized Representative during the period of performance under the award without first ensuring that the individual has the requisite legal authority.

**Condition 7**
Contract Provision: All contracts made by the award recipients under the federal award must contain the provisions required under 2 C.F.R. Part 200, Appendix II to Part 200—Contract Provisions for Non-Federal Entity Contracts Under Federal Awards. Please see appendices in the Award Owner's Manual for a full text of the contract provisions.

**Condition 8**
Award Owner's Manual: The recipient agrees to comply with the terms and conditions in the applicable award year COPS Office Program Award Owner's Manual; DOJ Grants Financial Guide; COPS Office statute (34 U.S.C. § 10381, et seq.) as applicable; Students, Teachers, and Officers Preventing (STOP) School Violence Act of 2018 (34 U.S.C. § 10551, et seq.) as applicable; the requirements of 2 C.F.R. Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards), including subsequent changes, as adopted by the U.S. Department of Justice in 2 C.F.R. § 2800.101; 48 C.F.R. Part 31 (FAR Part 31) as applicable (Contract Cost Principles and Procedures); the Cooperative Agreement as applicable; representations made in the application; and all other applicable program requirements, laws, orders, regulations, or circulars.

Failure to comply with one or more award requirements may result in remedial action including, but not limited to, withholding award funds, disallowing costs, suspending, or terminating the

award, or other legal action as appropriate.

Should any provision of a condition of this award be held to be invalid or unenforceable by its terms, then that provision shall first be applied with a limited construction so as to give it the maximum effect permitted by law (to any person or circumstance) under this award. Should it be held, instead, that a condition (or a provision thereof) is of utter invalidity or unenforceability, such condition (or such provision) shall be deemed severable from this award.

### Condition 9

Federal Civil Rights: The recipient and any subrecipient must comply with applicable federal civil rights and nondiscrimination statutes and regulations including: Section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), as implemented in Subparts C and D of 28 C.F.R. Part 42; section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), as implemented in Subpart G of 28 C.F.R. Part 42; section 901 of the Education Amendments of 1972 (20 U.S.C. § 1681), as implemented in Subpart D of 28 C.F.R. Parts 42 and 54; section 303 of the Age Discrimination Act of 1975 (42 U.S.C. § 6102), as implemented in Subpart I of 28 C.F.R. Part 42; and section 809(c) of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. § 10228(c)), as implemented in Subpart D of 28 C.F.R. Part 42. In addition to applicable federal statutes and regulations that pertain to civil rights and nondiscrimination, the recipient and any subrecipient must comply with the requirements in 28 C.F.R. Parts 22 (Confidentiality of Identifiable Research and Statistical Information); 28 C.F.R. Part 23 (Criminal Intelligence Systems Operating Policies); 28 C.F.R. Part 38 (Partnerships with Faith-Based and Other Neighborhood Organizations); and 28 C.F.R. Part 46 (Protection of Human Subjects). For an overview of the civil rights laws and nondiscrimination requirements in connection with your award, please see https://www.ojp.gov/program/civil-rights/overview.

### Condition 10

Duplicative Funding: The recipient understands and agrees to notify the COPS Office if it receives, from any other source, funding for the same item or service also funded under this award.

### Condition 11

Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and COPS Office authority to terminate award): The recipient and subrecipient agree to comply with the following requirements of 2 C.F.R. Part 175, Appendix A to Part 175 – Award Term:
I. Trafficking in Persons
(a) Provisions applicable to a recipient that is a private entity. (1) Under this award, the
recipient, its employees, subrecipients under this award, and subrecipient's employees must not engage in:
(i) Severe forms of trafficking in persons;
(ii) The procurement of a commercial sex act during the period of time that this award
or any subaward is in effect;
(iii) The use of forced labor in the performance of this award or any subaward; or
(iv) Acts that directly support or advance trafficking in persons, including the following acts:
(A) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;
(B) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:
(1) Exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant or cooperative agreement; or
(2) The employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;
(C) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;
(D) Charging recruited employees a placement or recruitment fee; or
(E) Providing or arranging housing that fails to meet the host country's housing and safety standards.
(2) The Federal agency may unilaterally terminate this award or take any remedial
actions authorized by 22 U.S.C. 7104b(c), without penalty, if any private entity under this award:
(i) Is determined to have violated a prohibition in paragraph (a)(1) of this appendix; or
(ii) Has an employee that is determined to have violated a prohibition in paragraph
(a)(1) of this appendix through conduct that is either:
(A) Associated with the performance under this award; or
(B) Imputed to the recipient or the subrecipient using the standards and due process for imputing the conduct of an

individual to an organization that are provided in 2 CFR part 180, ''OMB
Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement),'' as implemented by DOJ
at 2 C.F.R. Part 2867.
(b) Provision applicable to a recipient other than a private entity. (1) The Federal agency
may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C.
7104b(c), without penalty, if a subrecipient that is a private entity under this award:
(i) Is determined to have violated a prohibition in paragraph (a)(1) of this
appendix; or
(ii) Has an employee that is determined to have violated a prohibition in paragraph
(a)(1) of this appendix through conduct that is either:
(A) Associated with the performance under this award; or
(B) Imputed to the subrecipient using the standards and due process for imputing the
conduct of an individual to an organization that are provided in 2 CFR part 180, ''OMB
Guidelines to Agencies on Government-wide Debarment and Suspension
(Nonprocurement),'' as implemented by 2 C.F.R. Part 2867.
(c) Provisions applicable to any recipient.
(1) The recipient must inform the Federal agency and the Inspector General of the Federal agency immediately of any
information you receive from any source alleging a violation of a prohibition in paragraph (a)(1) of this appendix.
(2) The Federal agency's right to unilaterally terminate this award as described in paragraphs (a)(2) or (b)(1) of this
appendix:
(i) Implements the requirements of 22 U.S.C. 78, and
(ii) Is in addition to all other remedies for noncompliance that are available to the Federal agency under this award.
(3) The recipient must include the requirements of paragraph (a)(1) of this award term in any subaward it makes to a
private entity.
(4) If applicable, the recipient must also comply with the compliance plan and certification requirements in 2 CFR
175.105(b).
(d) Definitions. For purposes of this award term:
Employee means either:
(1) An individual employed by the recipient or a subrecipient who is engaged in the performance of the project or
program under this award; or
(2) Another person engaged in the performance of the project or program under this award and not compensated by
the recipient including, but not limited to, a volunteer or individual whose services are contributed by a third party as an
in-kind contribution toward cost sharing
requirements.
Private Entity means any entity, including for-profit organizations, nonprofit organizations, institutions of higher
education, and hospitals. The term does not include foreign public entities, Indian Tribes, local governments, or states
as defined in 2 CFR 200.1.
The terms ''severe forms of trafficking in persons,'' ''commercial sex act,'' ''sex trafficking,'' ''Abuse or threatened abuse
of law or legal process,'' ''coercion,'' ''debt bondage,'' and ''involuntary servitude'' have the meanings given at section
103 of the TVPA, as amended (22 U.S.C. 7102).


**Condition 12**
Termination: Recipient understands and agrees that the COPS Office may terminate funding, in whole or in part, for
the following reasons:
(1) When the recipient fails to comply with the terms and conditions of a Federal award.
(2) When the recipient agrees to the termination and termination conditions.
(3) When the recipient provides the COPS Office written notification requesting termination including the reasons,
effective date, and the portion of the award to be terminated. The COPS Office may terminate the entire award if the
remaining portion will not accomplish the purposes of the award.
(4) Pursuant to any other award terms and conditions, including, when an award no longer effectuates the program
goals or agency priorities to the extent such termination is authorized by law.
2. C.F.R. § 200.340.


**Condition 13**
Recipient Integrity and Performance Matters: For awards over $500,000, the recipient agrees to comply with the
following requirements of 2 C.F.R. Part 200, Appendix XII to Part 200 – Award Term and Condition for Recipient
Integrity and Performance Matters:
I. Reporting of Matters Related to Recipient Integrity and Performance

(a) General Reporting Requirement.

(1) If the total value of your active grants, cooperative agreements, and procurement contracts from all Federal agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient must ensure the information available in the responsibility/qualification records through the System for Award Management (SAM.gov), about civil, criminal, or administrative proceedings described in paragraph (b) of this award term is current and complete. This is a statutory requirement under section 872 of Public Law 110–417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111– 212, all information posted in responsibility/qualification records in SAM.gov on or after April 15, 2011 (except past performance reviews required for Federal procurement contracts) will be publicly available.

(b) Proceedings About Which You Must Report.

(1) You must submit the required information about each proceeding that—

(i) Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

(ii) Reached its final disposition during the most recent five-year period; and

(iii) Is one of the following—

(A) A criminal proceeding that resulted in a conviction;

(B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

(C) An administrative proceeding that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

(D) Any other criminal, civil, or administrative proceeding if—

(1) It could have led to an outcome described in paragraph (b)(1)(iii)(A) through (C);

(2) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

(3) The requirement in this award term to disclose information about the proceeding does not conflict with applicable laws and regulations.

(c) Reporting Procedures. Enter the required information in SAM.gov for each proceeding described in paragraph (b) of this award term. You do not need to submit the information a second time under grants and cooperative agreements that you received if you already provided the information in SAM.gov because you were required to do so under Federal procurement contracts that you were awarded.

(d) Reporting Frequency. During any period of time when you are subject to the requirement in paragraph (a) of this award term, you must report proceedings information in SAM.gov for the most recent five-year period, either to report new information about a proceeding that you have not reported previously or affirm that there is no new information to report. If you have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000, you must disclose semiannually any information about the criminal, civil, and administrative proceedings.

(e) Definitions. For purposes of this award term—

Administrative proceeding means a nonjudicial process that is adjudicatory in nature to make a determination of fault or liability (for example, Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with the performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

Conviction means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere. Total value of currently active grants, cooperative agreements, and procurement contracts includes the value of the Federal share already received plus any anticipated Federal share under those awards (such as continuation funding).


## Condition 14

Reporting Subawards and Executive Compensation: The recipient agrees to comply with the following requirements of 2 C.F.R. Part 170, Appendix A to Part 170 – Award Term:

I. Reporting Subawards and Executive Compensation

(a) Reporting of first-tier subawards—(1) Applicability. Unless the recipient is exempt as provided in paragraph (d) of this award term, the recipient must report each subaward that equals or exceeds $30,000 in Federal funds for a subaward to an entity or Federal agency. The recipient must also report a subaward if a modification increases the Federal funding to an amount that equals or exceeds $30,000. All reported subawards should reflect the total amount of the
subaward.

(2) Reporting Requirements. (i) The entity or Federal agency must report each subaward
described in paragraph (a)(1) of this award term to the Federal Funding Accountability
and Transparency Act Subaward Reporting System (FSRS) at http://www.fsrs.gov.

(ii) For subaward information, report no later than the end of the month following the month in which the subaward was issued. (For example, if the subaward was made on November 7, 2025, the subaward must be reported by no later than December 31, 2025).

(b) Reporting total compensation of recipient executives for entities—(1) Applicability. The recipient must report the total compensation for each of the recipient's five most highly compensated executives for the preceding completed fiscal year if:

(i) The total Federal funding authorized to date under this Federal award equals or exceeds $30,000;

(ii) in the preceding fiscal year, the recipient received:

(A) 80 percent or more of the recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and,

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

(2) Reporting Requirements. The recipient must report executive total compensation described in paragraph (b)(1) of this appendix:

(i) As part of the recipient's registration profile at https://www.sam.gov.

(ii) No later than the month following the month in which this Federal award is made, and annually after that. (For example, if this Federal award was made on November 7, 2025, the executive total compensation must be reported by no later than December 31, 2025.)

