UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO, et al., | Case No. 26-cv-01535-WHO |
| Plaintiffs, | |
| v. | **ORDER ON MOTION FOR PRELIMINARY INJUNCTION** |
| MARKWAYNE MULLIN, et al., | Re: Dkt. No. 20 |
| Defendants. | |

Plaintiffs[1], eleven cities and counties in California and Oregon, regularly receive grants from the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of the Interior ("DOI") to advance public safety and emergency preparedness. Defendants[2] seek to impose conditions on those grants to implement President Trump's Executive Orders concerning immigration, diversity, equity and inclusion, and "anti-discrimination" (the "Challenged Conditions") that have nothing to do with or contradict the Congressional purpose in authorizing the programs for which the plaintiffs seek grants. What defendants seek to do likely violates the Constitution (separation of powers and Spending Clause) and the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* ("APA"). The result of their imposition of the Challenged Conditions would irreparably injure plaintiffs and their ability to provide critical services, as well

[1] Plaintiffs include City of Fresno, City of Santa Clara, City of Redwood City, City of Santa Cruz, City of Beaverton, City or Corvallis, City of Hillsboro, City of Stockton, County of San Diego, County of Los Angeles, and County of Santa Barbara.

[2] Defendants include the Department of Homeland Security ("DHS"), the Federal Emergency Management Agency ("FEMA"), Markwayne Mullin, in his official capacity as Secretary of Homeland Security, Karen Evans, in her official capacity as Acting Administrator of FEMA, the United States Department of the Interior ("DOI"), Doug Burgum, in his official capacity as Secretary of the Interior, the United States Department of Justice ("DOJ"), and Todd Blanche, in his official capacity as Acting Attorney General.

United States District Court
Northern District of California

as would threaten public safety.  I GRANT plaintiffs' motion to enjoin enforcement of the Challenged Conditions at DHS, DOJ, and DOI in grants for which plaintiffs have applied or intend to apply.

**BACKGROUND**

I start by describing the important purposes of the grants at issue in this motion.  I then identify the defendants' attempt to implement conditions on those grants that either bear no relation to or contradict the Congressional purpose of those programs.  And before I get to the merits, I include the threatened impact alleged by each plaintiff.[3]

### A.   Congressional Appropriations

#### 1.   Department of Homeland Security

The Department of Homeland Security ("DHS") was established by Congress in 2002 in the aftermath of the September 11, 2001 attacks.  Complaint ("Compl.") [Dkt. No. 1] ¶ 49; *see* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135.  DHS "administers both competitive and entitlement grant programs." *Id.*  The Secretary of Homeland Security is "responsible for the overall direction, supervision, and coordination of the [DHS], including oversight of its component agencies, the administration of grants and other financial assistance programs, and ensuring compliance with statutory and executive mandates." *Id.*; *see* 6 U.S.C. § 112(a)(1).

The Federal Emergency Management Agency ("FEMA") is a "component agenc[y]" of the

---

[3] Plaintiffs request judicial notice of numerous documents in support of their motion for a preliminary injunction.  *See* Request for Judicial Notice ("RJN") [Dkt. No. 21].  These documents include Notice of Funding Opportunities ("NOFO") and grant term conditions for each of the challenged grant programs.  They also include letters from Pam Bondi, former Attorney General, and Todd Blanche, former Deputy Attorney General.

Plaintiffs' request is GRANTED.  Federal Rule of Evidence 201(b) permits courts to take judicial notice of any "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Information and documents located on websites run by the government are subject to judicial notice. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).  So too are "matters of public record," *see Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), and official acts taken by the executive branch, *see Patrap v. Wells Fargo Bank, N.A.*, 63 F. Supp. 3d 1101, 1104 n.1 (N.D. Cal. 2014).  Each of plaintiffs' documents fall into at least one of the categories identified above and are accordingly subject to judicial notice.

DHS. *Id.* ¶ 50. "Congress established FEMA in 1979 to consolidate all federal support for emergency preparedness, mitigation, and response activities under one agency's purview." *Id.* The DHS Secretary is "responsible for all actions taken by the Department's component agencies," including FEMA, and the "administrator of FEMA reports directly to the DHS Secretary." *Id.*

At issue in this case are at least four grants administered by the DHS or FEMA, which some plaintiffs have received, been awarded, or anticipate receiving. Those plaintiffs include plaintiffs City of Santa Clara, City of Santa Cruz, City of Redwood City, City of Fresno, City of Corvallis, City of Hillsboro, and the County of Santa Barbara (collectively, the "DHS Plaintiffs"). *Id.* ¶ 79. I summarize the grants below.

### a.      Homeland Security Grant Program

The Homeland Security Grant Program ("HSGP") is composed of "several distinct subprograms," two of which are at issue—the State Homeland Security Program ("SHSP") and the Urban Area Security Initiative ("UASI") grant programs. *Id.* ¶ 51.

### i.      State Homeland Security Program

The SHSP grant system "provide[s] federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism." *Id.* ¶ 52. SHSP funding originates with the USA PATRIOT Act in 2001; the program was later codified by Congress at 6 U.S.C. §§ 603, 605–09. *Id.* "States, and, through them, local governments, both may receive SHSP funding." *County of Santa Clara v. Noem* ("*Santa Clara*"), 815 F. Supp. 3d 979, 992 (N.D. Cal. 2025). FEMA allocates SHSP funds "pursuant to a risk assessment, which determines the relative threat, vulnerability, and consequences to each State from acts of terrorism, considering factors such as population density and history of threats." Compl. ¶ 53 (citing 6 U.S.C. § 608(a)(1)). Upon receiving a SHSP grant, recipients may use their funds "for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries." *Id.* (citing 6 U.S.C. § 609(a)).

SHSP funds are "formula grants based on a statutory risk formula." *Id.* ¶ 54. Because "each State is entitled to a minimum and specific allocation based on the risk assessment

3

whenever a notice of funding opportunity ["NOFO"] is posted," Congress has directed the FEMA Administrator to ensure "each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for the SHSP." *Id.* (citing 6 U.S.C. § 605(e)(1)(A)(v)).

### i.    Urban Areas Security Initiative

UASI grants are "used to ensure States—and, through them, local government entities serving high-risk urban areas—build and maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism." *Id.* ¶ 55.  UASI funding has been available since 2003 and is codified at 6 U.S.C. §§ 603–04, 606–09. *Id.*; *see* Pub. L. No. 108-90, 117 Stats. 1137, 1146.  Every year, FEMA conducts a "risk assessment based on a list of factors specified by statute to determine the relative threat, vulnerability, and consequences" the top 100 most populous metropolitan statistical areas in the United States "would face from an act of terrorism." *Id.* ¶ 56 (citing 6 U.S.C. §§ 601(5), 604(b)(2)(A)(i), 608(a)(1)).

Upon receiving a SHSP grant, recipients may use their funds "for purposes permitted by statute," such as" enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries." *Id.* ¶ 58.  UASI grants are distributed to States, who then are tasked with "provid[ing] ... eligible urban area[s] in that State with at least 80% of the grant funds." *Id.* (citing 6 U.S.C. § 604(d)(2)(A)).

### ii.    Hazard Mitigation Grant Program

Section 324 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act") "authorizes FEMA to provide funding under the Hazard Mitigation Grant Program (HMGP) for management costs incurred in the administration of HMGP." *Id.* ¶ 61.  The Stafford Act notes that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." *Id.* (quoting 42 U.S.C. § 5170c(a)).  This has been expanded with the HMGP, which provides "federal funding to state, local, tribal, and territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration." *Id.* ¶ 62.  Such projects may include retrofitting facilities, installing flood barriers, building shelters in disaster-prone areas, stabilizing

4

slopes, and developing or improving warning systems. *Id.* ¶ 63 (citing 42 U.S.C. § 5170c(f)–(g)).

Unlike other grant programs, HMGP funding "do[es] not necessarily operate on a predictable, fiscal-year basis"; instead, funding "often follows the occurrence of disasters, emergencies, and other events." *Id.* ¶ 64. Upon declaration of a "major disaster," States can apply for HMGP funding. *Id.* ¶¶ 62, 64. The amount of HMGP funding available is a "function of the level of disaster assistance provided." *Id.* ¶ 64. States will typically review project applications from local jurisdictions and choose which to submit to FEMA for funding approval. *Id.* All funding requests must be submitted to FEMA within 15 months of the date of disaster declaration. *Id.*

### b.    Flood Mitigation Assistance

The Flood Mitigation Assistance ("FMA") Program is "administered by FEMA to reduce or eliminate the risk of repetitive flood damage to structures insured under the National Flood Insurance Program (NFIP) and to enhance community flood resilience within NFIP-participating communities." *Id.* ¶ 66. The FMA program was authorized by Congress in Section 1366 of the National Flood Insurance Act of 1968. *Id.* ¶ 67; *see* 42 U.S.C. § 4104c. It has since been "expanded and supported" through Division J, Title V of the Infrastructure Investment and Jobs Act, which "provides additional funding and directives for flood mitigation and resilience activities." *Id.*; *see* Pub. L. No. 117-58, 135 Stat. 1387–1388 (2021).

To be eligible for a FMA grant, applicants must be "NFIP-participating States, local governments, Tribes, or territories" seeking funding for projects meant to "reduce or eliminate flood risk to structures insured under the [NFIP]." Compl. ¶ 68; 42 U.S.C. § 4104c(a)–(b). Congress directed FEMA to "prioritize mitigation projects benefiting repetitive loss and severe repetitive loss properties." *Id.* FEMA must also consider applications based on their "cost-effectiveness, technical feasibility, and consistency with FEMA-approved hazard mitigation plans." *Id.*

### c.    United States Fire Administration Grant Programs

The United States Fire Administration ("USFA") is a "component of FEMA established by Congress under the Federal Fire Prevention and Control Act of 1974 to provide national

leadership in fire prevention, training, research, and data collection." *Id.* ¶ 70; *see* 15 U.S.C. § 2204. Congress has authorized the USFA, through FEMA, to "administer national fire grant programs" that "advance fire prevention and control efforts, improve firefighter and public safety, promote public education and awareness, conduct fire-related research, and support professional development through training and technical assistance." *Id.* Two subprograms are at issue in this case: the Staffing for Adequate Fire and Emergency Response ("SAFER") Grant Program and the Assistance to Firefighters Grant ("AFG") Program.

### i.      Staffing for Adequate Fire and Emergency Response

The SAFER program was established by Congress to "provide funding directly to local fire departments (among other entities) to help them increase or maintain the number of trained, front-line firefighters available to serve their communities." *Id.* ¶ 71. Specifically, SAFER seeks to "enhance local fire departments' abilities to comply with staffing, response, and operational standards established by the National Fire Protection Association, including assisting fire departments with 'attain[ing] 24-hour staffing to provide adequate protection from fire and fire-related hazards.'" *Id.* ¶ 72 (quoting 15 U.S.C. § 2229a(a)(1)(A)). SAFER grants are awarded by FEMA "on a competitive basis through a neutral peer review process." *Id.* (quoting 15 U.S.C. § 2229a(a)(1)(G)). The Fiscal Year ("FY") 2024 SAFER NOFO requires recipients of funding to "comply with DHS Standard Terms and Conditions in effect at the time the award is issued." *Id.* ¶ 73.

### ii.      Assistance to Firefighters Grant

The AFG was established by Congress to "ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards." *Id.* ¶ 74 (citing 15 U.S.C. § 2229(c)). To obtain AFG funding, fire departments must consult the "chief executives of the States in which the recipients are located." *Id.* (citing 15 U.S.C. § 2229(c)(1)–(2), (e)). Awards are granted "on a competitive basis," with the amount of funding being "based on population size." *Id.* FEMA awards AFG funding "on a rolling basis." *Id.* ¶ 75. The FY 2024 AFG NOFO requires recipients to "comply with the DHS Standard Terms and Conditions in effect as of the

United States District Court
Northern District of California

date of the federal award." *Id.*

### d.    Other DHS Grant Programs

Plaintiffs also allege that "DHS and its operating divisions and agencies administer a range of other grant programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive." *Id.* ¶ 77.  It does not identify those programs in its complaint. *See id.* ¶¶ 77–79.

### 2.    Department of Justice

The Department of Justice ("DOJ") was established by Congress in 1870.  28 U.S.C. §§ 501 *et seq.*  The DOJ "administers competitive, formula, and block grant programs that provide funds to local governments to support public safety and justice activities in their communities." Compl. ¶ 80.   The DOJ administers such grants through its program offices, including the Community Oriented Policing Services ("COPS") Office and the Office of Justice Programs ("OJP"), which includes the Bureau of Justice Assistance ("BJA") and the Offices of Victims of Crime ("OVC").  *Id.*

At issue in this case are at least four grants administered by the DOJ, which some plaintiffs have received or been awarded, or anticipate receiving or being awarded.  Those plaintiffs include the City of Santa Clara, City of Santa Cruz, City of Redwood City, City of Fresno, City of Beaverton, City of Corvallis, City of Hillsboro, City of Stockton, County of San Diego, County of Los Angeles, and County of Santa Barbara (collectively, the "DOJ Plaintiffs").  *Id.* ¶ 141.  I address the grant programs below.

### a.    Byrne Memorial Justice Assistance Grant Program

The Edward Byrne Memorial Justice Assistance Grant ("JAG") program "operates under a comprehensive statutory framework established by 34 U.S.C. § 10156 that mandates a precise, data driven allocation formula for distributing federal criminal justice funding to states and localities." *Id.* ¶ 82.  To allocate grants, the DOJ employs a "dual-factor formula: 50% of funds are allocated based on each state's population ratio compared to the total U.S. population, and 50% based on each state's average annual Part 1 violent crimes reported to the FBI over the three

United States District Court
Northern District of California

most recent years compared to all states." *Id.* (citing 34 U.S.C. § 10156(a)(1)).  Local governments receive 40% of their state's allocation based on their proportional share of Part 1 violent crimes.  *Id.*

The JAG statute "authorizes funds to states and units of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice across nine specific program categories: law enforcement programs; prosecution and court programs; prevention and education programs; corrections and community corrections programs; drug treatment and enforcement programs; planning, evaluation, and technology improvement programs; crime victim and witness programs; mental health programs and related law enforcement and corrections programs; and implementation of state crisis intervention court proceedings and related programs or initiatives." *Id.* ¶ 83 (citing 34 U.S.C. § 10152(a)).  To receive JAG funding, states or local governments must submit an application within 120 days after funds are appropriated.  *Id.* ¶ 84 (citing 34 U.S.C. § 10153).  Recipients must agree that the federal funds will "not supplant state or local funds but will increase available law enforcement funding." *Id.*  They must also "develop comprehensive statewide strategic plans detailing how [the] grants will improve criminal justice administration." *Id.* ¶ 85.  Each plan must be "designed in consultation with local governments and representatives of all criminal justice system segments, including descriptions of funding allocation approaches, descriptions of evidence-based data gathering processes, identification of barriers to implementing evidence-based approaches, and be updated every five years with annual progress reports." *Id.* (citing 34 U.S.C. § 10153(a)(6)).

                **b.**     **Community Oriented Policing Services Grant Programs**

The COPS program was authorized by Congress through the enactment of the Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, Title I, Sept. 13, 1994, 108 Stat. 1807.  The goal of the COPS program is to "increase the number of law enforcement officers interacting directly with members of the community," as well as improving "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community."  Compl. ¶ 87 (citing 34 U.S.C. §

United States District Court
Northern District of California

10381(b)).  The enabling statue authorizes the DOJ to provide funding to states and local governments to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." Pub. L. No 103-322 at § 1701, 108 Stat. at 1808; Compl. ¶ 88.  The statute identifies "twenty-four purposes for which grants may be made," including "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing."  Compl. ¶ 88 (citing 34 U.S.C. § 10381(b)(2)).[4]  To receive funding, applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." *Id.* ¶ 89 (quoting 34 U.S.C. § 10382(c)(11)).

The DOJ Plaintiffs have received "several COPS grants, including the Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement, Community Policing Development Microgrant Program, and Law Enforcement Mental Health and Wellness Program Grant." *Id.* ¶ 90.