(c) Reporting of total compensation of subrecipient executives—(1) Applicability. Unless a first-tier subrecipient is exempt as provided in paragraph (d) of this appendix, the recipient must report the executive total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

(i) The total Federal funding authorized to date under the subaward equals or exceeds $30,000;

(ii) In the subrecipient's preceding fiscal year, the subrecipient received:

(A) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and,

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal awards (and subawards) subject to the Transparency Act; and

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

(2) Reporting Requirements. Subrecipients must report to the recipient their executive total compensation described in paragraph (c)(1) of this appendix. The recipient is required to submit this information to the Federal Funding Accountability and Transparency Act Subaward Reporting System (FSRS) at http://www.fsrs.gov no later than the end of the month following the month in which the subaward was made. (For example, if the subaward was made on November 7, 2025, the subaward must be reported by no later than December 31, 2025.)

(d) Exemptions. (1) A recipient with gross income under $300,000 in the previous tax year is exempt from the requirements to report:

(i) Subawards, and

(ii) The total compensation of the five most highly compensated executives of any subrecipient.

(e) Definitions. For purposes of this award term:

Entity includes:

(1) Whether for profit or nonprofit:

(i) A corporation;

(ii) An association;

(iii) A partnership;

(iv) A limited liability company;

(v) A limited liability partnership;

(vi) A sole proprietorship;
(vii) Any other legal business entity;
(viii) Another grantee or contractor that is not excluded by subparagraph (2); and
(ix) Any State or locality;
(2) Does not include:
(i) An individual recipient of Federal financial assistance; or
(ii) A Federal employee.
Executive means an officer, managing partner, or any other employee holding a management position.
Subaward has the meaning given in 2 CFR200.1.
Subrecipient has the meaning given in 2CFR 200.1.
Total Compensation means the cash and noncash dollar value an executive earns during an entity's preceding fiscal year. This includes all items of compensation as prescribed in 17 CFR 229.402(c)(2).

## Condition 15
Assurances and Certifications: The recipient acknowledges its agreement to comply with the Assurances and Certifications forms that were signed as part of its application.

## Condition 16
Conflict of Interest: Recipients and subrecipients must disclose in writing to the COPS Office or pass-through entity, as applicable, any potential conflict of interest affecting the awarded federal funding in 2 C.F.R. § 200.112.

## Condition 17
Debarment and Suspension: The recipient agrees not to award federal funds under this program to any party which is debarred or suspended from participation in federal assistance programs. 2 C.F.R. Part 180 (Government-wide Nonprocurement Debarment and Suspension) and 2 C.F.R. Part 2867 (DOJ Nonprocurement Debarment and Suspension).

## Condition 18
Equal Employment Opportunity Plan (EEOP): Please see the Office for Civil Rights website https://www.ojp.gov/eeop-notice for current information on the recipient's responsibilities related to the federal regulations pertaining to the development and implementation of an Equal Employment Opportunity Plan.

## Condition 19
Employment Eligibility: The recipient agrees to complete and keep on file, as appropriate, the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS) Employment Eligibility Verification Form (I-9). This form is to be used by recipients of federal funds to verify that persons are eligible to work in the United States. Immigration Reform and Control Act of 1986 (IRCA), Public Law 99-603.

## Condition 20
Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information: Recipients and subrecipients agree not to discharge, demote, or otherwise discriminate against an employee as reprisal for the employee disclosing information that he or she reasonably believes is evidence of gross mismanagement of a federal contract or award, a gross waste of federal funds, an abuse of authority relating to a federal contract or award, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or award. Recipients and subrecipients also agree to provide to their employees in writing (in the predominant native language of the workforce) of the rights and remedies provided in 41 U.S.C. § 4712. Please see appendices in the Award Owner's Manual for a full text of the statute.

## Condition 21
False Statements: False statements or claims made in connection with COPS Office awards may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law. 31 U.S.C. § 3729-3733.

## Condition 22
Mandatory Disclosure: Recipients and subrecipients must timely disclose in writing to the Federal awarding agency or

pass-through entity, as applicable, all federal criminal law violations involving fraud, bribery, or gratuity that may potentially affect the awarded federal funding. Recipients that receive an award over $500,000 must also report certain civil, criminal, or administrative proceedings in SAM and are required to comply with the Term and Condition for Recipient Integrity and Performance Matters as set out in 2 C.F.R. Part 200, Appendix XII to Part 200. Failure to make required disclosures can result in any of the remedies, including suspension and debarment, described in 2 C.F.R. § 200.339. 2 C.F.R. § 200.113.

## Condition 23
Reports/Performance Goals: To assist the COPS Office in monitoring and tracking the performance of your award, your agency will be responsible for submitting semi-annual programmatic performance reports that describe project activities during the reporting period and quarterly Federal Financial Reports using Standard Form 425 (SF-425). 2 C.F.R. §§ 200.328 - 200.329. The performance report is used to track your agency's progress in implementing the award, and, as applicable, community policing strategies including gauging the effectiveness of your agency's community policing capacity. The Federal Financial Report is used to track the expenditures of the recipient's award funds on a cumulative basis throughout the life of the award.

## Condition 24
System for Award Management (SAM.gov) and Universal Identifier Requirements: The recipient agrees to comply with the following requirements of 2 C.F.R. Part 25, Appendix A to Part 25 – Award Term:
I. System for Award Management (SAM.gov) and Universal Identifier Requirements
(a) Requirement for System for Award Management. (1) Unless exempt from this requirement under 2 CFR 25.110, the recipient must maintain a current and active registration in SAM.gov. The recipient's registration must always be current and active until the recipient submits all final reports required under this Federal award or receives the final payment, whichever is later. The recipient must review and update its information in SAM.gov at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the recipient's immediate and highest-level owner and subsidiaries and providing information about the recipient's predecessors that have received a Federal award or contract within the last three years.
(b) Requirement for Unique Entity Identifier (UEI). (1) If the recipient is authorized to make subawards under this Federal award, the recipient:
(i) Must notify potential subrecipients that no entity may receive a subaward until the entity has provided its UEI to the recipient.
(ii) Must not make a subaward to an entity unless the entity has provided its UEI to the recipient. Subrecipients are not required to complete full registration in SAM.gov to obtain a UEI.
(c) Definitions. For the purposes of this award term:
System for Award Management (SAM.gov) means the Federal repository into which a recipient must provide the information required for the conduct of business as a recipient. Additional information about registration procedures may be found in SAM.gov (currently at https://www.sam.gov).
Unique entity identifier means the universal identifier assigned by SAM.gov to uniquely identify an entity.
Entity is defined at 2 CFR 25.400 and includes all of the following types as defined
in 2 CFR 200.1:
(1) Non-Federal entity;
(2) Foreign organization;
(3) Foreign public entity;
(4) Domestic for-profit organization; and
(5) Federal agency.
Subaward has the meaning given in 2 CFR 200.1.
Subrecipient has the meaning given in 2 CFR 200.1.

## Condition 25
Additional High-Risk Recipient Requirements: The recipient agrees to comply with any additional requirements that may be imposed during the award performance period if the awarding agency determines that the recipient is a high-risk recipient. 2 C.F.R. § 200.208.

## Condition 26
Allowable Costs: The funding under this award is for the payment of approved costs for program-specific purposes. The allowable costs approved for your agency's award are limited to those listed in your agency's award package. In

accordance with 2 C.F.R. § 200.400(g), the recipient or subrecipient must not earn or keep any profit resulting from the award. Your agency may not use award funds for any costs not identified as allowable in the award package.

**Condition 27**
Training Guiding Principles: Any training or training materials developed or delivered with award funding provided by the Office of Community Oriented Policing Services is to adhere to the following guiding principles –

1. Trainings must comply with applicable law.
In developing and conducting training under the award, recipients (and any subrecipients) shall not violate the Constitution or any federal law, including any law prohibiting discrimination.

2. The content of trainings and training materials must be accurate, appropriately tailored, and focused.
The content of training programs must be accurate, useful to those being trained, and well matched to the program's stated objectives. Training materials used or distributed at trainings must be accurate, relevant, and consistent with these guiding principles.

3. Trainers must be well-qualified in the subject area and skilled in presenting it.
Trainers must possess the subject-matter knowledge and the subject-specific training experience necessary to meet the

4. Trainers must demonstrate the highest standards of professionalism.
Trainers must comport themselves with professionalism. While trainings will necessarily entail varying teaching styles, techniques, and degrees of formality, as appropriate to the particular training goal, professionalism demands that trainers instruct in the manner that best communicates the subject matter while conveying respect for all.

**Condition 28**
Computer Network Requirement: The recipient understands and agrees that no award funds may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography. Nothing in this requirement limits the use of funds necessary for any federal, state, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities. Full-Year Continuing Appropriations and Extensions Act, 2025, Public Law 119-4; Consolidated Appropriations Act, 2024, Public Law 118-42, Division C, Title V, Section 527.

**Condition 29**
Evaluations: The COPS Office may conduct monitoring or sponsor national evaluations of its award programs. The recipient agrees to cooperate with the monitors and evaluators. 34 U.S.C. § 10385(b).

**Condition 30**
Extensions: Recipients may request an extension of the award period to receive additional time to implement their award program. Such extensions do not provide additional funding. Only those recipients that can provide a reasonable justification for delays will be granted no-cost extensions. Extension requests must be received prior to the end date of the award. 2 C.F.R. §§ 200.308(f)(10) and 200.309.

**Condition 31**
Human Subjects Research: The recipient agrees to comply with the provisions of the U.S. Department of Justice's common rule regarding Protection of Human Subjects, 28 C.F.R. Part 46, prior to the expenditure of Federal funds to perform such activities, if applicable. The recipient also agrees to comply with 28 C.F.R. Part 22 regarding the safeguarding of individually identifiable information collected from research participants.

**Condition 32**
Modifications: Award modifications are evaluated on a case-by-case basis in accordance with 2 C.F.R. § 200.308(i). For federal awards in excess of the simplified acquisition threshold (currently, $250,000), any modification request involving the reallocation of funding between budget categories that exceed or are expected to exceed 10 percent (10%) of the total approved budget requires prior written approval by the COPS Office. Regardless of the federal award amount or budget modification percentage, any reallocation of funding is limited to approved budget categories. In addition, any budget modification that changes the scope of the project requires prior written approval by the COPS Office.

**Condition 33**
The Paperwork Reduction Act Clearance and Privacy Act Review: Recipient agrees, if required, to submit all surveys, interview protocols, and other information collections to the COPS Office for submission to the Office of Management and Budget (OMB) for clearance under the Paperwork Reduction Act (PRA). Before submission to OMB, all information collections that request personally identifiable information must be reviewed by the COPS Office to ensure compliance with the Privacy Act. The Privacy Act compliance review and the PRA clearance process may take several months to complete. 44 U.S.C. §§ 3501-3520 and 5 U.S.C. § 552a.

**Condition 34**
Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment: Recipient agrees that it, and its subrecipients, will not use award funds to extend, renew, or enter into any contract to procure or obtain any covered telecommunication and video surveillance services or equipment as described in 2 CFR §200.216. Covered services and equipment include telecommunications or video surveillance services or equipment produced or provided by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities); Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities); or an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of China. The use of award funds on covered telecommunications or video surveillance services or equipment are unallowable.
2. C.F.R. § §200.216 & 471. See also Section 889 of the John S. McCain National Defense Authorization Act of Fiscal Year 2019, Public Law 115-232.

**Condition 35**
Sole Source Justification: Recipients who have been awarded funding for the procurement of an item (or group of items) or service in excess of the simplified acquisition threshold (currently, $250,000) and who plan to seek approval for use of a noncompetitive procurement process must provide a written sole source justification to the COPS Office for approval prior to obligating, expending, or drawing down award funds for that item or service. 2 C.F.R. § 200.325(b)(2).

**Condition 36**
Supplementing, not Supplanting: State, local, and tribal government recipients must use award funds to supplement, and not supplant, state, local, or Bureau of Indian Affairs (BIA) funds that are already committed or otherwise would have been committed for award purposes (hiring, training, purchases, and/or activities) during the award period. In other words, state, local, and tribal government recipients may not use COPS Office funds to supplant (replace) state, local, or BIA funds that would have been dedicated to the COPS Office-funded item(s) in the absence of the COPS Office award. 34 U.S.C. § 10384(a).