### c.    Paul Coverdell Forensic Science Improvement Grant

Congress authorized the Paul Coverdell Forensic Science Improvement Grant program (the "Coverdell grant") after enacting the Paul Coverdell National Forensic Sciences Improvement Act of 2000, Pub. L. No. 106-561, 114 Stat. 2788 (2000).  *Id.* ¶ 93.  The Coverdell grant is meant to "improve the quality, timeliness, and credibility of forensic science services for criminal justice purposes."  *Id.* (citing 34 U.S.C. § 10564(a)).  The Coverdell grant is administered by the DOJ. *Id.* ¶ 94.  Congress authorized the Attorney General to award Coverdell grants to "states and units of local government."  *Id.* (citing 34 U.S.C. § 10561)).

Recipients who receive a Coverdell grant may use the funding for "one or more statutorily defined purposes to improve forensic science and medicolegal death investigation services."  *Id.* ¶

---

[4] In 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, Jan. 10, 2018, 131 State. 2276, which amended the COPS Statute to add a twenty-fifth purpose for the statute: "to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies." *Id.* (quoting 34 U.S.C. § 10381(b)(24)).

95 (citing 34 U.S.C. § 10564). Such eligible uses include "carrying out all or a substantial part of a program to improve the quality and timeliness of forensic science or medical examiner services, including services provided by State and local government laboratories; eliminating backlogs in the analysis of forensic science evidence across a wide range of disciplines; training, assisting, and employing forensic laboratory personnel and medicolegal death investigators as necessary to eliminate such backlogs; addressing emerging forensic science issues and technologies; educating and training forensic pathologists; and funding medicolegal death investigation systems to facilitate accreditation of medical examiner and coroner offices and certification of medicolegal death investigators." *Id.* (citing 34 U.S.C. § 10564(a)(1)–(6)).

To apply for a Coverdell grant, a State or unit of local government must submit "several certifications" to the Attorney General. *Id.* ¶ 96. Applicants must certify that they have "developed a forensic science laboratory plan consistent with the program described in 34 U.S.C. § 10564(a) and must provide a specific description of how the grant funds will be used to carry out that plan." *Id.* (citing 34 U.S.C. § 10562(1)). They must also certify that the laboratory system or office that will receive funding uses "generally accepted laboratory practices and procedures," and that they are "accredited by an intentionally recognized accrediting body, or, in the alternative, must provide a legally binding and enforceable assurance that a portion of the grant funds will be used to prepare and apply for such accreditation within two years of the grant award." *Id.*

### d.    Office of Victims of Crime Grants

Congress passed the Victims of Crime Act ("VOCA") in 1984, which established the Office for Victims of Crime ("OVC") as an office within the DOJ. *Id.* ¶ 104. "Congress structured VOCA 'with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime' in order to support state and local victim assistance programs." *Id.* (quoting S. Rep. No. 497, 98th Cong., 2d Sess. at 1, 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3607, 3607, 1984 WL 37447). While the original statute intended to "keep conditions on Federal Aid to a bare minimum," *see* S. Rep. No. 497, 98th Cong., 2d Sess. at 9, Congress has amended VOCA to "allow a great measure of flexibility to [the] programs" and provide "greater certainty" that funding "will not wax and wane," S. Rep. No. 179, 104th Cong.,

United States District Court
Northern District of California

1st Sess. at 29 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 941, 1995 WL 731704. Compl. ¶¶ 104–05.

Funding for VOCA includes a Crime Victims Fund composed of "various penalties and fees recovered from individuals convicted of federal offenses." *Id.* ¶ 106. "Since VOCA's enactment, VOCA funds have been instrumental in providing critical support to millions of victims and survivors (and their families) of serious crime." *Id.* ¶ 108. Because the amount of funding in the Crime Victims Fund varies by year, "Congress has taken action to make additional funds available, including by amendments to VOCA through the 2001 USA PATRIOT ACT, Pub. L. 107-56, and the VOCA Fix to Sustain the Crime Victims Fund Act of 2021, Pub. L. 117-27." *Id.* ¶ 109.

### i. OVC Formula Grants

Congress has directed OVC to "administer two formula grant programs pursuant to VOCA that support crime victim compensation and assistance: Victim Compensation Formula Grants and Victim Assistance Formula Grants." *Id.* ¶ 110.

Victim Compensation Formula Grants ("VCF") are used to "provide compensation to eligible crime victims for costs resulting from crime, including for medical care, lost wages, mental health counseling, funeral expenses, and crime scene clean-up." *Id.* ¶¶ 113–14 (citing 34 U.S.C. § 20102). Grants are "designed to supplement state and territory efforts." *Id.* ¶ 114. VOCA sets forth a "precise set of requirements that a state victim compensation program must satisfy to be eligible for a grant." *Id.* ¶ 116. These include requiring that "States pay for certain victim expenses, treat federal and state crimes and residents and non-residents the same, and do not deny compensation based on a victim's familial relationship with an offender." *Id.* (citing 34 U.S.C. § 20102(b)(1)–(9)). Recipients must also certify funds will "not be used to supplant State funds otherwise available to provide crime victim compensation." *Id.* (citing 34 U.S.C. § 20102(b)(3)).

VCF grants are "distributed among eligible recipients based on a statutory formula that accounts for the amount of money each state crime victim compensation program distributed to victims in the preceding fiscal year." *Id.* ¶ 117. The OVC Director "shall make an annual grant

11

from the Fund to an eligible crime victim compensation program of 75 percent of the amounts awarded" by the state compensation program "during the preceding fiscal year, other than amounts awarded for property damage." *Id.* (quoting 34 U.S.C. § 20102(a)(1)).

Victim Assistance Formula Grants ("VAF") provide financial support for eligible crime victim assistance programs. *Id.* ¶ 121 (citing 34 U.S.C. § 20103(a)). VAF grants are meant to "improve the treatment of victims of crime by providing them with the assistance, support, and services necessary to aid their restoration and healing after a criminal act." *Id.* ¶ 122. Grants are "intended to enable States to provide subgrants to local community-based organizations and public agencies that provide services directly to crime victims, including but not limited to victim and witness advocacy services; crisis counseling; telephone and onsite information and referrals; criminal justice support and advocacy; emergency shelter; therapy; and consistent communication about significant events in their case." *Id.* VOCA requires the OVC Director to "make an annual grant" to the chief executive of each State to provide financial support to eligible victim assistance programs. *Id.* ¶ 123 (citing 34 U.S.C. § 20103(a)). States then subgrant funding to "community-based organizations and public agencies that provide services directly to crime victims." *Id.* (citing 34 U.S.C. § 20103(b)–(c)).

To be eligible for a VAF grant, a program must be "run by a public agency or nonprofit organization, has a demonstrated record of providing effective services to crime victims, assists victims in seeking compensation benefits, and does not discriminate against victims because they disagree with how a case is prosecuted." *Id.* ¶ 124. The State's chief executive must also certify that "funds awarded to eligible crime victim assistance programs will not be used to supplant State and local funds otherwise available for crime victim assistance." *Id.* (quoting 34 U.S.C. § 20103(a)(2)). Once awarded, VAF grants are distributed to the States according to a "fixed statutory formula." *Id.* ¶ 125. "Under that formula, each State is entitled to a base amount of $500,000 and an additional share of the remaining available money in the Crime Victims Fund based on 'each State's population in relation to the population of all States.'" *Id.* (quoting 34 U.S.C. § 20103(a)(3)).

ii.    <strong>OVC Competitive Grants</strong>

United States District Court
Northern District of California

OVC administers "many competitive grant programs authorized by VOCA, such as Services for Victims of Crime; Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program; Technology to Support Services for Victims of Crime; Services for Victims of Technology-Facilitated Abuse; Sexual Assault Nurse Examiner Program Development and Operation Guide; National Crime Victim Crisis Hotlines; and Increasing Availability of Medical Forensic Examinations for Victims of Sexual Assault." *Id.* ¶ 128. These grant programs "support a range of initiatives designed to expand and strengthen services for crime victims, including funding specialized assistance for children, elders, and victims of technology-facilitated abuse; providing housing assistance for victims; expanding victims' access to specialized medical forensic professionals and examinations; and development of statewide technology programs to improve the quality and reach of victim services." *Id.* ¶ 129. "Collectively, they enhance the quality and accessibility of services for victims of crime nationwide." *Id.*

VOCA's competitive grants are "generally governed" by 34 U.S.C. § 20103(c). *Id.* ¶ 130. That statute specifies that the OVC Director "shall make grants" for "victim services, demonstration projects, program evaluation, compliance efforts, and training and technical assistance services to eligible crime victim assistance programs" and "for the financial support of services to victims of Federal crime by eligible crime victim assistance programs." *Id.* (quoting 34 U.S.C. § 20103(c)(1)(A)–(B)). VOCA has discretion for how to allocate these awards, with the exception that "not more than 50 percent of available funds shall be used for support of victims of Federal crime." *Id.* ¶ 131 (citing 34 U.S.C. § 20103(c)(2)(A)–(B)).

OVC also administers competitive grant programs focused on "combating human trafficking and providing comprehensive services to victims." *Id.* ¶ 133. These include Housing Assistance for Victims of Human Trafficking; Integrated Services for Minor Victims of Human Trafficking; Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking; and Services for Victims of Human Trafficking. *Id.*

Awards under these programs "support a broad range of initiatives intended to identify victims of human trafficking and provide trauma-informed, victim-centered services," including

"emergency, transitional, and long-term housing assistance; coordinated service delivery for minor victims; multidisciplinary task force efforts involving law enforcement, service providers, and prosecutors; and comprehensive services addressing victims' medical, mental health, legal, and social service needs." *Id.* ¶ 134. "Collectively, these programs are designed to improve victim safety, stability, and access to justice, and to strengthen coordinated community responses to human trafficking." *Id.*

Human Trafficking Program grants are authorized under 22 U.S.C. § 7105(b), part of the Trafficking Victims Protection Act ("TVPA"). *Id.* ¶ 135. This statute provides that the "Attorney General may give priority to any applicant that files an attestation with the Attorney General stating that the grant funds" will be used to:

a. "assist in the prevention of severe forms of trafficking in person";
b. "strengthen efforts to investigate and prosecute those who knowingly benefit financially from participation in a venture that has engaged in any act of human trafficking";
c. "take affirmative measures to avoid arresting, charging, or prosecuting victims of human trafficking for any offense that is the direct result of their victimization; and"
d. "[not] require a victim of human trafficking to collaborate with law enforcement officers as a condition of access to any shelter or restorative services"

*Id.* (quoting 22 U.S.C.A. § 7105(b)(2)(D)). The statute also provides that an "alien who is a victim of a severe form of trafficking in persons, or an alien classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, shall be eligible for benefits and services under any Federal or State program or activity funded or administered by any official or agency described in subparagraph (B) to the same extent as an alien who is admitted to the United States as a refugee under section 1157 of Title 8."[5] *Id.* ¶ 136 (quoting 22 U.S.C.A. § 7105(b)(1)(A)). 22 U.S.C.A. § 7105(b)(1)(B)(i) similarly notes that federal agencies "shall expand benefits and services to victims of severe forms of trafficking in persons in the United States, and aliens classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, without regard to the immigration status of such victims." *Id.* ¶ 137.

---

[5] While I use the term "noncitizen" to refer to individuals, I include the original language of "alien" in the statute and other case law references.

14

### e.    Other DOJ Grant Programs

Plaintiffs highlight that the "DOJ and its operating divisions and agencies administer a range of other grant programs, such as the Preventing Trafficking of Girls grants program, that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive." *Id.* ¶ 139.

### 3.    Department of the Interior

The Department of the Interior ("DOI") was created in 1849 by Congress to "administer the rapidly expanding land holdings acquired by the Federal Government in the first half of the nineteenth century." *Id.* ¶ 142 (citing Act of Mar. 3, 1849, ch. 108, § 11, 9 Stat. at 396).  Today, the DOI is responsible for "420 million acres of federal lands, nearly 55 million acres of tribal lands, more than 700 million acres of subsurface minerals, and about 2.5 billion acres of the outer continental shelf." *Id.*  The Secretary of the Interior is responsible for "all actions taken by the Department and its component offices, which include the Bureau of Indian Affairs (BIA), Bureau of Indian Education (BIE), Bureau of Land Management (BLM), Bureau of Ocean Energy Management (BOEM), Bureau of Reclamation, Bureau of Safety and Environmental Enforcement (BSEE), National Park Service (NPS), Office of Surface Mining Reclamation and Enforcement (OSMRE), U.S. Fish and Wildlife Service (FWS), and U.S. Geological Survey (USGS)." *Id.*

At issue in this case are at least two grants administered by the DOI, which some plaintiffs have received or been awarded, or anticipate receiving or being awarded.  Those plaintiffs include the City of Fresno, City of Santa Cruz, City of Corvallis, City of Hillsboro, City of Stockton, County of Los Angeles, and County of Santa Barbara (collectively, the "DOI Plaintiffs").  *Id.* ¶ 155.  I address each grant below.

### a.    Land and Water Conservation Fund Grant Program

Congress created the Land and Water Conservation Fund Grant Program ("LWCF") by enacting the Land and Water Conservation Fund Act of 1965.  *Id.* ¶ 144; *see* Pub. L. 88-578, 54 U.S.C. § 200301 *et seq.*  The Act is meant to "assist the states and agencies to meet the 'present and future outdoor recreation demands and needs of the American people.'"  Compl. ¶ 144

(quoting Pub. L. 88-578). The LWCF is authorized and governed by statutory directives. *Id.* ¶ 145. The Land and Water Conservation Act, 54 U.S.C. § 200305, specifies "what activities are eligible for funding under the LWCF," as well as the formula for allocating funds and what conditions the DOI may place on funding. *Id.* ¶¶ 145–46.

### b.    WaterSMART Grant Program

The DOI established the WaterSMART (Sustain and Manage American Resources for Tomorrow) program in 2010. *Id.* ¶ 148. This program, codified under the Omnibus Public Land Management Act of 2009, Pub. L. 111-11, as amended 42 U.S.C. § 10364, seeks to "pursue a sustainable water supply for the Nation by establishing a framework to provide federal leadership and assistance on the efficient use of water, integrating water and energy policies to support the sustainable use of all natural resources, and coordinating the water conservation activities of the various Interior bureaus and office." *Id.* WaterSMART "authorizes the DOI Secretary to provide cost-shared funding in four grant categories on a competitive basis: water and energy efficiency, small-scale water efficiency, water strategy grants, and environmental water resources projects." *Id.* ¶ 149 (citing 42 U.S.C. § 10364(a)(1)). To receive funding, applicants must be from a specified list of states and territories[6], and must submit a proposal of the improvement the grant is intended to fund. *Id.* Applicants must also agree to "cost sharing requirements of fifty percent or more of the total project cost, among other considerations." *Id.* (citing 42 U.S.C. § 10364(a)(3)(e)).

### c.    Other DOI Grants

The "DOI and its operating divisions and agencies administer a range of other grant programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive." *Id.* ¶ 153. Plaintiffs do not name any of these other grants.

---

[6] Applicants must be located in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, American Samoa, Guam, the Northern Mariana Islands, and the Virgin Islands.

**B.     The Trump Administration Begins to Direct Agencies to Grant Funding with Anti-DEI and Immigration Conditions**

Since taking office in January 2025, President Trump has issued numerous executive orders that impose conditions on federal funding that plaintiffs believe "bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend." *Id.* ¶ 156.  These orders particularly attack "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") programs and policies that many government entities have adopted, as well as states and governments who, in their view, fail to comply with federal immigration and anti-discrimination laws. *Id.*

**1.     DHS Revises its Fiscal Year 2025 Grant Terms and Conditions**

Over the past year, the DHS has revised its standard terms and conditions applicable to Fiscal Year ("FY") 2025 grants, cooperative agreements, fixed amount awards, and other types of federal financial assistance.  *Id.* ¶ 165.  One of these revisions is the "FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025" (the "Standard DHS Terms")  *Id.* ¶ 166.  The Standard DHS Terms contain three sets of conditions"—the "DEI Condition," the "Immigration Conditions," and the "EO Condition" (collectively, the "DHS Conditions").