**Condition 37**
Travel Costs: Travel costs for transportation, lodging and subsistence, and related items are allowable with prior approval from the COPS Office. Payment for allowable travel costs will be in accordance with 2 C.F.R. § 200.475.

**Condition 38**
Copyright: If applicable, the recipient may copyright any work that is subject to copyright and was developed, or for which ownership was acquired, under this award in accordance with 2 C.F.R. § 200.315(b). The COPS Office reserves a royalty-free, nonexclusive and irrevocable license to reproduce, publish, or otherwise use the work, in whole or in part (including create derivative works), for Federal Government purposes, and to authorize others to do so. The COPS Office also reserves the right, at its discretion, not to publish deliverables and other materials developed under this award as a U.S. Department of Justice resource.

Products and deliverables developed with award funds and published as a U.S. Department of Justice resource will contain the following copyright notice:

"This resource was developed under a federal award and may be subject to copyright. The U.S. Department of Justice reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use the work for Federal Government purposes and to authorize others to do so. This resource may be freely distributed and used for noncommercial and educational purposes only."

**Condition 39**
Requirement to report actual or imminent breach of personally identifiable information (PII).

The recipient (and any subrecipient at any tier) must have written procedures in place to respond in the event of an actual or imminent breach (as defined in OMB M-17-12) if it (or a subrecipient)-- 1) creates, collects, uses, processes, stores, maintains, disseminates, discloses, or disposes of personally identifiable information (PII) (as defined in 2 C.F.R. 200.1) within the scope of a COPS Office grant-funded program or activity, or 2) uses or operates a Federal information system (as defined in OMB Circular A-130). The recipient's breach procedures must include a requirement to report actual or imminent breach of PII to the recipient's COPS Office Program Manager no later than 24 hours after an occurrence of an actual breach, or the detection of an imminent breach.

**Condition 40**
Domestic preferences for procurements: Recipient agrees that it, and its subrecipients, to the greatest extent practicable, will provide a preference for the purchase, acquisition, or use of goods, products, and materials produced in, and services offered in, the United States. 2. C.F.R. § 200.322 and Executive Order 14005, Ensuring the Future is Made in All of America by All of America's Workers, January 25, 2021.

**Condition 41**
Public Release Information: The recipient agrees to submit one copy of all reports and proposed publications resulting from this award ninety (90) days prior to public release. Any publications (written, curricula, visual, sound, or websites) or computer programs, whether or not published at government expense, shall contain the following statement:

"This project was supported, in whole or in part, by federal award number [YYYY-XX-XXXX] awarded to [Entity] by the U.S. Department of Justice, Office of Community Oriented Policing Services. The opinions contained herein are those of the author(s) or contributor(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific individuals, agencies, companies, products, or services should not be considered an endorsement by the author(s), contributor(s), or the U.S. Department of Justice.

**Condition 42**
Determination of suitability required, in advance, for certain individuals who may interact with participating minors.

SCOPE. This condition applies to this award if it is indicated –- in the application for the award (as approved by DOJ)(or in the application for any subaward, at any tier), the DOJ funding announcement (solicitation), or an associated federal statute –- that a purpose of some or all of the activities to be carried out under the award (whether by the recipient, or a subrecipient at any tier) is to benefit a set of activities under 18 years of age.

The recipient, and any subrecipient at any tier, must make determinations of suitability before certain individuals may interact with participating minors. This requirement applies regardless of an individual's employment status.

1. Advance determination regarding suitability. The recipient (and any subrecipient at any tier) may not permit any covered individual to interact with any participating minor in the course of activities under the award, unless the recipient or subrecipient first has made a written determination of the suitability of that individual to interact with participating minors, based on current and appropriate information as described in paragraph 3.E., and taking into account the factors and considerations described in paragraph 4.

2. Updates and reexaminations

A. The recipient (or subrecipient) must, at least every five years, update the searches described in paragraph 3.E.1. and 2., reexamine the covered individual's suitability determination in light of those search results, and, if appropriate, modify or withdraw that determination.

B. The recipient also must reexamine a covered individual's suitability determination upon learning of information that reasonably may suggest unsuitability and, if appropriate, modify or withdraw that determination.

3. Definitions

A. "Covered individual" means any individual (other than a participating minor, as defined in this condition, or a client of

the recipient (or subrecipient)) who is expected, or reasonably likely, to interact with any participating minor (other than the individual's own minor children). A covered individual need not have any particular employment status or legal relationship with the recipient (or subrecipient). Such an individual might be an employee of a recipient (or subrecipient), but also might be (for example) a consultant, contractor, employee of a contractor, trainee, volunteer, or teacher.

B. "Participating minor." All individuals under 18 years of age within the set of individuals described in the scope section of this condition as it appears on the award document are participating minors.

C. "Interaction" includes physical contact, oral and written communication, and the transmission of images and sound, and may be in person or by electronic (or similar) means. But "interaction" does not include--

(1) brief contact that is both unexpected by the recipient (or subrecipient) and unintentional on the part of the covered individual -- such as might occur when a postal carrier delivers mail to an administrative office.

(2) personally-accompanied contact -- that is, infrequent or occasional contact (for example, by someone who comes to make a presentation) in the presence of an accompanying adult, pursuant to written policies and procedures of the recipient (or subrecipient) that are designed to ensure that -- throughout the contact -- an appropriate adult who has been determined to be suitable pursuant to this condition will closely and personally accompany, and remain continuously within view and earshot of, the covered individual.

D. "Activities under the award." Whether paid for with federal funds from the award, "matching" funds included in the COPS Office-approved budget for the award, or "program income" for the award as defined by the (DOJ) Part 200 Uniform Requirements), activities under the award include both --

(1) activities carried out under the award by the recipient (or subrecipient); and

(2) actions taken by an entity or individual pursuant to a procurement contract under the award or to a procurement contract under a subaward at any tier.

E. "Current and appropriate information"

In addition to information resulting from checks or screening required by applicable federal, state, tribal, or local law, and/or by the recipient's (or subrecipient's) written policies and procedures, current and appropriate information includes the results of all required searches listed below, each of which must be completed no earlier than six months before the determination regarding suitability.

(1) Public sex offender and child abuse websites/registries

A search (by current name, and, if applicable, by previous name(s) or aliases), of the pertinent and reasonably-accessible federal, state, and (if applicable) local and tribal sex offender and child abuse websites/public registries, including--

(a) the Dru Sjodin National Sex Offender Public Website (www.nsopw.gov);

(b) the website/public registry for each state (and/or tribe, if applicable) in which the individual lives, works, or goes to school, or has lived, worked, or gone to school at any time during the past five years; and

(c) the website/public registry for each state (and/or tribe, if applicable) in which the individual is expected to, or reasonably likely to, interact with a participating minor in the course of activities under the award.

(2) Criminal history registries and similar repositories of criminal history records

For each individual at least 18 years of age who is a covered individual under this award, a fingerprint search (or, if the recipient or subrecipient documents that a fingerprint search is not legally available, a name-based search, using current and, if applicable, previous names and aliases) (-- encompassing at least the time period beginning five calendar years preceding the date of the search request -- of pertinent state (and, if applicable, local and tribal) criminal history registries or similar repositories, including--

(a) the criminal history registry for each state in which the individual lives, works, or goes to school, or has lived, worked, or gone to school at any time during the past five years; and

(b) the criminal history registry for each state in which he or she is expected to, or reasonably likely to, interact with a participating minor in the course of activities under the award.

4. Factors and considerations in determinations regarding suitability

In addition to the factors and considerations that must or may be considered under applicable federal, state, tribal, or local law, and under the recipient's (or subrecipient's) written policies and procedures, in making a determination regarding suitability, the recipient (or subrecipient) must consider the current and appropriate information described in paragraph 3.E.

In particular (unless applicable law precludes it), with respect to either an initial determination of suitability or a subsequent reexamination, the recipient (or subrecipient) may not determine that a covered individual is suitable to interact with participating minors in the course of activities under the award if the covered individual--

A. Withholds consent to a criminal history search required by this condition;

B. Knowingly makes (or made) a false statement that affects, or is intended to affect, any search required by this condition;

C. Is listed as a registered sex offender on the Dru Sjodin National Sex Offender Public Website;

D. To the knowledge of the recipient (or subrecipient), has been convicted -- whether as a felony or misdemeanor -- under federal, state, tribal, or local law of any of the following crimes (or any substantially equivalent criminal offense, regardless of the specific words by which it may be identified in law):

(1) sexual or physical abuse, neglect, or endangerment of an individual under the age of 18 at the time of the offense;
(2) rape/sexual assault, including conspiracy to commit rape/sexual assault;
(3) sexual exploitation, such as through child pornography or sex trafficking;
(4) kidnapping;
(5) voyeurism; or

E. Is determined by a federal, state, tribal, or local government agency not to be suitable.

5. Administration; rule of construction

A. The requirements of this condition are among those that must be included in any subaward (at any tier), and must be monitored. They apply as of the date of acceptance of this award, and throughout the remainder of the period of performance.

B. The recipient is to contact the DOJ awarding agency with any questions regarding the requirements of this condition and must not allow a covered individual to interact with a participating minor until such questions are answered.

C. Award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions designed to ensure compliance with this condition, provided that such funds would not supplant non-federal funds that would otherwise be available for such costs.

D. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, or any person or other entity, to violate any federal, state, tribal, or local law, including any applicable civil rights or nondiscrimination law.

**Condition 43**
The recipient understands that one or more cost items within the approved budget is subject to further programmatic review. The recipient agrees not to obligate, expend, or draw down funds for these specific cost items until the COPS Office issues an Award Condition Modification (ACM) which will remove this award condition and release the identified funds. The partial withholding is specific to cost items requiring further review and will not impact use of the remaining funding. For additional information on the specific cost item(s) that are pending programmatic review, please contact

the COPS Office Program Manager.

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Award Acceptance

### Declaration and Certification to the U.S. Department of Justice as to Acceptance

By checking the declaration and certification box below, I--

A.    Declare to the U.S. Department of Justice (DOJ), under penalty of perjury, that I have authority to make this declaration and certification on behalf of the applicant.

B.    Certify to DOJ, under penalty of perjury, on behalf of myself and the applicant, to the best of my knowledge and belief, that the following are true as of the date of this award acceptance: (1) I have conducted or there was conducted (including by applicant's legal counsel as appropriate and made available to me) a diligent review of all terms and conditions of, and all supporting materials submitted in connection with, this award, including any assurances and certifications (including anything submitted  in connection therewith by a person on behalf of the applicant before, after, or at the time of the application submission and any materials that accompany this acceptance and certification); and (2) I have the legal authority to accept this award on behalf of the applicant.

C.    Accept this award on behalf of the applicant.

D.    Declare the following to DOJ, under penalty of perjury, on behalf of myself and the applicant:  (1) I understand that, in taking (or not taking) any action pursuant to this declaration and certification, DOJ will rely upon this declaration and certification as a material representation; and (2) I understand that any materially false, fictitious, or fraudulent information or statement in this declaration and certification (or concealment or omission of a material fact as to either) may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant to civil penalties and administrative remedies under the federal False Claims Act (including under 31 U.S.C. §§ 3729-3730 and/or §§ 3801-3812) or otherwise.