**a.     DEI Condition**

Section C.XVII(1)–(4) of the Standard DHS Terms sets out the "DEI Condition" attached to recipients of federal grant funding.  *See id.* ¶ 170.  Specifically, the DEI Condition states:

> Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).
> (1) Definitions.  As used in this clause –
>     (a) DEI means "diversity, equity, and inclusion."
>     (b) DEIA means "diversity, equity, inclusion, and accessibility."
>     (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
>     (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
>     (e) Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.
> (2) Grant award certification.

17

(a) By accepting the grant award, recipients are certifying that:

    (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

    (ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

    (iii) [*Provision omitted and included within Immigration Conditions, supra.*]

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

### b.  Immigration Conditions

Section C.IX and Subsection C.XVII(2)(a)(iii) of the Standard DHS Terms set out what plaintiffs describe as the "DHS Immigration Enforcement Conditions." Compl. ¶¶ 167–69.

Plaintiffs summarize the Immigration Conditions as follows:

a.  The Information Sharing Condition (Sec. IX(1)(a)): Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644, [which] prohibit state restrictions on sharing information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual ...."

b.  The Compliance Condition (Sec. IX(1)(b)): Grant recipients "must comply" with various criminal laws, including 8 U.S.C. § 1324, that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

c.  The Cooperation Condition (Sec IX(1)(c)): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance."

d.  The Access Condition (Sec. IX(1)(d)): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

e.  The Publicization Condition (Sec. IX(1)(e)): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

f.  The Certification and Monitoring Condition (Sec. IX(2)): Grant recipients must certify compliance with the above

18

conditions and require subgrant recipients to do the same. *Id.* ¶ 167 (collectively, the "DHS Immigration Enforcement Conditions").

### c.   EO Condition

Section C.XXXI of the Standard DHS Terms sets out what plaintiffs refer to as the "EO Condition." *Id.* ¶ 173. The EO Condition mandates that "[r]ecipients [of funding] must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *Id.*

### 2.   DOJ Attaches New Conditions to DOJ Grants

### a.   FY25 Notice of Funding Opportunities ("NOFO")

Plaintiffs highlight numerous instances where the "DOJ and its operating divisions and agencies have implemented President Trump's Executive Orders." *Id.* ¶ 180. These include:

DOJ Office of Justice Programs: On May 12, 2025, the DOJ published "General Conditions" for Office of Justice Programs ("OJP") awards in FY 2025, noting that:

> The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

*Id.* ¶ 181 (the "OJP DEI Condition").

COPS Grants: The DOJ's FY 2025 NOFO for COPS grants "warns applicants that funding may not be used to 'promote gender ideology' (the "COPS Gender Ideology Condition") or 'for projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities,' (the "COPS DEI Condition")." *Id.* ¶ 182. It also provides that "the COPS Office will provide priority consideration to state or local law enforcement applicants that respond affirmatively to the application question related to cooperation with federal immigration officials." *Id.* (the "COPS Immigration Priority Conditions"). The same conditions are placed on the FY25 "COPS Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement" program, *see id.* ¶ 183, and similar conditions are placed on the FY25 "COPS Law Enforcement Mental Health and Wellness

Act (LEMWHA) Implementation Projects," *id.* ¶ 184. In August 2025, the DOJ reaffirmed in its COPS award manual that "[c]ompliance . . . is a condition of [their] award, and this manual is binding guidance." *Id.* ¶ 186. So too with the DOJ's LEMHWA Manual. *See id.* ¶¶ 187–188 (recipients "must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President," as well as "not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws").

OVC Grants: Plaintiffs also note that the NOFOs issued by the OVC contain allegedly unlawful conditions implementing the President's Executive Orders.[7] *See id.* ¶ 190. "All of the[se] OVC NOFOs list as an 'unallowable use,' '[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents' and is 'out of the program scope and will not be funded.'" *Id.* ¶ 191 (the "OVC Immigration Enforcement Condition"). Plaintiffs believe this language functions as an eligibility requirement. *Id.* ¶ 192. Moreover, all of the OVC NOFOs indicate:

> Compliance with Federal civil rights and nondiscrimination laws is material to the government's decision to make any award and payment under this program, including for purposes of the False Claims Act, and each recipient will be required to certify (in its acceptance of the conditions of the award) that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws[.]

*Id.* ¶ 194.

Some grants also provide that "OJP will provide priority consideration to applicants that

---

[7] *See, e.g.*, RJN Ex. H [OVC FY 2025 Victims of Crime Act (VOCA) Victim Assistance Formula Grant NOFO]; *id.* Ex. I [OVC FY25 Victims of Crime Act (VOCA) Victim Compensation Formula Grant NOFO]; *id.* Ex. J [OVC FY25 Services for Victims of Crime NOFO]; *id.* Ex. K [OVC FY25 Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking NOFO]; *id.* Ex. L [OVC FY25 Services for Victims of Human Trafficking NOFO]; *id.* Ex. M [OVC FY25 Integrated Services for Minor Victims of Human Trafficking NOFO]; *id.* Ex. N [OVC FY25 Preventing Trafficking of Girls NOFO]; *id.* Ex. O [OVC FY25 Housing Assistance for Victims of Human Trafficking].

propose (as applicable within the scope of this funding opportunity) projects . . . [d]irectly supporting law enforcement operations (including immigration law enforcement operations[.]" *Id.* ¶ 193.[8]  And all but the VOCA NOFO list as an "unallowable use" "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) any applicable Federal civil rights or nondiscrimination law (e.g., by unlawfully favoring or disfavoring individuals in any race or group on the basis that it is (or is not) a majority or minority (or privileged or unprivileged) race or group in a given area or population or sector)." *Id.* ¶ 195 (the "OVC DEI Condition II").[9]

Paul Coverdell Forensic Science Improvement – Competitive Grants Program:  Plaintiffs finally allege that the Bureau of Justice Assistance's Coverdell FY25 NOFO imposes a "DEI condition identical to the OVC DEI condition discussed above," (the "BJA DEI Condition"), as well as "incorporates the unlawful conditions implementing President Trump's executive orders." *Id.* ¶¶ 197–98.  The FY25 NOFO also lists as an "unallowable costs and certain activities that are out of the program scope" "any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" (the "BJA Immigration Enforcement Condition").  *Id.* ¶ 199.

### b.     DOJ Leadership Interpretations

In addition to the NOFOs issued by the agency, various high-ranking officials within the DOJ have "issued statements confirming" their intent to follow President Trump's orders.  *Id.* ¶

---

[8] While plaintiffs did not specify which grants contain this language, a cursory search reveals that the condition appears in the OVC FY25 Services for Victims of Crime NOFO, OVC FY25 Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking NOFO, OVC FY25 Services for Victims of Human Trafficking NOFO OVC FY25 Integrated Services for Minor Victims of Human Trafficking NOFO, OVC FY25 Preventing Trafficking of Girls NOFO, and OVC FY25 Housing Assistance for Victims of Human Trafficking.

[9] The FY25 VOCA NOFO includes the same language as the OVC DEI Condition II, but also adds a clause explicitly "including . . . any program or activity having any component relating to diversity, equity, or inclusion."  *Id.* ¶¶ 195–96 (the "OVC DEI Condition III").

United States District Court
Northern District of California

United States District Court
Northern District of California

200.  For example, on February 5, 2025, then-Attorney General Pamela Bondi wrote a letter to DOJ employees stating that the agency's Civil Rights Division will "penalize" and "eliminate" all "illegal DEI and DEIA" activities," including "divid[ing] individuals based on race or sex." *See* RJN [Dkt. No. 21] Ex. C (Letter from Pam Bondi, Attorney General, to all DOJ Employees).

Bondi again attempted to clarify these executive orders in a Department of Justice memo issued on July 29, 2025, titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination." (the "Discrimination Guidance Memo").  Compl. ¶ 201; *see* RJN Ex. D.  The purpose of this memorandum was to establish "best practices" "to help entities comply with federal antidiscrimination laws and avoid legal pitfalls," although the document did not impose "mandatory requirements." Discrimination Guidance Memo at 1.  The memorandum provides a "non-exhaustive list of unlawful practices that could result in revocation of grant funding," as well as potential "liab[ility] for discrimination" for funding recipients if they "knowingly fund the unlawful practices of contractors, grantees, and other third parties." *Id.* at 4.  Such unlawful practices include "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics . . . if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id.* at 2.

Finally, in May 2025, Deputy Attorney General Todd Blanche issued a letter indicating that the DOJ will invoke the False Claims Act, 31 U.S.C. §§ 3729–33, to pursue recipients who engage in "civil rights fraud," including by supporting DEI initiatives.  Compl. ¶ 202; RJN Ex. E (Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys on May 19, 2025).  Blanche "strongly encourage[d]" private FCA lawsuits against such recipients. *See id.*

### 3.   DOI Attaches Conditions to DOI Grants

Like the DHS and DOJ, the "DOI and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching" conditions to its grants.  Compl. ¶ 205.  For example, "on or around July 30, 2025, the DOI's Office of Grants Management issued General Award Terms and Conditions." *Id.* ¶ 206.  These conditions included a provision that

states: "In accepting this award the grant recipient agrees to operating in compliance in all respects with all applicable Federal anti-discrimination laws, and certify that it does not operate any programs promoting diversity, equity and inclusion programs that violate any applicable Federal antidiscrimination laws." (the "DOI DEI Condition").

### C.    Plaintiffs Receive, Expect to Receive, or Anticipate Applying for Grants Including the Contested Conditions

Plaintiffs are a collective of cities, counties, municipalities, and local agencies that "deliver essential public services, including disaster mitigation and prevention, victim services and law-enforcement training, and water conservation initiatives that protect public safety, public health, and local economies." Compl. Introduction at 1. The grant programs described above form the basis of their claims. Each plaintiff has submitted declarations describing how their policies and practices are at odds with the Discrimination Condition and EO Condition attached to their federal grants:

### 1.    City of Fresno

The City of Fresno, California "has either been awarded, applied for, or intends to apply for" (1) $297,935 in "Justice Assistance Grant ("JAG") funding from the Bureau of Justice, a DOJ subdivision"; (2) $250,000 in COPS Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement grants; (3) $100,000 in COPS Mental Health and Wellness Act funding; and (4) $87,500 in COPS Community Policing Development Microgrants. Declaration of Mindy Casto in Support of Plaintiffs' Motion for Preliminary Injunction ("Casto Decl.") [Dkt. No. 20-22] ¶ 3. While Fresno was made aware of the FY 2025 JAG funding containing the DEI Condition, it "submitted its application under protest with full reservation of rights to challenge the unlawful conditions." Id. ¶ 4. Fresno previously did not apply for numerous COPS-related grants "due to the inclusion of unlawful grant conditions," but "would reapply for these funds in the future should this language no longer be enforced." Id. ¶ 6.

Fresno maintains that the "loss of these federal funds would hinder the City's ability to support crucial justice programs that lead to the efficient administration of the justice system." Id. ¶ 10. Specifically, it contends that loss of funding will mean the City will be "unable to purchase

United States District Court
Northern District of California

the equipment necessary to keep officers safe or divert funds to other essential services," and that the City "will be forced to reduce imperative health and wellness services tailored to the unique needs of first responders." *Id.* Finally, it will "lose key resources to develop solutions to the unique policing and public safety issues its officers and residents face," resulting in a diminishing effectiveness and safety of the City. *Id.*

Fresno also has been awarded from FEMA and DHS (1) a $7,347,000 "multi-year [SAFER] grant with a remaining balance of $887,592.32" and (2) a $702,727.27 AFG grant. Declaration of Billy Alcorn in Support of Preliminary Injunction ("Alcorn Decl.") [Dkt. No. 20-23] ¶ 3. The SAFER grant has been used by Fresno to "provide funding directly to fire departments and volunteer firefighter interest organizations to assist in increasing the number of firefighters . . . and attain 24-hour staffing." *Id.* ¶ 4. Fresno intends to use its AFG funding to purchase Source Capture Exhaust Systems for thirteen of its fire stations, which will consist of "hose connections, electrical power wiring, exhaust fan, mechanical installation, and tailpipe modifications." *Id.* ¶ 5.

Fresno maintains that loss of DHS and FEMA funding would "impact the Fire Department's ability to maintain its current level of service," and ultimately its "ability to adequately combat fires," posing a threat to the community. *Id.* ¶ 6. Loss of funding would also "hinder the City's ability to provide necessary maintenance and upgrades to fire apparatus citywide," which would "increase danger to the firefighters, other first responders, and the public at large." *Id.*

### 2.      City of Santa Clara

The City of Santa Clara, California "has either been awarded, applied for, or intends to apply" from FEMA and DHS: (1) $11,269,422 in SAFER grant funding; (2) $517,360 in HSGP grants ($47,983, $208,947, and $260,430, respectively); and (3) $60,000 in Bay Area UASI funding. Declaration of Ruben Torres in Support of Preliminary Injunction ("Torres Decl.") [Dkt. No. 20-26] ¶ 3. The purpose of the HSGP funding was to "reimburse Urban Search and Rescue personnel costs, cover approved training and deployments, and purchase vehicle barriers." *Id.* ¶ 5; *see* Declaration of Cory Morgan in Support of Preliminary Injunction ("Morgan Decl.") [Dkt. No.

20-25] ¶¶ 3–4.  Similarly, the Bay Area UASI funding was used to "provide Hazardous Material training for Super Bowl 60 and FIFA World Cup."  Torres Decl. ¶ 6.

Should Santa Clara be forced to forego the use of these funds, the City maintains that "it will be unable to recruit and replenish the labor force needed to maintain the industry minimum for consistent staffing of the Fire Department."  *Id.* ¶ 7.  This would limit the ability to "adequately combat fires and other emergencies," would "pose an immediate threat to the safety of the Santa Clara community," and would force the City to "cease essential training and deployments of City employees for . . . emergency scenarios."  *Id.*

### 3.    City of Redwood City

The City of Redwood City, California has been awarded the following funds from FEMA: (1) $1,320,578 in AFG funding; (2) a FEMA Public Assistance Grant for $444,980; two grants from the Flood Mitigation Assistance Grant Program, totaling $888,602.48 ($856,903.99 and $31,698.49, respectively); (3) three HMGP grants, worth $501,682.50, $809,925, and $2,000,000; and (4) a SAFER grant for $3,630,607.  Declaration of Patrick Heisinger in Support of Preliminary Injunction ("Heisinger Decl.") [Dkt. No. 20-20] ¶ 3.  These funds have been used for a variety of projects, including developing a Stormwater Master Plan assessing existing drainage and wetland vulnerabilities to flooding and sea-level rise, improving the City's stormwater pump stations to minimize street and property flooding, and funding the salary and benefits for six firefighters.  *Id.* ¶¶ 8–10.

This past year, Redwood City declined to pursue or accept UASI and JAG grants from FEMA and the DOJ because of "concerns regarding the [agencies'] prohibition of DEI and requiring cooperation with federal immigration enforcement."  *Id.* ¶¶ 4–5.  Such funding would have "supported catastrophic preparedness projects" and "would have been used to purchase simulator models for de-escalation training."  *Id.*

Should the City forego the funding, it will "have to delay or cancel the Watershed and Wetland Capacity Scoping Project, increasing the risk for flooding and limiting the City's ability to mitigate future water damage."  *Id.* ¶ 11.  It will also have to "delay or cancel the planned improvements to stormwater pump stations and a regional levee, [further] increasing the risk of

United States District Court
Northern District of California

flooding and other disasters." *Id.*

### 4. City of Santa Cruz

The City of Santa Cruz currently has under contract with the DHS and FEMA (1) $190,000 in HMGP funding; (2) $360,994 in FEMA Disaster Relief Grant funding; (3) $12,520,035 in Public Works Project funding; and from the DOJ, (4) $19,020 in Bulletproof Vest Partnership Grant funding. Declaration of Elizabeth Cabell in Support of Preliminary Injunction ("Cabell Decl.") [Dkt. No. 20-17] ¶ 5. At the time plaintiffs filed their preliminary injunction, Santa Cruz was also "in the process of contracting for" "DOI funding through the Bureau of Reclamation for new water supply projects through the WaterSMART Grant programs," and "$2,123,000 in FEMA Disaster Relief Grant funding for Water projects related to 2023 winter storm damage." *Id.* ¶ 6.