### Agency Approval

| Title of Approving Official | Name of Approving Official | Signed Date And Time |
|---|---|---|
| COPS Acting Director | Cory D. Randolph | 9/29/25 8:08 PM |

## Authorized Representative

☐ Declaration and Certification (Law Enforcement Executive/Program Official)

### Entity Acceptance

### Title of Authorized Entity Official
no value

### Name of Authorized Entity Official
no value

### Signed Date And Time
no value

☐ Declaration and Certification (Government Executive/Financial Official)

### Entity Acceptance

**Title of Authorized Entity Official**
City Manager

**Name of Authorized Entity Official**
 no value

**Signed Date And Time**
 no value

# Exhibit 3



# Department of Justice (DOJ)

### Office of Community Oriented Policing Services (COPS Office)

*Washington, D.C. 20531*

| | |
|---|---|
| **Name and Address of Recipient:** | COUNTY OF SANTA CLARA<br>55 W YOUNGER AVE |
| **City, State and Zip:** | SAN JOSE, CA 95110 |
| **Recipient UEI:** | JNECJW88ML98 |

| | |
|---|---|
| **Project Title:** FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects - COUNTY OF SANTA CLARA, CA | **Award Number:** 15JCOPS-25-GG-00436-LEMH |

**Solicitation Title:** FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects

| | |
|---|---|
| **Federal Award Amount:** $200,000.00 | **Federal Award Date:** 10/10/25 |

| | |
|---|---|
| **Awarding Agency:** | Office of Community Oriented Policing Services |
| **Award Type:**<br>**Funding Instrument Type:** | Initial<br>Grant |

**Opportunity Category:** D
**Assistance Listing:**
16.070 - Law Enforcement Mental Health and Wellness Act

| | |
|---|---|
| **Project Period Start Date:** 10/1/25 | **Project Period End Date:** 9/30/27 |
| **Budget Period Start Date:** 10/1/25 | **Budget Period End Date:** 9/30/27 |

**Project Description:**

The Santa Clara County Sheriff's Office is committed to building a resilient, mission-ready workforce through a comprehensive wellness strategy that supports both fitness for duty and long-term quality of life. They will contract a part-time law enforcement chaplain (20 hours/week for 2 years) to offer emotional, moral, and spiritual support to deputies, professional staff, and their families; provide evidence-based training that strengthens compassion, emotional regulation, and resilience; and launch a 30-Minute Wellness Check Pilot Program. Expected outcomes include 150-200 personnel receiving wellness checks, increased EAP referrals and early interventions, and creation of a sustainable model for a mandatory wellness check program in future budget cycles. Together, these integrated strategies aim to reduce mental health stigma, increase access to timely and culturally competent care, and strengthen individual and organizational resilience across the agency.

**Award Letter**

October 10, 2025

Dear Robert Jonsen,

On behalf of Attorney General Pamela Bondi, it is my pleasure to inform you the Office of Community Oriented Policing Services (the COPS Office) has approved the application submitted by  COUNTY OF SANTA CLARA  for an award under the funding opportunity entitled 2025 FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects. The approved award amount is $200,000.

Review the Award Instrument below carefully and familiarize yourself with all conditions and requirements before accepting your award. The Award Instrument includes the Award Offer (Award Information, Project Information, Financial Information, and Award Conditions) and Award Acceptance. For COPS Office and OVW funding the Award Offer also includes any Other Award Documents.

Please note that award requirements include not only the conditions and limitations set forth in the Award Offer, but also compliance with assurances and certifications that relate to conduct during the period of performance for the award. These requirements encompass financial, administrative, and programmatic matters, as well as other important matters (e.g., specific restrictions on use of funds). Therefore, all key staff should receive the award conditions, the assurances and certifications, and the application as approved by the COPS Office, so that they understand the award requirements. Information on all pertinent award requirements also must be provided to any subrecipient of the award.

Should you accept the award and then fail to comply with an award requirement, DOJ will pursue appropriate remedies for non-compliance, which may include termination of the award and/or a requirement to repay award funds.

Prior to accepting the award, your Entity Administrator must assign a Financial Manager, Grant Award Administrator, and Authorized Representative(s) in the Justice Grants System (JustGrants). The Entity Administrator will need to ensure the assigned Authorized Representative(s) is current and has the legal authority to accept awards and bind the entity to the award terms and conditions. To accept the award, the Authorized Representative(s) must accept all parts of the Award Offer in the Justice Grants System (JustGrants), including by executing the required declaration and certification, within 45 days from the award date.

To access your funds, you will need to enroll in the Automated Standard Application for Payments (ASAP) system, if you haven't already completed the enrollment process in ASAP. The Entity Administrator should have already received an email from ASAP to initiate this process.

Congratulations, and we look forward to working with you.


Cory D. Randolph
COPS Acting Director
## Office for Civil Rights Notice for All Recipients

The Office for Civil Rights (OCR), Office of Justice Programs (OJP), U.S. Department of Justice (DOJ) enforces federal civil rights laws and other provisions that prohibit discrimination by recipients of federal financial assistance from OJP, the Office of Community Oriented Policing Services (COPS), and the Office on Violence Against Women (OVW).

Several civil rights laws, including Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973, require recipients of federal financial assistance (recipients) to give assurances that they will comply with those laws.  Taken together, these and other civil rights laws prohibit recipients from discriminating in the provision of services and employment because of race, color, national origin, religion, disability, and sex or from discriminating in the provision of services on the bases of age.

Some recipients of DOJ financial assistance have additional obligations to comply with other applicable nondiscrimination provisions like the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits discrimination on the basis of religion in addition to race, color, national origin, and sex.  Recipients may also have related requirements regarding the development and implementation of equal employment opportunity programs.

OCR provides technical assistance, training, and other resources to help recipients comply with civil rights obligations. Further, OCR administratively enforces civil rights laws and nondiscrimination provisions by investigating DOJ recipients that are the subject of discrimination complaints.  In addition, OCR conducts compliance reviews of DOJ recipients based on regulatory criteria.  These investigations and compliance reviews permit OCR to evaluate whether DOJ recipients are providing services to the public and engaging in employment practices in a nondiscriminatory manner.

For more information about OCR, your civil rights and nondiscrimination responsibilities, how to notify your employees or beneficiaries of their civil rights protections and responsibilities and how to file a complaint, as well as technical assistance, training, and other resources, please visit www.ojp.gov/program/civil-rights-office/outreach.  If you would like OCR to assist you in fulfilling your civil rights or nondiscrimination responsibilities, please contact us at askOCR@ojp.usdoj.gov or www.ojp.gov/program/civil-rights-office/about#ocr-contacts.

## Award Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

## Recipient Information

## Recipient Name

**UEI**
JNECJW88ML98

**ORI Number**
CA04300

**Street 1**
55 W YOUNGER AVE

**Street 2**

**City**
SAN JOSE

**State/U.S. Territory**
California

**Zip/Postal Code**
95110

**Country**
United States

**County/Parish**

**Province**

## Award Details

**Federal Award Date**
10/10/25

**Award Type**
Initial

**Award Number**
15JCOPS-25-GG-00436-LEMH

**Supplement Number**
00

**Federal Award Amount**
$200,000.00

**Funding Instrument Type**
Grant

| Assistance Listing Number | Assistance Listings Program Title |
|---|---|
| 16.070 | Law Enforcement Mental Health and Wellness Act |

**Statutory Authority**

The Public Safety Partnership and Community Policing Act of 1994, 34 U.S.C. § 10381 et seq

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

Page: 3 of 17

## Project Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

**Solicitation Title**
2025 FY25 Law Enforcement Mental Health and
Wellness Act (LEMHWA) Implementation Projects

**Awarding Agency**
COPS

**Application Number**
GRANT14420594

**Grant Manager Name**
Bethany Wilson

**Phone Number**
202-330-2299

**E-mail Address**
bethany.wilson@usdoj.gov

**Project Title**
FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects - COUNTY OF SANTA CLARA, CA

**Performance Period Start Date**
10/01/2025

**Performance Period End Date**
09/30/2027

**Budget Period Start Date**
10/01/2025

**Budget Period End Date**
09/30/2027

## Project Description

The Santa Clara County Sheriff's Office is committed to building a resilient, mission-ready workforce through a comprehensive wellness strategy that supports both fitness for duty and long-term quality of life. They will contract a part-time law enforcement chaplain (20 hours/week for 2 years) to offer emotional, moral, and spiritual support to deputies, professional staff, and their families; provide evidence-based training that strengthens compassion, emotional regulation, and resilience; and launch a 30-Minute Wellness Check Pilot Program. Expected outcomes include 150-200 personnel receiving wellness checks, increased EAP referrals and early interventions, and creation of a sustainable model for a mandatory wellness check program in future budget cycles. Together, these integrated strategies aim to reduce mental health stigma, increase access to timely and culturally competent care, and strengthen individual and organizational resilience across the agency.

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Financial Information

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

A financial analysis of budgeted costs has been completed. All costs listed in the approved budget below were

programmatically approved based on the final proposed detailed budget and budget narratives submitted by your agency to the COPS Office. Any adjustments or edits to the proposed budget are explained below.

Budget Clearance Date: 8/26/25 9:43 PM

| **Comments** |
| --- |
| No items |

## Budget Summary

| Budget Category | Proposed Budget | Change | Approved Budget | Percentage |
| --- | --- | --- | --- | --- |
| Sworn Officer Positions: | $0 | $0 | $0 | |
| Civilian or Non-Sworn Personnel: | $100,000 | $0 | $100,000 | |
| Travel: | $0 | $0 | $0 | |
| Equipment: | $0 | $0 | $0 | |
| Supplies: | $5,500 | -$5,500 | $0 | |
| SubAwards: | $0 | $0 | $0 | |
| Procurement Contracts: | $0 | $0 | $0 | |
| Other Costs: | $94,500 | $5,500 | $100,000 | |
| Total Direct Costs: | $200,000 | $0 | $200,000 | |
| Indirect Costs: | $0 | $0 | $0 | |
| Total Project Costs: | $200,000 | $0 | $200,000 | |
| Federal Funds: | $200,000 | $0 | $200,000 | 100.00% |
| Match Amount: | $0 | $0 | $0 | 0.00% |
| Program Income: | $0 | $0 | $0 | 0.00% |

[ ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

## Award Conditions

**This award is offered subject to the conditions or limitations set forth in the Award Information, Project Information, Financial Information, and Award Conditions.**

**Condition 1**
Restrictions on Internal Confidentiality Agreements: No recipient or subrecipient under this award, or entity that receives a contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts the lawful reporting of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive

such information. Full-Year Continuing Appropriations and Extensions Act, 2025, Public Law 119-4; Further Consolidated Appropriations Act, 2024, Public Law 118-47, Division B, Title VII, Section 742.

**Condition 2**
Compliance with 8 U.S.C. § 1373: Authority to obligate or expend contingent on compliance with this condition. State or local government entity recipients of this award, and any subrecipient of this award at any tier that is an entity of a State or of a unit of local government, must comply with 8 U.S.C. §1373, which provides that such entities may not prohibit, or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity. This includes any prohibitions or restrictions imposed or established by a State or local government entity or official.

Any obligations or expenditures of a recipient or subrecipient that are impermissible under this condition shall be unallowable costs for purposes of this award.

References to the Immigration and Naturalization Service in 8 U.S.C. 1373 are to be read, as a legal matter, as references to components of the U.S. Department of Homeland Security.

**Condition 3**
Federal Civil Rights and Nondiscrimination Laws (certification): The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

**Condition 4**
Federal Laws, Presidential Memoranda, and Executive Orders: Recipients of grant funding must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President.

**Condition 5**
Award Monitoring Activities: Federal law requires that recipients receiving federal funding from the COPS Office must be monitored to ensure compliance with their award conditions and other applicable statutes and regulations. The COPS Office is also interested in tracking the progress of our programs and the advancement of community policing. Both aspects of award implementation—compliance and programmatic benefits—are part of the monitoring process coordinated by the U.S. Department of Justice. Award monitoring activities conducted by the COPS Office include site visits, enhanced office-based grant reviews, alleged noncompliance reviews, financial and programmatic reporting, and audit resolution. As a COPS Office award recipient, you agree to cooperate with and respond to any requests for information pertaining to your award. This includes all financial records, such as general accounting ledgers and all supporting documents. All information pertinent to the implementation of the award is subject to agency review throughout the life of the award, during the close-out process and for three-years after the submission of the final expenditure report. 2 C.F.R. §§ 200.334 and 200.337, and, as applicable, 34 U.S.C. § 10385(a).