Should Santa Cruz lose this funding, the City would "face[] a dire financial situation," as it would "struggle to provide essential public services, which its residents rely on and which the City has already promised to deliver." *Id.* ¶ 12. It would also "risk significant delays or outright non-completion" for "ongoing projects, including critical water infrastructure and hazard-mitigation construction." *Id.* Uncertainty about funding would also require the City to "reconsider its staffing, including by considering employee layoffs," as well as place the City in a limbo about "whether to operate, pause, or cancel its programs." *Id.* ¶¶ 13–14.

### 5. City of Beaverton

The City of Beaverton, Oregon has been awarded, applied for, or intends to apply from the DOJ (1) $742,000 to the Beaverton Municipal Court for the Beaverton Sobriety Opportunity for Beginning Recovery ("B-SOBR") program; and (2) $500,000 for the Community Project Funding Byrne Discretionary Grants Program. Declaration of Elizabeth Coffey in Support of Plaintiffs' Motion for Preliminary Injunction ("Coffey Decl.") [Dkt. No. 20-14] ¶ 3. The B-SOBR program helps "offenders recovering from alcohol and drug addictions" stay out of jail in exchange for adhering to strict conditions. *Id.* ¶ 4. The Byrne Discretionary Grant funding is used to support Beaverton's Behavioral Health Court, which "promotes public safety and recovery by providing opportunities for people with mental illness to stabilize, engage in treatment, and avail themselves

United States District Court
Northern District of California

United States District Court
Northern District of California

of services and opportunities that promote their own recovery." *Id.* ¶ 5. Should Beaverton be forced to forego these funds, "these important diversion programs will likely be eliminated," placing an increased strain on the already limited resources of the City and its courts. *Id.* ¶ 6. It would also "hinder critical oversight, support, and intervention measures provided to high-risk addicts, lowering their likelihood of rehabilitation." *Id.*

Beaverton additionally receives from the DOJ (1) $54,269 in JAG funding and (2) $20,228.50 from the Patrick Leahy Bulletproof Vest Partnership ("BVP"), as well as (3) $68,479.50 in EMPG grant funding from the DHS. Declaration of Stacy Jepson in Support of Preliminary Injunction ("Jepson Decl.") [Dkt. No. 20-16] ¶ 3. The JAG funding is meant to "improve criminal investigations outcomes through the purchase of portable radio communication devices . . . and enhance recruitment and retention efforts." *Id.* ¶ 4. The BVP funding will help pay 50% of the cost of the Beaverton Police Department's bulletproof vests. *Id.* ¶ 5. Finally, the EMPG grant will be used to "support the operational costs of the City's Emergency Management Department, building and sustaining capabilities that address high consequence events." *Id.* ¶ 6. Beaverton maintains that loss of such funding will result in either it being unable to purchase necessary equipment or forcing it to redirect funds from other critical services to purchase these items. *Id.* ¶ 7. Foregoing such funding would also "increase the City's vulnerabilities to high consequence events such as seismic events, major storms, and hazardous materials spills." *Id.*

### 6.    City of Corvallis

The City of Corvallis, Oregon relies on funding from the DHS, DOJ, and DOI. In 2023, the city was awarded approximately $1,200,000 in Ground Emergency Medical Transportation funding from the DHS, which was used to "offset the difference between the City's actual cost of providing ambulance transport services to Medicaid patients and what the City is able to bill Medicaid for those services." Declaration of Ben Janes in Support of Preliminary Injunction ("Janes Decl.") [Dkt. No. 20-15] ¶¶ 3–4. Corvallis has also received $800,000 in additional funding for 2024, but is awaiting for additional payments in 2025. *Id.* ¶ 3. Should the City be forced to forego these funds, Corvallis maintains that it will "limit the City's ability to provide effective responses to urgent health needs and reduce the rate of successful emergency treatment

27

outcomes." *Id.* ¶ 5.

Corvallis also received $16,800 in BVP funding in 2023 and $16,800 in 2024. Declaration of James Harvey in Support of Preliminary Injunction ("Harvey Decl.") [Dkt. No. 20-6] ¶ 3. The City has reapplied for FY 2025 funding but has not heard back from the DOJ. *Id.* Like other BVP programs, this funding reimbursed 50% of the cost of body armor vests for law enforcement purchased the prior year. *Id.*

Finally, Corvallis has received $875,790.95 in Land and Water Conservation Fund Grant Program funding from the DOI, which will be "used for capital improvements at Dr. Martin Luther King, Jr. Park in [the City], a project that includes the construction of a children's play area, restroom facilities, an outdoor fitness area, a basketball court, and adjoining pathways." Declaration of Meredith Petit in Support of Preliminary Injunction ("Petit Decl.") [Dkt. No. 20-10] ¶¶ 3–4. Loss of this funding would not only decrease "residents' ability to use and enjoy the benefits of public city space" but also risks the City being "forced to cancel or breach contracts related to the projects due to a lack of funding." *Id.* ¶ 5.

### 7.    City of Hillsboro

The City of Hillsboro, Oregon has been awarded, applied for, or intends to apply for the following funds: (1) $506,300 in two Land and Water Conservation Fund grants from the DOI ($410,000 and $96,300, respectively); (2) $1,104,000 in HSGP and HMGP funding from FEMA, including $200,000 in UASI funding; (3) $24,974,599.64 in Flood Mitigation Assistance Grant funding from the DHS; (4) $533,000 in SVAW grant funding from the DOJ in the amounts of $400,000 and $133,000; and (5) $92,045 in JAG funding from the DOJ. Declaration of Robby Hammond in Support of Preliminary Injunction ("Hammond Decl.") [Dkt. No. 20-5] ¶ 3. The City also would have applied for $224,000 in COPS Safer Outcomes Grant Program funding from the DOJ, but chose not to due to the Challenged Conditions. *Id.* ¶ 4. The City "would apply for the grant going forward should the imposition of those conditions cease." *Id.*

Should the City be forced to forego these funds, it will be "forced to cancel or delay scheduled improvements to public parks, and in doing so risk breaching associated contracts," as well as will be "unable to implement necessary security enhancements to public facilities, posing a

United States District Court
Northern District of California

risk to community welfare." *Id.* ¶ 11.  Hillsboro would also be unable to provide resources to crime victims, including survivors of intimate partner violence and abuse, and will not be able to mitigate flood risks on key roadways.  *Id.*

### 8.    City of Stockton

The City of Stockton, California has received $500,000 in COPS Safer Outcomes grants from the DOJ, which will be used to "train employees to safely handle situations with people in crisis or experiencing mental health issues," facilitate "closer collaboration with SJC Behavioral Health on specific field scenarios an officer might encounter," and "support[] the procurement of equipment to further training."  Declaration of Jeanetta McDonald in Support of Preliminary Injunction ("McDonald Decl.") [Dkt. No. 20-9] ¶¶ 3–4.  Should Stockton be forced to forego these funds, it maintains that it will lose crucial resources that will jeopardize "the safety of both the City's law enforcement officers and its residents, as it reduces law enforcement personnel's ability to protect themselves and the public."  *Id.* ¶ 5.

Stockton also has received $4,273,925 in WaterSMART Water and Energy Efficiency Grant program funding from the DOI.  Declaration of Travis Small in Support of Preliminary Injunction ("Small Decl.") [Dkt. No. 20-11] ¶ 3.  Such funding will "support a project to replace and retrofit the City's outdated metering system, improving water meters with advanced metering infrastructure for residential, commercial, and irrigation customers."  *Id.* ¶ 4.  Loss of funding would result in delay or cancelation of the project, limiting "access to clean, safe drinking water for the City's most vulnerable communities."  *Id.* ¶ 5.  It would also "decrease the reliability of the City's irrigation systems, on which the City, its residents, and its economy depend."  *Id.*

### 9.    County of San Deigo

The County of San Diego, California has applied for $1,900,000 in Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking funds for FY 2025 ($1,000,000 for the District Attorney's Office and $900,000 for the County Sherriff's Office).  Declaration of Andrew Strong in Support of Preliminary Injunction ("Strong Decl.") [Dkt. No. 20-19] ¶ 3.  This funding will "support the development, expansion, and strengthening of multidisciplinary task forces that combine law enforcement agencies and victim service

United States District Court
Northern District of California

organizations to combat human trafficking." *Id.* ¶5.  Funding will also be used to improve agency coordination, enhance victim identification, and ensure victim-centered investigations and prosecutions.  *Id.*  The ultimate goal for such funding is to "increase the number of victims identified and served, improve investigative outcomes, and secure justice for trafficking survivors through collaborative approaches."  *Id.*  Loss of such funding would "severely undercut the County's ability to combat and mitigate human trafficking," which is especially urgent considering the County's proximity to international borders.  *Id.* ¶ 7.

The County also intends to apply for $3,000,000 in Public Safety and Mental Health Initiative funding for FY 2025 from the BJA.  *Id.* ¶ 4.  This funding would support "coordinated, direct intervention efforts across public safety, justice, mental health, and substance use agencies to increase access to mental health and substance use treatment through civil commitment, institutional treatment, and step-down approaches from pre-arrest through reentry, using accountability measures that ensure compliance with treatment plans."  *Id.* ¶ 6.  Loss of funding would hinder the County's ability to "provide crucial, life-changing intervention resources . . . [for] some of the County's most vulnerable and in-need populations."  *Id.* ¶ 8.

### 10.    County of Los Angeles

The County of Los Angeles, California has been conditionally awarded a National Parks Service Land and Water Conservation Fund grant for approximately $15 million for the "development of a section of the 40-acre Western Deck of the former Puente Hills Landfill, including a 5-acre bike skills course, a children's nature play area, a picnic area, an amphitheater, dog run, open grassland and ceremonial space."  Declaration of Alina Bodke in Support of Preliminary Injunction ("Bodke Decl.") [Dkt. No. 20-1] ¶ 5.  The County is aware that such funding is conditioned on it not "promoting diversity, equity, and inclusion programs that violate any applicable Federal antidiscrimination laws."  *Id.* ¶ 7.  Loss of this funding would "severely impact the schedule to begin the western deck . . . potentially leading to a new procurement process that would extend the Park's opening by years."  *Id.* ¶ 12.  It would also prevent the opening of an open space for the local community, who currently does not have access to such natural spaces.  *Id.*

The County also receives more than $243,547 annually in BJA funding through Coverdell and Strengthening the Medical Examiner-Coroner Systems ("SMECS") Grants. Declaration of Dr. Nichelle H. Shaw in Support of Preliminary Injunction ("Shaw Decl.") [Dkt. No. 20-2] ¶ 5. The SMECS grant allows the Department of Medical Examiner to secure paid fellows for 36 months. *Id.* ¶ 6. The Coverdell grant funds are used to support "staff, including deputy medical examiners, investigators, and criminalists, to attend classes, conferences, and seminars for continuing education." *Id.* ¶ 7. Both grants contain anti-DEI provisions. *Id.* ¶ 9. This has plaed the Department of Medical Examiner "in limbo about whether it will actually receive the grant funding" in question. *Id.* ¶ 11. Potential loss of this funding will prevent the training of Pathology Fellows, "destabilize immediate and future budgets," "make it more difficult for [the Department] to comply with regulatory requirements," and force the County to "either terminate programs or pay for them with local funds without knowing if the federal government will reimburse the[m]." *Id.* ¶ 12.

Finally, the Los Angeles District Attorney's Office has applied for a DOJ OVC FY 2025 Services for Victims of Crime grant in the amount of $500,000. Declaration of Navjot Kuar in Support of Preliminary Injunction ("Kuar Decl.") [Dkt. No. 20-3] ¶ 5. This funding would "strengthen and expand services to help victims rebuild their lives after gang violence." *Id.* Projects would include "crisis intervention; emergency assistance; victim advocacy, including providing information about crime victims' rights and services to help clients exercise their rights as crime victims within the criminal justice process; providing resources and referrals for counseling and other necessary services; victim compensation assistance; court escort and support; [and] case status and updates." *Id.* The DA has not received a notice of award for the grant. *Id.* Should it be awarded the grant, it is the County's understanding that it would be forced to adhere to the Immigration and DEI conditions. *Id.* ¶¶ 6–7. The Department previously declined to apply for a BJA FY 2025 National Sexual Assault Kit Initiative for $2.5 million because the application "required the submittal of DEI and immigration-related certifications, and also included immigration related priorities and DEI and immigration-related unallowable uses similar to the DOJ OVC grant." *Id.* ¶ 9. The DA is concerned loss of such funding will limit its ability to

31

"ensure accountability, prosecution, justice for victims of sexual assault, and community safety by timely and effectively prosecuting sex offenders and ensuring proper victim services and support for past and current victims of sexual assault." *Id.* ¶ 10. It would also result in a "significant resource shortfall that may require the DA's Office to discontinue program expansion efforts intended to support crime victims." *Id.* ¶ 11.

### 11.    County of Santa Barbara

The County of Santa Barbara, California relies on federal funds from the DHS, DOJ, and DOI. From the DOI, Santa Barbara County received $436,667 to fund its Water-Wise Landscape Rebate Program. Declaration of Rachel Major in Support of Preliminary Injunction ("Major Decl.") [Dkt. No. 20-21] ¶ 3. It was also $122,375 by the DOJ through the JAG program to support the County's Bomb Squad Program. Declaration of Juan Camarena in Support of Preliminary Injunction ("Camarena Decl.") [Dkt. No. 20-13] ¶ 3. Santa Barbara County similarly received $105,024 in JAG funding to purchase a mobile X-ray machine for analyzing suspicious packages, as well as $686,972 in CalOES grants from the OVC and $385,000 in Smart Prosecution – Innovative Prosecution Solutions grants from the BJA. *Id.* Finally, the County received $360,000 in OVC Services for Victims of Human Trafficking grants, and $500,000 in funding to increase availability of medical forensic examinations for sexual assault victims. *Id.*

Santa Barbara County was awarded from FEMA $914,316 in Public Assistance and HMGP funding to assist with infrastructure repair and improvements, including performing a right-of-way survey and concurrent physical replacement of each survey monument. Declaration of Aleksandar Jevremovic in Support of Preliminary Injunction ("Jevremovic Decl.") [Dkt. No. 20-8] ¶¶ 3–4. $1,384,040 in HMGP funding has also been allocated for the County's San Marcos Grade Stabilization Project. Declaration of Mostafa Estaji in Support of Preliminary Injunction ("Estaji Decl.") [Dkt. No. 20-18] ¶ 3. Similarly, the County has received $7,716,975.24 in HMGP grants to fund various debris basin capacity improvement projects. Declaration of Walter Rubalcava in Support of Preliminary Injunction ("Rubalcava Decl.") [Dkt. No. 20-4] ¶¶ 3–4. Finally, the County has secured $448,412 in HSGP funds and $200,919 in EMPG funds in 2025. Declaration of Kelly Hubbard in Support of Preliminary Injunction ("Hubbard Decl.") [Dkt. No.

32

20-7] ¶ 3.

**LEGAL STANDARD**

Issuance of a preliminary injunction is warranted if the movant establishes (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of relief; (3) that the balance of equities tips in the movant's favor; and (4) that granting relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in the Ninth Circuit evaluate these factors on a "sliding scale" such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest." *Arc. of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (cleaned up). As government entities are parties to this case, the final two factors merge. *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). In the discussion that follows, I find that plaintiffs have satisfied the *Winter* factors.