**Condition 6**
Authorized Representative Responsibility: The recipient understands that, in accepting this award, the Authorized Representatives declare and certify, among other things, that they possess the requisite legal authority to accept the award on behalf of the recipient entity and, in so doing, accept (or adopt) all material requirements throughout the period of performance under this award. The recipient further understands, and agrees, that it will not assign anyone to the role of Authorized Representative during the period of performance under the award without first ensuring that the individual has the requisite legal authority.

**Condition 7**
Contract Provision: All contracts made by the award recipients under the federal award must contain the provisions required under 2 C.F.R. Part 200, Appendix II to Part 200—Contract Provisions for Non-Federal Entity Contracts Under Federal Awards. Please see appendices in the Award Owner's Manual for a full text of the contract provisions.

## Condition 8

Award Owner's Manual: The recipient agrees to comply with the terms and conditions in the applicable award year COPS Office Program Award Owner's Manual; DOJ Grants Financial Guide; COPS Office statute (34 U.S.C. § 10381, et seq.) as applicable; Students, Teachers, and Officers Preventing (STOP) School Violence Act of 2018 (34 U.S.C. § 10551, et seq.) as applicable; the requirements of 2 C.F.R. Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards), including subsequent changes, as adopted by the U.S. Department of Justice in 2 C.F.R. § 2800.101; 48 C.F.R. Part 31 (FAR Part 31) as applicable (Contract Cost Principles and Procedures); the Cooperative Agreement as applicable; representations made in the application; and all other applicable program requirements, laws, orders, regulations, or circulars.

Failure to comply with one or more award requirements may result in remedial action including, but not limited to, withholding award funds, disallowing costs, suspending, or terminating the
award, or other legal action as appropriate.

Should any provision of a condition of this award be held to be invalid or unenforceable by its terms, then that provision shall first be applied with a limited construction so as to give it the maximum effect permitted by law (to any person or circumstance) under this award. Should it be held, instead, that a condition (or a provision thereof) is of utter invalidity or unenforceability, such condition (or such provision) shall be deemed severable from this award.

## Condition 9

Federal Civil Rights: The recipient and any subrecipient must comply with applicable federal civil rights and nondiscrimination statutes and regulations including: Section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), as implemented in Subparts C and D of 28 C.F.R. Part 42; section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), as implemented in Subpart G of 28 C.F.R. Part 42; section 901 of the Education Amendments of 1972 (20 U.S.C. § 1681), as implemented in Subpart D of 28 C.F.R. Parts 42 and 54; section 303 of the Age Discrimination Act of 1975 (42 U.S.C. § 6102), as implemented in Subpart I of 28 C.F.R. Part 42; and section 809(c) of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. § 10228(c)), as implemented in Subpart D of 28 C.F.R. Part 42. In addition to applicable federal statutes and regulations that pertain to civil rights and nondiscrimination, the recipient and any subrecipient must comply with the requirements in 28 C.F.R. Parts 22 (Confidentiality of Identifiable Research and Statistical Information); 28 C.F.R. Part 23 (Criminal Intelligence Systems Operating Policies); 28 C.F.R. Part 38 (Partnerships with Faith-Based and Other Neighborhood Organizations); and 28 C.F.R. Part 46 (Protection of Human Subjects). For an overview of the civil rights laws and nondiscrimination requirements in connection with your award, please see https://www.ojp.gov/program/civil-rights/overview.

## Condition 10

Duplicative Funding: The recipient understands and agrees to notify the COPS Office if it receives, from any other source, funding for the same item or service also funded under this award.

## Condition 11

Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and COPS Office authority to terminate award): The recipient and subrecipient agree to comply with the following requirements of 2 C.F.R. Part 175, Appendix A to Part 175 – Award Term:
I. Trafficking in Persons
(a) Provisions applicable to a recipient that is a private entity. (1) Under this award, the
recipient, its employees, subrecipients under this award, and subrecipient's employees must not engage in:
(i) Severe forms of trafficking in persons;
(ii) The procurement of a commercial sex act during the period of time that this award
or any subaward is in effect;
(iii) The use of forced labor in the performance of this award or any subaward; or
(iv) Acts that directly support or advance trafficking in persons, including the following acts:
(A) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;
(B) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:
(1) Exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant or cooperative agreement; or
(2) The employee is a victim of human trafficking seeking victim services or legal redress in the country of employment

Page: 7 of 17

or a witness in a human trafficking enforcement action;

(C) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

(D) Charging recruited employees a placement or recruitment fee; or

(E) Providing or arranging housing that fails to meet the host country's housing and safety standards.

(2) The Federal agency may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if any private entity under this award:

(i) Is determined to have violated a prohibition in paragraph (a)(1) of this appendix; or

(ii) Has an employee that is determined to have violated a prohibition in paragraph (a)(1) of this this appendix through conduct that is either:

(A) Associated with the performance under this award; or

(B) Imputed to the recipient or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement)," as implemented by DOJ at 2 C.F.R. Part 2867.

(b) Provision applicable to a recipient other than a private entity. (1) The Federal agency may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if a subrecipient that is a private entity under this award:

(i) Is determined to have violated a prohibition in paragraph (a)(1) of this appendix; or

(ii) Has an employee that is determined to have violated a prohibition in paragraph (a)(1) of this appendix through conduct that is either:

(A) Associated with the performance under this award; or

(B) Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement)," as implemented by 2 C.F.R. Part 2867.

(c) Provisions applicable to any recipient.

(1) The recipient must inform the Federal agency and the Inspector General of the Federal agency immediately of any information you receive from any source alleging a violation of a prohibition in paragraph (a)(1) of this appendix.

(2) The Federal agency's right to unilaterally terminate this award as described in paragraphs (a)(2) or (b)(1) of this appendix:

(i) Implements the requirements of 22 U.S.C. 78, and

(ii) Is in addition to all other remedies for noncompliance that are available to the Federal agency under this award.

(3) The recipient must include the requirements of paragraph (a)(1) of this award term in any subaward it makes to a private entity.

(4) If applicable, the recipient must also comply with the compliance plan and certification requirements in 2 CFR 175.105(b).

(d) Definitions. For purposes of this award term:

Employee means either:

(1) An individual employed by the recipient or a subrecipient who is engaged in the performance of the project or program under this award; or

(2) Another person engaged in the performance of the project or program under this award and not compensated by the recipient including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing requirements.

Private Entity means any entity, including for-profit organizations, nonprofit organizations, institutions of higher education, and hospitals. The term does not include foreign public entities, Indian Tribes, local governments, or states as defined in 2 CFR 200.1.

The terms "severe forms of trafficking in persons," "commercial sex act," "sex trafficking," "Abuse or threatened abuse of law or legal process," "coercion," "debt bondage," and "involuntary servitude" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).


**Condition 12**

Termination: Recipient understands and agrees that the COPS Office may terminate funding, in whole or in part, for the following reasons:

(1) When the recipient fails to comply with the terms and conditions of a Federal award.

(2) When the recipient agrees to the termination and termination conditions.

(3) When the recipient provides the COPS Office written notification requesting termination including the reasons,

effective date, and the portion of the award to be terminated. The COPS Office may terminate the entire award if the remaining portion will not accomplish the purposes of the award.

(4) Pursuant to any other award terms and conditions, including, when an award no longer effectuates the program goals or agency priorities to the extent such termination is authorized by law.

2. C.F.R. § 200.340.


**Condition 13**

Recipient Integrity and Performance Matters: For awards over $500,000, the recipient agrees to comply with the following requirements of 2 C.F.R. Part 200, Appendix XII to Part 200 – Award Term and Condition for Recipient Integrity and Performance Matters:

I. Reporting of Matters Related to Recipient Integrity and Performance

(a) General Reporting Requirement.

(1) If the total value of your active grants, cooperative agreements, and procurement contracts from all Federal agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient must ensure the information available in the responsibility/qualification records through the System for Award Management (SAM.gov), about civil, criminal, or administrative proceedings described in paragraph (b) of this award term is current and complete. This is a statutory requirement under section 872 of Public Law 110–417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111–212, all information posted in responsibility/qualification records in SAM.gov on or after April 15, 2011 (except past performance reviews required for Federal procurement contracts) will be publicly available.

(b) Proceedings About Which You Must Report.

(1) You must submit the required information about each proceeding that—

(i) Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

(ii) Reached its final disposition during the most recent five-year period; and

(iii) Is one of the following—

(A) A criminal proceeding that resulted in a conviction;

(B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

(C) An administrative proceeding that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

(D) Any other criminal, civil, or administrative proceeding if—

(1) It could have led to an outcome described in paragraph (b)(1)(iii)(A) through (C);

(2) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

(3) The requirement in this award term to disclose information about the proceeding does not conflict with applicable laws and regulations.

(c) Reporting Procedures. Enter the required information in SAM.gov for each proceeding described in paragraph (b) of this award term. You do not need to submit the information a second time under grants and cooperative agreements that you received if you already provided the information in SAM.gov because you were required to do so under Federal procurement contracts that you were awarded.

(d) Reporting Frequency. During any period of time when you are subject to the requirement in paragraph (a) of this award term, you must report proceedings information in SAM.gov for the most recent five-year period, either to report new information about a proceeding that you have not reported previously or affirm that there is no new information to report. If you have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000, you must disclose semiannually any information about the criminal, civil, and administrative proceedings.

(e) Definitions. For purposes of this award term—

Administrative proceeding means a nonjudicial process that is adjudicatory in nature to make a determination of fault or liability (for example, Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with the performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

Conviction means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere. Total value of currently active grants, cooperative agreements, and procurement contracts includes the value of the Federal share already received plus any anticipated Federal share under those awards (such as continuation funding).


**Condition 14**

Reporting Subawards and Executive Compensation: The recipient agrees to comply with the following requirements of 2 C.F.R. Part 170, Appendix A to Part 170 – Award Term:

I. Reporting Subawards and Executive Compensation

(a) Reporting of first-tier subawards—(1) Applicability. Unless the recipient is exempt as provided in paragraph (d) of this award term, the recipient must report each subaward that equals or exceeds $30,000 in Federal funds for a subaward to an entity or Federal agency. The recipient must also report a subaward if a modification increases the Federal funding to an amount that equals or exceeds $30,000. All reported subawards should reflect the total amount of the
subaward.

(2) Reporting Requirements. (i) The entity or Federal agency must report each subaward
described in paragraph (a)(1) of this award term to the Federal Funding Accountability
and Transparency Act Subaward Reporting System (FSRS) at http://www.fsrs.gov.

(ii) For subaward information, report no later than the end of the month following the month in which the subaward was issued. (For example, if the subaward was made on November 7, 2025, the subaward must be reported by no later than December 31, 2025).

(b) Reporting total compensation of recipient executives for entities—(1) Applicability. The recipient must report the total compensation for each of the recipient's five most highly compensated executives for the preceding completed fiscal year if:

(i) The total Federal funding authorized to date under this Federal award equals or
exceeds $30,000;

(ii) in the preceding fiscal year, the recipient received:

(A) 80 percent or more of the recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and,

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

(2) Reporting Requirements. The recipient must report executive total compensation described in paragraph (b)(1) of this appendix:

(i) As part of the recipient's registration profile at https://www.sam.gov.

(ii) No later than the month following the month in which this Federal award is made, and annually after that. (For example, if this Federal award was made on November 7,
2025, the executive total compensation must be reported by no later than December 31,
2025.)