**DISCUSSION**

**I.    Likelihood of Success on the Merits**

Plaintiffs attack the Challenged Conditions on the same grounds as the plaintiffs in *County of Santa Clara v. Noem*, asserting violations of (1) the separation of powers doctrine; (2) the Spending Clause of the United States Constitution; and (3) the Administrative Procedure Act ("APA"). *See* 815 F. Supp. 3d 979 (N.D. Cal. 2025) ("*Santa Clara*"). The government acknowledges that "many of the arguments" it asserts in its opposition "were previously presented to the Court in [*Santa Clara*]," where I "broadly ruled against the government." Oppo. at 12. It also admits that "the common questions of law between this case and the Court's preliminary injunction analysis in *Santa Clara* would likely control the result should the Court adhere to its prior reasoning." *Id.* It also raises what it refers to as justiciability concerns as well, but none undercuts the propriety of injunctive relief. As in *Santa Clara*, plaintiffs are likely to prevail on the merits of their claims.

### A.    Separation of Powers

#### 1.    Plaintiffs' Claims are Constitutional

"In many cases, the plaintiff's right to seek judicial intervention arises from a statute." *League of United Latin Am. Citizens v. Exec. Office of the Pres.*, 808 F. Supp. 3d 29, 69 (D.D.C. Oct. 31, 2025). "Often, in cases challenging action by the Executive Branch, that statute is the Administrative Procedure Act." *Id.* But "because 'the President is not an agency within the meaning of the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." *Id.* (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

The APA affords no statutory right to direct judicial relief: plaintiffs must point to either a cause of action under a federal statute or "resort to equity" to find relief in this case. *Id.* "The availability of such implied equitable relief substantially depends on whether the plaintiff claims a statutory or constitutional violation." *Id.* "If a plaintiff is alleging a violation of a federal statute, the availability of equitable relief to enforce compliance with the statute—often called *ultra vires* review—is extremely limited." *Id.* (internal quotations omitted). But "broader latitude [is afforded] to a plaintiff seeking equitable relief from a *constitutional* violation, rather than a statutory one." *Id.* (emphasis in original).

The government urges me to read plaintiffs' claims as an "attempt to constitutionalize [a] statutory claim." Oppo. at 16–17. It rehashes an argument I have squarely rejected in both *Santa Clara* and *San Francisco*: that the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994), renders plaintiffs' separation of powers claims inadmissible. *See* 816 F. Supp. at 1034–36; 815 F. Supp. 3d at 1024–25.

In *Dalton*, the plaintiffs "sought to enjoin the Sectary of Defense ... from carrying out a decision by the President to close the Philadelphia Naval Shipyard" pursuant to the Defense Base Closure and Realignment Act of 1990 ("DBCRA"). 511 U.S. at 464. The plaintiffs sought relief under the APA, alleging that the Secretary "violated substantive and procedural requirements of the 1990 Act in recommending closure of the ... [s]hipyard." *Id.* at 466. The Third Circuit recognized under *Franklin v. Massachusetts*, 505 U.S. 788 (1992), that the President's actions

34

were not reviewable under the ADA, since the President is not an agency. *Id.* at 468. But the court concluded the claims were subject to judicial review, as the "President's actions may still be reviewed for constitutionality." *Id.* at 469.

The Supreme Court reversed, finding that the claims were statutory, not constitutional, in nature. *Id.* at 477–78. The Court noted that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473–74. Because the procedural requirements were outlined to the DBCRA, which granted "to the discretion of the President" the ability to close certain military bases, the Court concluded that judicial review was "not available." *Id.* at 469–72.

Unlike *Dalton*, plaintiffs' claims here are not rooted solely in a statutory theory. *Santa Clara*, 815 F. Supp. 3d at 1025. Instead, plaintiffs argue that "[n]othing in the Constitution or federal statutes authorizes Defendants to impose the Challenged Conditions, or anything of the kind, on funds administered through congressional grant programs." Mot. at 25. As in *Santa Clara*, these claims concern the separation of powers between the Executive and Legislative branches. Accordingly, plaintiffs' claims are constitutional in nature and are afforded "broader latitude." *See League of United Latin Am. Citizens*, 808 F. Supp. 3d at 69.

### 2. The Conditions Conflict with Congressional Intent in Enacting the Questioned Grants

The separation of powers doctrine recognizes that the "United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)). "Aside from the power of veto, the President is without authority to thwart congressional will by

United States District Court
Northern District of California

canceling appropriations passed by Congress." *City & Cnty. of S.F.*, 897 F.3d at 1232. Rather, executive agencies "literally ha[ve] no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F.*, 897 F.3d at 1235.

Plaintiffs maintain that "[n]othing in the Constitution or federal statutes authorizes Defendants to impose the Challenged Conditions, or anything of the kind, on funds administered through congressional grant programs." Mot. at 25. They also assert that the Conditions "conflict with Congress's intent in establishing many of the grant programs at issue." *Id.* I agree.

### a.    DEI Conditions

Plaintiffs identify fifteen conditions related to DEI programs with the umbrella term "DEI Conditions." Mot. at 25 n.8.[10] Each of the programs operate differently. "Some agencies, such as the COPS Office and the LEMHWA program, implemented the DEI Order in an unqualified and categorical manner, prohibiting the use of federal funds for any projects that 'provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities,' regardless of whether such activities violate federal civil rights laws." Mot. at 26. Others prohibit activities DEI-related activities "that violate any applicable Federal civil rights or nondiscrimination laws." *Id.* The question is whether imposing the DEI Conditions on these grants, taken together, violate separation of powers principles and thus warrant issuance of a preliminary injunction. They do.

Plaintiffs maintain that the DEI Conditions, despite some being worded slightly differently, "conflict with congressional uniformity because they run counter to antidiscrimination law as written by Congress and interpreted by courts." *Id.* They point to various cases, including *Santa Clara*, finding similar DEI Conditions to be "inconsistent with well-established legal precedent."

---

[10] These include the DHS DEI Condition, HSGP Reporting Condition, OJP DEI Condition, OVW DEI Condition, OVC DEI Condition, OVC DEI Condition II, OVC DEI Condition III, BJA DEI Condition, COPS DEI Condition, LEMHWA Owner's Manual DEI Condition, COPS Owner's Manual DEI Condition, DOI DEI Condition, WaterSMART DEI Condition, WaterSMART DEI Condition II, and the COPS Gender Ideology Condition.

*Id.*; *City of Chicago v. United States Dep't of Just.*, 822 F. Supp. 3d 873, 887 (N.D. Ill. 2026) (quoting *Seattle v. Trump*, 808 F. Supp. 3d 1204, 1218 (W.D. Wash. 2025)); *see also Santa Clara*, 815 F. Supp. 3d at 1037 ("Put simply, the [DEI Condition] appears contrary to established federal anti-discrimination law."). Moreover, they assert that many of the DEI Conditions are "at odds with Congress's intent in establishing several of the grant programs at issue." Mot. at 27. These include:

> COPS: In enacting the COPS Statute, Congress noted that applicants for grants must "seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

> TVPA: Congress also recognizes that trafficking "victims are predominantly women and girls[,]" *see* 22 U.S.C. § 7101(b)(2), and provides grants for victims who are "women or girls in underserved populations," *id.* § 7105(b)(2)(A)(iii).

> 15 U.S.C. § 2205 (affecting AFG and SAFER grants): Congress indicates that the Administrator of the United States Fire Administration, within FEMA, "shall [create] programs to provide specialized information for those groups of individuals who are particularly vulnerable to fire hazards, such as the young and the elderly."

*Id.* at 27–28.

I addressed 15 U.S.C. § 2205 in *Santa Clara*, finding that the "President's ongoing executive orders targeting DEIA programs seemingly conflict with the purpose set out by Congress in the AFG and SAFER programs, as it contravenes the grants' goal in educating "particularly vulnerable" populations about fire safety." 815 F. Supp. 3d at 1027. So too do the DEI Conditions in the COPS and TVPA grants likely conflict with Congress's purposes in passing these statutes. While the COPS Statute clearly indicates a preference to recruit women and those with racial and ethnic minority backgrounds, the DOJ's FY 2025 NOFO for COPS grants "warns applicants that funding may not be used to 'promote gender ideology' (the "COPS Gender Ideology Condition") or 'for projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities,' (the "COPS DEI Condition")." *Id.* ¶ 182. Similarly, while the TVPA recognizes women as uniquely vulnerable to issues of trafficking, Bondi's February 5, 2025 letter to DOJ employees noted that the Department

United States District Court
Northern District of California

would "penalize" and "eliminate" all "illegal DEI and DEIA" activities," including "divid[ing] individuals based on race or sex." Bondi Feb. 5, 2025 Letter at 1.

Taken together, these seeming contradictions show that plaintiffs have a strong claim that the DHS Conditions violate the separation of powers with respect to the grants identified above.

### b.    EO Conditions

Plaintiffs additionally contend that the EO Conditions violate the separation of powers because "[n]one of the grant-authorizing statutes require[] compliance with all (or any) EOs, nor do they authorize Defendants to superimpose EO compliance on congressionally authorized grants." Mot. at 28. While they recognize that some grant-authorizing statutes may "contain language permitting the executive to issue guidance," *see id.* at 29, plaintiffs assert that executive agencies do not have "carte blanche to impose political priorities expressed in Presidential Executive Orders on grantees." *City of Chicago v. Noem*, No. 25-cv-12765, 2025 WL 3251222, at *7 (N.D. Ill. Nov. 21, 2025). The government counters by focusing on the fact that they are "required to incorporate into the terms of their grants 'national policy requirements,' including those flowing from 'executive order[s].'" Oppo. at 19 (quoting 2 C.F.R. § 200.211(c)(1)(ii)).

The government is mistaken. The Supreme Court has recognized that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n.*, 476 U.S. at 374. And district courts interpreting 2 C.F.R. § 200.211 have recognized that a "regulation cannot create statutory authority; only Congress can do that." *Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1248 (W.D. Wash. 2025); *see City of Chicago v. U.S. Dep't of Just.*, 822 F. Supp. 3d 873, 888 (N.D. Ill. 2026). For these reasons, I find that plaintiffs are likely to show that, by attaching the EO Condition to grants, defendants acted beyond the power proscribed to them by Congress.

### c.    Immigration Conditions

Plaintiffs finally argue that the Immigration Conditions violate the separation of powers. Mot. at 29–30. They maintain that "Congress has repeatedly declined to enact legislation cutting off federal funds for so-called 'sanctuary jurisdictions,'" and that "no federal law authorizes Defendants to require localities receiving federal grants to cooperate with federal immigration

enforcement, or to carve out activities from the program's scope that 'promote[] or facilitate[]' the violation of federal immigration law." Mot. at 29 (citing *San Francisco*, 897 F.3d at 1231; *Hous. Auth. v. Turner*, 2025 WL 3187761, at *11). Plaintiffs also note that the Immigration Conditions are inconsistent with the TVPA Programs, which "expressly prohibit[] the use of funds to require trafficking victims to cooperate with law enforcement as a condition of access to services." *Id.* (citing 22 U.S.C. § 7105(b)(2)(D)). These statutory programs mandate that victims of "severe forms of trafficking" are eligible for services "without regard to the immigration status of such victims." *Id.* (quoting 22 U.S.C. § 7105(b)(1)(A), (B)). Plaintiffs conclude that providing "priority consideration" to applicants who support federal immigration law enforcement operations "not only exceeds Defendants' authority but also affirmatively undermines Congress's express determination that access to services should not be conditioned on cooperation with law enforcement . . ." *Id.* at 29–30.

Congress made an intentional choice to preclude immigration status from consideration in granting TVPA awards. The Immigration Conditions appear to squarely conflict with that statutory scheme, as plaintiffs would be forced to cooperate with federal law enforcement to receive "priority consideration" for any present or future grants. Plaintiffs are therefore likely to prevail on the merits of this claim.

### B.     Spending Powers

The Spending Clause of the Constitution provides Congress with "broad power . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). Plaintiffs claim that the Challenged Conditions are "unlawful because they contravene spending-power constrains in at least two respects: they are impermissibly []ambiguous and are unrelated to the content of the grants." Mot. at 31. Plaintiffs are likely to succeed on the merits of this claim.

#### 1.     Ambiguity

The spending power is "subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). First, the spending power "must be in pursuit of 'the general welfare,'" and courts must "defer substantially to the judgment of Congress." *Id.* (quoting *Helvering v. Davis*,

United States District Court
Northern District of California

301 U.S. 619, 640–41 (1937)).  Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'"  *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  Finally, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"  *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)).

Plaintiffs claim that the Challenged Conditions are "irremediably ambiguous, making it impossible for public entities to understand their meaning, scope, and application, let alone the entities' obligations under the conditions."  Mot. at 31.  Plaintiffs are likely to succeed on this claim.

### a.  DEI Conditions

Plaintiffs argue that the "meaning and scope of the DEI Conditions, especially when read in context with the executive orders and DOJ memoranda, are unclear."  *Id.*  I agree.

First, like the DEI Conditions in *Santa Clara*, the DEI Conditions here are ambiguous. While the DEI Conditions differ in their text, the crux of each grant provides that grantees will "not . . . operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti discrimination laws," and lists as an unallowable use of funds "projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities."  *Id.*  But the DHS does not explain how grantees could "provide or advance" these ideologies.  *See Santa Clara*, 815 F. Supp. 3d at 1030–35 (explaining how the Trump Administration's Executive Orders and DOJ memoranda fail to clarify what "provide or advance" means).  Nor does it explain how these terms fit within the current understanding of federal anti-discrimination law.  *See, e.g.*, *Bostock*, 590 U.S. at 662, 670 (recognizing "Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them."); *Lam v. University of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing that "the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their [lived] experiences").  This lack of clarity regarding what compliance would look like for a grantee raises significant concerns about the ambiguity of the DEI Conditions.

40

Defendants respond that "Congress must only make clear that acceptance of federal funds obligates State to comply with a condition," and that a Spending Clause program may be "largely indeterminate" so long as Congress gives "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply" with the condition. Oppo. at 17–18 (quoting *Pennhurst*, 451 U.S. at 18). In other words, Defendants contend that States understand and make an "informed choice" to comply with conditions placed on federal funding, even if they are "unpredictable." Oppo. at 18.

Defendants' argument misses the mark. "When determining the ambiguity of conditions on federal grants, courts evaluate 'whether [a recipient] . . . would clearly understand . . . the obligations of the [conditions]." *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2469330, at *6 (N.D. Cal. Aug. 27, 2025) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). As I noted in *Santa Clara*, "it does not appear that any other President has attempted to comprehensively override understanding of federal anti-discrimination law in the way this Administration seeks to through Executive Orders." 815 F. Supp. 3d at 1037. It is unclear, therefore, how a recipient could "clearly understand . . . the[ir] obligations" with respect to the DEI Conditions. *City of Fresno*, 2025 WL 2469330, at *6. These conditions are more than just "unpredictable," as the government argues; instead, they provide no meaningful guidance on how a grantee could comply with the Executive's changing interpretation of federal anti-discrimination law. Plaintiffs are likely to prevail in showing that the DEI Conditions are impermissibly ambiguous.

That the DEI Conditions are "rife with vagueness and ambiguity, leaving grantees to speculate what is proscribed and what is permitted," is particularly concerning considering the False Claims Act (the "FCA"), which Defendants threaten in the DHS Conditions. *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 746 (N.D. Cal. 2025) (Chen, J.). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Plaintiffs who violate the FCA may be subject to civil penalties and mandatory treble damages. 31 U.S.C. § 3729(a)(2); 28 C.F.R. § 85.5(a). While Defendants correctly note that the "consequences of failing to follow anti-

41

discrimination laws, such as an investigation into False Claims Act liability, does not [alone] make the requirement to comply ambiguous," Oppo. at 18, it certainly "heighten[s] the constitutional infirmities associated with the conditions' ambiguity."  Mot. at 33.

Accordingly, plaintiffs are likely to prevail on the merits of their Spending Clause claim with respect to the DEI Conditions.

### b.    EO Conditions

Plaintiffs are also likely to succeed on the merits of their claim that the EO Conditions are impermissibly ambiguous.