(c) Reporting of total compensation of subrecipient executives—(1) Applicability. Unless a first-tier subrecipient is exempt as provided in paragraph (d) of this appendix, the recipient must report the executive total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

(i) The total Federal funding authorized to date under the subaward equals or exceeds
$30,000;

(ii) In the subrecipient's preceding fiscal year, the subrecipient received:

(A) 80 percent or more of its annual gross revenues from Federal procurement contracts
(and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and,

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal awards (and subawards) subject to the Transparency Act; and

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see
the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

(2) Reporting Requirements. Subrecipients must report to the recipient their executive total compensation described in paragraph
(c)(1) of this appendix. The recipient is required to submit this information to the
Federal Funding Accountability and Transparency Act Subaward Reporting System (FSRS) at http://www.fsrs.gov no later than the end of the month following the month in which the subaward was made. (For example, if the subaward was made on November 7, 2025, the subaward must be reported by no later than December 31, 2025).

(d) Exemptions. (1) A recipient with gross income under $300,000 in the previous tax year is exempt from the requirements to report:
(i) Subawards, and
(ii) The total compensation of the five most highly compensated executives of any subrecipient.
(e) Definitions. For purposes of this award term:
Entity includes:
(1) Whether for profit or nonprofit:
(i) A corporation;
(ii) An association;
(iii) A partnership;
(iv) A limited liability company;
(v) A limited liability partnership;
(vi) A sole proprietorship;
(vii) Any other legal business entity;
(viii) Another grantee or contractor that is not excluded by subparagraph (2); and
(ix) Any State or locality;
(2) Does not include:
(i) An individual recipient of Federal financial assistance; or
(ii) A Federal employee.
Executive means an officer, managing partner, or any other employee holding a management position.
Subaward has the meaning given in 2 CFR200.1.
Subrecipient has the meaning given in 2CFR 200.1.
Total Compensation means the cash and noncash dollar value an executive earns during an entity's preceding fiscal year. This includes all items of compensation as prescribed in 17 CFR 229.402(c)(2).

**Condition 15**
Assurances and Certifications: The recipient acknowledges its agreement to comply with the Assurances and Certifications forms that were signed as part of its application.

**Condition 16**
Conflict of Interest: Recipients and subrecipients must disclose in writing to the COPS Office or pass-through entity, as applicable, any potential conflict of interest affecting the awarded federal funding in 2 C.F.R. § 200.112.

**Condition 17**
Debarment and Suspension: The recipient agrees not to award federal funds under this program to any party which is debarred or suspended from participation in federal assistance programs. 2 C.F.R. Part 180 (Government-wide Nonprocurement Debarment and Suspension) and 2 C.F.R. Part 2867 (DOJ Nonprocurement Debarment and Suspension).

**Condition 18**
Equal Employment Opportunity Plan (EEOP): Please see the Office for Civil Rights website https://www.ojp.gov/eeop-notice for current information on the recipient's responsibilities related to the federal regulations pertaining to the development and implementation of an Equal Employment Opportunity Plan.

**Condition 19**
Employment Eligibility: The recipient agrees to complete and keep on file, as appropriate, the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS) Employment Eligibility Verification Form (I-9). This form is to be used by recipients of federal funds to verify that persons are eligible to work in the United States. Immigration Reform and Control Act of 1986 (IRCA), Public Law 99-603.

**Condition 20**
Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information: Recipients and subrecipients agree not to discharge, demote, or otherwise discriminate against an employee as reprisal for the employee disclosing information that he or she reasonably believes is evidence of gross mismanagement of a federal contract or award, a gross waste of federal funds, an abuse of authority relating to a federal contract or award, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal

contract (including the competition for or negotiation of a contract) or award. Recipients and subrecipients also agree to provide to their employees in writing (in the predominant native language of the workforce) of the rights and remedies provided in 41 U.S.C. § 4712. Please see appendices in the Award Owner's Manual for a full text of the statute.

**Condition 21**
False Statements: False statements or claims made in connection with COPS Office awards may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law. 31 U.S.C. § 3729-3733.

**Condition 22**
Mandatory Disclosure: Recipients and subrecipients must timely disclose in writing to the Federal awarding agency or pass-through entity, as applicable, all federal criminal law violations involving fraud, bribery, or gratuity that may potentially affect the awarded federal funding. Recipients that receive an award over $500,000 must also report certain civil, criminal, or administrative proceedings in SAM and are required to comply with the Term and Condition for Recipient Integrity and Performance Matters as set out in 2 C.F.R. Part 200, Appendix XII to Part 200. Failure to make required disclosures can result in any of the remedies, including suspension and debarment, described in 2 C.F.R. § 200.339. 2 C.F.R. § 200.113.

**Condition 23**
Reports/Performance Goals: To assist the COPS Office in monitoring and tracking the performance of your award, your agency will be responsible for submitting semi-annual programmatic performance reports that describe project activities during the reporting period and quarterly Federal Financial Reports using Standard Form 425 (SF-425). 2 C.F.R. §§ 200.328 - 200.329. The performance report is used to track your agency's progress in implementing the award, and, as applicable, community policing strategies including gauging the effectiveness of your agency's community policing capacity. The Federal Financial Report is used to track the expenditures of the recipient's award funds on a cumulative basis throughout the life of the award.

**Condition 24**
System for Award Management (SAM.gov) and Universal Identifier Requirements: The recipient agrees to comply with the following requirements of 2 C.F.R. Part 25, Appendix A to Part 25 – Award Term:
I. System for Award Management (SAM.gov) and Universal Identifier Requirements
(a) Requirement for System for Award Management. (1) Unless exempt from this requirement under 2 CFR 25.110, the recipient must maintain a current and active registration in SAM.gov. The recipient's registration must always be current and active until the recipient submits all final reports required under this Federal award or receives the final payment, whichever is later. The recipient must review and update its information in SAM.gov at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the recipient's immediate and highest-level owner and subsidiaries and providing information about the recipient's predecessors that have received a Federal award or contract within the last three years.
(b) Requirement for Unique Entity Identifier (UEI). (1) If the recipient is authorized to make subawards under this Federal award, the recipient:
(i) Must notify potential subrecipients that no entity may receive a subaward until the entity has provided its UEI to the recipient.
(ii) Must not make a subaward to an entity unless the entity has provided its UEI to the recipient. Subrecipients are not required to complete full registration in SAM.gov to obtain a UEI.
(c) Definitions. For the purposes of this award term:
System for Award Management (SAM.gov) means the Federal repository into which a recipient must provide the information required for the conduct of business as a recipient. Additional information about registration procedures may be found in SAM.gov (currently at https://www.sam.gov).
Unique entity identifier means the universal identifier assigned by SAM.gov to uniquely identify an entity.
Entity is defined at 2 CFR 25.400 and includes all of the following types as defined in 2 CFR 200.1:
(1) Non-Federal entity;
(2) Foreign organization;
(3) Foreign public entity;
(4) Domestic for-profit organization; and
(5) Federal agency.

Subaward has the meaning given in 2 CFR 200.1.
Subrecipient has the meaning given in 2 CFR 200.1.

**Condition 25**
Additional High-Risk Recipient Requirements: The recipient agrees to comply with any additional requirements that may be imposed during the award performance period if the awarding agency determines that the recipient is a high-risk recipient. 2 C.F.R. § 200.208.

**Condition 26**
Allowable Costs: The funding under this award is for the payment of approved costs for program-specific purposes. The allowable costs approved for your agency's award are limited to those listed in your agency's award package. In accordance with 2 C.F.R. § 200.400(g), the recipient or subrecipient must not earn or keep any profit resulting from the award. Your agency may not use award funds for any costs not identified as allowable in the award package.

**Condition 27**
Training Guiding Principles: Any training or training materials developed or delivered with award funding provided by the Office of Community Oriented Policing Services is to adhere to the following guiding principles –

1. Trainings must comply with applicable law.
In developing and conducting training under the award, recipients (and any subrecipients) shall not violate the Constitution or any federal law, including any law prohibiting discrimination.

2. The content of trainings and training materials must be accurate, appropriately tailored, and focused.
The content of training programs must be accurate, useful to those being trained, and well matched to the program's stated objectives. Training materials used or distributed at trainings must be accurate, relevant, and consistent with these guiding principles.

3. Trainers must be well‐qualified in the subject area and skilled in presenting it.
Trainers must possess the subject‐matter knowledge and the subject‐specific training experience necessary to meet th

4. Trainers must demonstrate the highest standards of professionalism.
Trainers must comport themselves with professionalism. While trainings will necessarily entail varying teaching styles, techniques, and degrees of formality, as appropriate to the particular training goal, professionalism demands that trainers instruct in the manner that best communicates the subject matter while conveying respect for all.

**Condition 28**
Computer Network Requirement: The recipient understands and agrees that no award funds may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography. Nothing in this requirement limits the use of funds necessary for any federal, state, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities. Full-Year Continuing Appropriations and Extensions Act, 2025, Public Law 119-4; Consolidated Appropriations Act, 2024, Public Law 118-42, Division C, Title V, Section 527.

**Condition 29**
Evaluations: The COPS Office may conduct monitoring or sponsor national evaluations of its award programs. The recipient agrees to cooperate with the monitors and evaluators. 34 U.S.C. § 10385(b).

**Condition 30**
Extensions: Recipients may request an extension of the award period to receive additional time to implement their award program. Such extensions do not provide additional funding. Only those recipients that can provide a reasonable justification for delays will be granted no-cost extensions. Extension requests must be received prior to the end date of the award. 2 C.F.R. §§ 200.308(f)(10) and 200.309.

**Condition 31**
Human Subjects Research: The recipient agrees to comply with the provisions of the U.S. Department of Justice's

common rule regarding Protection of Human Subjects, 28 C.F.R. Part 46, prior to the expenditure of Federal funds to perform such activities, if applicable. The recipient also agrees to comply with 28 C.F.R. Part 22 regarding the safeguarding of individually identifiable information collected from research participants.

**Condition 32**
Modifications: Award modifications are evaluated on a case-by-case basis in accordance with 2 C.F.R. § 200.308(i). For federal awards in excess of the simplified acquisition threshold (currently, $250,000), any modification request involving the reallocation of funding between budget categories that exceed or are expected to exceed 10 percent (10%) of the total approved budget requires prior written approval by the COPS Office. Regardless of the federal award amount or budget modification percentage, any reallocation of funding is limited to approved budget categories. In addition, any budget modification that changes the scope of the project requires prior written approval by the COPS Office.

**Condition 33**
The Paperwork Reduction Act Clearance and Privacy Act Review: Recipient agrees, if required, to submit all surveys, interview protocols, and other information collections to the COPS Office for submission to the Office of Management and Budget (OMB) for clearance under the Paperwork Reduction Act (PRA). Before submission to OMB, all information collections that request personally identifiable information must be reviewed by the COPS Office to ensure compliance with the Privacy Act. The Privacy Act compliance review and the PRA clearance process may take several months to complete. 44 U.S.C. §§ 3501-3520 and 5 U.S.C. § 552a.

**Condition 34**
Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment: Recipient agrees that it, and its subrecipients, will not use award funds to extend, renew, or enter into any contract to procure or obtain any covered telecommunication and video surveillance services or equipment as described in 2 CFR §200.216. Covered services and equipment include telecommunications or video surveillance services or equipment produced or provided by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities); Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities); or an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of China. The use of award funds on covered telecommunications or video surveillance services or equipment are unallowable.
2. C.F.R. § § 200.216 & 471. See also Section 889 of the John S. McCain National Defense Authorization Act of Fiscal Year 2019, Public Law 115-232.

**Condition 35**
Sole Source Justification: Recipients who have been awarded funding for the procurement of an item (or group of items) or service in excess of the simplified acquisition threshold (currently, $250,000) and who plan to seek approval for use of a noncompetitive procurement process must provide a written sole source justification to the COPS Office for approval prior to obligating, expending, or drawing down award funds for that item or service. 2 C.F.R. § 200.325(b)(2).

**Condition 36**
Supplementing, not Supplanting: State, local, and tribal government recipients must use award funds to supplement, and not supplant, state, local, or Bureau of Indian Affairs (BIA) funds that are already committed or otherwise would have been committed for award purposes (hiring, training, purchases, and/or activities) during the award period. In other words, state, local, and tribal government recipients may not use COPS Office funds to supplant (replace) state, local, or BIA funds that would have been dedicated to the COPS Office-funded item(s) in the absence of the COPS Office award. 34 U.S.C. § 10384(a).