The EO Condition mandates that "[r]ecipients [of funding] must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference."  Compl. ¶ 173. Plaintiffs argue that the EO Condition does not specify "which EOs are applicable to grantees or exactly how the EOs—directed to federal agency heads and other federal agency components—are to be applied to cities and counties in their myriad operations."  Mot. at 33.  Moreover, plaintiffs assert that "grantees cannot possibly ascertain what it means to comply with all executive orders related to grants that this Administration has issued or might issue in the future."  *Id.*  While they acknowledge that Congress may attach conditions to federal funds under the Spending Clause, they argue that the EO Condition fails to provide States with "clear notice" of the terms of their grants.  *Id.* (quoting *Pennhurst*, 451 U.S. at 25).  Instead, plaintiffs believe the EO Conditions "surpris[e] participating States with post acceptance or 'retroactive' conditions" that make compliance impossible.  *Id.*

The government counters that the EO Conditions are unambiguous, as they "merely require Plaintiffs to comply with executive orders in the same manner as they would have to follow any changes to federal statutes or regulations or intervening court decisions."  Oppo. at 19. The government also notes that plaintiffs fail to identify "examples of [any] Executive Orders that they believe may cause them harm," and instead argue that they cannot guarantee their compliance with future Executive Orders.  *Id.* at 20.  Even so, it posits that the EO Conditions "do[] not place upon a recipient any unanticipated burdens because any recipient must anticipate having to

42

comply with the law," even if it shifts. *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 630 (1983) (Marshall, J., dissenting). It therefore believes that the EO Conditions surpass the "low-threshold" of relatedness to overcome an ambiguity challenge. *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018) (Orrick, J.).

While a party may reasonably expect compliance with federal law as a condition of a federal grant, plaintiffs' challenge here is with respect to the scope of their compliance with potentially unlawful Executive Orders. I noted my concerns with the government's theory in *Santa Clara*:

> Must plaintiffs comply with only those Executive Orders that focus exclusively on grants? Could the President "attach" a sentence at the end of every Executive Order discussing grant funding, thus requiring plaintiffs to adhere to every Order? What if the Executive Orders directly contradict Congress's intent in passing a grant program? Or contain conditions enjoined as unconstitutional? Such questions, even if they do not appear on the face of the EO Condition, raise concerns that render it impermissibly ambiguous.

815 F. Supp. 3d at 1036. The EO Condition in this case is similar to that in *Santa Clara*, and I again conclude that plaintiffs are likely to succeed on their claim that it is ambiguous. "To find otherwise would defy the power of Congress to confer upon agencies the authority to grant funding in the first place." *Id.*

### c. Immigration Conditions

Finally, plaintiffs are likely to succeed on the merits of their ambiguity argument with respect to the Immigration Conditions. Plaintiffs argue that numerous terms in the Immigration Conditions, including "benefits," "incentivizes," "promotes," "impedes," and "hinders," are "undefined and sweeping, leaving recipients without guidance as to whether ordinary public services, victim assistance programs, or community outreach efforts could be deemed to 'benefit' or 'incentivize' undocumented individuals." Mot. at 34. They also assert that the Immigration Conditions are "equally unclear in prohibiting programs that 'indirectly 'violate federal immigration law or 'promote or facilitate' such violations," as the language is "so vague that it fails to specify which conduct would trigger noncompliance." *Id.* Plaintiffs conclude that grantees are therefore "left to speculate about the scope of the restriction while facing the potential

43

loss of significant federal funding and liability under the FCA." *Id.*

Defendants respond that "FEMA has already determined that the DHS Immigration Enforcement Conditions do not apply to many of the grant programs invoked in this lawsuit (*see* Richardson Decl. ¶ 8), and there is thus no basis for a preliminary injunction to issue with respect to those grant programs." Oppo. at 21. Even so, the government invokes the Supreme Court's decision in *South Dakota v. Dole*, 483 U.S. 203 (1987), to suggest that "federal government may, constitutionally, create incentives for states to act in accordance with federal law and policies." *Id.* at 22. While that may be true, courts have found that "[s]weeping immigration-related conditions imposed on every DHS-administered grant, regardless of statutory purpose, lack[s] the necessary tailoring" under *Dole* to survive a Spending Clause challenge. *See Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 96 (D.R.I. 2025). I agree with that court and similarly conclude that *Dole* provides no basis for the swooping and impermissibly broad Immigration Conditions placed on the grants in question. Plaintiffs are likely to prevail on the merits of this claim.

### 2. Relatedness

For a grant to adhere to the spending powers, its conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citation omitted); *Dole*, 483 U.S. at 207, 209 (Conditions on federal grants must be "reasonably calculated to address th[e] particular ... purpose ... for which the funds are expended"). Without a relationship between the conditions and the "purpose of the federal spending," "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

Plaintiffs assert that the Challenged Conditions "are not only unrelated to the purpose of the DHS, DOJ, and DOI grant programs," but "squarely conflict with many of their statutory authorization provisions." Mot. at 34 (quoting *Santa Clara*, 815 F. Supp. 3d at 1037 (citing *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 750)). Other judges and I have already addressed similar programs and have found that they lack the relatedness mandated by *Dole* and its progeny. *See Santa Clara*, 815 F. Supp. 3d at 1036 (finding similar Discrimination and EO Conditions to not be

44

United States District Court
Northern District of California

"sufficiently related to the purpose of the DHS and FEMA grant programs"); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 96 (D.R.I. 2025) (finding similar Immigration Conditions to be "not reasonably related to the purposes of the grants to which they attach"); *Freedom Network USA v. Trump*, No. 25 C 12419, ---- F. Supp. 3d ----, 2026 WL 1899186, at *15–18 (finding the DOJ's TVPA conditional funding to violate the Spending Clause); *City of Chicago*, 822 F. Supp. 3d at 889 ("The Immigration Condition and Anti-DEI Condition thus extend well beyond the police and well beyond any reasonable relationship with the purpose of the COPS Act."); *City of Chicago v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020) ("The Byrne JAG grant was enacted by Congress to support the needs of local law enforcement to help fight crime, yet it now is being used as a hammer to further a completely different policy of the executive branch— presenting a city such as Chicago with the stark choice of forfeiting the funds or undermining its own law enforcement effectiveness by damaging that cooperative relationship with its residents."); *City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) ("local and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities. Such trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored.").

Defendants contend that plaintiffs make "conclusory, undifferentiated assertions about DHS, FEMA, DOJ, and DOI grant programs, without discussing the underlying statutory provisions or tying those purported grant purposes to the specific [Conditions] imposed on each grant program." Oppo. at 18. They also note that the Supreme Court has "never struck down a condition on federal grants based on th[e] relatedness prong," and encourage me to not "break new ground." *Id.* at 19 (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019)). Defendants believe that each of the Challenged Conditions pass the "low-threshold" of being reasonably related to the purpose of the expenditure. *See id.* at 20 (arguing that the Challenged Conditions merely require recipients to comply with federal law, which is always related to the goals of a grant).

As I stated in *Santa Clara*, "that non-discrimination conditions have *always* been attached to federal grant funding is unpersuasive" because "it does not appear that any other President has attempted to comprehensively override understanding of federal anti-discrimination law in the way this Administration seeks to through Executive Orders." 815 F. Supp. 3d at 1037. These Challenged Conditions conflict with 42 U.S.C. § 2000d-1, which authorizes agencies to only issue "rules, regulations, or orders ... consistent with achievement of the objectives of the statute authorizing the financial assistance." As discussed above, these conditions are not consistent with Congress's goals in establishing these grants. The grant programs are therefore unrelated to the Challenged Conditions attached to them.

### C.    Administrative Procedure Act

Plaintiffs finally contest the Challenged Conditions as an impermissible violation of the APA.  Plaintiffs are likely to succeed on the merits of this claim.

#### 1.    Final Agency Action

"[T]wo conditions must be satisfied for agency action to be 'final'" and subject to judicial review: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  Finality "must be interpreted in a pragmatic and flexible manner." *Ore. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up).

Plaintiffs' claims clearly meet the first prong of *Bennett*.  "Where an agency establishes conditions on grant eligibility, the agency has taken action that 'mark[s] the 'consummation' of the agency's decisionmaking process.'" *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 740 (citing *Bennett*, 520 U.S. at 177–78); *see also City & Cnty. of S.F.*, 783 F. Supp. 3d at 1198–99 (finding "the [DOJ's] instruction to freeze the distribution of all DOJ funds to implement President Trump's directive to defund 'sanctuary' jurisdictions . . . clearly 'mark[s] the consummation of'

United States District Court
Northern District of California

the DOJ's 'decision-making process' that so-called 'sanctuary' jurisdictions are ineligible for federal funding."). Plaintiffs establish that the grants in question require adherence to the Challenged Conditions to receive funding, indicating a consummation of the DHS, DOJ, and DOI's decision-making processes. Mot. at 37–38. Similarly, "legal consequences will flow" from the Challenged Conditions because the DHS, DOJ, and DOI can deny or terminate grants should plaintiffs fail to adhere to their requirements. *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 740. Because both prongs of *Bennett* are satisfied, there is final agency action and this case is subject to judicial review. *See Santa Clara*, 815 F. Supp. 3d at 1038; *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 741–42; *ASSE Int'l, Inc.*, 803 F.3d at 1068; *Martin Luther King Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 882–84 (W.D. Wash. 2025); *City of Fresno*, 2025 WL 2721390, at *6; *Housing Auth. of the City & Cnty. of S.F.*, 2025 WL 3187761, at *16–17; *Am. Assn. of Univ. Profs. v. Trump*, 815 F. Supp. 3d 907, 966–70 (N.D. Cal. 2025).

### 2.      Agency Discretion

The parties also dispute whether plaintiffs' grant awards are reviewable under the APA under principles of agency discretion. "[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)," which precludes review under the APA if the challenged agency action is "committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985); 5 U.S.C. § 701(a)(2). Courts have construed Section 701(a) to preclude review "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.

Defendants argue that an "agency's allocation of appropriated funds is typically and presumptively committed to agency discretion by law because 'the very point . . . is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.'" Oppo. at 23 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)). Because "[n]o statutory provision limits Defendants' discretion to issue funding for [the Challenged] grants, much less . . . prevent requiring compliance with federal anti-discrimination law or Executive Branch policy directives," Defendants conclude that "those decisions [by the agencies are] presumptively unreviewable." *Id.* at 24.

47

Not so. "[T]he § 701(a)(2) exception for action committed to agency discretion [is read] 'quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dept. of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyehaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). The Ninth Circuit has made clear that the "fact that a statute contains discretionary language does not make agency action unreviewable." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)). Plaintiffs have convincingly shown that the "grant programs are authorized and governed by statutes that set forth the purpose, selection criteria, recipient requirements, and grant conditions, among other things, thereby providing a basis for this Court to exercise judicial review." Repl. at 7; *see Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d at 884. Accordingly, defendants' actions are not committed to agency discretion by law. Nothing in the record suggests to me that I cannot reach the merits of plaintiffs' APA claims.

### 3.    APA Violation

Section 706 of the APA provides, in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>
> (D) without observance of procedure required by law[.]

5 U.S.C. § 706. Plaintiffs assert that the Challenged Conditions violate the APA because they (1) exceed the agencies' statutory authority; (2) are contrary to a constitutional power; and (3) are arbitrary and capricious. I address these claims below.

United States District Court
Northern District of California

### a.    Statutory Authority and Contrary to Constitutional Powers

Under the APA, a court may set aside agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C).  Plaintiffs maintain that the Challenged Conditions violate both the separation of powers doctrine and the Spending Clause, resulting in violations of Section 706(2)(B) of the APA.  Mot. at 39.  They also maintain that defendants' imposition of the Challenged Conditions "do[] not derive from the authorizing statutes for these grants or any other statutory authority," violating Section 706(2)(C).  *Id.*  Because plaintiffs have sufficiently demonstrated that their separation of powers and spending clause claims will prevail on the merits, I agree that plaintiffs are similarly likely to succeed in showing the Challenged Conditions violate these provisions of the APA.

### b.    Arbitrary and Capricious

Under the APA, an agency decision is unlawfully arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  While agencies have the discretion to change their policies, they must "provide a reasoned explanation for the change [and] display awareness that [it has a] changing position." *F.D.A. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up).  "When an agency rescinds a 'longstanding' position, it must consider any 'serious reliance interests' it may have engendered, 'determine whether they [are] significant, and weigh [them] against competing policy concerns.'"  *Am. Assn. of Univ. Profs.*, 815 F. Supp. 3d at 972 (quoting *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020)).

Plaintiffs argue that while the Challenged Conditions "reflect a drastic change in agency position that departs from previous agency practice, the statutory purposes of the grant programs, and federal anti-discrimination law, Defendants have not offered any explanation for the change or even acknowledged that such a change has occurred."  Mot. at 40; *cf. City of Fresno*, 2025 WL

49

2721390, at *8 (finding these conditions to depart from federal anti-discrimination law and the statutory purposes of the grant program); *Santa Clara*, 815 F. Supp. 3d at 1040 (same). Plaintiffs believe that defendants acted arbitrarily and capriciously by imposing the Challenged Conditions to advance the President's policy priorities without taking into consideration whether those goals were authorized by the statutory language set forth by Congress in each grant program. Mot. at 40–41. They similarly argue that defendants failed to consider the consequences these conditions would place on state and local governments, who rely on federal funding to support essential services and infrastructure. *Id.* at 41. Finally, they assert that defendants imposed the Challenged Conditions without providing any justification or attempt to ensure the Conditions were consistent with the purposes of the grant programs. *Id.*

Defendants respond that judicial review under the APA's arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency." Oppo. at 24 (quoting *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "All that is required is for the agency to 'act[] within a zone of reasonableness.'" *Id.* (quoting *Prometheus*, 529 U.S. at 423). Applying this standard, defendants reason that "given the agency's discretion to impose appropriate terms and conditions on the receipt of federal funds, and general grantmaking requirements that the recipients of such funds follow federal law, the adoption of grant conditions that require recipients to comply with executive orders, federal anti-discrimination laws, and (in certain instances) immigration enforcement can hardly be considered arbitrary or capricious." Oppo. at 24. They also suggest that the while the grant conditions "may have been worded differently in the past, the Challenged Conditions are not new, nor do they constitute a 'drastic change' in conditions applicable to Defendants' grants." *Id.* at 25.

I rejected Defendants' argument in *Santa Clara* and do the same here. In *Santa Clara*, I noted:

> Defendants' characterization of the [Challenged] Conditions is misleading. That the current DHS Conditions are merely "worded differently" ignores that their *interpretation* has starkly changed. As explained above, the Trump Administration's Executive Orders, the Discrimination Guidance Memo, and the DHS Conditions all depart from both federal anti-discrimination law and the statutory purposes of many grant programs without real explanation. This departure violates 2 C.F.R. § 3002.10, which requires federal agencies to

"ensur[e] that specific Federal award conditions . . . are consistent with the [statutory] program design,' and to explain 'why the specific condition(s) is being imposed . . . [p]rior to imposing [such] conditions.' 2 C.F.R. § 200.208(a); 2 C.F.R. § 200.208(d)(2). Given the lack of a "reasoned explanation" for such changes, plaintiffs have demonstrated that the DHS Conditions are likely arbitrary and capricious in violation of the APA. *See Wages & White Lion Invs., L.L.C.*, 604 U.S. at 568; *see also City of Fresno*, 2025 WL 2721390, at *9 (finding DEI conditional grants to be arbitrary and capricious in similar circumstances); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d at 92–94 (finding the Immigration Condition to be arbitrary and capricious as applied to FEMA grants).

815 F. Supp. 3d at 1040. Defendants rehash the same argument they raised in *Santa Clara*, and I find no reason to depart from my previous holding. Plaintiffs are likely to succeed in showing that the Challenged Conditions are arbitrary and capricious in violation of the APA.