**Condition 37**
Travel Costs: Travel costs for transportation, lodging and subsistence, and related items are allowable with prior approval from the COPS Office. Payment for allowable travel costs will be in accordance with 2 C.F.R. § 200.475.

**Condition 38**
Copyright: If applicable, the recipient may copyright any work that is subject to copyright and was developed, or for

which ownership was acquired, under this award in accordance with 2 C.F.R. § 200.315(b). The COPS Office reserves a royalty-free, nonexclusive and irrevocable license to reproduce, publish, or otherwise use the work, in whole or in part (including create derivative works), for Federal Government purposes, and to authorize others to do so. The COPS Office also reserves the right, at its discretion, not to publish deliverables and other materials developed under this award as a U.S. Department of Justice resource.

Products and deliverables developed with award funds and published as a U.S. Department of Justice resource will contain the following copyright notice:

"This resource was developed under a federal award and may be subject to copyright. The U.S. Department of Justice reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use the work for Federal Government purposes and to authorize others to do so. This resource may be freely distributed and used for noncommercial and educational purposes only."

**Condition 39**
Requirement to report actual or imminent breach of personally identifiable information (PII).

The recipient (and any subrecipient at any tier) must have written procedures in place to respond in the event of an actual or imminent breach (as defined in OMB M-17-12) if it (or a subrecipient)-- 1) creates, collects, uses, processes, stores, maintains, disseminates, discloses, or disposes of personally identifiable information (PII) (as defined in 2 C.F.R. 200.1) within the scope of a COPS Office grant-funded program or activity, or 2) uses or operates a Federal information system (as defined in OMB Circular A-130). The recipient's breach procedures must include a requirement to report actual or imminent breach of PII to the recipient's COPS Office Program Manager no later than 24 hours after an occurrence of an actual breach, or the detection of an imminent breach.

**Condition 40**
Domestic preferences for procurements: Recipient agrees that it, and its subrecipients, to the greatest extent practicable, will provide a preference for the purchase, acquisition, or use of goods, products, and materials produced in, and services offered in, the United States. 2. C.F.R. § 200.322 and Executive Order 14005, Ensuring the Future is Made in All of America by All of America's Workers, January 25, 2021.

**Condition 41**
The recipient understands that one or more cost items within the approved budget is subject to further programmatic review. The recipient agrees not to obligate, expend, or draw down funds for these specific cost items until the COPS Office issues an Award Condition Modification (ACM) which will remove this award condition and release the identified funds. The partial withholding is specific to cost items requiring further review and will not impact use of the remaining funding. For additional information on the specific cost item(s) that are pending programmatic review, please contact the COPS Office Program Manager.

**Condition 42**
Public Release Information: The recipient agrees to submit one copy of all reports and proposed publications resulting from this award ninety (90) days prior to public release. Any publications (written, curricula, visual, sound, or websites) or computer programs, whether or not published at government expense, shall contain the following statement:

"This project was supported, in whole or in part, by federal award number [YYYY-XX-XXXX] awarded to [Entity] by the U.S. Department of Justice, Office of Community Oriented Policing Services. The opinions contained herein are those of the author(s) or contributor(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific individuals, agencies, companies, products, or services should not be considered an endorsement by the author(s), contributor(s), or the U.S. Department of Justice.

[  ] *I have read and understand the information presented in this section of the Federal Award Instrument.*

**Award Acceptance**

**Declaration and Certification to the U.S. Department of Justice as to Acceptance**

By checking the declaration and certification box below, I--

A.   Declare to the U.S. Department of Justice (DOJ), under penalty of perjury, that I have authority to make this declaration and certification on behalf of the applicant.

B.   Certify to DOJ, under penalty of perjury, on behalf of myself and the applicant, to the best of my knowledge and belief, that the following are true as of the date of this award acceptance: (1) I have conducted or there was conducted (including by applicant's legal counsel as appropriate and made available to me) a diligent review of all terms and conditions of, and all supporting materials submitted in connection with, this award, including any assurances and certifications (including anything submitted  in connection therewith by a person on behalf of the applicant before, after, or at the time of the application submission and any materials that accompany this acceptance and certification); and (2) I have the legal authority to accept this award on behalf of the applicant.

C.   Accept this award on behalf of the applicant.

D.   Declare the following to DOJ, under penalty of perjury, on behalf of myself and the applicant:  (1) I understand that, in taking (or not taking) any action pursuant to this declaration and certification, DOJ will rely upon this declaration and certification as a material representation; and (2) I understand that any materially false, fictitious, or fraudulent information or statement in this declaration and certification (or concealment or omission of a material fact as to either) may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant to civil penalties and administrative remedies under the federal False Claims Act (including under 31 U.S.C. §§ 3729-3730 and/or §§ 3801-3812) or otherwise.

**Agency Approval**

| **Title of Approving Official** | **Name of Approving Official** | **Signed Date And Time** |
|---|---|---|
| COPS Acting Director | Cory D. Randolph | 9/29/25 7:17 PM |

## Authorized Representative

☐ Declaration and Certification (Law Enforcement Executive/Program Official)

**Entity Acceptance**

### Title of Authorized Entity Official
no value

### Name of Authorized Entity Official
no value

### Signed Date And Time
no value

☐ Declaration and Certification (Government Executive/Financial Official)

**Entity Acceptance**

### Title of Authorized Entity Official
County Executive

### Name of Authorized Entity Official
no value

### Signed Date And Time
no value

Exhibit 4



# Office of the Attorney General
## Washington, D. C. 20530

July 29, 2025

MEMORANDUM FOR ALL FEDERAL AGENCIES

FROM:        THE ATTORNEY GENERAL

SUBJECT:      GUIDANCE FOR RECIPIENTS OF FEDERAL FUNDING REGARDING UNLAWFUL DISCRIMINATION

## I.    INTRODUCTION

One of our Nation's bedrock principles is that all Americans must be treated equally. Not only is discrimination based on protected characteristics illegal under federal law, but it is also dangerous, demeaning, and immoral. Yet in recent years, the federal government has turned a blind eye toward, or even encouraged, various discriminatory practices, seemingly because of their purportedly benign labels, objectives, or intentions. No longer. Going forward, the federal government will not stand by while recipients of federal funds engage in discrimination.

This guidance clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs.[1] Entities receiving federal funds, like all other entities subject to federal antidiscrimination laws, must ensure that their programs and activities comply with federal law and do not discriminate on the basis of race, color, national origin, sex, religion, or other protected characteristics—no matter the program's labels, objectives, or intentions. In furtherance of that requirement, this guidance identifies "Best Practices" as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls; these are not mandatory requirements but rather practical recommendations to minimize the risk of violations.

Entities that receive federal financial assistance or that are otherwise subject to federal anti-discrimination laws, including educational institutions, state and local governments, and public and private employers, should review this guidance carefully to ensure all programs comply with their legal obligations.

---

[1] DEI programs go by other names as well, such as Diversity, Equity, Inclusion, and Accessibility ("DEIA") and Diversity, Equity, Inclusion, and Belonging ("DEIB").

Case 8:25-cv-02309-PJM Document 16-1 Filed 08/28/25 Page 174 of 181

Memorandum for All Federal Agencies                                                    Page 2
Subject:  Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination

## II.    EXECUTIVE SUMMARY

This guidance emphasizes the significant legal risks of initiatives that involve discrimination based on protected characteristics and provides non-binding best practices to help entities avoid the risk of violations. Key points include:

- **Statutory nondiscrimination requirements:** Federal law prohibits discrimination based on protected characteristics like race, sex, color, national origin, or religion.

- **Legal pitfalls of DEI Programs:** The use of terms such as "DEI," "Equity," or other euphemistic terms does not excuse unlawful discrimination or absolve parties from scrutiny regarding potential violations.

- **Prohibition on Protected Characteristics as Criteria:** Using race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities, opportunities, or benefits, is unlawful, except in rare cases where such discrimination satisfies the relevant level of judicial scrutiny.

- **Importance of Sex-Separated Intimate Spaces and Athletic Competitions:** Compelling employees to share intimate spaces with the opposite sex or allowing men to compete in women's athletic competitions would typically be unlawful.

- **Unlawful Proxy Discrimination:** Facially neutral criteria (e.g., "cultural competence," "lived experience," geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics.

- **Scrutiny of Third-Party Funding:** Recipients of federal funds should ensure federal funds do not support third-party programs that discriminate.

- **Protection Against Retaliation:** Individuals who object to or refuse to participate in discriminatory programs, trainings, or policies are protected from adverse actions like termination or exclusion based on that individual's opposition to those practices.[2]

## III.    KEY FEDERAL ANTIDISCRIMINATION PROVISIONS AND LAW

Federal antidiscrimination laws prohibit discrimination on the basis of protected characteristics, including race, color, religion, sex, and national origin. The U.S. Supreme Court has consistently held that policies or practices based upon protected characteristics are subject to

---

[2] Unlawful retaliation occurs when a federally funded entity takes adverse actions against employees, participants, or beneficiaries because they engage in protected activities related to opposing DEI practices they reasonably believe violate federal antidiscrimination laws.

rigorous judicial scrutiny. Race-based classifications are subject to strict scrutiny, requiring a compelling governmental interest and narrowly tailored means to achieve that interest.[3] Sex-based classifications are subject to heightened scrutiny, requiring an exceedingly persuasive justification and substantial relation to an important governmental objective.[4] Discrimination based on other protected characteristics, such as religion, is also evaluated under analogous standards.[5] Entities receiving federal funds must comply with applicable civil rights laws, including:

- **Title VI of the Civil Rights Act of 1964:** Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. This includes most educational institutions, healthcare providers, and state and local government agencies.

- **Title VII of the Civil Rights Act of 1964:** Prohibits employment discrimination based on, or motivated by, race, color, religion, sex, or national origin, in any terms, conditions, or privileges of employment, including hiring, promotion, demotion, termination, compensation, job transfers, training, or access to employment privileges and benefits.

- **Title IX of the Education Amendments of 1972:** Prohibits discrimination based on sex in education programs or activities receiving federal financial assistance. Title IX protections extend beyond athletics and include addressing sexual harassment, sex-based harassment, admissions policies, and equal access to resources and programs.

---

[3] *See, e.g., Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 214 (2023) (holding racial classifications by public institutions are subject to strict scrutiny and racial classifications by private institutions can serve as basis for revoking funding under Title VI); *Ricci v. DeStefano*, 557 U.S. 557, 579 (2009) ("[E]xpress, race-based decision-making violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."); *see also Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (holding grant program with race and sex preferences is unlawful under Equal Protection Clause).
[4] *See, e.g., United States v. Virginia*, 518 U.S. 515, 531 (1996).
[5] *See, e.g., Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 479 (2020) ("The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status . . . . [S]trict scrutiny applies . . . because Montana's no-aid provision discriminates based on religious status"); *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969) (holding discriminating against individual for exercising fundamental constitutional rights is subject to heightened scrutiny), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (relying on Equal Protection principles in holding intentional discrimination against exercise of religion is subject to strict scrutiny).

- **Equal Protection Clause of the Fourteenth Amendment:** Prohibits States from denying any person the equal protection of the laws, relevant in the context of discrimination claims involving state or local government actions.

## IV.    UNLAWFUL DISCRIMINATORY POLICIES AND PRACTICES

The following is a non-exhaustive list of unlawful practices that could result in revocation of grant funding. Federal funding recipients may also be liable for discrimination if they knowingly fund the unlawful practices of contractors, grantees, and other third parties.

### A.    Granting Preferential Treatment Based on Protected Characteristics

#### 1.    What Constitutes Unlawful Preferential Treatment?

Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics in a way that disadvantages other qualified persons, including such practices portrayed as "preferential" to certain groups. Such practices violate federal law unless they meet very narrow exceptions.