### D.     Justiciability

Defendants make four separate attacks on the justiciability of plaintiffs' claims. *See* Oppo. at 8–12. First, they argue that plaintiffs lack Article III standing to seek relief if they are not participants in the specific grant programs at issue. *See id.* at 8–9. This is not really a standing issue but one concerning the scope of injunctive relief, which is discussed in the next section. The second is that the grant conditions in this case do not arise out of the same transaction or occurrence so the plaintiffs are improperly joined under Federal Rule of Civil Procedure 20(a). *See id.* at 9–11. This is not persuasive because the government misstates the nature of the claims, which arise from a common course of conduct, and permissive joinder is appropriate. The third is that the Tucker Act prevents me from hearing and enforcing an injunction in this case. *See id.* at 13–14. That argument has been squarely rejected by numerous courts, and I do the same here. Finally, defendants claim that venue is improper for out-of-district plaintiffs to obtain certain relief. *See id.* at 11–12. Because permissive joinder is appropriate, out-of-district plaintiffs are equally entitled to relief.

#### 1.     Standing

A plaintiff has standing under Article III of the United States Constitution if (1) they have suffered an injury-in-fact or face an imminent injury; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "At the preliminary injunction stage . . . the

United States District Court
Northern District of California

plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

Defendants challenge the first prong of the standing analysis—whether plaintiffs have adequately established an injury-in-fact. *See* Oppo. at 8–9. An injury-in-fact must be concrete, particularized, and imminent. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). An injury is concrete when it has a "close relationship" to a harm "traditionally" recognized as providing a basis for suit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). An injury is particularized if it affects the plaintiff in a "personal and individual way." *Spokeo*, 578 U.S. at 339 (internal citation omitted). An injury is actual or imminent if it has already occurred or there is a substantial risk that it will occur. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983). Plaintiffs typically must make a separate showing as to each form of relief requested. *Id.* at 111.

Defendants claim that plaintiffs' preliminary injunction motion—which seeks to enjoin the Challenged Conditions on behalf of all "Plaintiffs or their subrecipients"—is a "facially overbroad request, and . . . is not supported by the case or controversy requirement inherent in Article III of the Constitution." Oppo. at 8 (quoting Mot. at 27). They take issue specifically with the following grants:

> **DHS/FEMA:** City of Beaverton, City of Stockton, County of San Diego, and County of Los Angeles do not purport to be DHS Plaintiffs, nor do they claim to receive grant funding from DHS/FEMA. Compl. ¶¶ 20–21, 23–24, 32–33, 35–36, 79.

> **DOJ:** City of Santa Clara and City of Redwood City do not allege facts establishing that they participate in any of the DOJ grant programs that contain the Challenged Conditions at issue in this lawsuit. Compl. ¶¶ 6, 10. City of Hillsboro, OR is the only Plaintiff that alleges receiving OVW grant funding (*id.* ¶ 30), and the other 10 Plaintiffs thus cannot obtain preliminary relief with respect to OVW grants. Further, the only Plaintiffs with alleged connections to COPS Office grant programs are City of Stockton, City of Fresno, and City of Hillsboro, OR (*id.* ¶¶ 16, 30, 32), and the other eight Plaintiffs do not have standing to obtain preliminary relief with respect to COPS Office grants. Finally, City of Stockton does not claim to be a recipient of OJP grant funding (*id.* ¶ 32), and County of San Diego does not allege that it has applied for OJP funding (*id.* ¶ 20)—those Plaintiffs do not have standing to seek relief with respect to OJP grants.

> **DOI:** City of Santa Clara, City of Redwood City, City of Beaverton, and County of San Diego do not purport to be DOI Plaintiffs and/or

52

they do not claim to receive grant funding from DOI. Compl. ¶¶ 5–6, 8–10, 12–14, 20–21, 23–24, 155. Further, City of Santa Cruz alleges that it "intends to apply for DOI funding . . . as soon as funding becomes available." *Id.* ¶ 14. As a result, any grant conditions claims that City of Santa Cruz might have in the future are not ripe for adjudication. *See Texas v. United States*, 523 U.S. 296, 300 (1998) (a claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (internal quotes and citation omitted); *Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) ("The basic rationale of the ripeness doctrine is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements") (internal quotes and citation omitted).

*Id.* at 8–9.

Plaintiffs "challenge the implementation of policy by Defendant agencies to impose unauthorized and ambiguous conditions on *all federal grant programs*, not individual grant agreements." Repl. at 1 (emphasis in original). The "alleged injury— having to accept unconstitutional conditions or forfeit millions in critical funding—is an injury that 'stems from' Defendants' policies to impose the new and unlawful conditions." *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 997–98 (9th Cir. 2012)). Many similar cases involving grant programs have found Article III standing was satisfied. *Id.* at 2; *see Santa Clara*, 815 F. Supp. 3d at 1019–23; *City of Fresno*, 2025 WL 2469330, at *4; *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1180–82 (N.D. Cal. 2025) (Orrick, J.); *City of Chicago v. Noem*, 2025 WL 3251222, at *3–4; *City of Chicago v. United States Dep't of Just.*, No. 25 C 13863, 822 F. Supp. 3d at 883–84.

While plaintiffs satisfy Article III standing, not every plaintiff is entitled to enjoin every condition in every grant offered by DHS, DOJ, and DOI. I discuss this in Section II, *supra*.

### 2. Joinder

Under Federal Rule of Civil Procedure 20(a), joinder is proper where "(1) the plaintiffs asserted a right to relief arising out of the same transaction and occurrence and (2) some question of law or fact common to all the plaintiffs will arise in the action." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000); Fed. R. Civ. P. 20(a). Defendants maintain that claims "challenging various agencies' authority to add conditions to funding inevitably arise out of separate transactions or occurrences with each such agency and are thus improperly joined."

Oppo. at 10 (citing *Chippewa Cree Tribe of Rocky Boy's Rsrv., Montana v. U.S. Dep't of Interior*, 900 F.3d 1152, 1156 (9th Cir. 2018)).  In their view, the "disparate Challenged Conditions at issue contain differences in language and scope and . . . were imposed by different Defendants at different times, under different authorizing statutes, pursuant to distinct administrative records, and upon different types of grant programs (*e.g.*, formula, competitive, block, etc.)." *Id.* at 10–11. They distinguish my holding in *City and County of San Francisco* as inapposite because it involved "challenge[s] [to] the constitutionality of Executive Orders threatening *all* [of plaintiffs'] federal funding upon pain of conforming to federal immigration policy." *Id.* (citing 2025 WL 2243619, at *7).

But plaintiffs "do[] not challenge individualized determinations by agencies about particular grants."  Repl. at 2–3; *see* 2025 WL 2243619, at *7.  Instead, they challenge "the implementation of agency policy, a course of conduct originating in executive orders, and then arbitrarily implemented by Defendants across their departments and component agencies in disregard of the Constitution and the APA."  Repl. at 3.  Permissive joinder is "liberally construed to 'promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits.'"  *Pablo Sequen v. Kaiser*, 810 F. Supp. 3d 1076, 1081 (N.D. Cal. 2025) (Pitts, J.) (quoting *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 558 F.2d 914, 917 (9th Cir. 1977)).

Because plaintiffs' claims arise from a single, logically connected course of conduct, permissive joinder is proper under Rule 20.  Repl. at 3–4; *see Pablo Sequen*, 810 F. Supp. 3d at 1081–82 (Rule 20 "may comprehend a series of occurrences, depending not so much upon the immediateness of their connection as upon their *logical relationship*.") (emphasis added).  I agree with plaintiffs that while the agency conditions "may not be identical word-for-word across all programs, and the underlying authorizing statutes for each grant program may differ," here, the "common nucleus is the same: the top-down issuance of executive directives and their downstream implementation across multiple agencies' grant portfolios through materially similar conditional language."  Repl. at 4–5.

54

### 3.     The Tucker Act

Under 28 U.S.C. § 1491, the Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sound in tort.

28 U.S.C. § 1491(a)(1).  Further, 28 U.S.C. § 1346 provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, **except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort** which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41.

28 U.S.C. § 1346(a) (emphasis added).

Defendants argue that federal district courts lack jurisdiction to "order the payment of money" under the APA because the Tucker Act precludes bringing "contract actions" against "the government in a federal district court."  Oppo. at 13 (quoting *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67–68 (D.C. Cir. 2004)).  Although they acknowledge that plaintiffs seek an injunction, a form of equitable relief, defendants contend that the specific relief sought is contractual in nature.  *See id.*

To determine whether federal grants fall within the Tucker Act, courts must consider both "the source of the rights upon which plaintiff bases its claims" and upon "the type of relief sought (or appropriate)."  *Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025) (citing *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994)).  "If the plaintiff's rights and remedies, as alleged, 'are *statutorily or constitutionally* based, then district[] courts have jurisdiction,' but if those rights and remedies 'are *contractually* based then only the Court of Federal Claims does.'"  *Id.* (quoting *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis in original)).

55

Defendants cite two recent Supreme Court stay rulings dealing with the jurisdictional constraints of the Tucker Act to support their argument. First, in Department of Education v. California, the Court issued an emergency stay on a temporary restraining order that required the federal government to "pay out past-due [education] grant obligations and to continue paying obligations as they accrue." 604 U.S. 650, 650 (2025). In a four-paragraph order, the Court recognized that the APA's limited waiver of sovereign immunity does not provide jurisdiction to district courts to "enforce a contractual obligation to pay money." *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Rather, the Tucker Act confers the CFC jurisdiction over any suit based on an "express or implied contract with the United States." *Id.* (quoting 28 U.S.C. § 1491(a)(1)). That said, the Court noted that jurisdiction in a district court is "not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988) (internal quotations omitted)).

Defendants also rely on *National Institutes of Health v. American Public Health Association* ("*NIH*"). 606 U.S. ----, 145 S. Ct. 2658 (2025). There, plaintiffs brought APA, constitutional, and ultra vires challenges to the federal government's termination of various grants. *Id.* at 2659. The district court granted a partial injunction on the plaintiffs' APA claims, prohibiting the government from implementing the challenged policies and grants. *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 791 F. Supp. 3d 119 (D. Mass. 2025). On appeal, the First Circuit affirmed the order vacating the challenged policies. *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 145 F.4th 39, 50 (1st Cir. 2025). The Supreme Court disagreed with the lower courts with respect to vacating the grant termination programs and stayed the district court's order. 145 S. Ct. at 2660. The plurality reaffirmed that the APA does not confer jurisdiction to district courts "to order relief designed to enforce any 'obligation to pay money' pursuant to . . . grants." *Id.* Justice Barrett's concurrence also noted that the district court "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims." *Id.* at 2661 (Barrett, J., concurring).

The Ninth Circuit recently reaffirmed the holding of *NIH* in *Thakur v. Trump*, 176 F.4th

United States District Court
Northern District of California

1187 (9th Cir. 2026). Reversing in part a preliminary injunction requiring federal agencies to reinstate terminated grants, the court recognized that the relief sought by the plaintiffs—reinstatement—was "designed to enforce an[] obligation to pay money pursuant to [the] grants" at issue. *Id.* at 1199. Given that these claims sounded in contract, the Ninth Circuit found that the district court erred in concluding that the Tucker Act did not apply and that jurisdiction was proper. *See id.*

Plaintiffs' claims are factually distinct from *California*, *NIH*, and *Thakur*. Those cases involved the termination of grant funding; plaintiffs' claims do not revolve on any terminations of funding. As plaintiffs note in their reply, these claims involve the "Constitution and the APA [as] the source of [their] rights, not grant agreements." Repl. at 6. Claims "rooted in statutory and constitutional authorities and that are independent of . . . grant agreements" preclude the Tucker Act from applying. *See Washington v. U.S. Dep't of Health & Human Servs.*, No. 6:25-cv-01748-AA, 2025 WL 3002366, at *6 (D. Or. Oct. 27, 2025) (emphasis in original). District courts "have found with near or total uniformity that [they] have jurisdiction over claims such as these." *Housing Auth. of City & Cnty. of S.F. v. Turner*, No. 25-cv-08859-JST, 2025 WL 3187761, at *9 (N.D. Cal. Nov. 14, 2025) (Tigar, J.) (citing *S.F. Unified Sch. Dist. v. AmeriCorps*, 784 F. Supp. 3d 1280, 1291–97 (N.D. Cal. 2025) and collecting cases); *see Santa Clara*, 815 F. Supp. 3d at 1023 (collecting cases); *Washington v. U.S. Dept. of Homeland Sec.*, No. 2:25-cv-1401-BJR, 2026 WL 1469538, at *4–7 (W.D. Wash. May 26, 2026) (discussing the Tucker Act in an analogous case involving DHS and FEMA grants). I do not accept defendants' rehashed argument in light of this wall of authority. The Tucker Act does not bar this case from moving forward in district court.

### 4.     Venue

Under 28 U.S.C. § 1391(e), out-of-district plaintiffs may litigate claims against the federal government that "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" in any district where one plaintiff resides. *See* 28 U.S.C. § 1391(e). Defendants, however, assert that "out-of-district plaintiffs cannot borrow venue from an in-district plaintiff to litigate claims that are unrelated to the in-district plaintiff's grant programs." Oppo. at 11. "In

57

United States District Court
Northern District of California

other words," defendants argue, "Section 1391(e) does not permit an in-district plaintiff to add out-of-district co-plaintiffs to their lawsuit, and then allow those out-of-district plaintiffs (none of which could file a stand-alone complaint here) to engraft additional defendants and additional grant programs, all of which arise under different transactions and occurrences with no connection to this forum." *Id.*

Defendants identify "many of Plaintiffs' claims" against them that would not be supported by their interpretation of the joinder and venue statutes:

> [N]o in-District Plaintiff claims to have a grant relationship with DOI. City of Fresno, CA; City of Corvalis, OR; City of Hillsboro, OR; City of Stockton, CA; County of Los Angeles, CA; and County of Santa Barbara, CA are the only Plaintiffs that allegedly participate in DOI grant funding (*see* Compl. ¶¶ 17, 26, 28, 33, 36, 40), but none of those Plaintiffs is located within the Northern District of California.
> . . .
> [T]he only Plaintiff with an alleged connection to DOJ's OVW grant funding is City of Hillsboro, OR. . . . And the only Plaintiffs with alleged connections to DOJ's COPS Office grant programs are City of Stockton, City of Fresno, and City of Hillsboro, OR. . . . But, once again, these Plaintiffs are not located in the Northern District of California, and they could not bring a stand-alone complaint regarding their OVW or COPS Office grants here.

Oppo. at 11–12.

Although neither party identifies authority directly addressing defendants' argument, I have previously held that "[t]he clear weight of federal authority holds that venue is proper in a multi-plaintiff case if any plaintiff resides in the District." *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO, 2025 WL 2243619, at \*6 (N.D. Cal. Aug. 5, 2025) (quoting *Californians for Renewable Energy v. EPA*, No. C 15-3292 SBA, 2018 WL 1586211, at \*5 (N.D. Cal. Mar. 30, 2018)). This, together with my conclusion that the out-of-district plaintiffs' claims arise out of the same transactions or occurrences as those brought by the in-district plaintiffs, leads me to conclude that venue is proper for all plaintiffs in this action.

In any event, doctrine of pendent venue would likely allow these claims to proceed. "Under the doctrine of pendent venue, a court may allow claims that do not meet the statutory requirements of Section 1391(b) to be brought alongside claims that do meet the statutory requirements where doing so is justified by 'principles of judicial economy, convenience,

United States District Court
Northern District of California

avoidance of piecemeal litigation, and fairness to the litigants.'" *Unique v. Claybaugh*, 712 F. Supp. 3d 1265, 1272 (N.D. Cal. 2024) (Pitts, J.) (quoting *Martensen v. Koch*, 942 F. Supp. 2d 983, 998 (N.D. Cal. 2013)). While the Ninth Circuit has not "explicitly blessed the pendent venue doctrine, other Circuits have." *Id.* "The test for pendent venue in the Northern District of California is whether the improperly venued claims are 'closely related to the factual and legal bases' of the properly venued ones." *Id.* (quoting *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1192 (N.D. Cal. 2017)). Here, each of the out-of-district plaintiffs' claims are sufficiently related to those raised by in-district plaintiffs, as they arise from the same purported misconduct by defendants. Accordingly, plaintiffs can pursue their claims in this Court under the doctrine of pendent venue, notwithstanding potential statutory venue challenges under 28 U.S.C. § 1391.