#### 2.    Examples of Unlawful Practices

**Race-Based Scholarships or Programs:** A university's DEI program establishes a scholarship fund exclusively for students of a specific racial group (e.g., "Black Student Excellence Scholarship") and excludes otherwise qualified applicants of other races, even if they meet academic or financial need criteria. This extends to any race-exclusive opportunities, such as internships, mentorship programs, or leadership initiatives that reserve spots for specific racial groups, regardless of intent to promote diversity. Such race-exclusive programs violate federal civil rights law by discriminating against individuals based solely on their race or treating people differently based on a protected characteristic without meeting the strict legal standards required for race-conscious programs.

**Preferential Hiring or Promotion Practices:** A federally funded entity's DEI policy prioritizes candidates from "underrepresented groups" for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups, where the preferred "underrepresented groups" are determined on the basis of a protected characteristic like race.

**Access to Facilities or Resources Based on Race or Ethnicity:** A university's DEI initiative designates a "safe space" or lounge exclusively for students of a specific racial or ethnic group.

**B.**     **Prohibited Use of Proxies for Protected Characteristics**

    **1.**     **What Constitutes Unlawful Proxies?**

    Unlawful proxies occur when a federally funded entity intentionally uses ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics. While these criteria may appear facially neutral, they become legally problematic under any of the following circumstances:

- They are selected because they correlate with, replicate, or are used as substitutes for protected characteristics.

- They are implemented with the intent to advantage or disadvantage individuals based on protected characteristics.

    **2.**     **Examples of Potentially Unlawful Proxies**

    **"Cultural Competence" Requirements:** A federally funded university requires job applicants to demonstrate "cultural competence," "lived experience," or "cross-cultural skills" in ways that effectively evaluate candidates' racial or ethnic backgrounds rather than objective qualifications. This includes selection criteria that advantage candidates who have experiences the employer associates with certain racial groups. For instance, requiring faculty candidates to describe how their "cultural background informs their teaching" may function as a proxy if used to evaluate candidates based on race or ethnicity.

    **Geographic or Institutional Targeting:** A federally funded organization implements recruitment strategies targeting specific geographic areas, institutions, or organizations chosen primarily because of their racial or ethnic composition rather than other legitimate factors.

    **"Overcoming Obstacles" Narratives or "Diversity Statements":** A federally funded program requires applicants to describe "obstacles they have overcome" or submit a "diversity statement" in a manner that advantages those who discuss experiences intrinsically tied to protected characteristics, using the narrative as a proxy for advantaging that protected characteristic in providing benefits.

**C.**     **Segregation Based on Protected Characteristics**

    **1.**     **What Constitutes Unlawful Segregation?**

    Segregation based on protected characteristics occurs when a federally funded entity organizes programs, activities, or resources—such as training sessions—in a way that separates or restricts access based on race, sex, or other protected characteristics. Such practices generally violate federal law by creating unequal treatment or reinforcing stereotypes, regardless of the stated goal (e.g., promoting inclusion or addressing historical inequities). Exceptions are narrow

and include only cases where federal law expressly permits race-based remedies for specific, documented acts of past discrimination by the institution itself, or in specialized contexts such as correctional facilities where courts have recognized compelling institutional interests.

While compelled segregation is generally impermissible, failing to maintain sex-separated athletic competitions and intimate spaces can also violate federal law. Federally funded institutions that allow males, including those self-identifying as "women," to access single-sex spaces designed for females—such as bathrooms, showers, locker rooms, or dormitories—undermine the privacy, safety, and equal opportunity of women and girls. Likewise, permitting males to compete in women's athletic events almost invariably denies women equal opportunity by eroding competitive fairness. These policies risk creating a hostile environment under Title VII, particularly where they compromise women's privacy, safety, or professional standing, and can violate Title IX by denying women access to the full scope of sex-based protections in education. To ensure compliance with federal law and to safeguard the rights of women and girls, organizations should affirm sex-based boundaries rooted in biological differences.

## 2.    Examples of Unlawful Practices

**Race-Based Training Sessions:** A federally funded university hosts a DEI training program that requires participants to separate into race-based groups (e.g., "Black Faculty Caucus" or "White Ally Group") for discussions, prohibiting individuals of other races from participating in specific sessions. In contrast, a "Faculty Academic Support Network" open to all faculty interested in promoting student success avoids reliance on protected characteristics and complies with federal law.

**Segregation in Facilities or Resources:** A college receiving federal funds designates a "BIPOC-only study lounge," facially discouraging access by students of other races. Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment. This extends to any resource allocation—such as study spaces, computer labs, or event venues—that segregates access based on protected characteristics, even if intended to create "safe spaces." This does not apply to facilities that are single-sex based on biological sex to protect privacy or safety, such as restrooms, showers, locker rooms, or lodging.

**Implicit Segregation Through Program Eligibility:** A federally funded community organization hosts a DEI-focused workshop series that requires participants to identify with a specific racial or ethnic group (e.g., "for underrepresented minorities only") or mandates sex-specific eligibility, effectively excluding others who meet objective program criteria. Use of Protected Characteristics in Candidate Selection

## 3.    What Constitutes Unlawful Use of Protected Characteristics?

Unlawful use of protected characteristics occurs when a federally funded entity or program considers race, sex, or any other protected trait as a basis for selecting candidates for employment

Case 3:25-cv-03698-WHO Document 91-6 Filed 07/30/26 Page 179 of 181
Memorandum for All Federal Agencies                                                          Page 7
Subject: Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination

(e.g., hiring, promotions), contracts (e.g., vendor agreements), or program participation (e.g., internships, admissions, scholarships, training). This includes policies that explicitly mandate representation of specific groups in candidate pools or implicitly prioritize protected characteristics through selection criteria, such as "diverse slate" requirements, diversity decision-making panels, or diversity-focused evaluations. It also includes requirements that contracting entities utilize a specific level of working hours from individuals of certain protected characteristics to complete the contract. Such practices violate federal law by creating unequal treatment or disadvantaging otherwise qualified candidates, regardless of any intent to advance diversity goals.

### 4.        Examples of Unlawful Practices

**Race-Based "Diverse Slate" Policies in Hiring:** A federally funded research institute adopts a policy requiring that all interview slates for faculty positions include a minimum number of candidates from specific racial groups (e.g., at least two "underrepresented minority" candidates), rejecting otherwise qualified candidates who do not meet this racial criterion. This extends to any policy that sets racial benchmarks or mandates demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from "diverse" backgrounds.

**Sex-Based Selection for Contracts:** A federally funded state agency implements a DEI policy that prioritizes awarding contracts to women-owned businesses, automatically advancing female vendors or minority-owned businesses over equally or more qualified businesses without preferred group status. This includes any contract selection process that uses sex or race as a tiebreaker or primary criterion, such as policies favoring "minority- or women-owned" businesses without satisfying the appropriate level of judicial scrutiny.

**Race- or Sex-Based Program Participation:** A federally funded university's internship program requires that 50% of selected participants be from "underrepresented racial groups" or female students, rejecting equally or more qualified applicants who do not meet these demographic criteria. This extends to any program—such as scholarships, fellowships, or leadership initiatives—that uses race, sex, or any other protected characteristic as a selection criterion, even if framed as addressing underrepresentation.

### D.        Training Programs That Promote Discrimination or Hostile Environments

### 1.        What Constitutes Unlawful DEI Training Programs?

Unlawful DEI training programs are those that—through their content, structure, or implementation—stereotype, exclude, or disadvantage individuals based on protected characteristics or create a hostile environment. This includes training that:

- Excludes or penalizes individuals based on protected characteristics.

- Creates an objectively hostile environment through severe or pervasive use of presentations, videos, and other workplace training materials that single out, demean, or stereotype individuals based on protected characteristics.

### 2.       Examples of Unlawful Practices

**Trainings That Promote Discrimination Based on Protected Characteristics:** A federally funded school district requires teachers to complete a DEI training that includes statements stereotyping individuals based on protected characteristics—such as "all white people are inherently privileged," "toxic masculinity," etc. Such trainings may violate Title VI or Title VII if they create a hostile environment or impose penalties for dissent in ways that result in discriminatory treatment.[6]

### E.       Recommendations on Best Practices

**Ensure Inclusive Access:** All workplace programs, activities, and resources should be open to all qualified individuals, regardless of race, sex, or other protected characteristics. Avoid organizing groups or sessions that exclude participants based on protected traits.  Some sex separation is necessary where biological differences implicate privacy, safety, or athletic opportunity.

**Focus on Skills and Qualifications:** Base selection decisions on specific, measurable skills and qualifications directly related to job performance or program participation. For example, rather than asking about "cultural competence," assess specific skills such as language proficiency or relevant educational credentials. Criteria like socioeconomic status, first-generation status, or geographic diversity must not be used if selected to prioritize individuals based on racial, sex-based, or other protected characteristics.

**Prohibit Demographic-Driven Criteria:** Discontinue any program or policy designed to achieve discriminatory outcomes, even those using facially neutral means. Intent to influence demographic representation risks violating federal law. For example, a scholarship program must not target "underserved geographic areas" or "first-generation students" if the criteria are chosen to increase participation by specific racial or sex-based groups. Instead, use universally applicable criteria, such as academic merit or financial hardship, applied without regard to protected characteristics or demographic goals.

**Document Legitimate Rationales:** If using criteria in hiring, promotions, or selecting contracts that might correlate with protected characteristics, document clear, legitimate rationales unrelated to race, sex, or other protected characteristics. Ensure these rationales are consistently applied and are demonstrably related to legitimate, nondiscriminatory institutional objectives.

**Scrutinize Neutral Criteria for Proxy Effects:** Before implementing facially neutral criteria, rigorously evaluate and document whether they are proxies for race, sex, or other protected

---

[6] Federal law allows for workplace harassment trainings that are focused on preventing unlawful workplace discrimination and that do not single out particular groups as inherently racist or sexist.

characteristics. For instance, a program targeting "low-income students" must be applied uniformly without targeting areas or populations to achieve racial or sex-based outcomes.

**Eliminate Diversity Quotas:** Focus solely on nondiscriminatory performance metrics, such as program participation rates or academic outcomes, without reference to race, sex, or other protected traits. And discontinue policies that mandate representation of specific racial, sex-based, or other protected groups in candidate pools, hiring panels, or final selections. For example, replace a policy requiring "at least one minority candidate per slate" with a process that evaluates all applicants based on merit.

**Avoid Exclusionary Training Programs:** Ensure trainings are open to all qualified participants, regardless of protected characteristics. Avoid segregating participants into groups based on race, sex, or other protected characteristics. Trainings should not require participants to affirm specific ideological positions or "confess" to personal biases or privileges based on a protected characteristic.

**Include Nondiscrimination Clauses in Contracts to Third Parties and Monitor Compliance:** Incorporate explicit nondiscrimination clauses in grant agreements, contracts, or partnership agreements, requiring third parties to comply with federal law, and specify that federal funds cannot be used for programs that discriminate based on protected characteristics. Monitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials, participant feedback, and outcomes to identify potential discriminatory practices. Terminate funding for noncompliant programs.

**Establish Clear Anti-Retaliation Procedures and Create Safe Reporting Mechanisms:** Implement and communicate policies that prohibit retaliation against individuals who engage in protected activities, such as raising concerns, filing complaints, or refusing to participate in potentially discriminatory programs. Include these policies in employee handbooks, student codes of conduct, and program guidelines. Provide confidential, accessible channels for individuals to report concerns about unlawful practices.

## V.    CONCLUSION

Entities are urged to review all programs, policies, and partnerships to ensure compliance with federal law, and discontinue any practices that discriminate on the basis of a protected status. The recommended best practices provided in this guidance are non-binding suggestions to assist entities in avoiding legal pitfalls and upholding equal opportunity for all. By prioritizing nondiscrimination, entities can mitigate the legal, financial, and reputational risks associated with unlawful DEI practices and fulfill their civil rights obligations.