## II.    Irreparable Harm

"[S]imply showing some 'possibility of irreparable injury' fails to satisfy" the irreparable harm factor. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009) (citing *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998), *abrogated on other grounds*, *Singh v. Holder*, 658 F.3d 879 (9th Cir. 2011)). Rather, plaintiffs must provide sufficient evidence showing that they will be "irreparably injured absent" a preliminary injunction. *Id.* at 426.

Plaintiffs assert that because the "Challenged Conditions violate due process, Separation of Powers, and the Spending Clause," they have "made a sufficient showing of irreparable harm that would result from imposition of those provisions, as it is 'well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.'" Mot. at 42 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (internal quotations omitted)). They also point to decisions from both this Court and other district courts "evaluating similar circumstances" that found "constitutional injury and budgetary uncertainty constitute[s] an irreparable injury." *Id.* at 43; *see Santa Clara*, 815 F. Supp. 3d at 1041; *City & Cnty. of San Francisco v. United States Dep't of Just.*, No. 25-cv-09227-JD, 2026 WL 177945, at *8 (N.D. Cal. Jan. 21, 2026) (Donato, J.); *City of Fresno*, 2025 WL 2721390, at *19; *Hous. Auth. v. Turner*, 2025 WL 3187761, at *20.

Defendants counter that plaintiffs failed to "introduc[e] affirmative evidence of imminent

United States District Court
Northern District of California

irreparable harm tied to their legal claims in order to meet this element of the *Winter* test." Oppo. at 25; *see Harris v. Atchley*, No. 22-cv-00529-EMC, 2023 WL 7312969, at *2 & 5 (N.D. Cal. Oct. 18, 2023) (Chen, J.) ("*Winter* makes clear that it is a plaintiff's burden to fulfill all the elements for a preliminary injunction."). They also maintain that a "deprivation of constitutional rights [does not] unquestionably constitute[] irreparable injury," as that argument would "create an entitlement to preliminary injunctive relief whenever purported constitutional rights are at issue, a proposition that is belied by the Supreme Court's warning that preliminary relief is an 'extraordinary remedy never awarded as of right.'" Oppo. at 26 (quoting *Winter*, 555 U.S. at 24)). Instead, plaintiffs must meet their affirmative burden by providing declarations or other evidence supporting the position that each individual plaintiff suffered irreparable harm.

Defendants spend much of their time challenging each declaration submitted by the plaintiffs as lacking foundation to establish irreparable harm. *See id.* at 26–30. They characterize these declarations as "rest[ing] on nothing more than the boilerplate conclusion that 'if forced to forego this funding' Plaintiffs will purportedly suffer injury.'" *Id.* at 30. Moreover, defendants believe there are "no factual assertions tying those funding decisions by Plaintiffs to the facts and claims of this case, and the attorney *ipse dixit* assertions made in the Motion and/or the underlying Complaint cannot provide that factual link." *Id.*

I mostly disagree. The great majority of the plaintiffs' declarations clearly establish that the individual plaintiffs have received, or expect to receive, funding from the federal government containing one or more of the Challenged Conditions. *See* Background Section C, *supra* (describing each declaration in detail and what funding opportunities each plaintiff received). At present, plaintiffs are forced to make a Hobson's choice—accept funding with potentially unconstitutional or harmful conditions or forego funding altogether. I have previously found this scenario to constitute irreparable harm and do so again here. *See Santa Clara*, 815 F. Supp. 3d at 1041; *City & Cnty. of S.F. v. Trump*, 779 F. Supp. 3d 1077, 1082 (N.D. Cal. 2025) (finding "irreparable injury in the form of budgetary uncertainty, deprivation of constitutional rights, and undermining trust between the Cities and Counties and the communities they serve"). I find that each plaintiff has established that it is likely to suffer both short- and long-term negative

60

consequences and injury unless I grant a preliminary injunction in their favor for programs to which it has applied or intends to apply.

The City of Santa Cruz has not met this burden with respect to the Challenged Conditions imposed by DOI (it has with respect to DHS and DOJ). In its original declaration in support for a preliminary injunction, Santa Cruz noted:

> 6. Santa Cruz is also in the process of contracting for additional federal funding, including:
>
> a. DOI funding through the Bureau of Reclamation for new water supply projects through the WaterSMART Grant programs.
> b. $2,123,000 in FEMA Disaster Relief Grant funding for Water projects related to 2023 winter storm damage.

Cabell Decl. ¶¶ 5–6. After oral argument, however, Santa Cruz submitted an additional declaration stating that it was not seeking any additional funding from DOI at this time, including the WaterSMART Grant programs, although it might do so in the future. *See* Second Declaration of Elizabeth Cabell in Support of Preliminary Injunction [Dkt. No. 31] ¶¶ 8–9.

Mere speculation about future plans is not enough to establish irreparable harm. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction"). While Santa Cruz's declaration sufficiently describes irreparable harm with respect to DHS and DOJ funding, the City has not provided evidence suggesting a preliminary injunction is warranted for its potential future DOI funding. No plaintiff is entitled to injunctive relief for grants it has not identified in their declarations. Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, supra, at 22.

Defendants finally suggest that "[t]o the extent the challenged conditions have already been enjoined by other courts, there is no current possibility of irreparable harm for any of the grant conditions that are already enjoined." Oppo. at 30 (citing *Hawai'i v. Trump*, 233 F. Supp. 3d 850, 853 (D. Haw. 2017)). While this is true with respect to cases where all the substantive relief requested by the plaintiffs had been granted, here, none of the injunctions addressing the

61

Challenged Conditions provide coextensive permanent relief.  That is not a good reason to deny injunctive relief here.

### III.    Balance of the Equities and Public Interest

In cases where the federal government is the opposing party, the balance of the equities and public interest factors merge.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  These two factors often turn on whether the district court finds a likelihood of success on the merits of the underlying claim.  *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Melendres*, 695 F.3d at 1002 (concluding it is "always in the public interest to prevent the violation of a party's constitutional rights") (cleaned up).

As in *Santa Clara*, plaintiffs' interest in ensuring that their communities receive funding for critical infrastructure, public safety, harm reduction, victim assistance, and emergency response programs far exceeds defendants' interests.  Plaintiffs represent the interests of millions of individuals, and many plaintiffs are unable to otherwise fund critical programs without these grants.  They have a compelling interest in a preliminary injunction.

So does the general public, which is interested in seeing its communities receive funding for critical infrastructure and public safety initiatives—funding that is paid for by their federal tax dollars. It is also interested in seeing that regulations passed by Congress are properly implemented; should relief not be granted, many grant programs will be contradicted or impermissibly overridden by the President's Executive Orders. These interests also strongly weigh in favor of granting a preliminary injunction.

The government responds by arguing that an injunction here would cause significant harm by "forc[ing] [it] to pay out funds that it may not be able to recover."  Oppo. at 31 (citing *Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025); *Heckler v. Turner*, 468 U.S. 1305, 1307–08 (1984) (Rehnquist, J., in chambers); *cf. Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025)).  It also maintains that "any injunction interfering with the administration's priorities is itself a substantial harm in the balance of equities analysis."  *Id.* at 32; *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time [the Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable

United States District Court
Northern District of California

injury."). The government's concerns do not outweigh the significant harm plaintiffs will face should they be forced to accept grants with the Challenged Conditions or forego federal funding altogether. And because Congress has already appropriated many of these funds via the statutory schemes described above, the government's argument that is "may not be able to recover" any lost funding from an injunction is unconvincing. The balance of the equities and public interest both therefore favor granting plaintiffs' request for injunctive relief.

## IV.    Issuance of a Bond

Defendants finally request that if I grant the injunction, it be accompanied by a bond under Federal Rule of Civil Procedure 65(c). Oppo. at 33. To support their request, defendants cite to authority from the D.C. Circuit stating that "injunction bonds are generally required." *Id.* (citing *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam)).

Whether a security bond should be issued is within the court's discretion. *Barhona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). "It is within [a] district court's discretion to waive [the] bond requirement entirely if [there is] 'no evidence the party will suffer damages from the injunction,' or if there is a 'high probability of success that equity compels waiving the bond, the balance of equities overwhelmingly favors the movant . . . or the requirement of a bond would negatively impact the movant's constitutional rights." *City & Cnty. of S.F.*, 783 F. Supp. 3d at 1203 (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003); *Gilmore v. Wells Fargo Bank, N.A.*, No. C 14-2389-CW, 2014 WL 3749984, at *6 (N.D. Cal. July 29, 2014); *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868 (N.D. Cal. 2018).

Defendants have not shown why a security bond is required in this case. They do not explain how making the grants without the Challenged Conditions would result in damages for the government later. As in both *San Francisco* and *Santa Clara*, the balance of equities tips strongly in plaintiffs' favor, since "imposing a bond would negatively impact their access to the courts and their ability to assert their constitutional rights." *Id.*; 815 F. Supp. 3d at 1043. Defendants' request for the issuance of a bond is DENIED.

United States District Court
Northern District of California

## V.    Section 705 Stay

In addition to requesting a preliminary injunction, plaintiffs' proposed order seeks a stay under 5 U.S.C. § 705, which provides that courts can "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  Proposed Order [Dkt. No. 20-27] ¶¶ 3, 6; 5 U.S.C. § 705. The question "'is whether an injunction' is required to 'offer complete relief *to the plaintiffs before the court*.'"  *Nat'l TPS Alliance v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025) (quoting *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025) (emphasis in original)).

Here, plaintiffs do not argue that "statutory constraints prohibit Defendants from applying the grant conditions in a piecemeal fashion as to some recipients and not others."  *City of Fresno*, 2026 WL 1146290, at *11.  Nor have they shown how "postponement of agency action under the APA, effective nationwide, [would be] both permissible and necessary to provide complete relief to Plaintiffs."  *Nat'l TPS Alliance*, 150 F.4th at 1029.  Accordingly, the preliminary injunction— which prohibits "enforcement of Defendants' unlawful grant conditions against Plaintiffs who currently receive or actively seek grants from Defendants"—provides complete relief without the need for a stay of all unlawful agency action.  *City of Fresno*, 2026 WL 1146290, at *11. Plaintiffs' request is DENIED.  That said, plaintiffs may return to this court for further relief if they identify additional grants for which they seek to apply that include the Challenged Conditions.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is GRANTED in part for all plaintiffs.  It is ORDERED that:

> 1. The U.S. Department of Homeland Security (DHS), the Federal Emergency Management Agency (FEMA), the U.S. Department of Justice (DOJ), the U.S. Department of the Interior (DOI), and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined Parties") ARE RESTRAINED AND ENJOINED from directly or indirectly imposing or enforcing the Challenged Conditions, as defined in the Court's Order, or any materially similar terms or conditions with respect to any grants or other funding applicable to the City of Fresno, City of Santa Clara,

United States District Court
Northern District of California

City of Redwood City, City of Santa Cruz, City of Beaverton, City or Corvallis, City of Hillsboro, City of Stockton, County of San Diego, County of Los Angeles, County of Santa Barbara, or their subrecipients; (2) requiring the Plaintiffs to make any certification or other representation related to compliance with such terms or conditions; or (3) refusing to issue, process, or sign agreements, as to Plaintiffs, based on the Challenged Conditions or Plaintiffs' participation in this lawsuit.

2. The Enjoined Parties shall immediately treat any actions taken to implement or enforce the Challenged Conditions or any materially similar terms or conditions as to Plaintiffs, or their subrecipients, including but not limited to any delays or withholding of funds based on such conditions, as null, void, and rescinded; shall, while this preliminary injunction is in effect, treat any such conditions included in any grant agreement executed by Plaintiffs or their subrecipients as null and void; and may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction.

3. Notwithstanding the foregoing, this Preliminary Injunction does not apply to DOI with respect to the City of Santa Cruz. It only applies to the grant programs that plaintiffs reference in their declarations to which they either have applied or intend to apply. For the avoidance of doubt, I have listed those programs for each plaintiff in Exhibit A, attached.

As I indicated at the hearing, I am interested in moving this case to summary judgment at the earliest appropriate time. The parties shall meet and confer and file a proposed case schedule or dueling schedules in a Joint Case Management Statement by July 31, 2026. A Case Management Conference is set for August 4, 2026, at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: July 9, 2026

William H. Orrick
United States District Judge

65

United States District Court
Northern District of California

**EXHIBIT A**

| Plaintiff | Defendant | Grants |
|---|---|---|
| City of Fresno | DOJ | 1. Bureau of Justice Assistance Grant<br>2. COPS Safer Outcomes: Enhancing De-Escalation and Crisis Responding Training for Law Enforcement<br>3. COPS Mental Health and Wellness Act<br>4. COPS Community Policing Development Microgrant |
| City of Fresno | DHS / FEMA | 1. SAFER Grant<br>2. AFG Grant |
| City of Fresno | DOI | 1. WaterSMART Water and Energy Efficiency Grant<br>2. WaterSMART Drought Resiliency Program Grant |
| City of Santa Clara | DHS / FEMA | 1. SAFER Grant<br>2. HSGP Grant (including UASI grants) |
| City of Redwood City | DHS / FEMA | 1. AFG Grant<br>2. FEMA Public Assistance Grant<br>3. Flood Mitigation Assistance Grant Program<br>4. HMGP Grant<br>5. UASI Grant |
| City of Redwood City | DOJ | 1. Byrne Justice Assistance Grant |
| City of Santa Cruz | DHS / FEMA | 1. HMGP Grant<br>2. FEMA Disaster Relief Grant<br>3. Public Works Project Grant |
| City of Santa Cruz | DOJ | 1. Patrick Leahy Bulletproof Vest Partnership Grant |
| City of Beaverton | DOJ | 1. Byrne Justice Assistance Grant<br>2. Patrick Leahy Bulletproof Vest Partnership Grant |

1

United States District Court
Northern District of California

| City of Beaverton | DHS / FEMA | 1. Emergency Management Performance Grant |
|---|---|---|
| City of Corvallis | DHS / FEMA | 1. Ground Emergency Medical Transportation Grant |
| City of Corvallis | DOJ | 1. Patrick Leahy Bulletproof Vest Partnership Grant |
| City of Corvallis | DOI | 1. Land and Water Conservation Fund Grant |
| City of Hillsboro | DOI | 1. Land and Water Conservation Fund Grant |
| City of Hillsboro | DHS / FEMA | 1. HSGP Grant<br>2. HMGP Grant (including UASI funding)<br>3. Flood Mitigation Assistance Grant |
| City of Hillsboro | DOJ | 1. Byrne Justice Assistance Grant<br>2. Stop Violence Against Women Grant<br>3. COPS Safer Outcomes Grant |
| City of Stockton | DOJ | 1. COPS Safer Outcomes: Enhancing De-escalation and Crisis Response Training for Law Enforcement Grant |
| City of Stockton | DOI | 1. WaterSMART Water and Energy Efficiency Grant |
| County of San Diego | DOJ | 1. Office for Victims of Crime ECM Task Force to Combat Human Trafficking Grant<br>2. Public Safety and Mental Health Initiative Grant |
| County of Los Angeles | DOI | 1. National Parks Service Land and Water Conservation Fund Grant |

2

| County of Los Angeles | DOJ | 1. Coverdell Grant<br>2. Services for Victims of Crime Grant<br>3. National Sexual Assault Kit Initiative Grant |
|---|---|---|
| County of Santa Barbara | DOJ | 1. Byrne Justice Assistance Grant<br>2. OVC Services for Victims of Human Trafficking Grant<br>3. Bureau of Justice Assistance Grant (Smart Prosecution – Innovative Prosecution Solutions)<br>4. CalOES grants through OVC |
| County of Santa Barbara | DHS / FEMA | 1. Public Assistance Grant<br>2. HMGP Grant<br>3. HSGP Grant<br>4. EMPG Grant |
| County of Santa Barbara | DOI | 1. Water-Wise Landscape Rebate Program |

United States District Court
Northern District of California

3